# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF VERMONT

JESSICA GINGRAS and ANGELA C. GIVEN,
on behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

JOEL ROSETTE, TED WHITFORD, TIM
MCINERNEY, THINK FINANCE, INC., TC
LOAN SERVICE, LLC, KENNETH E. REES,
TC DECISION SCIENCES, LLC, TAILWIND
MARKETING, LLC, SEQUOIA CAPTIAL
OPERATIONS, LLC and TECHNOLOGY
CROSSOVER VENTURES,

Defendants.

Docket No. 1:15-cv-101

### DEFENDANTS THINK FINANCE, INC., TC LOAN SERVICE, LLC,
### TC DECISION SCIENCES, LLC, AND TAILWIND MARKETING, LLC'S
### MOTION TO COMPEL ARBITRATION

Defendants Think Finance, Inc., TC Loan Service, LLC, TC Decision Sciences, LLC,
and Tailwind Marketing, LLC, by and through counsel, hereby move pursuant to the Federal
Arbitration Act, 9 U.S.C. §§ 2-4, to compel arbitration, and to dismiss this action, or in the
alternative, to stay this action pending the outcome of the arbitration. In support of this motion,
the Think Defendants submit the attached Declaration of Matt Hargrove in Support of
Defendants Think Finance, Inc., TC Loan Service, LLC, TC Decision Sciences, LLC, and
Tailwind Marketing, LLC's Motion to Compel Arbitration and the following Memorandum of
Law.

## MEMORANDUM OF LAW

## INTRODUCTION

This dispute belongs in arbitration, not in court.  On four separate occasions each, Plaintiffs Jessica Gingras and Angela Given ("Plaintiffs") entered into written agreements to arbitrate all disputes related to short-term loans that they applied for and obtained from Plain Green.  Specifically, they agreed to arbitrate "any controversy or claim" regarding the "validity" or "enforceability" of their loans.  Despite their agreements to arbitrate such claims, Plaintiffs have brought a putative class action lawsuit alleging that the loans they obtained from Plain Green were illegal under Vermont usury law.  They have attempted to avoid their agreements to arbitrate by bringing suit against Think Finance, Inc. ("Think Finance"), TC Loan Service, LLC ("TC Loan Servce"), TC Decision Sciences, LLC "TC Decision Sciences"), and Tailwind Marketing, LLC ("Tailwind Marketing") (collectively, the "Think Defendants"), the entities that they contend first orchestrated the creation of and now provide services to Plain Green, instead of suing Plain Green directly.

Plaintiffs' attempted end-run around their arbitration agreements fails under the plain language of the agreements.  Plaintiffs agreed to arbitrate not only claims directly made against Plain Green but also all disputes against "related third parties," including Plain Green's marketing agent, servicing agent, collection agent, or any other agent.  To the extent that Plaintiffs dispute that plain language, their agreements further provide that disputes about the scope of the arbitration provision would be decided by an arbitrator rather than a court.

Fully aware that they are violating the terms of the arbitration agreements, Plaintiffs attack through their First Amended Complaint ("FAC") the validity of the arbitration agreement as a whole, as well as the delegation clause.  Plaintiffs offer no allegations, however, supporting their claim that they were fraudulently induced to enter into the delegation agreement.  Thus, an arbitrator must decide the issues of arbitrability that Plaintiffs raise, as well as their objections to the arbitration agreements themselves.

Even if the Court were to decide the scope, validity, and enforceability of the arbitration provision despite Plaintiffs' agreement to have an arbitrator decide those issues, the outcome would be the same. Courts have repeatedly required arbitration of claims against nonsignatory third parties in exactly these circumstances: where the language of the arbitration agreement covers such third-party claims, or where the claim is intertwined with the very agreement in which the arbitration clause appears. Courts have also rejected Plaintiffs' same arguments as to why the arbitration agreements are unconscionable, and Plaintiffs cannot otherwise show that they are fraudulent or their intent has been frustrated. For these reasons, the Think Defendants respectfully request that the Court compel arbitration and dismiss or stay this action.

## I.  BACKGROUND

### A.  Plaintiffs Agreed to Arbitrate All Claims Related to Their Loans With Plain Green.

Plaintiffs applied for and obtained four loans each from Plain Green, an online lender wholly owned and operated by a federally recognized Indian tribe, the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation ("Chippewa Cree Tribe"). (Declaration of Matt Hargrove in Support of the Think Defendants' Motion to Compel Arbitration ("Hargrove Decl.") ¶ 2.) On July 3, 2011, July 21, 2012, August 30, 2012, and December 30, 2013, Ms. Gingras applied for and obtained loans in the amounts, respectively, of $1,050.00, $500.00, $2,400.00, and $2,400.00 from Plain Green. (*Id.* ¶¶ 11-14; Exs. 4-7.) On July 19, 2011, July 24, 2012, May 20, 2013, and July 16, 2013, Ms. Given applied for and obtained loans in the amounts, respectively, of $1,250, $2,000, $250, and $3,000 from Plain Green. (*Id.* ¶¶ 16-19; Exs. 8-11.)

To obtain their loans, Plaintiffs completed an online application available on Plain Green's website. (*Id.* ¶ 5.) To obtain a loan from Plain Green, a customer follows several steps. The customer first fills out a loan application, chooses the date of her first payment, and then selects a loan amount. (*Id.* ¶ 6.) If Plain Green approves the loan, the customer is provided a copy of the "Consumer Loan Agreement" (later titled the "Consumer Installment Loan Agreement"), which includes an arbitration provision. (*Id.* ¶ 7.)

2

Plaintiffs were under no obligation to agree to arbitrate disputes. As the loan agreement explained in all capital and bold lettering, Plaintiffs were free to opt out of the arbitration provision within 60 days of the date of the loan agreement. (Hargrove Decl. Ex. 4 at 6, Ex. 11 at 6.) Doing so would have no impact on the other terms of their loans. And, there were no onerous obstacles in the process—a simple e-mail or a letter sufficed.

After the customer chooses whether to receive the loan proceeds electronically or by U.S. Mail, the customer types her full name to provide an electronic signature. (*Id.* ¶ 7; *id.* Ex. 2.) The customer also types the phrase "I Agree" in a box on the screen to indicate her acceptance of the loan terms. (*Id.*) Once the loan agreement is submitted, the customer is alerted of the option to print it. (*Id.* ¶ 8.) The customer is then directed to a page that informs her that once her loan application information is verified, she will receive the funds from the loan. (*Id.* ¶ 9; *id.* Ex. 3.)

On four occasions, Ms. Gingras submitted the agreement and typed "I Agree" in the appropriate box to indicate her acceptance of its terms. (*Id.* ¶ 7; *id.* Exs. 4-7.) On four occasions, Ms. Given too submitted the agreement and typed "I Agree" in the appropriate box to indicate her acceptance of its terms. (*Id.* ¶ 7; *id.* Exs. 8-11.) Though they were entitled to cancel the loans, Plaintiffs chose to retain the proceeds instead. (First Am. Compl. ("FAC") ¶¶ 48-49, 60-63.) And though they were also entitled to opt out of the arbitration agreement, Plaintiffs chose not to do so. (Hargrove Decl. ¶¶ 21-22.)

**B.** **The Terms of the Written Arbitration Agreements that Each of the Plaintiffs Signed on Four Separate Occasions.**

Plaintiffs signed two different versions of Plain Green's loan agreement.[1] In the Consumer Loan Agreement (signed for Plaintiffs' first three loans), Plaintiffs agreed that "any dispute you have with [Plain Green] or *anyone else* under this Agreement will be resolved by binding arbitration."[2] (Hargrove Decl. Ex. 4 at 6 (emphasis added).) Plaintiffs further agreed to

---

[1] Plaintiffs do not distinguish between these versions in their FAC.
[2] For ease, throughout this memorandum the Think Defendants cite to one of Ms. Gingras's Consumer Loan Agreements and Ms. Given's Consumer Installment Loan Agreement as representative of the agreements Plaintiffs signed.

arbitrate "any Dispute," which is broadly defined as "any controversy or claim between you and Lender, *its marketing agent, collection agent*, any subsequent holder of this Note, or *any of their respective agents, affiliates*, assigns, employees, officers, managers, members or shareholders (each considered a "Holder" for purposes of this Agreement)."  (*Id.* at 7 (emphasis added).)

The arbitration agreement in the Consumer Loan Agreement expressly provides that "the term Dispute is to be given its broadest possible meaning," including "any claim arising from, related to or based upon *marketing or solicitations to obtain the loan and the handling or servicing of your account . . . .*"  (*Id.* (emphasis added).)  The arbitration agreement further provides that a "Dispute" includes "*any* issue concerning the *validity, enforceability, or scope*" of the loan or agreement to arbitrate.  (*Id.* (emphasis added).)  It also states that the provision benefits the customer, Plain Green, and related third parties.  (*Id.* at 8-9.)

Under the arbitration agreement, the Plaintiffs have the right—regardless of which party invokes arbitration—to select the American Arbitration Association, JAMS, or any other arbitration organization agreed upon by the parties to the Dispute.  (*Id.* at 7.)  The arbitration will take place, at the customer's choice, on tribal land or within thirty miles of the customer's residence, provided that the latter choice is not construed as a relinquishment or waiver of sovereign status or immunity (i.e., not a request to "reaffirm immunity").  (*Id.* at 7-8.)  The arbitration agreement provides that it is to be governed by Chippewa Cree Tribe law and that the arbitrator will apply the same law, as well as the rules and procedures of the chosen arbitration organization applicable to consumer disputes.  (*Id.* at 8.)

Plain Green agreed to pay the filing fee and any costs or fees charged by the arbitrator regardless of which party initiates the arbitration.  (*Id.*)  Each party is responsible for its own attorneys' fees and other expenses, and, if allowed by statute or applicable law, the arbitrator may award statutory damages, and/or reasonable attorneys' fees and expenses.  (*Id.*)  In short, the agreement does not impose on Plaintiffs any upfront arbitration costs and shifts certain costs away from Plaintiffs if the arbitrator renders a decision in their favor.  For their part, Plaintiffs agreed to waive their ability to participate in class-wide arbitration.  (*Id.*)

4

Additionally, the Consumer Loan Agreement specifically highlights the arbitration provision, stating in capital, bold lettering:

> **(a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**
>
> **(b) YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE AGAINST US OR RELATED THIRD PARTIES; and**
>
> **(c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

(*Id.* at 7.)

The Consumer Installment Loan Agreement Plaintiffs each signed on their most recent loans is materially identical to the Consumer Loan Agreement except that it provides that the arbitration agreement covers any "Dispute" between Plaintiffs and "us," which is defined to include Plain Green or any of its affiliated companies, the Chippewa Cree Tribe, Plain Green's "*servicing and collection representatives and agents, and each of their respective agents,* representatives, employees, officers, directors, members, managers, attorneys, successors, predecessors, and assigns." (*Id.* Ex. 11 at 7 (emphasis added).) "Dispute" is again broadly defined to include "*any claim or controversy* of any kind between you and us . . . , including events that occurred prior to origination of your Loan . . . , based on any legal or equitable theory . . . and regardless of the type of relief sought." (*Id.* (emphasis added).)

### C. Plaintiffs Filed Suit Against the Think Defendants Despite Their Agreement to Arbitrate.

Ignoring their arbitration agreements, Plaintiffs originally filed this putative class action on May 13, 2015 against Plain Green CEO Joel Rosette and Plain Green board members Ted Whitford and Tim McInerney in their official capacities. (Compl. at 1.) Plaintiffs amended their complaint on August 4, 2015, adding the Think Defendants, Kenneth E. Rees, Sequoia Capital Operations, LLC, and Technology Crossover Ventures. Plaintiffs assert six claims against the

5

Think Defendants for (1) violation of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536(a); (2) violation of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45; (3) violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693k; (4) violation of the Vermont Consumer Fraud Act ("VCFA"), 9 V.S.A. § 2453; (5) violation of RICO predicated upon wire and mail fraud, 18 U.S.C. § 1962(c); (6) violation of RICO predicated upon collection of unlawful debt; and (7) unjust enrichment.  (*See* FAC ¶¶ 165-225.) Plaintiffs seek to represent a nationwide class defined as "[a]ll persons who took out payday loans from Defendants."  (*Id*. ¶ 156.)

Plaintiffs allege that Defendants Rees and Think Finance approached the Chippewa Cree Tribe to form "a tribal entity to conduct an illegal lending scheme over the Internet."  (FAC ¶ 77.)  They claim that as part of the "scheme," the resulting lender, Plain Green, would offer loans—that is, be "in the business of lending money at a usurious rate," (*id.* ¶ 148)—and Think Finance would provide services to the lender, (*id.* ¶¶ 80, 83).

According to Plaintiffs, Rees and Think Finance came to "control" and "dominate" Plain Green.  (FAC ¶¶ 80, 99, 104.)  While Plain Green allegedly creates the financial arrangements that grant it automatic access to borrowers' bank accounts and operates the website that allows transactions from those accounts to proceed, (*id.* ¶¶ 30, 93, 101), Rees and Think Finance are alleged to provide everything else "that the enterprise need[s] to operate," (*id.* ¶ 80), including "customer service, verification of accounts, and collection of debt *on behalf of* Plain Green," (*id.* ¶ 109 (emphasis added)).  Plaintiffs further allege that Tailwind Marketing, TC Decision Services, and TC Loan Services assisted in carrying out the terms of the loan agreements.  (*Id.* ¶ 104.)  Specifically, Tailwind Marketing provides marketing services for a fee and TC Decision Services provides customer service, verification, and collections of customer accounts for a fee. (*Id.* ¶¶ 89-90, 152-153.)  Thus, the Think Defendants are alleged to both have acted in concert with and served as the agents of Plain Green in furtherance of the "illegal lending scheme."  (*Id.* ¶ 92.)  Yet, Plaintiffs have not sued Plain Green or the Indian tribe that owns it.

Each of Plaintiffs' claims is predicated on the allegation that the loans they obtained from Plain Green were illegal under Vermont law. (FAC ¶¶ 167-168 ("exorbitant interest rates" and reporting of "illegal debts to credit rating agencies" unfair, deceptive, or abusive practice); *id.* ¶¶ 176, 178 (same are unfair methods of competition); *id.* ¶¶ 103-104, 110 (ACH transfers used as part of scheme to extract payments on "illegal loans"); *id.* ¶¶ 110, 201 (Defendants "charge[d interest in excess" of that allowed by Vermont law); *id.* ¶¶ 103, 210 (Think Finance "called for the use of ACH transaction or mail to make payments on the illegal loans"); *id.* ¶ 220 (Think Defendants charged "usurious rates"); *id.* ¶ 224 ("Defendants have been unjustly enriched by their continued possession of funds illegally taken from people").)

## II.     ARGUMENT

The Court should grant the Think Defendants' motion to compel arbitration because Plaintiffs signed valid, enforceable arbitration agreements that cover their claims against the Think Defendants. To the extent Plaintiffs dispute the validity, enforceability, or scope of their arbitration agreements, they must raise those issues before the arbitrator pursuant to the plain terms of the agreement and the Supreme Court's decision in *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63 (2010). And regardless of who decides arbitrability, the outcome is the same: the Think Defendants are entitled to enforce the arbitration agreements under principles of equitable estoppel, third-party beneficiary law, and agency, and Plaintiffs' challenge to the enforceability of the arbitration agreements fails.

### A.     Plaintiffs Agreed to Arbitrate This Dispute.

The Federal Arbitration Act ("FAA") was enacted to promote the enforcement of privately entered agreements to arbitrate "according to their terms." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 53-54 (1995) (internal quotations and citation omitted). The FAA provides that a written arbitration provision contained in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In passing the FAA, Congress established a strong national policy in favor of arbitration. *See, e.g.,*

*Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001). In evaluating a motion to compel under the FAA, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *E.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *French v. Wells Fargo Advisors, LLC*, No. 5:11-CV-246, 2012 WL 479961, at *2 (D. Vt. Feb. 14, 2012).

In deciding a motion to compel arbitration, the court must consider two issues: (1) whether the parties agreed to arbitrate; and (2) whether the scope of the arbitration clause covers a plaintiff's claims. *E.g.*, *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003); *French*, 2012 WL 479961, at *4. As explained below, the Court should resolve both of these issues in favor of compelling arbitration in this case.

First, Plaintiffs agreed to arbitrate "any controversy or claim" between themselves and Plain Green or any related third party. (Hargrove Decl. Ex. 4 at 7, Ex. 11 at 7.) Plaintiffs do not allege that they did not enter into these agreements. Plaintiffs also had the opportunity to opt out of the arbitration provision by simply sending written notice within sixty days of signing their loan agreements, but chose not to do so. (Hargrove Decl. ¶¶ 21-22, *id.* Ex. 4 at 6, Ex. 11 at 6.)

Second, these terms encompass the instant suit. The FAA requires courts to "construe arbitration clauses as broadly as possible." *S.A. Mineracao Da Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 194 (2d Cir. 1984). "[A]rbitration should be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *McMahan Sec. Co. v. Forum Capital Mkts. L.P.*, 35 F.3d 82, 88 (2d Cir. 1994) (citation omitted).

To say the least, the arbitration agreements are "susceptible of an interpretation that covers the covers the asserted dispute." *McMahan Sec. Co.*, 35 F.3d at 88 (internal quotation marks and citation omitted). The plain language of the agreements provides that Plaintiffs agreed to arbitrate "any controversy or claim," including any claims related to the validity or enforceability of the loan agreements. (Hargrove Decl. Ex. 4 at 7, Ex. 11 at 7.) Plaintiffs' claims are all expressly predicated on the notion that the loan agreements are illegal and therefore void

8

and invalid.  (*See* Part I.B, *supra*; *see also* FAC ¶¶ 51, 67 (Plaintiffs seeking a declaration that their loans are "illegal") *id.* ¶ 101 (alleging that challenged loans were made at "illegally high and extortionate interest rates").)

Moreover, under the Consumer Loan Agreement, Plaintiffs agreed to arbitrate "Disputes" against "related third parties" or "anyone else under this Agreement," including Plain Green's marketing and collection agents or any other agents or affiliates.  (Hargrove Decl. Ex. 4 at 6-7. (emphasis omitted).)  Under the Consumer Installment Loan Agreement, Plaintiffs agreed to arbitrate "Disputes" against the same, except the agreement specifically mentioned servicing instead of marketing agents.   (*Id.* Ex. 11 at 7-8 (emphasis and capitalization omitted).)

Plaintiffs' own allegations show how the arbitration agreement in either version of the loan agreement applies to the Think Defendants.  Plaintiffs allege that Think Finance "provide[s] everything" that Plain Green needs to operate, from marketing to collections.  (FAC ¶ 80; *see id.* ¶¶ 43, 109 (Think Finance performs services "on behalf of Plain Green").)  Plaintiffs further allege that Tailwind Marketing, TC Decision Sciences, and TC Loan Services complete these tasks at the direction of Think Finance.  (*Id.* ¶ 104.)  Plaintiffs specifically allege that Tailwind Marketing provides marketing and TC Decision Sciences provides customer service, verification, and collections for Plain Green.  (*Id.* ¶¶ 89-90, 152-153.)  Plaintiffs cannot evade their agreements to arbitrate by suing the Think Defendants for the services they performed for Plain Green to carry out Plaintiffs' loan agreements, instead of suing Plain Green directly.

**B.**     **To the Extent Plaintiffs Dispute the Validly, Enforceability, or Scope of the Arbitration Agreements, the Parties Agreed that the Arbitrator Should Resolve Those Issues.**

To the extent that Plaintiffs challenge the validity, enforceability, or scope of the arbitration agreements, the agreements expressly provide that those issues are to be decided by the arbitrator rather than the courts.  As the Supreme Court has recognized, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,'" including the validity, enforceability, and scope of an arbitration agreement. *Rent-A-Center W., Inc.*, 561 U.S. at 68-72; *see also, e.g., First*

*Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (noting that parties can agree for arbitrators to decide arbitrability).

### 1. The Parties Delegated Arbitrability to the Arbitrator.

The parties here "clearly and unmistakably" agreed to arbitrate arbitrability, and the Court should enforce that agreement. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). The arbitration agreements provide that "any issues concerning the validity, enforceability, or scope" of the loan or arbitration agreement are to be decided by an arbitrator (the "delegation agreement"). Courts routinely find that similar language evidences an agreement to arbitrate arbitrability.[3]

### 2. The Delegation Clause is Enforceable.

Plaintiffs cannot avoid the effect of the delegation agreement by contending that it is "fraudulent." (FAC ¶ 131.) The Supreme Court has explained that where parties agree to delegate "gateway" questions to an arbitrator, this antecedent agreement "is valid under § 2 'save upon such grounds as exist at law or in equity for the revocation of any contract' . . . ." *Rent-A-Center W., Inc.*, 561 U.S. at 69 (quoting 9 U.S.C. § 2). A challenge to an agreement to delegate on those grounds is to be decided by the court. *Id.* at 70; *see, e.g., Kuehn v. Citibank, N.A.*, No. 12 Civ. 3287(DLC), 2012 WL 6057941, at *3 (S.D.N.Y. Dec. 6, 2012) ("[A] party seeking to avoid arbitration on unconscionability grounds must demonstrate that the delegation agreement in particular, rather than the arbitration agreement as a whole, is unconscionable."). Plaintiffs fail to show that the delegation agreement is invalid on any of those grounds.

---

[3] *See, e.g., Benzemann v. Citibank N.A.*, No. 12 Civ. 9145(NRB), 2014 WL 2933140, at *3 (S.D.N.Y. June 27, 2014) (finding that arbitration agreement provision that "[a]ny claim or dispute" will be subject to arbitration, where "dispute" was defined to include "claims relating to the enforceability or interpretation of any of these arbitration provisions" showed parties agreed to arbitrate arbitrability); *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 85 (S.D.N.Y. 2012) (concluding that provision that "[a]ll determinations as to the scope, enforceability, and effect of this Dispute Resolution section shall be decided by the arbitrator and not by a court" delegated questions of enforceability to an arbitrator).

Plaintiffs allege that the delegation agreement was drafted to "shield" Defendants' alleged fraud from "federal court review." (FAC ¶ 131.) Under Vermont law, fraudulent inducement requires "an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to his damage."[4] *Lewis v. Cohen*, 603 A.2d 352, 354 (Vt. 1991) (citation omitted). Plaintiffs, however, point to no misrepresentation that specifically induced them to enter into the delegation agreement.

What is more, the Second Circuit has rejected similarly bare allegations as inadequate to challenge an arbitration agreement as part of a plan to defraud. In *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 666 (2d Cir. 1997), the plaintiffs argued that an "arbitration-in-Italy" clause was part of the defendants' scheme to defraud because defendants hoped that it would prevent plaintiffs from seeking relief in New York courts, where the remedies for fraud are more extensive than in arbitration in Italy. The court concluded that plaintiffs' "conclusory allegations" of "more extensive" remedies were insufficient "to establish that the arbitration clause in particular was a tool used to further a scheme to defraud." *Id.* at 667. Without further allegations showing "some substantial relationship between the fraud or misrepresentation and the arbitration clause in particular," the plaintiffs' challenge went to the contract generally, and resolving it would require the court to adjudicate the entire scheme to defraud. *Id.* The court declined to do so, however, as that task is for an arbitrator. *Id.*

*Campaniello Imports, Ltd.* is controlling here. Plaintiffs' bare allegation that the delegation agreement is part of Defendants' fraudulent plan fails to establish that the delegation agreement in particular was used as a "tool" to defraud them. Plaintiffs do not allege any "substantial relationship" between any fraud or misrepresentation and the delegation agreement

---

[4] The Think Defendants do not object to the application of Vermont law as to issues of contract formation and enforceability, as they do not believe the outcome would be different under tribal law on those issues.

in particular.  *See Simply Fit of N. Am., Inc. v. Poyner*, 579 F. Supp. 2d 371, 381 (E.D.N.Y. 2008) (plaintiffs' contention that arbitration agreement was not for dispute resolution, but rather to prevent public disclosure of fraudulent activities insufficient to support a finding that the arbitration agreement was itself induced by fraud).  Plaintiffs' challenge is really to the loan agreements, and must be reserved for an arbitrator.  Accordingly, the court should enforce the delegation agreement and preserve any arbitrability or enforceability issues for an arbitrator.

C.    **Even If the Court Were to Address Whether This Dispute Is Within the Scope of the Arbitration Agreements And Whether the Arbitration Agreements are Valid and Enforceable, Plaintiffs Must Arbitrate Their Dispute With the Think Finance Defendants.**

Even if this Court concludes that it, and not an arbitrator, should decide whether Plaintiffs' claims in this action fall within the scope of the arbitration agreement, the result would be the same:  the motion to compel arbitration should be granted.  Second Circuit case law and numerous federal cases confirm that Plaintiffs cannot evade their agreements to arbitrate by suing the Think Defendants instead of their lender.  Moreover, even if this Court also determines that it should decide Plaintiffs' challenge to the validity and enforceability of the arbitration agreements, that challenge is likewise foreclosed.

1.    **Governing Case Law Mandates that Plaintiffs Cannot Escape Their Agreement to Arbitrate by Suing the Think Defendants Instead of Their Lender.**

Although the Think Defendants are not signatories to the arbitration agreements, courts have routinely permitted nonsignatories to enforce such agreements when (1) equitable estoppel applies because the nonsignatory is being sued for conduct that is intertwined with the agreement containing the arbitration provisions; (2) the nonsignatory is a third-party beneficiary of the agreement; *or* (3) the claim at issue is based on conduct in which the nonsignatory was allegedly acting as an agent on behalf of the party with which the plaintiff agreed to arbitrate.  Enforcement of the arbitration agreements here is proper on any of those bases.

12

### a. Plaintiffs Are Equitably Estopped from Evading Their Agreements to Arbitrate Disputes About the Validity of Their Loans.

The doctrine of equitable estoppel compels arbitration here. Courts have repeatedly held that "a nonsignatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute" where (1) "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed" and (2) there is "a relationship among the parties of a nature that justifies" enforcement of the arbitration provision. *Kastner v. Vanbestco Scandanavia, AB*, No. 5:14-CV-141, 2014 WL 6682440, at *7 (D. Vt. Nov. 25, 2014) (internal quotation marks and citation omitted). "Plaintiff cannot artfully plead around an arbitration agreement simply by naming a non-signatory defendant who acted in concert with the signatory." *See, e.g.*, *Chastain v. Union Sec. Life Ins. Co.*, 502 F. Supp. 2d 1072, 1081 (C.D. Cal. 2007).

This dispute easily satisfies both prongs of the test. Courts have repeatedly compelled plaintiffs—including the additional Plain Green customers mentioned in the FAC, (FAC ¶¶ 72, 73)—to arbitrate with nonsignatory service providers under the Plain Green arbitration agreement for alleged involvement in the collection of unlawful debt. *See, e.g.*, *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1401-04 (S.D. Fla. 2014); *see, e.g.*, *Booth v. BMO Harris Bank, N.A.*, No. 13-5968, 2014 WL 3952945, at *3-7 (E.D. Pa. Aug. 11, 2014), *Graham v. BMO Harris Bank, N.A.*, No. 3:13CV1460 (WWE), 2014 WL 4090548, at *5-7 (D. Conn. July 16, 2014). This case is no different.

As to the first prong, Plaintiffs' claims are "intertwined" with the loan agreements that they signed with Plain Green. Plaintiffs' claims depend on the terms of the loan agreements being illegal because of allegedly usurious interest rates under Vermont law. Moreover, Plaintiffs have alleged a "scheme" between Plain Green and the Think Defendants to extend "illegal" loans—the very subject of the loan agreements—to consumers.[5]

---

[5] *See, e.g.*, *Booth*, 2014 WL 3952945, at *3-7 (concluding that plaintiffs' claims were intertwined with loan agreements where each was premised on the idea that the bank defendants were

(Footnote continues on next page.)

*Moss v. BMO Harris Bank, N.A.*, 24 F. Supp. 3d 281 (E.D.N.Y. 2014), *order vacated in part on other grounds*, No. 13-CV-5438 (JFB) (GRB), 2015 WL 4380841 (E.D.N.Y. July 16, 2015), is indistinguishable. There, the court compelled arbitration between plaintiff borrowers challenging allegedly illegal loans and the nonsignatory defendant banks who debited their accounts on behalf of the lender. *Moss*, 24 F. Supp. 3d at 283-84. The court explained that plaintiffs' claims arose from the subject matter of the loan agreements because "[e]very one of plaintiffs' causes of action requires the conclusion that the loan agreements are invalid." *Id.* at 288. The court further reasoned that "the goal of the alleged conspiracy is directly related to the agreements: otherwise, defendants would have had no loans to facilitate." *Id.* at 289.

So here too. Plaintiffs' claims arise from the Think Defendants' purported role in the collection of debt on and provision of services related to the loans, as set forth in the loan agreements. Those claims depend on the terms of the loan agreements being illegal. (*See, e.g.*, Part B.1, *supra*.) Plaintiffs also allege that Think Finance, along with Defendant Kenneth Rees, developed and orchestrated the "scheme" to extend "loans at illegally high and extortionate interest rates" and used their control and domination of Plain Green and Defendants Tailwind Marketing, TC Loan Services, and TC Decision Sciences to do so. (FAC ¶ 101.) Plaintiffs go so far as to allege that Think Finance used the loan agreements as "tools to further deceive" Plaintiffs and debit their bank accounts "with illegal ACH transactions in excess of any legal amount of interest." (*Id.* ¶¶ 112, 115.) Thus, as in *Moss*, the loan agreements are crucial to the goal of the alleged conspiracy, as without them, the Think Defendants would not have had the instruments of their alleged fraud.

---

(Footnote continued from previous page.)

involved in the collection of unlawful debt under the loan agreements); *Jamaica Hosp. Med. Ctr., Inc. v. United Health Grp., Inc.*, 584 F. Supp. 2d 489, 497 (E.D.N.Y. 2008) (compelling arbitration with nonsignatory where plaintiff alleged that wrongs "*collectively* served to further the business practices about which Plaintiffs complain"); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 402-03 (S.D.N.Y. 2003) (ordering arbitration with nonsignatories where they were alleged to be involved in a conspiracy to fix the prices of fees for credit cards that "are at the heart of the underlying contract containing the arbitration agreement").

This case also satisfies the second prong of the test: a relationship among the parties that justifies enforcement of the arbitration provisions. Plaintiffs' own allegations estop her from denying that the relationship requirement is satisfied. The court's decision in *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005), is instructive here. In *Currency Conversion*, the court explained that the plaintiffs had alleged a sufficiently "close" relationship where they alleged that the signatory banks controlled the nonsignatory credit card network defendants and the "banks have insinuated themselves into the network defendants to such a degree that the networks are effectively part of the member banks' operations." 361 F. Supp. 2d at 263. The network defendants were also alleged to have acted in collaboration with the banks to further their alleged price fixing conspiracy because the networks' currency conversion fee could only be imposed through the banks. *Id.*

The same logic applies here. The core of Plaintiffs' FAC is their allegation of concerted misconduct between the Think Defendants and Plain Green to defraud consumers. Plaintiffs allege that Think Finance "controls" and "dominates" Plain Green and has used that power over Plain Green to perpetrate the alleged "scheme" to extend "illegal" loans. (FAC ¶¶ 101, 104; *see id.* ¶ 115.) They further allege that Think Finance could not have operated this scheme without working in concert with Plain Green, which initiated wire transfers and mailings and operated the website. (*Id.* ¶ 101.) The FAC also asserts that Think Finance performs services "on behalf of Plain Green" with the assistance of Tailwind Marketing, TC Decision Sciences, and TC Loan Services. (*Id.* ¶ 109.) Simply put, Plaintiffs cannot sue the Think Defendants for their ostensible role in orchestrating and carrying out Plaintiffs' allegedly illegal loan agreements with Plain Green, while simultaneously denying the applicability of the arbitration provision in those very loan agreements.[6]

---

[6] *See, e.g.*, *Victorio v. Sammy's Fishbox Realty Co., LLC*, No. 14 Civ. 8678(CM), 2015 WL 2152703, at *18 (S.D.N.Y. May 6, 2015) (finding sufficient "intertwined-ness" to compel plaintiff to arbitrate with nonsignatory where nonsignatory allegedly controlled signatory and plaintiff alleged that they acted as a single related enterprise); *Moss*, 24 F. Supp. 3d at 290 ("Having agreed to arbitrate with undefined agents and servicers, and likewise having agreed that agents and servicers could perform the ACH transactions, it would be inequitable for plaintiffs to

(Footnote continues on next page.)

sf-3568127

More generally, courts routinely find this "relationship" requirement to be met when the agreement containing the arbitration provision mentions the nonsignatory's role, even if the nonsignatory itself is not specifically named. For example, in *In re A2P SMS Antitrust Litigation*, 972 F. Supp. 2d 465, 476 (S.D.N.Y. 2013), the court found that equitable estoppel applied to nonsignatory WMC Global, Inc. because, although the agreement did not specifically mention that entity by name, it referred to "agents" and "anticipate[d] . . . their role." 972 F. Supp. 2d at 479. Here, each arbitration agreement expressly "benefits" and "is binding" on Plain Green's related entities and agents providing such services as loan servicing, collections, and marketing, as the Think Defendants are alleged to do. (Hargrove Decl. Ex. 4 at 8-9, Ex. 11 at 7.) *Cf. Ross v. Am. Express Co.*, 547 F.3d 137, 148 (2d Cir. 2008) (finding no relationship between the signatory banks and the nonsignatory seeking arbitration because the nonsignatory was not mentioned in the agreements and "perform[ed] no function whatsoever relating to their operation"). Given that the Think Defendants are "linked textually" to the arbitration agreements, Plaintiffs cannot argue that they did not consent to arbitrate or did not anticipate having to arbitrate with them. *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 479.

### b. The Think Defendants Are Third-Party Beneficiaries of the Arbitration Agreements.

"[T]he FAA requires the enforcement of an arbitration agreement not just in favor of parties to the agreement, but also in favor of third party beneficiaries." *Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*, 85 F.3d 21, 27 (2d Cir. 1996) (concluding "the insurance companies are entitled, as third-party beneficiaries of an arbitration agreement, to insist on arbitration"). To determine if a nonsignatory is a third-party beneficiary, courts look to whether "'the parties to [the] contract intended to confer a benefit on [the nonsignatory party] when

---

(Footnote continued from previous page.)

avoid arbitration with those same agents and servicers."); *Crewe*, 884 F. Supp. 2d at 75 n.6 (finding that nonsignatory could invoke equitable estoppel given "pervasive allegations of interdependent and coordinated misconduct between the nonsignatories and signatory").

contracting.'" *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019-20 (2d Cir. 1993) (quoting *McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771, 773 (2d Cir. 1992)).

As noted above, each arbitration agreement expressly "benefits" Plain Green's related entities and agents providing such services as loan servicing, collections, and marketing. (Hargrove Decl. Ex. 4 at 9, Ex. 11 at 7.)  The standard set forth by the Second Circuit is that "[a]rbitration should be ordered unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *McMahan Sec. Co.*, 35 F.3d at 88 (emphasis added).  It is impossible to imagine how these agreements could be anything but susceptible to the interpretation that they cover claims against the Think Defendants, who are alleged to have provided numerous services to Plain Green, including marketing, servicing, and collections services.  (*See* FAC ¶¶ 43, 89-90, 104, 109, 152-153.) *Compare McPheeters*, 953 F.2d at 773 (declining to find that a nonsignatory was a third-party beneficiary of an arbitration agreement where the nonsignatory was left "entirely out of the picture" and third-party claims were not mentioned in the arbitration clause).

It makes perfect sense that the arbitration agreements were intended to benefit third-party service providers like the Think Defendants.  Without such coverage, the arbitration agreements could be easily circumvented by suing a service provider providing an essential service (like servicing, collections, mail delivery, or electricity) rather than the lender itself.  Although such a suit would have to be captioned differently, it could still seek to have the loan declared invalid or unenforceable and could prevent the lender from using third parties to carry out its essential lending functions.  Opening such a loophole in an arbitration agreement would subvert the goal of reducing litigation costs for both the lender and borrower, and it is entirely sensible that the arbitration provisions here expressly precluded such an end-run around its terms.  *See Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993) ("[W]e believe that the parties fully intended to protect the individual Chairs to the extent they are charged with misconduct within the scope of the agreements. If it were otherwise, it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity Agents themselves.").

### c. Plaintiffs' Suit Is Predicated on Allegations that the Think Defendants Are Agents of Plain Green.

Arbitration is also proper for an independent and final reason: Plaintiffs' suit is predicated on the actions that the Think Defendants allegedly took as agents "on behalf of" Plain Green. (FAC ¶ 109; *see id.* ¶¶ 89-90, 104, 152-153.) The Second Circuit has held that nonsignatories to an arbitration agreement may nevertheless compel arbitration where the alleged "liability arises out of the same misconduct charged against" the party who signed the agreement. *Roby*, 996 F.2d at 1360 (granting motion to dismiss and finding arbitration clauses applied because "complaints against the individual Chairs are completely dependent on the complaints against the Agents"); *Fensterstock v. Educ. Fin. Partners*, No. 08 Civ. 3622(TPG), 2012 WL 3930647, at *5 (S.D.N.Y. Aug. 30, 2012) ("The Second Circuit has held that an agent of a signatory to a contract is one of the parties entitled to invoke the arbitration provisions.").

*Campaniello Imports, Ltd* is again instructive. There, the Second Circuit held that the district court had properly concluded that an arbitration agreement covered claims against a nonsignatory because the nonsignatory was acting as an agent of the party that signed the arbitration agreement. 117 F.3d at 668-69. The Second Circuit emphasized that the plaintiffs had "not alleged that they had dealt with [the nonsignatory] outside of his capacity as an agent for [the party that signed the arbitration agreement]." *Id.* at 668. Because the plaintiffs' claims against the defendant "arise out of his relationship with [the party that had signed the arbitration agreement], they are . . . subject to mandatory arbitration." *Id.* at 669. Likewise, here, Plaintiffs' challenge the Think Defendants' role as service providers to Plain Green, and how, in that role, they were able to collect on purportedly illegal debt.

Moreover, the FAC alleges an agency relationship between Plain Green and the Think Defendants (in addition to alleging that Plain Green was likewise an agent of Think Finance). *See Crewe*, 884 F. Supp. 2d at 75 (enforcing an arbitration agreement concerning a dispute with a nonsignatory because the plaintiff himself "broadly pleads that all defendants acted as one another's agents" and that other defendants were the "'guiding force'" behind certain conduct).

18

Plaintiffs contend that Think Finance "perform[ed] the function of customer service, verification of accounts, and collection of debt *on behalf of* Plain Green" and that Tailwind Marketing, TC Decision Services, and TC Loan Services also assisted in carrying out the terms of the loan agreements. (FAC ¶ 109 (emphasis added); *see id.* ¶ 104.) Plaintiffs further allege that Plain Green "is in the business of lending money at a usurious rate" and that Tailwind Marketing has furthered that alleged wrongdoing by providing marketing services for a fee and that TC Decision Services has done the same by providing customer service, verification, and collections of customer accounts for a fee. (*Id.* ¶ 148; *id.* ¶¶ 89-90, 152-153.) In short, Plaintiffs' claims against the Think Defendants are based on their conduct as alleged agents of Plain Green.

## 2. The Arbitration Agreements Are Enforceable.

Unable to avoid the plain language of the arbitration agreements, Plaintiffs take a different tack and challenge the agreements they agreed to four times each. Under § 2 of the FAA, "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements . . . ." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 682 (1996); *see Littlejohn v. Timberquest Park at Magic, LLC*, No. 5:14-CV-200, 2015 WL 4469929, at *6 (D. Vt. July 21, 2015). As the Supreme Court explained in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), however, arbitration agreements may not be rendered unenforceable by "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." 131 S. Ct. at 1742-43. In *Concepcion*, the Court held that the FAA preempted California's "*Discover Bank* rule," which prohibited as unconscionable waiver of classwide procedures in consumer contracts, explaining that § 2's saving clause does not preserve state-law rules that "stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 1748; *see id.* at 1745 ("[C]ourts must place arbitration agreements on an equal footing with other contracts"). Here, Plaintiffs cannot establish under generally applicable contract defenses that the arbitration agreements are unenforceable.

### a. The Arbitration Agreements Are Not Unconscionable.

A claim that an arbitration agreement is unconscionable is considered under state law. *Littlejohn*, 2015 WL 4469929, at *6. "Under Vermont law, terms of a contract may be avoided as unconscionable if they are procedurally or substantively unfair." *Bergman v. Spruce Peak Realty, LLC*, 847 F. Supp. 2d 653, 666 (D. Vt. 2012).

Plaintiffs' first set of attacks on the arbitration agreements go to procedural unconscionability. Plaintiffs contend that (1) the terms of the loan agreements are not easily discovered on Plain Green's website, (2) Plain Green cuts off access to the borrower's account once litigation has commenced so that the borrower cannot access her loan agreement, (3) the doctrine of tribal immunity is complicated, (4) they experienced an imbalance in negotiating power, and (5) the arbitration agreements are presented as "take it or leave it."[7] (FAC ¶ 121.)

Initially, these concerns must be set aside because they are not addressed specifically to the arbitration agreements. Instead, they apply with equal force to the loan agreements themselves and must be decided by an arbitrator. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006) (challenges to the contract as a whole are to be first considered by the arbitrator); *Kuchinsky v. Curry*, No. 09 Civ. 00299(DLC), 2009 WL 1492225, at *3 (S.D.N.Y. May 28, 2009) (concluding that a plaintiff's challenge to arbitration agreement on grounds that he did not understand the agreement, was required to "take it or leave it," had no bargaining power, and did not have the opportunity to consult an attorney were attacks that went to the enforceability of the agreement as a whole and were reserved for the arbitrator).

Even if the Court considers these objections on the merits, they are not availing. First, as explained above, borrowers may print a copy of their loan agreements during the application process. Second, it is unlikely that Plaintiffs' able counsel filed this lawsuit without first obtaining and reading the contracts at issue. Moreover, Plaintiffs' loan agreements were

---

[7] Plaintiffs also allege that the terms of the arbitration agreement change from when a person applies for the loan to when the terms are presented after the application process. (FAC ¶ 121.) Plaintiffs, however, fail to offer any allegations describing how the terms change.

attached to the initial motion to dismiss filed in this case and thus were in the record before Plaintiffs amended their complaint.  Third, when Plaintiffs signed their loan agreements, they agreed that they understood all the terms and conditions of the agreements.[8]  (*See* Hargrove Decl. Ex. 4 at 9, Ex. 11 at 8.)  Fourth, "[a]s the Vermont Supreme Court has repeatedly pointed out, 'unequal bargaining power alone will not nullify a contract.'"  *Littlejohn*, 2015 WL 4469929, at *7 (quoting *Maglin v. Tschannerl*, 174 Vt. 39, 45 (2002)).  There must be an allegation that the drafting party used the power differential to *coerce* the other party into signing, and there are no allegations of coercion here.  *Maglin*, 174 Vt. at 46.  Fifth, the fact that an agreement is offered on a take-it-or-leave-it basis "is insufficient to render the contract unconscionable, particularly when the plaintiff had the ability to go to other sources of credit."  *Anonymous v. JP Morgan Chase & Co.*, No. 05 Civ. 2442(JGK), 2005 WL 2861589, at *6 (S.D.N.Y. Oct. 31, 2005); *see also In re Vargas Realty Enters., Inc.*, 440 B.R. 224, 237-38 (S.D.N.Y. 2010) (a form contract offered on a take-it-or-leave-it basis or a disparity in bargaining power is insufficient to render a contract unconscionable).  Moreover, Plaintiffs were free to opt out of the arbitration agreements about which they now complain.  (*See* Hargrove Decl. Ex. 4 at 6, Ex. 11 at 6.)

Plaintiffs' second set of attacks go to substantive unconscionability.  Plaintiffs first contend that borrowers will have little incentive to bring actions because each borrower's damages are small and borrowers have few resources to bring a claim.  (FAC ¶ 121.)  However, a "class-action waiver is not rendered invalid by virtue of the fact that [a] claim is not economically worth pursuing individually."  *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 298 (2d Cir. 2013); *see Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2311 (2013).  Plaintiffs also suggest that the arbitration agreement has a provision for costs that effectively prohibits borrowers from making low-dollar claims.  (FAC ¶ 121.)  "[W]here . . . a party seeks to

---

[8] Plaintiffs do not identify why a detailed understanding of the concept would be required to understand the terms of their loan agreements.  Moreover, "[i]f Plaintiffs did not understand the form of the arbitration agreement or had questions about it, the burden was upon them to have their concerns addressed before placing their signatures on the agreement."  *Moss v. Rent-A-Ctr., Inc.*, No. 06 CV 3312(SLT)(KAM), 2007 WL 2362207, at *5 (E.D.N.Y. Aug. 15, 2007).

invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs . . . ." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). Plaintiffs have not even offered allegations suggesting that they could meet this burden. Moreover, this point is moot because the Think Defendants will, and hereby do, agree to cover the costs and fees charged by the arbitrator.

Plaintiffs' final objection is that Defendants will agree to arbitration where the borrower resides only if the borrower "reaffirms" that tribal immunity applies. (FAC ¶ 121.) That argument has no relevance to the Think Defendants, who claim no such immunity. Moreover, the argument is simply incorrect. The clause does not require Plaintiffs to "agree" to anything. It simply says that they will not argue that by affording them the convenience of arbitrating in a nearby forum, the Tribe has *waived* sovereign status or immunity.

### b. The Intent of the Arbitration Agreements Is Not Frustrated.

Plaintiffs next contend that the arbitration agreements are unenforceable because the intent of the arbitration agreements is frustrated by a dispute about the chief judge of the Chippewa Cree. (FAC ¶ 122.) They allege that because of "corruption," there is no guarantee that Plaintiffs will receive a fair, complete, simple, or final resolution of matters reserved to the tribal courts in the arbitration agreements. (*Id.*) Plaintiffs' contention is belied by their own allegations. Plaintiffs aver that some tribal officials have been convicted of, or pled guilty to, embezzlement and bribery. (*Id.* ¶ 132.) None of this wrongdoing is alleged, however, to be related to the Chippewa Cree Tribe's judiciary. The FAC has allegations only that the Chief Judge was replaced and that "apparently" several other judges were terminated, but these allegations do not explain how the wrongdoing of certain tribe members arises to a "dispute" about who is the chief judge or mean that the fair resolution of disputes cannot be delivered in tribal courts. (*Id.* ¶ 140.) If criminal activity among some government officials were a sign of the condition of a state's judiciary, no judicial system would receive a clean bill of health. Plaintiffs have thus failed to show that the intent of the arbitration agreements is frustrated.

###### c.     The Arbitration Agreements Are Not Fraudulent.

Lastly, Plaintiffs object that the arbitration agreements are "fraudulent and an important part of the scheme to defraud because" they aim "to deter victims from filing claims and to prevent federal court review of the illegal practices of the enterprise." (FAC ¶ 123.)  They also contend that the agreements contain several misstatements, including that (1) the lender is Plain Green, (2) the agreements will be governed by the law of the Chippewa Cree Tribe, and (3) the agreements and Plain Green are not subject to the laws of any state.  (*Id.* ¶¶ 124-126.)  These objections are without merit.

To the extent Plaintiffs' argument is that the arbitration agreements are part of Defendants' scheme to defraud, this argument falls flat for the same reason it failed as to the delegation provision.  (*See supra* at 10-12.)  Plaintiffs offer only their supposition that Think Finance has the ability to control the Chippewa Cree Tribe court to support their claim that the Think Defendants used arbitration to avoid federal court and instead rely on "sham" review by a tribal court.  (FAC ¶ 131.)  But they do not explain how a process that provides for a neutral arbitrator to decide their dispute is fraudulent.[9]  Nor do Plaintiffs provide any explanation as to why the arbitration agreements' appeal procedure in tribal court is fraudulent, unless they somehow mean to suggest that tribal courts are somehow inferior at or incapable of administrating an arbitration agreement.[10]  Plaintiffs' "conclusory allegations" are thus insufficient "to establish that the arbitration clause in particular was a tool used to further a scheme to defraud" and Plaintiffs' challenge must be reserved for the arbitrator.  *Campaniello Imports, Ltd.*, 117 F.3d at 667; *Simply Fit of N. Am., Inc.*, 579 F. Supp. 2d at 381.

---

[9] Arbitrators are regularly asked to apply the law of foreign jurisdictions and Plaintiffs provide no reason why an arbitrator could not fairly apply Chippewa Cree law.  *See, e.g.*, *Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995) (AAA arbitrator to apply French law).

[10] Presumably, the parties in this case would simply ask this Court to confirm or vacate any arbitration award, so Plaintiffs' concern is merely a hypothetical one that not be reached.  *See, e.g.*, *U.S. Underwriters Ins. Co. v. Kum Gang, Inc.*, 443 F. Supp. 2d 348, 352 (E.D.N.Y. 2006) ("A court cannot adjudicate conjectural or hypothetical cases or controversies.").

Plaintiffs' claim that the arbitration agreements were fraudulently induced because they contain certain misstatements is also directed to the loan agreements themselves. Plaintiffs fail to show the required "substantial relationship" between the alleged misstatements and the arbitration agreements. *Campaniello Imports, Ltd.*, 117 F.3d at 667. The loan agreements begin by noting that are subject to Chippewa Cree law, (Hargrove Decl. Ex. 4 at 1, Ex. 11 at 1), and the statement that Plain Green is the lender is not tied to the arbitration clause in particular. Thus, this challenge must also be decided by the arbitrator. *See Buckeye Check Cashing, Inc.*, 546 U.S. at 445-46 ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

Plaintiffs' fraudulent inducement claims also fail because Plaintiffs did not allege that they relied on any of the alleged misrepresentations in agreeing to arbitrate, and the alleged misrepresentations are not false. *See Lewis*, 603 A.2d at 354. First, Plaintiffs entered into loan agreements with *Plain Green*. The Term Sheet attached to the FAC actually undermines Plaintiffs' argument, as it provides that Haynes Investments, Inc. ("Haynes") will "provide funding to the Tribe to *enable it to make* each of the Loans," not that Haynes or the Think Defendants will make the loans. (FAC Ex. A (emphasis added).) Second, Plaintiffs base their allegation that Chippewa Cree Tribe law is "bought and paid for" on the term sheet, but that document does not support this disparagement of tribal law. There is nothing illicit about the Tribe's agreement in the term sheet to adopt a finance code to regulate the lending activities of Plain Green and provide important safeguards for customers. Regardless, the statement that Chippewa Cree law applies is true. Third, Plaintiffs have not established that state law applies to loan contracts concluded on the reservation. *See Williams v. Lee*, 358 U.S. 217, 220 (1959) ("Congress has also acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation."). Moreover, the statement that only Chippewa Cree Tribe law applies to the arbitration agreements is a statement of legal opinion that is not a misrepresentation. *See Winton v. Johnson & Dix Fuel Corp.*, 515 A.2d 371, 373 (Vt. 1986).

## III.    THE FAA REQUIRES DISMISSAL OR A STAY PENDING ARBITRATION.

Under § 3 of the FAA, a court is required to stay actions subject to arbitration "until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *see also Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) ("[T]he FAA mandate[s] a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."). Moreover, courts are vested with the discretion to dismiss actions involving only arbitrable claims. *See, e.g.*, *Lawrence v. Sol G. Atlas Realty Co.*, No. 14-CV-3616 (DRH) (GRB), 2015 WL 5076957, at *6 (E.D.N.Y. Aug. 27, 2015) (granting motion to compel and dismissing case where neither party requested a stay).

The Think Defendants respectfully request that the Court compel arbitration pursuant to the FAA and the loan agreements, and that it exercise its discretion to dismiss this action in its entirety or, in the alternative, to stay the action pending arbitration.

## CONCLUSION

Plaintiffs agreed—four times each—to arbitrate their dispute with the Think Defendants raised in the First Amended Complaint. Plaintiffs cannot now disavow the effect of those arbitration agreements by challenging their enforceability—an issue they agreed to arbitrate. In any event, those challenges are meritless. For these and all foregoing reasons, the Think Defendants respectfully request that the Court grant their motion to compel arbitration and dismiss or stay the claims against them.

Dated: September 22, 2015                    Respectfully submitted,

By:    /s/ Ritchie E. Berger, Esq.             James McGuire (*pro hac vice*)
       Ritchie E. Berger                        Lauren Wroblewski (*pro hac vice*)
       DINSE, KNAPP, &                          MORRISON & FOERSTER LLP
       MCANDREW, P.C.                           425 Market Street
       P.O. Box 988                             San Francisco, California 94105-2482
       Burlington, VT 05402-0988                Telephone: (415) 268-7000
       Telephone: (802) 864-5751                jmcguire@mofo.com
       rberger@dinse.com

                                                *Attorneys for Defendants Think Finance, Inc.,*
                                                *TC Loan Service, LLC, TC Decision*
                                                *Sciences, LLC, and Tailwind Marketing, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2015, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system. The CM/ECF system will provide service of such filing via Notice of Electronic Filing (NEF) to the following NEF parties:

Andre D. Bouffard, Esq.
Jonathan P. Boughrum, Esq.
Matthew B. Byrne, Esq.
Richard C. Carroll, Esq.
Jay A. Dubow, Esq.
Stephen D. Ellis, Esq.
Daniel M. Glosband, Esq.
Matthew B. Homberger, Esq.
Justin E. Kolber, Esq.
James R. McGuire, Esq.
Richard L. Scheff, Esq.
Lauren L. Wroblewski, Esq.
Richard J. Zack, Esq.

/s/Ritchie E. Berger, Esq.
Ritchie E. Berger
Dinse, Knapp & McAndrew, P.C.
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751
rberger@dinse.com

For Defendants Think Finance, Inc., TC Loan
Service, LLC, TC Decision Sciences, LLC,
and Tailwind Marketing, LLC