UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

| | | |
|---|---|---|
| ANGELA C. GIVEN and | ) | |
| JESSICA GINGRAS, on behalf of themselves | ) | |
| and all others similarly situated, | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Docket No. 5:15-cv-101 |
| | ) | |
| JOEL ROSETTE, TED WHITFORD, | ) | **JURY TRIAL DEMANDED** |
| TIM MCINERNEY, THINK FINANCE, INC., | ) | |
| TC LOAN SERVICE, LLC, KENNETH E. | ) | |
| REES, TC DECISION SCIENCES, LLC, | ) | |
| TAILWIND MARKETING, LLC, SEQUOIA | ) | |
| CAPITAL OPERATIONS, LLC and | ) | |
| TECHNOLOGY CROSSOVER VENTURES, | ) | |
| Defendants | ) | |

---

## OPPOSITION TO MOTIONS TO DISMISS

---

Matthew B. Byrne, Esq.
Gravel & Shea PC
76 St. Paul Street, 7th Floor, P. O. Box 369
Burlington, VT 05402-0369
(802) 658-0220
mbyrne@gravelshea.com
For Plaintiffs

gravel &
shea ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................... 1

Facts ....................................................................................................................... 1

Standard of Review .................................................................................................. 4

I.    PLAINTIFFS' FIRST AMENDED COMPLAINT COMPLIES WITH THE RULES FOR
      PLEADING A CLAIM ....................................................................................... 5

      A.    Plaintiffs Satisfy The Requirements Of Rule 8 ........................................ 6

            1.    Plaintiffs Have Made Detailed Allegations Against Rees And Think
                  Finance. ........................................................................................ 6

            2.    Plaintiffs Have Made Detailed Allegations Against TC Loan Service, TC
                  Decision Sciences, And Tailwind Marketing ................................. 12

            3.    Plaintiffs Have Made Detailed Allegations Against Technology Crossover
                  Ventures And Sequoia Capital ..................................................... 12

            4.    Plaintiffs' Allegations Are Sufficiently Individualized For The Purposes
                  Of Rule 8 ..................................................................................... 14

      B.    Plaintiffs Also Meet the Requirements Of Rule 9 ................................. 14

            1.    Plaintiffs Adequately Alleged That Think Finance And Rees Fraudulently
                  Stated That Plain Green Was The Lender ..................................... 17

            2.    Plaintiffs Adequately Alleged That Think Finance And Rees Fraudulently
                  Stated That Chippewa Cree Law Governs .................................... 18

            3.    Plaintiffs Adequately Alleged That Think Finance And Rees Fraudulently
                  Stated That The Fraudulent Enterprise Was Immune From The Laws Of
                  Any State Of The United States ................................................... 19

            4.    Plaintiffs Adequately Alleged That Think Finance And Rees
                  Fraudulently Stated That Plain Green Loans Are Less Expensive Than
                  A Payday Loan .............................................................................. 19

            5.    Plaintiffs Adequately Alleged That Think Finance And Rees Fraudulently
                  Made Misleading Comparisons To The Payment Of Various Late Fees ... 20

            6.    Plaintiffs Adequately Alleged That Think Finance And Rees Caused
                  Additional Non-Fraudulent Instances Of Wire And Mail Fraud .............. 20



II.    THE COURT HAS SUBJECT MATTER JURISDICTION................................................21

    A.    Sovereign Immunity Does Not Deprive This Court Of Subject Matter
        Jurisdiction.........................................................................................................21

        1.    Tribal Immunity Is Different From Subject Matter Jurisdiction................21

        2.    The Facts Support The Exercise Of Subject Matter Jurisdiction...............22

    B.    Defendants' Conception Of Official Capacity Actions Against Officers Of
        Subordinate Tribal Entities Is Fundamentally Incorrect And Departs From *Bay
        Mills* ...................................................................................................................24

    C.    Tribal Immunity Does Not Exist In This Case.....................................................27

    D.    Plaintiffs' Case Law Concerning Subordinate Tribal Entities Shows That
        Immunity Should Not Be Extended To Plain Green...............................................28

    E.    Plaintiffs Have Article III Standing ....................................................................28

III.   THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS ..........30

    A.    The Contacts Of The Entity Determine Whether There Is Personal Jurisdiction
        Over The Individuals ...........................................................................................30

    B.    There Are Sufficient Contacts To Support The Exercise Of Personal
        Jurisdiction.........................................................................................................31

        1.    The Wire Transmissions Support The Exercise Of Personal
            Jurisdiction...............................................................................................32

        2.    Plaintiffs' Interaction With The Enterprise's Website Supports Personal
            Jurisdiction...............................................................................................33

        3.    Defendants' Cases On Personal Jurisdiction Do Not Deal With Official
            Capacity Actions .......................................................................................34

    C.    Personal Jurisdiction Exists Over All Other Defendants Because Of Their
        Intentional Torts And Agreement To Conspire ....................................................34

        1.    The Defendants' Commission Of Fraud Provides A Basis For Exercising
            Personal Jurisdiction ................................................................................35

        2.    Defendants Can Also Be Haled Into Court Based On Conspiracy
            Jurisdiction...............................................................................................37

    D.    The Court Has Personal Jurisdiction Over Any Other Defendants Under
         RICO...................................................................................................................38

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

E.     <u>The Court May Order Jurisdictional Discovery To Determine Whether Personal Jurisdiction Exists</u> .................................................................................39

IV.    THE ENTITY IS NOT A NECESSARY PARTY IN AN OFFICIAL CAPACITY ACTION. .................................................................................................39

V.    DEFENDANTS HAVE FAILED TO SHOW THAT THE DISPUTE IS ARBITRABLE ...............................................................................................41

    A.     <u>The Purported Arbitration Agreement Is Unenforceable</u> ......................................41

         1.     The Purported Arbitration Agreement Is Unconscionable .........................42

             a.     The Court Should Apply Vermont Law When Examining Whether The Purported Arbitration Agreement Is Unconscionable .............42

             b.     The Proposed Arbitration Process Is Illusory Because Defendants Have Not Relinquished Tribal Immunity And Have Purchased The Law Governing The Arbitration ......................................................43

             c.     The Proposed Arbitration Process Is Illusory Because Chippewa Cree Tribal Courts Do Not Have Jurisdiction To Determine The Questions Reserved To Them ........................................................45

             d.     The Purported Arbitration Agreement Is Unconscionable Because It Has Several Features That Are Both Procedurally And Substantively Unconscionable .......................................................47

             e.     The Think Finance Defendants' Arguments Concerning Unconscionability Are Incorrect ...................................................50

         2.     Turmoil Within The Chippewa Cree Tribe Frustrates The Intention Of The Purported Arbitration Agreement ........................................................53

         3.     The Purported Arbitration Agreement Is Fraudulent ................................54

         4.     The Purported Right To Opt Out Of Arbitration Is Just Another Illusory Dead End ................................................................................................56

         5.     The Delegation Clause Of The Purported Arbitration Agreement Is Invalid ...................................................................................................57

              a.     The Tribal Defendants Incorrectly Identify The Delegation Clause ...........................................................................................59

              b.     Plaintiffs Are Specifically Challenging The Delegation Clause ....59

                  (1)    The Delegation Clause Is Fraudulent ................................60



gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

(2) The Disarray In The Tribal Judiciary Has Frustrated The Purpose Of The Delegation Clause .................................62

(3) The Delegation Clause Is Unconscionable ........................62

6. The Other Defendants Cannot Take Advantage Of The Purported Arbitration Agreement ................................................................64

7. The Court Should Allow Discovery Into The Issues Related To The Invalidity Of The Purported Arbitration Agreement If It Does Not Outright Deny The Motion To Compel Arbitration...................................71

8. Plaintiffs Are Entitled To A Jury Trial On The Issue Of Arbitrability .......71

VI. VENUE IS PROPER IN FEDERAL COURT IN VERMONT ........................71

VII. THE FEDERAL CLAIMS ARE ENFORCEABLE AGAINST DEFENDANTS ............72

A. The Consumer Financial Protection Act Is Enforceable Against Defendants .......72

B. The FTC Act Is Enforceable Against Defendants...................................74

C. The First Amended Complaint States A Claim Against Defendants Under The EFTA, Which Is Enforceable Against Defendants.................................75

VIII. THE VERMONT CONSUMER FRAUD ACT IS ENFORCEABLE AGAINST DEFENDANTS .........................................................................79

A. Sequoia And Technology Crossover Venture Provided "Direct Aid" And Are Therefore Liable Under The Vermont Consumer Fraud Act ...............................81

B. Defendant Rees Provided "Direct Aid" And Is Therefore Liable Under The Vermont Consumer Fraud Act ...............................82

IX. PLAINTIFFS HAVE ADEQUATELY ALLEGED RICO CLAIMS ...............................82

A. Plaintiffs Have Alleged A Claim Under 18 U.S.C. § 1962(c)..............................83

1. Plaintiffs Have Alleged A Claim For RICO Collection Of An Unlawful Debt...........................................................................84

a. Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt Against Rees ...................................................................86

b. Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt Against The Think Finance Defendants.........................................88



gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

c.     Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt Against The Tribal Defendants ......................................................91

d.     Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt Against Technology Crossover Ventures .......................................93

e.     Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt Against Sequoia Capital..............................................................98

f.     Plaintiffs Have Alleged A Conspiracy To Collect An Unlawful Debt..........................................................................................101

2.     Plaintiffs Have Stated A Claim For RICO Racketeering .........................102

a.     RICO's Management And Operations Test Is A Relatively Low Hurdle For Plaintiffs To Clear.....................................................102

b.     Plaintiffs Have Alleged That The Think Finance Defendants Participated In The Conduct Of The Enterprise..........................103

c.     Plaintiffs Have Alleged That Kenneth Rees Participated In The Conduct Of The Enterprise .......................................................109

     (1)     Plaintiffs Have Adequately Alleged That Kenneth Rees Participated In Mail And Wire Fraud...............................110

     (2)     Although Not Required, Plaintiffs Have Adequately Alleged That Kenneth Rees Controlled The Enterprise Through Racketeering.....................................................112

     (3)     Kenneth Rees Is Doing More Than Providing Services ..117

d.     The Tribal Defendants Are Not Entitled To Municipal Immunity..................................................................................120

3.     Plaintiffs Have Adequately Alleged An Enterprise..................................122

4.     Plaintiffs Have Adequately Alleged A Pattern of Racketeering     Activity123

5.     Plaintiffs Have Adequately Alleged That Their Injury Was "By Reason of" a RICO Violation ...............................................................................123

6.     RICO Does Not Require Reliance .........................................................128

**gravel &**
**shea** | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

X.      THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT ......................131

Conclusion ..........................................................................................................................133

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

## Preliminary Statement

The motions to dismiss are exactly what one would expect from a criminal enterprise specifically designed to evade the law. They are full of technical procedural arguments, but avoid the substance of Defendants' admitted illegal conduct. Ironically, Defendants submit documents proving they violated the law by charging interest rates of 198%, 371%, 159%, and 376%. Their defense is not that they did not do it, but that this Court is powerless to prevent their criminal behavior. Defendants are wrong. This Court has the power to stop this criminal enterprise.

When the Defendants created their loan sharking business to prey on unwitting borrowers, they believed that they had discovered a way to shield their criminal conduct from federal review. They established a relationship with a Native American tribe and drafted a document that purported to be an arbitration agreement. They intended to use the tribe to cloak their activities under the mantle of tribal immunity, and they created an arbitration provision so they could subject borrowers to an illusory process with a predetermined outcome. But Defendants miscalculated. Tribal immunity cannot be bought, and it does not exist in this case. Their arbitration "agreement" is nothing more than a sham that is unconscionable, fraudulent, and unenforceable. And once the Defendants participated in an intentional tort with effects in Vermont, they all became subject to personal jurisdiction in Vermont. Finally, even though Defendants carefully tried to evade federal and state law, they forgot that RICO specifically bars the collection of unlawful debt.

## Facts

Plaintiffs Jessica Gingras and Angela Given fell victim to a sophisticated loan sharking operation that was specifically designed by the Defendants to ensnare unsuspecting victims. Ms.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

Gingras and Ms. Given visited a bright and cheerful website, https://www.plaingreenloans.com, which promised to help them secure a loan. This website informs visitors that with an easy online application, they can obtain an answer within a matter of seconds:



The website proclaims that Plain Green is a better option than a payday loan:



However, the cheerful cartoon characters do not tell the whole story. The reality of Defendants' operation is far different than these shiny, innocent looking characters suggest. The Plain Green enterprise was created when Kenneth Rees, the mastermind of this illegal scheme, had his former business, ThinkCash, shut down by federal regulators. Rees was undeterred by this setback and sought a new way to prey on unsuspecting people. Rees believed that tribal immunity was the answer. So, Rees and his rebranded company, Think Finance, approached the

Chippewa Cree Tribe with a deal.  Rees and Think Finance would provide everything the Tribe needed to run a successful payday loan enterprise if the Tribe would let them use the concept of tribal immunity to stymie state and federal regulators.  In return, the Tribe would receive 4.5% of the revenues.  FAC, Exhibit 1 ("Term Sheet") at 2.

In Vermont, Ms. Gingras and Ms. Given completed the application from the website. They went through a multi-step process providing personal information, including their bank account information, employment information, email address, and age.  The multi-step process culminated in Defendants sending money into their bank accounts in Vermont by an American Clearing House ("ACH") transaction.  Given Decl. ¶¶ 4-6; Gingras Decl. ¶¶ 4-6.  Then, once every two weeks, Defendants took money out of their accounts.  Plaintiffs paid triple digit interest rates on their loans, often paying twice as much in interest than the principal that Defendants loaned them.  FAC ¶¶ 47-49,  60-63.

The transactions involved a lending agreement, which included a purported arbitration agreement.  (*See* Rosette, *et al.*'s Mot. to Dismiss Exhibit B, "Purported Arbitration Agreement.")  The Purported Arbitration Agreement made a number of material misstatements, including that (1) Plain Green was the lender, (2) that Chippewa Cree law governed the transaction, and (3) that state law did not apply.  *Id.* at 15-17.  The Purported Arbitration Agreement was a tool to deter claims from being made and to prevent federal courts from reviewing the legality of these transactions.  The Purported Arbitration Agreement did not reveal that Plain Green was merely a front company to allow Rees and Think Finance to claim the benefit of tribal immunity.  Mot. to Dismiss Exhibit B.  It did not disclose that Rees and Think Finance had created Chippewa Cree law that would permit Plain Green to make loans at rates that are illegal under state and federal law.  *Id.*

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Rees and Think Finance have taken control of not only Plain Green, but of the Business Committee of the Tribe. In an affidavit, the former CEO of Plain Green, Neal Rosette, avers that Rees and Think Finance forced the Business Committee of the Tribe to fire the Chairman of the Tribe, Ken Blatt-St. Marks, because Blatt-St. Marks sought more money for the Tribe. Preedom Aff. Exhibit 2, ¶¶ 8-11. In addition, an anonymous witness interviewed by the Department of the Interior reported that "the Business Committee removed Blatt-St. Marks as Chairman to continue to hide their wrong doings." Preedom Aff. Exhibit 3 at 4. The witness also reported that "every single one of the Business Committee members have taken something, i.e. money, equipment, vehicles." *Id.* Finally, an interview of a former Chippewa Cree tribal judge conducted by the Office of the Inspector General for the United States Department of the Interior demonstrates that the Chippewa Cree judiciary is neither independent nor functional. The former judge stated that: "he feared retaliation from both sides at the time [he was deciding whether to issue a TRO related to the removal of Blatt-St.Marks] – the Business Committee and St. Marks – because both could do harm to him job-wise." Additional Allegations ("AA"), attached as Exhibit 1 ¶ 9. The judge said that "the removal of St. Marks as Chairman should never have been effective because the Business Committee violated the [Chippewa Cree Tribe] Constitution." *Id.* However, this judge entered the order removing Blatt-St. Marks even though he thought it was improper and unconstitutional. *Id.*; *see also* Exhibit 2.

## Standard of Review

On a motion to dismiss under Rules 12(b)(1) and 12(b)(3), the Court must view the facts in the light most favorable to the non-movant. *TradeComet.com LLC v. Google, Inc.,* 647 F.3d 472, 475 (2d Cir. 2011). At the preliminary stage, the court must construe pleadings and affidavits in the plaintiffs' favor. *Pincione v. D'Alfonso*, 506 Fed. App'x 22 (2d Cir. 2012).

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

Discovery is available when a party argues that subject matter jurisdiction does not exist and there is a factual question as to whom immunity should extend. *First City, N.A. v. Rafidain Bank*, 150 F.3d 172, 176-177 (2d Cir. 1998)

For a Rule 12(b)(6) motion to dismiss, well-pleaded factual allegations should be presumed true. *Turkmen v. Hasty*, 789 F.3d 218, 2015 U.S. App. LEXIS 10160, *28 (2d Cir. June 17, 2015). "To satisfy *Iqbal's* plausibility standard, Plaintiffs must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Although plausibility is not a probability requirement, Plaintiffs must allege facts that permit more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotations omitted).

## I. PLAINTIFFS' FIRST AMENDED COMPLAINT COMPLIES WITH THE RULES FOR PLEADING A CLAIM.

Rule 1 of the Federal Rules of Civil Procedure states that the Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Accordingly, the Rules eliminated technical pleading requirements: "No technical form is required." Fed. R. Civ. P. 8(d)(1). Yet, Defendants' interpretation of an assorted variety of "group pleading" cases threatens to bring technical pleading requirements roaring back. For example, the essence of Defendant Rees's argument is that the Court can only consider allegations in which he alone appears. Defendant Rees wants the Court to ignore all allegations that refer to "Defendants Rees *and* Think Finance," even though Plaintiffs were conveying that both Defendants took an action.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

A.    <u>Plaintiffs Satisfy The Requirements Of Rule 8</u>.

Rule 8 requires a short and plain statement of the claim.  Plaintiffs are not required to plead all of their evidence.  They need only set out sufficient facts to plausibly state a claim.

1.    Plaintiffs Have Made Detailed Allegations Against Rees And Think Finance.

Defendants Rees and Think Finance ignore over 36 paragraphs of detailed factual allegations because Plaintiffs used the word "and" in making claims against both Rees and Think Finance.  The upshot of Defendants' position is that Rule 8 requires that the complaint provide a distinct paragraph for each individual whenever Plaintiffs allege that an individual is responsible for an act.  Defendants are incorrect.

The use of a conjunction does not mean that Plaintiffs have used group pleading.  Instead, the use of conjunctions is consistent with Rule 8's requirement of a short and plain statement of facts.  Conjunctions allow an author to avoid endless and mind numbing repetition.  Here, Plaintiffs allege "Rees and Think Finance" when both of these defendants did the act alleged.   If Plaintiffs did not use conjunctions, the complaint would be become a sea of repetitive, nearly identical allegations.  One example of Rees's preferred method of pleading shows the pleading disaster that awaits the adoption of Rees's argument.  Paragraph 33 of the First Amended Complaint states:

> In some cases, Defendants Rees and Think Finance through their control over Defendants Rosette, Whitford, and McInerney have blocked borrowers' access to their Plain Green accounts so that the borrowers cannot determine what they have paid.  In these cases, these Defendants have refused to allow the borrowers to have access to the documents that purportedly create a binding contractual relationship between the borrowers and Plain Green.

With Rees's approach, one paragraph expands to six paragraphs:

> 33. In some cases, Defendant Rees through his control over Defendant Rosette has blocked borrowers' access to their Plain


76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Green accounts so that the borrowers cannot determine what they have paid. In these cases, this Defendant has refused to allow the borrowers to have access to the documents that purportedly create a binding contractual relationship between the borrowers and Plain Green.

34. In some cases, Defendant Rees through his control over Defendant Whitford has blocked borrowers' access to their Plain Green accounts so that the borrowers cannot determine what they have paid. In these cases, Defendant Rees through his control over Defendant Whitford has refused to allow the borrowers to have access to the documents that purportedly create a binding contractual relationship between the borrowers and Plain Green.

35. In some cases, Defendant Rees through his control over Defendant McInerney has blocked borrowers' access to their Plain Green accounts so that the borrowers cannot determine what they have paid. In these cases, Defendant Rees through his control over Defendant Rosette has refused to allow the borrowers to have access to the documents that purportedly create a binding contractual relationship between the borrowers and Plain Green.

36. In some cases, Defendant Think Finance through its control over Defendant Rosette has blocked borrowers' access to their Plain Green accounts so that the borrowers cannot determine what they have paid. In these cases, Defendant Think Finance through its control over Defendant Rosette has refused to allow the borrowers to have access to the documents that purportedly create a binding contractual relationship between the borrowers and Plain Green.

37. In some cases, Defendant Think Finance through its control over Defendant Whitford has blocked borrowers' access to their Plain Green accounts so that the borrowers cannot determine what they have paid. In these cases, Defendant Think Finance through its control over Defendant Whitford has refused to allow the borrowers to have access to the documents that purportedly create a binding contractual relationship between the borrowers and Plain Green.

38. In some cases, Defendant Think Finance through its control over Defendant McInerney has blocked borrowers' access to their Plain Green accounts so that the borrowers cannot determine what they have paid. In these cases, Defendant Think Finance through its control over Defendant McInerney have refused to allow the borrowers to have access to the documents that purportedly create

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

a binding contractual relationship between the borrowers and Plain
Green.

This approach would have a deleterious effect on the entire complaint, making it virtually

unreadable.

The First Amended Complaint provides extensive individualized allegations as to each

defendant and exceeds the requirements of the Federal Rules.  Individual allegations against

Rees appear in at least 36 paragraphs of the FAC, including allegations that:

- Rees is the former President and Chief Executive Officer of Think Finance and
  the current Chairman of the Board of Think Finance.  FAC ¶ 10.

- Rees is the mastermind of the illegal scheme.  FAC ¶ 23.

- Rees had a former company, Think Cash, that was shut down by federal
  regulators.  FAC ¶ 23.  Paragraphs 37 through 44 provide additional factual
  background about Think Cash.

- Rees was undeterred by the action of federal regulators and developed a new
  system to avoid federal oversight.  FAC ¶ 23.

- Rees believed that tribal immunity was the answer to avoiding federal oversight
  for his illegal conduct.  *Id.*

- Rees approached the Chippewa Cree Tribe with a commercial transaction.  *Id.*

- Rees would provide the Tribe everything it needed to run a payday lending
  enterprise if the Tribe would let him use the concept of tribal immunity.  *Id.*

- Rees used contractual provisions to keep the usurious practices from review.  The
  contract provisions included phony choice of law provisions and provisions
  claiming tribal immunity.  *Id.* ¶ 32.

- Rees blocked access to Plain Green accounts so that borrowers cannot determine
  what they have actually paid to Plain Green.  *Id.* ¶ 33.

- Rees misrepresents that the loans are intended to be short term loans.  *Id.* ¶ 34.

- Rees misrepresents to credit reporting agencies that the loans are legitimate loans.
  *Id.* ¶ 35.

- Rees withdrew money from Jessica Gingras's account.  *Id.* ¶ 54.


gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- Rees negotiated the fraudulent contract with Jessica Gingras. *Id.* ¶ 55.

- Rees directed his fraudulent representation to Ms. Gingras in Vermont. ¶ 56.

- Rees has extended similar loans to thousands of people. *Id.* ¶58.

- Rees withdrew money from Angela Given's account. *Id.* ¶ 69.

- Rees negotiated the fraudulent contract with Angela Given. *Id.* ¶ 70.

- Rees directed his fraudulent representation to Ms. Given in Vermont. ¶ 71.

- Rees approached the Tribe in March 2001 about forming a tribal entity to conduct an illegal payday lending scheme over the Internet. *Id.* ¶ 77.

- Rees prepared a term sheet that reflected the essentials of the transaction. *Id.* ¶ 78

- Rees required that the Tribe adopt new law that would be favorable to Rees and the practice of payday lending. *Id.* ¶ 79.

- Rees provided everything that was needed to run the payday loan enterprise, including software, risk management, application processing, underwriting assistance, payment processing and marketing. *Id.*¶ 80.

- Rees established the plan to operate Plain Green. *Id.* ¶ 81.

- Rees established the web of different companies to insulate himself from liability. *Id.* ¶ 81.

- Rees has stated that he closed Think Cash because of the burden of complying with various state and federal laws. *Id.* ¶ 82.

- Rees created the Plain Green enterprise to avoid these various state law restrictions. *Id.* ¶ 82.

- Rees defined the type of loan that the Plain Green enterprise would offer to customers. The loan was an installment loan with a maximum amount of $2,500. It had a minimum repayment period of two months and a maximum repayment period of two years. *Id.* ¶ 83.

- The Term Sheet created by Rees dictated that illegal interests rates be charged from 60% to 360%. *Id.* ¶ 84.

- Rees required that Plain Green enter into relationships with a U.S. Bank to process transactions using the ACH system. *Id.* ¶ 85.

- Rees directed that Plain Green establish a reserve account to deal with any regulatory issues, lawsuits or other controversies. *Id.* ¶ 86.



gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

- Rees arranged for 99% of the loans to be purchased within two days by a Cayman Islands loan servicing company. *Id.* ¶ 87.

- Rees required that Plain Green enter into an attorney client relationship with Pepper Hamilton. *Id.* ¶ 91.

- Rees has established relationships with other tribes for the purpose of opening other payday lenders. *Id.* ¶ 94-98.

- Rees committed mail and wire fraud. *Id.* ¶100. Paragraphs 45 to 49 and paragraphs 60 to 63 describe the particular transactions involving Ms. Given and Ms. Gingras. Paragraphs 72 through 75 detail additional illegal transactions.

- Rees committed wire fraud by withdrawing funds from Plaintiffs' accounts while maintaining that the withdrawals were legitimate. *Id.* ¶ 100.

- Rees committed wire fraud by using the Internet to obtain consent to a fraudulent lending and Purported Arbitration Agreement. *Id.* ¶ 100.

- Rees committed mail fraud by using the mail to collect payments and communicate with other parts of the Plain Green enterprise. *Id.* ¶ 100.

- Rees established intermediaries to initiate wire transfers and mailings and to operate the website where information was collected from victims and the purported agreements were exchanged. *Id.* ¶ 101.

- Rees exercises control over and operates all elements of the website. The software determines which loan requests will be accepted and which requests denied. *Id.* ¶ 108.

- Rees exercised control over the drafting of the lending and Purported Arbitration Agreement through his close association with the attorney drafting the documents. *Id.* ¶ 110.

- Rees's supervision over the drafting was to push victims to accept ACH transactions so that money could be taken directly from their accounts. Pushing people to accept ACH transactions increases the chances of repayment because the scheme did not have to rely on victims to send money. *Id.* ¶ 110.

- Rees used the lending agreement and the Purported Arbitration Agreement as tools to deceive Plaintiffs. *Id.* ¶ 112.

- Rees also used the Purported Arbitration Agreement as another way to avoid legal liability. *Id.* ¶ 118. The Purported Arbitration Agreement deters victims from filing claims and prevents federal court review. *Id.* ¶ 123.



gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

These allegations are not simply boilerplate allegations. Rees appears individually (*see, e.g.,* FAC ¶¶ 10, 23, 81-82), with Think Finance alone (¶¶23, 32-35, 77-80, 83-91, 94-101, 108-112, 114, 118), and with Think Finance and the Tribal Defendants (¶¶32-35, 54-56, 58, 68-71). Plaintiffs also make a variety of detailed factual allegations against Think Finance. Many of the allegations are made concurrently with Kenneth Rees, but some also involve Think Finance alone. *See*, *e.g.*, FAC ¶¶ 9, 37-44, 136, 151.

Kenneth Rees's real argument is that Plaintiffs' counsel did not have a good faith basis for asserting that Rees was individually involved in the fraudulent scheme. In fact, Rees's counsel traveled all the way to Vermont to tell Plaintiffs' counsel that in person. However, Plaintiffs' counsel *does* have evidence that Rees was personally involved in the fraudulent scheme. For example, even though Rees claims to no longer be involved in the daily operation of Think Finance, Rees himself admits that he was involved in all the details of Think Finance's operation in the early days. "As a start-up C.E.O. without a lot of resources, you're involved in the details of everything." Exhibit 3 at 2. Rees has stated publicly that he was aware of the issue of the legality of the loans that he was making. "Rees, the Think Finance Chief Executive, said his company has shifted away from doing direct lending itself because 'byzantine state laws' made it complicated. Native American tribes, he said, 'don't have to look to each state's lending laws." Exhibit 4 at 5. Plaintiffs alleged Rees's personal involvement in the First Amended Complaint by referencing these articles. FAC ¶ 82. In addition, Rees's prior history of attempting to evade the law and having his old company shut down by federal regulators shows that Rees was well aware of the illegality of his conduct. FAC ¶¶ 36-44. At this stage of the proceeding, Plaintiffs are not required to identify all of the evidence that they have. In his affidavit, Rees does not deny that he was personally involved in the construction of Plain Green

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

and the operation of the criminal enterprise. As a result, the Court must accept those allegations as true.

2.      Plaintiffs Have Made Detailed Allegations Against TC Loan Service, TC Decision Sciences, And Tailwind Marketing.

The role that TC Loan Service, TC Decision Sciences, and Tailwind Marketing play is also detailed in the Complaint. Each of these entities was created as a tool to isolate and decrease any legal liability that Rees and Think Finance might face. FAC ¶¶ 99. Each entity existed to further the deception that Think Finance and Rees were only providing "services" to Plain Green, when in reality Rees and Think Finance were running the whole scheme. *Id.* ¶¶ 101, 104. Tailwind Marketing receives $100 for every approved borrower that Tailwind provides. FAC ¶ 89. At the direction of Think Finance and Rees, Tailwind Marketing provides information on potential targets for the illegal lending scheme. *Id.* ¶ 153. TC Decision Sciences receives $5 a month for every account it administers. FAC ¶ 90. At the direction of Think Finance and Rees, TC Decision Sciences provides customer service, verification, and collection of customer accounts. FAC ¶ 152. These allegations are sufficient to satisfy Rule 8.

3.      Plaintiffs Have Made Detailed Allegations Against Technology Crossover Ventures And Sequoia Capital.

Plaintiffs have also made individualized allegations concerning the roles that Technology Crossover Ventures and Sequoia Capital played in the scheme. In short, they provided money to fund the scheme. FAC ¶ 154. In a loan sharking enterprise, money is the fuel for the operation. Sequoia Capital and Technology Crossover Ventures also share in the profits of the venture. As Sequoia Capital admits, it is one of the premier venture capital operations in the world: "Sequoia Capital is a premier venture capital firm, whose impressive portfolio includes some of Silicon Valley's most elite innovators and well-known Internet brands such as Yahoo!, Google and

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

Paypal." Sequoia Capital's Mot. to Dismiss at 2 n.2. Venture funds of this caliber do not make investments without knowing precisely where their money is going. FAC ¶ 154.

The exact nature of the relationship that Technology Crossover Ventures and Sequoia Capital have with the enterprise is shrouded in mystery. Their agreements with the Think Finance entities are laden with confidentiality provisions designed to obscure Technology Crossover Ventures and Sequoia's roles from public view. When reporters ask about the relationship, Technology Crossover Ventures and Sequoia decline to comment. FAC ¶ 155.

In connection with its Motion to Dismiss, Technology Crossover Ventures filed an affidavit from John Drew, who admits that TCV V, L.P. made an equity investment in Think Finance. Drew Aff. ¶ 4. The disclosure that Technology Crossover Ventures made this equity investment led Plaintiffs to investigate further. That investigation revealed that Technology Crossover Ventures has a representative on the Board of Directors of Think Finance. AA ¶ 1. John C. Rosenberg, a General Partner and Head of Europe for Technology Crossover Ventures, has been a member of the Board of Directors of Think Finance since 2009. *Id.* As a director, he was fully aware of the illegal loansharking enterprise, Plain Green, and through his leadership of Think Finance, perpetuated the scheme. *Id.* Plaintiffs' investigation also revealed that Sequoia had a representative on the Board of Directors of Think Finance. AA ¶ 3. Michael L. Goguen, a General Partner at Sequoia Capital, served as a director for Think Finance. As a director, he was fully aware of the illegal payday enterprise, Plain Green, and through his leadership of Think Finance, he perpetuated the fraudulent scheme. *Id.* These allegations are enough to satisfy the requirements of Rule 8.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

- 13 -

4. Plaintiffs' Allegations Are Sufficiently Individualized For The Purposes Of Rule 8.

Defendants cite a bevy of cases that point out that group pleading is inappropriate under Rule 8. *See* Rees Mot. to Dismiss at 11-12; TCV Mot. to Dismiss at 9-10; TF Mot. to Dismiss at 10-11; Sequoia Mot. to Dismiss at 11-12.[1] However, Plaintiffs are not relying on group pleading to satisfy the requirements of Rule 8. The group pleading cases that Defendants rely upon largely involve situations where all defendants are grouped together in a single, undifferentiated whole. That is not the case here. Plaintiffs have made individualized factual allegations against each defendant detailing their role in the fraudulent scheme.

Judge Karas faced a similar argument in a RICO case involving defendants who had constructed a racketeering scheme involving the fraudulent lease of small equipment. In that case, Judge Karas recognized that: "In most of the cases Defendants cite, the court dismissed the complaint because it failed to distinguish *at all* between any of Defendants in claims alleging discrimination or constitutional rights violations." *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 143 (S.D.N.Y. 2014) (emphasis added). But in *Angermeir*, just as in this case, "the Complaint contains numerous allegations specific to each of the Defendants." *Id.*

B. Plaintiffs Also Meet The Requirements Of Rule 9.

At the pleading stage, Plaintiffs "must assert facts that plausibly support the inference of fraud." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 2015 U.S. App. LEXIS 12800, *23 (2d Cir. July 24, 2015). In the context of RICO, all allegations of fraudulent predicate acts must be alleged with specificity under Rule 9, while others elements of RICO do not need to be alleged with specificity. *Angermeir*, 14 F. Supp. 3d at 145. Thus, Plaintiffs'

---

[1] "TF" refers to the Think Finance Defendants including Think Finance, TC Loan Service, TC Decision Sciences, and Tailwind Marketing. "TD" refers to the Tribal Defendants, Joel Rosette, Ted Whitford, and Tim McInerney.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

allegations related to the collection of unlawful debt need only satisfy Rule 8.  *See Durante Bros*

*& Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 249 (2d Cir. 1985).

Moreover, when the complaint alleges that the mail and wire fraud were simply used in

furtherance of a master plan to defraud, but does not allege that the communications themselves

contained false or misleading information, the allegations need only describe the connection of

the wire or mail fraud to the fraudulent scheme and not the details of the misstatements

themselves.  *Id.* at 145 (citing *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y.

1998)).  "Routine and innocent mailings can support mail fraud."  *Shapo v. O'Shaunessy*, 246 F.

Supp. 2d 935, 957 (N.D. Ill. 2002).  The mailing or wiring does not have to contain false or

misleading information.  *Id.*  In the case of routine and innocent mailings, Plaintiffs need only

show that they were "incident to an essential part of the scheme."  *Id.*[2]

Even though Rule 9 requires specificity in some circumstances, it still must be read with

Rule 8's requirement of a short and plain statement of facts.  *In re Sumitomo Copper Litig.*, 995

F. Supp. at 456.  A plaintiff's complaint can be too long.  *Gollomp v. Spitzer*, 568 F.3d 355, 371

(2d Cir. 2009) (awarding sanction against plaintiff, in part, because of prolix complaints).

Plaintiffs must balance describing the underlying facts with avoiding interminable pleadings.[3]

---

[2] Plaintiffs allege *wire* fraud based both on Defendants' fraudulent statements and based on the wiring being merely incidental to a larger fraudulent scheme.  For example, transmission of the Purported Arbitration Agreement over the wires involved transmission of fraudulent statements.  However, withdrawing funds from the victims' accounts may not have involved any fraudulent statements.  Plaintiffs also allege *mail* fraud but solely based on it advancing the fraudulent scheme; no allegations of misstatements exist for Plaintiffs' mail fraud claim.

[3] Plaintiffs have a great deal more facts that can be alleged if the Court believes that Plaintiffs have struck an incorrect balance between pleading facts and complying with Rule 8's requirement of a short plain statement of facts.  Plaintiffs seek leave to amend their Complaint if necessary.  Fed. R. Civ. P. 15.

gravel &
shea  | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

Rule 9 places two additional burdens on Plaintiffs who allege fraudulent statements. *In re Sumitomo Copper Litig.*, 995 F. Supp. at 456. First, Plaintiffs must plead the circumstances of fraud, by (1) detailing the statements (or omissions) that Plaintiffs contend are fraudulent, (2) identifying the speaker, (3) stating where and when the statements (or omissions) were made, and (4) explaining why the statements are fraudulent. *Id.* Second, Plaintiffs must plead the defendant's mental state. Fed. R. Civ. P. 9. Mental states may be pleaded generally. *Id.*

Under Rule 9, certain statements can be pled as group statements. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F. 3d 160, 171-72. This occurs most frequently in the context of securities fraud, but can occur elsewhere as well. *See id.* at 172 n.7 (analyzing common law fraud on the basis of group pleaded allegations). In *Loreley*, the Second Circuit held that it was sufficient to identify a collection of Wachovia entities as the author of statements made in official documents made in connection with the sale of securities. The Second Circuit noted that it "would be strange indeed to demand greater precision of Plaintiffs in pleading the author's identity than they received as readers of those documents." *Id.* at 173; *see also Shapo*, 246 F. Supp. 2d at 956 (applications to the Illinois Insurance Commissioner could be pled as group statements).

Although Rule 9(b) requires details, it makes accommodations for the realities of pleading. Rule 9(b)'s requirements are relaxed "when the facts are peculiarly within the opposing party's knowledge." *IUE AFL-CIO Pension Fund v. Herrman*, 9 F.3d 1049, 1057 (2d Cir. 1993) (reversing Rule 9(b) dismissal); *Shapo v. O'Shaunessy*, 246 F. Supp. 2d 935, 955 (N.D. Ill. 2002); *Interlease Aviation Investors II (ALOHA) L.L.C. v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 914 (N.D. Ill. 2003) ("Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to occur where the plaintiff

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

alleges a fraud against one or more third parties.").  Where the fraudulent scheme is extensive

and involves numerous transactions that occurred over a long period of time, there is no need to

detail every transaction.  *United States ex. rel Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d

242, 258 (S.D.N.Y. 2014).  The pleading burden can be met by either (1) providing sufficient

identifying information about all the false claims, or (2) providing example of false claims.  *Id.* at

258.

      "[W]hile Rule 9(b) may be construed strictly in the context of civil RICO actions, it

should not be applied in a manner which would, in effect, obstruct all plaintiffs, including those

with valid claims, from initiating RICO actions.  RICO clearly provides for civil remedies to

benefit victims of racketeering and in the absence of congressional action, these provisions

should not be ignored."  *In re Sumitomo Copper Litig.*, 995 F. Supp. at 456; *see also Sedima,*

*S.P.R.L. v. Imrex, Inc.*, 473 U.S. 479, 495 (1985) (refusing to add requirements to RICO not

found in the text).

              1.      Plaintiffs Adequately Alleged That Think Finance And Rees Fraudulently
                       Stated That Plain Green Was The Lender.

      The Purported Arbitration Agreement misrepresents that Plain Green was the lender.

FAC ¶ 124.  There are eleven independent instances of wire fraud that relate to this

misrepresentation.  FAC ¶¶ 47-49, 60-63, 72-74, & 100.  The purported speaker of these

statements was Plain Green, but the true authors of the documents were Think Finance and

Kenneth Rees.  TF Mot to Compel Arb. Exhibit B; FAC ¶¶ 110, 118-119.  The

misrepresentations were made consistently to all borrowers.  FAC ¶¶ 100-101.  The

misrepresentations started in March 2011.  FAC ¶ 113.  With respect to Jessica Gingras and

Angela Given, they were not able to state the precise times the misrepresentations were made to

them because access to their accounts was shut off.  FAC ¶¶ 46, 59.  In addition, the precise

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

times of the drafting of the Purported Arbitration Agreement was hidden by the inner workings of the Think Finance corporate structure. The misrepresentations were made in the Purported Arbitration Agreement itself, which were available to borrowers after they completed an involved application process, but before they received money. FAC ¶¶ 100, 105, 112. As the exhibits to the various Motions to Dismiss make clear, the misrepresentations were made over a number of years to a large number of people, including to Plaintiffs on the dates identified in the exhibits.

The reason that these misrepresentations were false was because Plain Green only received 4.5% of the revenue from 99% of the loans. FAC ¶ 124. Plain Green also did not provide any of the money that was being loaned. *Id.* These statements were also false because Rees and Think Finance provided everything to operate the payday lending enterprise. FAC ¶ 23. Rees and Think Finance controlled every aspect of the payday lender's actual operation, including identifying the types of loans to be offered, determining the terms under which the loans would be offered, requiring that the payday lender establish a reserve account, and insisting that the payday lender enter into a relationship with a U.S. bank and the Pepper Hamilton law firm. *Id.* ¶¶ 82-87, 91. None of this information was disclosed to any of the borrowers.

These allegations are sufficient to satisfy Rule 9(b). The allegations clearly provided fair notice to Defendants about their alleged wrongdoing because two separate sets of Defendants used Plaintiffs' allegations to locate the precise Purported Arbitration Agreement at issue. *See* TD Mot. to Dismiss Exhibit B; and Exhibits 3-10 to TF Mot. to Compel Arb.

        2.        Plaintiffs Adequately Alleged That Think Finance And Rees Fraudulently Stated That Chippewa Cree Law Governs.

The Purported Arbitration Agreement stated that Chippewa Cree law governed their interpretation. However, these agreements did not disclose that Rees and Think Finance created

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

Chippewa Cree law to protect themselves and their business of payday lending. FAC ¶ 125. The statements made regarding Chippewa Cree law were false because Rees and Think Finance drafted and paid for the law that would constitute the "Chippewa Cree" law. FAC ¶ 32, 125, 127, 131. There were eleven independent instances of wire fraud that relate to these misrepresentations about Chippewa Cree law. FAC ¶¶ 47-49, 60-63, 72-74, & 100. The purported speaker of these statements was Plain Green, but the true authors of the Purported Arbitration Agreement were Think Finance and Kenneth Rees. TD Mot. to Dismiss Exhibit B; and TF Mot. to Compel Arb. Exhibits 3-10; FAC ¶¶ 110, 118-119. The misrepresentations were made over a number of years to a large number of people, including to Plaintiffs on the dates identified in the exhibits.

> 3. Plaintiffs Adequately Alleged That Think Finance And Rees Fraudulently Stated That The Fraudulent Enterprise Was Immune From The Laws Of Any State Of The United States.

The Purported Arbitration Agreement also represented that the agreements and the loans were not subject to state law. These were false statements because the loans involved off-reservation activity that was subject to state law. The purported speaker of these statements was Plain Green, but the true authors of the Purported Arbitration Agreement were Think Finance and Kenneth Rees. TF Mot to Dismiss Exhibit B; FAC ¶¶ 110, 118-119. There were another eleven independent instances of wire fraud that related to these misrepresentations. FAC ¶¶ 47-49, 60-63, 72-74, & 100.

> 4. Plaintiffs Adequately Alleged That Think Finance And Rees Fraudulently Stated That Plain Green Loans Are Less Expensive Than A Payday Loan.

The enterprise's website makes the representation that securing a loan from Plain Green is a good lending option because it is "less expensive than a payday loan." FAC ¶ 106. That is false because the actual rates charged by the enterprise are anything but affordable. FAC ¶¶ 24-

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

25.  The purported author of this statement is Plain Green.  The real authors of this statement are

Kenneth Rees and Think Finance.  FAC ¶¶ 101, 108, 112.  This representation is on the Plain

Green website and has been made continuously up until the filing of the First Amended

Complaint.  FAC ¶ 106.

> 5. Plaintiffs Adequately Alleged That Think Finance And Rees Fraudulently
> Made Misleading Comparisons To The Payment Of Various Late Fees.

The enterprise's website makes a misleading comparison between various late fees, such

as reconnect fees from utilities and overdraft fees from banks, and the interest rates paid on Plain

Green loans.  This comparison is false because it falsely claims that interest rates charged by the

Plain Green enterprise are cheap.  FAC ¶ 107.  Again, the purported author of this statement is

Plain Green.  The real authors are Kenneth Rees and Think Finance.  FAC ¶¶ 101, 108, 112.

This misrepresentation is on the website and has been made continuously up until the filing of

the First Amended Complaint.  FAC ¶ 107.

> 6. Plaintiffs Adequately Alleged That Think Finance And Rees Caused
> Additional Non-Fraudulent Instances Of Wire And Mail Fraud.

Plaintiffs have alleged 146 specific instances of wire fraud (not including the additional

specific instances in paragraphs 72-74) and thousands of general instances of wire fraud.  FAC

¶¶ 47-49, 60-63, & 100.  These allegations detail the amount of money taken by the enterprise

each time and the frequency of the wire transactions.  *Id.*  The 146 specific transactions took

money from Plaintiffs' accounts and moved it to a company in the Cayman Islands, GPL.  *Id.*

¶¶ 87-88.  Kenneth Rees and Think Finance created GPL in the Cayman Islands as an offshore

haven for the funds generated from the RICO enterprise.  *Id.*

In the end, Defendants know precisely what conduct is at issue in this case.  The 43-page,

225-paragraph First Amended Complaint lays out in unambiguous detail exactly what each

defendant did wrong.  While Defendants try to invoke procedural arguments under Rules 8 and

gravel &
shea  | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

9(b), these arguments are nothing more than another attempt to shield their illegal behavior from review.

II.    THE COURT HAS SUBJECT MATTER JURISDICTION.

A.    <u>Sovereign Immunity Does Not Deprive This Court Of Subject Matter Jurisdiction</u>.

The Court has subject matter jurisdiction regardless of whether tribal immunity exists. Plaintiffs have set forth many bases for federal jurisdiction:  (1) federal question jurisdiction under 28 U.S.C. § 1331; (2) diversity jurisdiction under 28 U.S.C. § 1332; (3) class action jurisdiction under 28 U.S.C. § 1332; (4) jurisdiction under RICO, 18 U.S.C. § 1965; and (5) jurisdiction under the Federal Consumer Financial Law, 12 U.S.C. § 5481.  Defendants ignore all of these separate bases for jurisdiction and focus exclusively on tribal immunity.  But Defendants' analysis is faulty.

1.    Tribal Immunity Is Different From Subject Matter Jurisdiction.

The Supreme Court has held that tribal immunity and federal subject matter jurisdiction are entirely separate concepts.  *Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024, 2029 n.2 (2014).  Tribal immunity is the "common law immunity from suit traditionally enjoyed by sovereign powers."  *Id.* at 2030 (quoting *Santa Clara Pueblo*, 436 U.S. at 58).  A common law immunity cannot take away the power of this Court to hear disputes under Article III of the Constitution or federal statutes.  In *Bay Mills*, all of the parties, including the party that won below on jurisdictional grounds, agreed that the issues of sovereignty and subject matter jurisdiction were distinct issues.  *Bay Mills*, 134 S.Ct. at 2029 n.2.  The Supreme Court held that the general federal question jurisdiction statute was sufficient to confer jurisdiction even though it eventually held that tribal immunity existed.  *Id.*; *see also Salt River Project Agric. Improvements & Power Dist. v. Lee*, 672 F. 3d 1176, 1178 (9th Cir. 2012).

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

Here, Defendants' attempt to frame the tribal immunity issue as a matter of subject matter jurisdiction is contrary to the most recent United States Supreme Court decision on Native American tribal immunity. While Defendants cite hundreds of other cases, they did not even mention *Bay Mills*, even though Plaintiffs cited it in the second paragraph of the First Amended Complaint. The *Bay Mills* decision is a complete answer to Defendants' argument that the First Amended Complaint must be dismissed for lack of subject matter jurisdiction.

2.     The Facts Support The Exercise Of Subject Matter Jurisdiction.

"A cause of action arises under federal law and thus confers subject matter jurisdiction pursuant to 28 U.S.C. § 1331 when the plaintiff's well-pleaded complaint raises an issue of federal law." *Fairfield County Med. Ass'n v. United Healthcare of New England*, 557 Fed. App'x 53, 55 (2d Cir. 2014) (internal citations and quotations omitted). Only "when the claim is so insubstantial, implausible, foreclosed by prior decisions of the Supreme Court, or otherwise completely devoid of merit as not to involve a federal controversy," may the Court dismiss for lack of subject matter jurisdiction. *Id.* "Once a federal court has determined that a plaintiff's jurisdiction conferring claims are not insubstantial on their face, no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter." *Id; see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511 (2006) ("Subject matter jurisdiction in federal question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by federal law asserted as a predicate for relief – a merits related determination."). Here, the Court has subject matter jurisdiction because Plaintiffs raise four federal questions for resolution: whether there is a claim under (1) the Consumer Financial

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Protection Act ("CFPA"), (2) the Federal Trade Commission Act ("FTC Act"), (3) the Electronic Funds Transfer Act ("EFTA"), and (4) RICO.[4]

The federal agencies in charge of enforcing the CFPA, the FTC Act, and the EFTA have brought very similar claims against Native American tribal entities. The courts reviewing those claims have found them to have merit. *See Consumer Fin. Prot. Bureau v. Great Plains Lending*, *LLC*, No. CV-14-2090-MWF-(PLAx), 2014 U.S. Dist. LEXIS 89022, *48 (C. D. Cal. May 27, 2014); *FTC v. AMG Serv.*, 2014 U.S. Dist. LEXIS 29570, at *10 (D. Nev. March 7, 2014) (finding that the "FTC Act is an act of general applicability without an exception for Indian tribes that therefore applies to arms of Indian tribes, their employees, and contractors"); *FTC v. AMG Serv., Inc.*, 2013 U.S. Dist. LEXIS 185783 (D. Nev. July 16, 2013) (a magistrate decision holding that the EFTA applied to Native American defendants). As a result, the federal claims identified in this case easily pass the requirements for subject matter jurisdiction.

This Court also has jurisdiction under the Class Action Fairness Act. To state a claim under that Act, Plaintiffs must establish: (1) 100 or more class members, (2) an aggregate amount in controversy of at least $5,000,000, exclusive of interest and costs, and (3) minimal diversity. *Blockbuster*, *Inc. v. Galeno*, 472 F.3d 53, 56 (2d Cir. 2006); *see also Jackson v. Pay Day Fin'l, LLC*, 764 F. 3d 765, 772 (7th Cir. 2013). For the purposes of determining whether diversity exists under the Class Action Fairness Act, the citizenship of any corporate entity is determined by reviewing their state of organization and principal place of business. 28 U.S.C. § 1332(d)(10).

In this case, all three elements of the Class Action Fairness Act are satisfied. There is complete diversity of citizenship because Plaintiffs are Vermont citizens and all Defendants are

---

[4] In addition, the issue of whether tribal immunity exists is itself a federal question.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

not citizens of Vermont.  FAC ¶¶ 4-15; Preedom Aff. Exhibit 14.  The documents filed by

Defendants in other federal court litigation show that the aggregate amount in controversy is at

least $13,000,000, easily exceeding the $5,000,000 required.  Preedom Aff. Exhibit 4.  In fact,

news reports indicate that the amount in controversy is in the $500 to $700 million range.

Preedom Aff. Exhibit 5 at 3.  And finally, given that the loans were made in small dollar

amounts, the number of class members easily exceeds 100.  Even assuming, *arguendo*, that the

Plain Green enterprise only initiated $13,000,000 worth of loans and the highest Plain Green

loan amount was $3,000, there would still be 4,333 separate loans, which clearly demonstrates

that there are more than 100 class members.  *See* FAC ¶ 17.  In fact, Plaintiffs have alleged that

there are thousands of borrowers.  FAC ¶ 58.

     The Court also has jurisdiction from multiple statutes with specific grants of subject

matter jurisdiction, including RICO and federal consumer financial laws.  *See* 18 U.S.C. § 1965

and 12 U.S.C. § 5565(a)(1).  The definition of federal consumer financial laws includes the

EFTA.  12 U.S.C. § 5481.

     **B.**    <u>Defendants' Conception Of Official Capacity Actions Against Officers Of</u>
           <u>Subordinate Tribal Entities Is Fundamentally Incorrect And Departs From *Bay*</u>
           <u>*Mills*</u>.

     The Tribal Defendants fundamentally misstate the meaning of *Ex Parte Young.*

Defendants see it as an opportunity to raise a host of procedural arguments designed to avoid

liability for obviously illegal conduct.  *See* TD Mot. to Dismiss at 10.  *Ex Parte Young* stands for

the exact opposite proposition.  Faced with the problem of states asserting sovereign immunity to

prevent enforcement of Constitutional guarantees, the Supreme Court developed a legal fiction

that allowed the Constitution to be enforced against states.  The Supreme Court recently

confirmed that officers of Native American tribes can be sued under the doctrine of *Ex Parte*

*Young* and must not only comply with federal law but also state law.  *Michigan v. Bay Mills*

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

*Indian Community*, 134 S. Ct. 2024 (2014).  As a result, there is no doubt that Plaintiffs can maintain an action against the officers of Plain Green to require them to comply with Vermont law.

Defendants' argument that tribal immunity bars this action is flatly contradicted by the *Bay Mills* case.  In discussing whether a tribe could set up a casino in Michigan in violation of state law, the Supreme Court stated that "tribal immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct."  *Bay Mills*, 134 S. Ct. at 2035.  To the contrary, Michigan has a "panoply" of civil and criminal state law tools it could use to "shutter, quickly and permanently, an illegal casino."  *Id.*

The Second Circuit has also recently confirmed the obligation of Native American payday lenders to comply with state law.  "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] . . . otherwise applicable to all citizens of [that] State."  *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 113 (2d Cir. 2014) (citing *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973)); *see also Nevada v. Hicks*, 533 U.S. 353, 362 (2001) ("When, however, state interests outside the reservation are implicated, States may regulate activities even of tribe members on tribal land, as exemplified by our decision in *Confederated Tribes.*").  Here, the activities of the Plain Green enterprise occurred outside the reservation, which triggered the Tribal Defendants' obligation to comply with state law.  *See infra,* at 32-34, 45-47.

The *Otoe* Court rejected the argument that the payday loan activity occurred on the reservation, which is precisely the argument that Defendants raise here.  "The complexities introduced by modern electronic commercial transactions also weaken plaintiffs' arguments.  Much of the commercial activity at issue takes place in New York.  That is where the borrower is

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

located; the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation." *Id.* at 115; *see also Jackson*, 764 F.3d at 777. While the Court was ruling on a motion for a preliminary injunction, it did not think that the factual issues were likely to be resolved in favor of the Tribe.

*Pennhurst State School & Hospital v. Halderman* does not hold differently. 465 U.S. 89 (1984). The Tribal Defendants cite *Pennhurst* for the proposition that the "*Ex Parte Young* doctrine may be applied to enjoin only violations of federal – not state – law." TD Mot. to Dismiss at 10. While this is true with respect to *Ex Parte Young* actions, it is not true with respect to *Bay Mills* official capacity actions. As the Supreme Court held, *Ex Parte Young* involves enforcing federal law against state officials and is only meant to be an analogy to official capacity actions against tribal officials. *See Bay Mills*, 134 S.Ct. at 2035.

*Pennhurst* denied the power to enforce state law against states in federal court because of concerns about "the principles of federalism that underlie the Eleventh Amendment." *Pennhurst*, 465 U.S. at 106. The Constitutional principles of federalism and the Eleventh Amendment do not apply to tribes. The text of the Eleventh Amendment does not mention tribes. Likewise, the principles of federalism are not involved with Native American tribes.

The Tribal Defendants also cite *Garcia*, but it does not support their position. First, *Garcia* involved a claim of employment discrimination **on** the reservation. *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 78 (2d Cir. 2001); *see also Chayoon v. Chao*, 355 F.3d 141 (2d Cir. 2004) (involving an on-reservation employment dispute). Second, if *Garcia*'s holding extended to individuals *off* the reservation – which there is no reason to think that it did – then *Bay Mills* and *Otoe* overruled it.

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

C. **Tribal Immunity Does Not Exist In This Case**.

Defendants' effort to claim tribal immunity fails because sovereignty has never been a commodity that can be sold. But that is exactly what Think Finance and Kenneth Rees did when they negotiated the Term Sheet and subsequently implemented the agreement reflected in the Term Sheet. In exchange for less than 5% of the revenues of the Plain Green enterprise, Rees and Think Finance purchased the right to make sovereign immunity arguments whenever their criminal conduct was challenged.

The idea of selling sovereignty is inconsistent with the concept of sovereign immunity. The Supreme Court has held that sovereign immunity does not exist when the sovereign becomes a shareholder in a company. *Bank of United States v. Planter's Bank of Georgia*, 22 U.S. 904, 907 (1824). This is true even when the sovereign is a 100% shareholder. *Southern Ry Co. v. North Carolina Ry. Co.*, 81 F. 595 (1897). As the Second Circuit said in *Otoe*, "a tribe has no legitimate interest in selling an opportunity to evade state law." *Otoe-Missouria Tribe of Indians*, 769 F.3d at 114.

Independently, in order for an assertion of sovereignty to be legitimate, "self-government and sovereign and independent authority" must be "left in the administration of the state." *Worchester v. Georgia*, 31 U.S. 515, 561 (1831). That independence does not exist in this case because the Tribe allowed Rees and Think Finance to have control over the Tribe. The Term Sheet and the Affidavit of Neal Rosette show that the Tribe did not control its own laws or its government. FAC Exhibit 1 at 1, 3; Preedom Aff. Exhibit 2. The reality is that outside third parties receive more than 95% of the revenue from the Plain Green enterprise and actually control all operations of the enterprise. FAC ¶ 80. The fact that Think Finance exercised control over the Tribe is also demonstrated by the Affidavit of Neal Rosette which demonstrates that when the profitability of Think Finance was threatened, Think Finance ordered the Tribe to fire

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

its elected Chief.  Preedom Aff. Exhibit 2.  This Court should not extend tribal immunity to an entity that was specifically formed to protect unrelated third parties from the proper application of the law.

Moreover, if there is any factual question about the sale of sovereignty or other immunity related issues, this Court should allow jurisdictional discovery to uncover the true facts.  *Rafidain Bank*, 150 F.3d at 176-77.  Here, additional discovery would further illuminate the fraudulent scheme created by Rees and Think Finance and would show how the Tribe sold its sovereignty.

     D.      <u>Plaintiffs' Case Law Concerning Subordinate Tribal Entities Shows That Immunity Should Not Be Extended To Plain Green</u>.

At the threshold, it is important to note that the Supreme Court has never recognized the right of subordinate economic entities to claim tribal immunity.  *See Bay Mills*, 134 S. Ct. at 2052 n.4 (Thomas, J., dissenting).  Defendants rely on *Warren v. United States*, 859 F. Supp. 2d 522 (W.D.N.Y. 2012) to argue that the Plain Green enterprise should be entitled to immunity.  Several factors in *Warren* actually weigh against a decision to apply immunity.  *Warren* identifies factors designed to look at the economic substance of the transaction, including whether:  (1) "the tribe is the legal owner of property used by the organization, with title held in the tribe's name" and (2) "the organization's administrative and/or accounting activities are controlled or exercised by tribal officials."  *Id.* at 540.[5]  The Term Sheet and the Affidavit of Neal Rosette bring those factors sharply into dispute.

     E.      <u>Plaintiffs Have Article III Standing</u>.

The Tribal Defendants also assert that Plaintiffs lack Article III standing.  TD Mot. to Dismiss at 11.  However, Plaintiffs have alleged all the prerequisites for Article III standing.  "At

---

[5] *Warren* improperly extended *Garcia* to off-reservation activity by failing to note that *Garcia* involved on-reservation activity.  *Warren*'s incorrect reading of the law is shown by the opinion in *Bay Mills* that stated official capacity actions could proceed on state law violations.

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss, we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs have made these general allegations of injury. FAC ¶¶ 50-51, 66-67. These general allegations are accompanied by many paragraphs that describe how Plaintiffs were injured. *Id.* ¶¶ 47-51, 60-63, 66-67.

The allegations of the First Amended Complaint establish that Plaintiffs have Article III standing. First, the injuries that the Plaintiffs are suffering are actual and imminent. They currently do not have the money that was illegally taken from them. They also are currently suffering reputational harm. *See Jackson v. Payday Fin., LLC*, 76 F. Supp. 3d 779, 789 (N.D. Ill. Feb. 3, 2015). Second, Plaintiffs have alleged a causal relationship between their injuries and Defendants' conduct. Plaintiffs are suffering this damage because of the illegal loans that Defendants gave to them. Third, a favorable decision will redress Plaintiffs' injury. A declaration that the Plain Green enterprise's loans are illegal will assist Plaintiffs with credit rating agencies. In addition, an injunction against Defendants will force them to correct the misstatements that they have made and are continuing to make about the loans. Moreover, a declaration that the loans are illegal will resolve the controversy about the balances on the loans that continues to this day.

Defendants' claim that there is no irreparable injury is incorrect. At the threshold, Plaintiffs do not have to plead irreparable injury. Plaintiffs are seeking declaratory relief and do not have to show irreparable harm to obtain that relief. *Levin v. Harrison*, 966 F.2d 85, 90 (2d Cir. 1992).

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

Nonetheless, Plaintiffs are suffering irreparable injury. Courts have held that the types of injuries Plaintiffs are suffering are irreparable. Reputational harm has often been recognized as an irreparable injury by courts. *See, e.g.*, *Dominion Video v. Echostar Satellite Corp.*, 269 F.3d 1149, 1157 (10th Cir. 2001). In addition, the prospect that Plaintiffs will not recover any money given to Defendants also constitutes irreparable injury. *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 838 F. Supp. 2d 183, 243 (D. Vt. 2012), *aff'd in relevant part* 733 F.3d 393 (2d Cir. 2013). There remains an outstanding balance on Plaintiffs' loans. If Plaintiffs pay off their loans, they are likely to never see their funds returned from Defendants because Defendants have improperly claimed tribal immunity. Moreover, Plaintiffs are suffering irreparable injury because their loans continue to be reported to credit rating agencies as legitimate and open loans. *See Paine Webber, Inc. v. Nwogugu*, 1998 U.S. Dist. LEXIS 13307, *7 (S.D.N.Y. Aug. 21, 1998). This reporting negatively impacts Plaintiffs' ability to obtain alternative financing from other third parties. FAC ¶¶ 50, 66.

III.     THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS.

A.     <u>The Contacts Of The Entity Determine Whether There Is Personal Jurisdiction Over The Individuals.</u>

The Tribal Defendants' misunderstanding of *Ex Parte Young* continues with their analysis of the issue of personal jurisdiction. *See* TD Mot. to Dismiss at 19. In an official capacity action, the relevant minimum contacts for the purposes of establishing personal jurisdiction are the contacts of the entity, not the individuals. The reason for using the contacts of the entity is that *Ex Parte Young* rests on a legal fiction. But that legal fiction is a limited legal fiction. "Official capacity suits, in contrast [to personal capacity suits], generally represent only another way of pleading an action against an entity of which an officer is an agent. As long

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

as the government entity receives notice and an opportunity to respond, an official-capacity suit

is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v.*

*Graham*, 473 U.S. 159, 165 (1985).

Courts that have addressed personal jurisdiction in official capacity actions have held that

the entity's contacts determine whether personal jurisdiction exists, not whether the official has

individual contacts sufficient to support jurisdiction. *Grand River Enters. Six Nations, Ltd. v.*

*Pryor*, 425 F.3d 158, 167 (2d Cir. 2005) (holding that personal jurisdiction existed over official

representatives of states where attorney generals attended negotiations in New York City and

states enacted legislation to implement the settlement); *Ass'n for Molecular Pathology v. United*

*States PTO*, 669 F. Supp. 2d 365 (S.D.N.Y. 2009), *aff'd in relevant part, rev'd in part* 653 F.3d

1329 (Fed. Cir. 2011) ("courts routinely examine the contacts of the state official in their

capacity as representatives of the state, rather than their contacts with the forum in their

individual capacity"); *Pharm. Research & Mfrs. of Am. v. Thompson*, 259 F. Supp. 2d 39, 59

(D.D.C. March 28, 2003) ("[A]lthough *Ex Parte Young* draws a distinction between state

officials and the state itself, DCH has not established that this distinction is relevant for purposes

of analyzing personal jurisdiction or venue.").

> B.  There Are Sufficient Contacts To Support The Exercise Of Personal Jurisdiction.

The Court has personal jurisdiction over the Tribal Defendants. "Where, as here, specific

jurisdiction is asserted, minimum contacts necessary to support such jurisdiction exist where the

defendant purposefully availed itself of the privilege of doing business in the forum and could

foresee being hauled into court there." *Eades v. Kennedy, PC Law Offices,* 2015 U.S. App.

LEXIS 9295, *8 (2d Cir. June 4, 2015) (internal citation and quotation omitted). For specific


gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

jurisdiction, "the commission of a single act or occasional acts of the corporate agent in a state may sometimes be enough." *Id.*

In this case, the Court should resolve the personal jurisdiction analysis under the intentional torts framework. *Walden v. Fiore*, 134 S.Ct. 1115 (2014); *Calder v. Jones*, 465 U.S. 783 (1983). In these cases, "a nonresident's physical presence within the territorial jurisdiction of the court is not required, the nonresident generally must have certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Walden*, 134 S.Ct. at 1121.

      1.     The Wire Transmissions Support The Exercise Of Personal Jurisdiction.

The Tribal Defendants have many contacts with Vermont. The Tribal Defendants allowed Plaintiffs to apply for the loans at their residences in Vermont. The Tribal Defendants wired the money into Plaintiffs' accounts in Vermont. The Tribal Defendants withdrew money from Plaintiffs' accounts in Vermont by ACH withdrawal. Ms. Gingras's bank, Community National Bank, only has bank branches in Vermont. The Tribal Defendants negotiated the purported and fraudulent contract with Plaintiffs in Vermont. The Tribal Defendants directed their fraudulent representations to Plaintiffs in Vermont. Gingras Decl**.** ¶¶ 4-6; Given Decl. ¶¶ 4-6.

Moreover, none of Plain Green's loan activity actually occurs on the Rocky Boy's Reservation. The Plain Green enterprise uses third parties to carry out all of its administrative tasks. Preedom Aff. Exhibit 1 at 1; https://www.plaingreenloans.com/about/contact-us (accessed on July 24, 2015). The third parties perform all of these tasks off of the reservation. Plaintiffs have never been to Rocky Boy's Reservation.

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

2.      Plaintiffs' Interaction With The Enterprise's Website Supports Personal
        Jurisdiction.

The Second Circuit has indicated that internet commerce cases are helpful in determining

whether personal jurisdiction exists in internet payday lending cases.  *See Otoe-Missouria Tribe*

*of Indians*, 769 F.3d at 115 n.6 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 252 (2d Cir.

2007).  In *Best Van Lines*, the Second Circuit adopted a sliding scale to decide when internet

commerce give rise to personal jurisdiction.  The Court noted that "[i]f the defendant enters into

contracts with residents of a foreign jurisdiction that involve the knowing and repeated

transmission of computer files over the Internet, personal jurisdiction is proper."  *Best Van Lines*,

490 F.3d at 251 (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa.

1997).  In these types of cases, a high level of interactivity with the website supports the exercise

of jurisdiction.  *Id.*

In this case, the statements that the Tribal Defendants have made in court show that there

is a high level of interactivity in their website, and, as a result, they have submitted themselves to

personal jurisdiction in this forum.  In an affidavit in another case, Joel Rosette explained the

operation of the website.  A customer first views the home page.  Preedom Aff. Exhibit 7 at ¶ 6

(Rosette Decl. ¶ 6).  To apply for the loan, the customer must then click the "APPLY NOW"

button.  *Id.*  The customer provides information to the Tribal Defendants, including whether the

customer is gainfully employed and over 18 years of age, information related to an active bank

account, and the customer's email address.  *Id.* at ¶¶5-6.  In the process, borrowers must complete

a five step process in which they:  (1) apply for a loan; (2) select the loan amount; (3) confirm

the loan amount; (4) sign the loan agreement; and (5) verify the account.  *Id.* at ¶ 7.  The

borrower is also required to make a selection about whether they want to receive funds through

U.S. Mail or electronically.  *Id.* ¶ 8.  The Tribal Defendants then require the borrower to type her

gravel &
shea        ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

full name to provide an electronic signature to agree to accept the loan from the Tribal

Defendants.  *Id.* ¶ 8.  The high level of interactivity in the Plain Green enterprise's website shows

that the Tribal Defendants are subject to personal jurisdiction.

> 3. Defendants' Cases On Personal Jurisdiction Do Not Deal With Official
>    Capacity Actions.

The cases cited by the Tribal Defendants are inapposite.  TD Mot. to Dismiss at 19-21.

Neither *Dumont*, *Keeton*, nor *AstraZeneca* deal with an *Ex Parte Young* situation.  In *Dumont*,

Judge Conroy expressly noted that employees of Corrections Corporation of America were not

state officials for determining personal jurisdiction.  *Dumont v. Correction Corp. of Am.*, No.

2:14-cv-209, 2015 U.S. Dist. LEXIS 79032, *15 (April 29, 2015 D. Vt.).  *Keeton v. Hustler*

*Magazine*, *Inc.* involved a libel action seeking damages.  It did not involve an official capacity

action.  *Keeton*, 465 U.S. 770, 772 (1983).  In fact, *Keeton* actually supports the exercise of

jurisdiction here.  "A state has an especial interest in exercising judicial jurisdiction over those

who commit torts within its territory."  *Id.* at 776.  *In re AstraZeneca* involved a securities class

action.  Again, the plaintiffs in that case were not seeking relief from governmental officials.  *In*

*re AstraZeneca Sec. Litig.*, 559 F. Supp.2d 453 (S.D.N.Y. 2003).

> C. Personal Jurisdiction Exists Over All Other Defendants Because Of Their
>    Intentional Torts And Agreement To Conspire.

The "constitutional touchstone" for establishing personal jurisdiction is whether the

defendants have established such minimum contacts with a forum state that they should

reasonably anticipate being haled into court.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462

(1985).  There must be "some act by which the defendant purposefully avails itself of the

privilege of conducting activities within the forum state, thus invoking the benefits and

protections of its laws."  *Id.* at 475.  For the exercise of jurisdiction to be consistent with the Due

Process Clause, a defendant must have fair warning that he or she will be haled into court.



gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Sheet
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

Where a forum state seeks to assert specific jurisdiction over an out of state defendant, the fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum. *Id.* at 473.

There are several reasons why a forum state may legitimately exercise jurisdiction over a non-resident defendant. *Id.* First, the state has a manifest interest in providing its residents with a convenient forum for redressing injuries by out of state actors. *Id.* Second, where individuals derive benefits from interstate activities, it may be unfair to allow them to escape liability for their choices. *Id.* at 473-74. Third, because modern transportation and communication have made it much less burdensome for a party to defend himself in a state where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity. *Id.* All of these considerations weigh in favor of exercising jurisdiction here.

        1.      The Defendants' Commission Of Fraud Provides A Basis For Exercising Personal Jurisdiction.

When defendants commit intentional torts or fraud, they have purposefully availed themselves of a forum state and are subject to personal jurisdiction in that forum. *Calder v. Jones*, 465 U.S. 783 (1983). In *Calder*, the Supreme Court held that an out of state author and editor were subject to personal jurisdiction in California. *Id.* at 789. Drawing a distinction between "untargeted negligence" and libel, the Court stated that "their intentional and allegedly tortious actions were expressly aimed at California." *Id.* The defendants knew that the article "would have potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation." *Id.* at 789-90. Under the circumstances in that

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

case, "petitioners [] 'reasonably anticipate[d] being haled into court there' to answer for the truth of the statements made in the article." *Id.* at 790.

Similarly, the Fifth Circuit held that personal jurisdiction existed when tobacco trade associations made misrepresentations concerning the health effects of smoking that reached a plaintiff in Louisiana. *Guidry v. United States Tobacco Co.*, 188 F.3d 619 (5th Cir. 1999). In jurisdictional discovery, the tobacco associations admitted that their agents appeared on nationwide television to deny that tobacco caused health problems. *Id.* at 626. The Court found that personal jurisdiction existed. "When a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal adjudicative jurisdiction over the tortfeasor and the causes of actions arising from its offenses or quasi-offenses." *Id.* at 628; *see also Nat'l Union Fire Ins. Co. v. Kozeny*, 115 F. Supp. 2d 1231, 1236 (D. Colo. 2000) ("The commission of fraud provides a basis for personal jurisdiction in Colorado.")

The same is true here. Each Defendant committed the tort of participation in a criminal RICO enterprise. Rees and Think Finance set up the criminal enterprise to have a nationwide scope. FAC ¶¶ 72-75, 100. The entire point of the enterprise was to avoid laws in states like Vermont that set usury limits. FAC ¶¶ 38, 42-43. Defendant Tailwind Marketing provided information on the potential targets for the illegal lending scheme. FAC ¶ 153. TC Decision Sciences provided customer service, verification, and collection of customer accounts. FAC ¶ 152. Tailwind Marketing, TC Decision Sciences, and TC Loan also provided shields from liability for the actions of the Plain Green enterprise. In addition, at the time that Sequoia and Technology Crossover Ventures invested, they would have known that scope of the enterprise

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

was nationwide. "Sequoia and Technology Crossover were fully aware of the practices of the enterprise and knew that the practices violated the law. Sequoia and Technology Crossover do not make investments without substantial due diligence into their investments, including legal review of the activities of their investment vehicle." FAC ¶ 154. Each Defendant's participation in the Plain Green enterprise subjected them to personal jurisdiction in Vermont.

The effects of the criminal enterprise have been felt in Vermont. The Plain Green enterprise had hundreds of contacts with Plaintiffs in Vermont over many years. The enterprise had contact with Plaintiffs when they interacted with the website. The enterprise also had contacts with Vermont on a biweekly basis when it took money out of Plaintiffs' accounts over many years. Defendants took advantage of Vermont's banks and utilized Vermont's infrastructure for executing financial transactions. Defendants also took advantage of Vermont's policy of encouraging high speed internet usage. Finally, Defendants took advantage of the Vermont laws that protect financial transactions executed over wires. Because Defendants took advantage of all of these benefits from Vermont to commit an intentional tort and fraud, they now must answer in court in Vermont for their actions.

> 2.    Defendants Can Also Be Haled Into Court Based On Conspiracy
>        Jurisdiction.

Defendants can also be haled into court under the conspiracy theory of jurisdiction. "To meet due process requirements, a substantial connection between the conspiracy and the forum state must be shown." *Vermont Castings*, *Inc. v. Evans Prods. Co. v. Grossman's Division*, 510 F. Supp. 940, 944 (D. Vt. 1981). The nonresident co-conspirator must know or have good reason to know that his conduct will have effects in the forum state. *Id.*[6]

---

[6] A case cited by Defendants recognizes the existence of the conspiracy theory of personal jurisdiction. *Allstate Life Ins. v. Linter Group, Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992)

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

- 37 -

Jurisdiction that is exercised under a conspiracy theory extends to "a conspiracy that takes place entirely outside of the forum, but with the conspirator's knowledge that the forum would bear the brunt of the conspiracy's harmful effects." *Newsome v. Gallacher*, 722 F.3d 1257, 1265 (10th Cir. 2013). The Tenth Circuit noted that if "three Kansans conspired to fire a cannonball into Oklahoma, we do not believe the Constitution would foreclose Oklahoma courts from exercising jurisdiction over the conspirators simply because they confined themselves to Kansas." *Id.* at 1266.

The FAC alleges that each Defendant entered into an agreement to conduct the affairs of the Plain Green enterprise. Think Finance and Rees entered into an agreement with the Tribal Defendants to create Plain Green in the Term Sheet. FAC ¶¶ 77-86. Rees and Think Finance directed Tailwind Marketing, TC Decision Sciences, and TC Loan to enter the conspiracy by providing services to the enterprise. FAC ¶ 89-90, 101. As a result, they can be held liable for the actions of their co-conspirators, the Tribal Defendants, in Vermont. Sequoia and Technology Crossover Ventures joined the conspiracy when they entered into agreements with Think Finance. FAC ¶¶ 154-55. Each of the contacts that the Plain Green enterprise had with each Plaintiff can be imputed to each Defendant because of the Defendants' agreements to conspire.

    D.    <u>The Court Has Personal Jurisdiction Over Any Other Defendants Under RICO</u>.

The Second Circuit has held that the RICO statute gives courts the power to exercise jurisdiction over defendants even if they lack minimum contacts with a forum state when the ends of justice require it. *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71-72 (2d Cir. 1997). Here, justice requires the exercise of jurisdiction under RICO because Plaintiffs have very limited resources. In addition, any Defendants not subject to jurisdiction under a minimum contacts analysis are exceptionally wealthy, making litigation in Vermont not a substantial burden. Moreover, the Defendants are diverse geographically; some Defendants are likely to

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

object to jurisdiction in any venue, so that no single judicial district will be acceptable to all Defendants. In addition, each of the Defendants entered into this criminal enterprise with full knowledge of its illegality.[7]

> E.   The Court May Order Jurisdictional Discovery To Determine Whether Personal Jurisdiction Exists.

Finally, "where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues." *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 n.13 (1978). Indeed, as courts within the Second Circuit have explained in response to motions to dismiss on personal jurisdiction grounds, "pre-motion discovery should be permitted where the facts necessary to establish personal jurisdiction and propriety of venue lie exclusively within the defendant's knowledge." *Winston & Strawn v. Dong Won Secs. Co.,* 2002 U.S. Dist. LEXIS 20952 *16 (S.D.N.Y. 2002) (denying a motion to dismiss and allowing personal jurisdiction discovery); *accord Uebler v. Boss Media, AB,* 363 F.Supp. 2d 499,506 (E.D.N.Y. 2005) ("To permit discovery in this case is bolstered by the fact that the facts necessary to establish personal jurisdiction lie within Boss Media's exclusive knowledge.")


IV.   THE ENTITY IS NOT A NECESSARY PARTY IN AN OFFICIAL CAPACITY ACTION.

Defendants' Rule 19 argument suffers from the same misunderstanding of *Ex Parte Young* that pervades their Motions to Dismiss. TD Mot. to Dismiss at 21; Rees Mot. to Dismiss at 10; TF Mot. to Dismiss at 19; TCV Mot. to Dismiss at 21; Sequoia Mot. to Dismiss at 10. Defendants argue that the Tribe and Plain Green must be joined to the case and, at the same time, Defendants argue that these entities cannot be joined as parties. Defendants' argument means

---

[7] Other circuits have held that RICO creates nationwide personal jurisdiction. *See PT United Can Co.*, 138 F.3d at 70. Plaintiffs reserve the right to make this argument at the proper time.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

that no *Ex Parte Young* action could be brought *ever*.  Not surprisingly, federal courts have long

rejected this argument.

The United States Supreme Court resolved this issue nearly two hundred years ago in

*Osborn v. President*, *Directors*, *and Company of the Bank of the United States*, 22 U.S. 738

(1824).  In *Osborn*, the Defendants raised precisely the same argument.  *Id.* at 846.  The Court

rejected the argument and held that to obtain funds illegally taxed by the State of Ohio, the

plaintiff did not have to sue or join the State of Ohio.  It was sufficient to sue the officers of the

state for an injunction.  *Id.* at 859.  In the end, the Court ordered the officers of the state to return

tax money collected illegally.  *Id.* at 871.

The Courts of Appeals that have recently addressed the issue have reaffirmed that

sovereign entities, including Native American tribes, do not have to be joined under Rule 19.

*Vann v. United States Dept. of Interior*, 701 F.3d 927, 929-930 (D.C. Cir. 2014); *Salt River*

*Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1177 (9th Cir. 2012).  In

*Vann*, descendants of former slaves of the Cherokee Nation sued to restore the rights they

obtained after the end of the Civil War when the United States entered a treaty with the Nation

that granted them "all the rights of native Cherokees."  *Vann*, 701 F.3d at 928.  The D.C. Circuit

held that "[a]s a practical matter, therefore, the Cherokee Nation and the Principal Chief in his

official capacity are one and the same in an *Ex Parte Young* suit for declaratory and injunctive

relief.  As a result, the Principal Chief can adequately represent the Cherokee nation in this suit,

meaning that the Cherokee Nation itself is not a required party for purposes of Rule 19."  *Id.* at

929-30.  In *Salt River*, two non-Native American entities sought "to enjoin Navajo Nation tribal

officials from applying tribal law to them in tribal courts."  *Salt River*, 672 F. 3d 1176, 1177.

The Ninth Circuit held that Rule 19 did not bar an official capacity action.  "Indeed, a contrary

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

holding would effectively gut the *Ex Parte Young* doctrine.  That doctrine permits actions for

prospective non-monetary relief against state or tribal officials in their official capacity to enjoin

them from violating federal law, without the presence of the immune State or tribe." *Id.* at 1181.

The three cases cited by Defendants did not involve *Ex Parte Young* actions and are not

relevant to the issue.  *World Touch Gaming* involved a purely commercial sale and leasing of

gambling machines.  *World Touch Gaming v. Massena Mgmt.*, *LLC*, 117 F. Supp.2d 271, 273-74

(N.D.N.Y. 2000).  *Fluent* involved hundreds of leases of tribal land governed by a federal treaty.

*Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 543 (2d Cir. 1991).  *Kermanshah*

involved an interfamily dispute about real estate and a rug business.  *Kermanshah v.*

*Kermanshah*, 2010 U.S. Dist. LEXIS 45896, *7 (S.D.N.Y. May 11, 2000).  In sum, there is no

need in this case to join either Plain Green or the Tribe.


V.      DEFENDANTS HAVE FAILED TO SHOW THAT THE DISPUTE IS ARBITRABLE.

A.      The Purported Arbitration Agreement Is Unenforceable.

The Court should not compel arbitration in this case because the Purported Arbitration

Agreement is revocable under Section 2 of the Federal Arbitration Act.  The Federal Arbitration

Act ("FAA") provides that arbitration agreements are unenforceable when a reason exists "at law

or in equity for the revocation of any contract."  9 U.S.C. § 2.  This saving clause [9 U.S.C. § 2]

permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses,

fraud, duress, or unconscionability,' but not defenses that apply only to arbitration or that derive

their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility v.*

*Concepcion*, 131 S.Ct. 1740, 1746 (2010); *see also*, *e.g.*, *Chavarria v. Ralphs Grocery Co.*, 733

F.3d 916, 921 (9th Cir. 2013) ("Like other contracts, arbitration agreements can be invalidated

for fraud, duress, or unconscionability.").  "If a party challenges the validity under § 2 of the



76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Rent-A-Center, W., Inc. v. Jackson*, 130 S.Ct. 2772, 2778 (2010). In *Chavarria*, the Ninth Circuit held that an arbitration clause was unenforceable because it was a contract of adhesion and had an unreasonable provision about the costs of the arbitration. In invalidating the clause, the Court noted that "[f]ederal law favoring arbitration is not a license to tilt the arbitration process in favor of the party with more bargaining power." *Chavarria*, 733 F. 3d at 927.

        1.      The Purported Arbitration Agreement Is Unconscionable.

The Purported Arbitration Agreement is unconscionable because the Defendants have predetermined the outcome of the arbitration before it has even started. The Defendants have entered into agreements that enable them to dictate the substance of Chippewa Cree law. In at least one case, they have intimidated the Chippewa Cree tribal judiciary into issuing a decision that is contrary to both the Chippewa Cree Constitution and the tribal court's actual view of the case. In addition, the Chippewa Cree tribal courts do not even have jurisdiction to rule on the issues reserved to them in the Purported Arbitration Agreement. Thus, the entire arbitration process created by the Purported Arbitration Agreement is a sham.

        a.      The Court Should Apply Vermont Law When Examining Whether The Purported Arbitration Agreement Is Unconscionable.

Courts have rejected the application of tribal law and applied the law of the forum state to determine whether an arbitration clause is unconscionable. *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777 (7th Cir. 2014) (applying Illinois law); *see also Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1355 (11th Cir. 2014) (Restani, J., concurring) (applying Florida law) *cert. denied.* 2015 U.S. Dist. LEXIS 2386 (U.S. Apr. 6, 2015). In *Jackson*, the Seventh Circuit held that the application of the laws of the Cheyenne River Sioux Tribe was unreasonable because the law did

not provide any guidance regarding arbitration. *Id.* at 776. The Court then determined that the arbitration agreement was unconscionable under Illinois law. *Id.* at 777.

In this case, the Purported Arbitration Agreement specifies that the Court should apply Chippewa Cree law. However, the application of Chippewa Cree law is unreasonable for several reasons. First, the Defendants entered into agreements with the Chippewa Cree Tribe that enabled the Defendants to dictate the substance of Chippewa Cree law and insulate the Plain Green enterprise from liability. FAC Exhibit 1. In addition, it is nearly impossible to access the statutes, rules, or decisions that define Chippewa Cree law. Preedom Aff. ¶¶ 12-19. It is not available through law libraries without visiting Montana. *Id.* It is not available over the Internet. *Id.* As a result, this Court should apply Vermont law in determining whether the Purported Arbitration Agreement is unconscionable.

> b. The Proposed Arbitration Process Is Illusory Because Defendants Have Not Relinquished Tribal Immunity And Have Purchased The Law Governing The Arbitration.

In this case, the generally applicable contract defense of unconscionability bars the enforcement of the Purported Arbitration Agreement. Under Vermont law, an arbitration procedure need only be substantively unconscionable to be invalid. *Glassford v. BrickKicker*, 2011 VT 118, ¶ 13. Moreover, where a portion of the arbitration process is unconscionable, a boilerplate severability clause will not save the arbitration provision. *Id.* ¶ 30. In *BrickKicker*, a home inspection company created an arbitration process where the sole available relief was the amount paid to conduct the home inspection. *Id.* ¶ 14. The Vermont Supreme Court found that "the subject contract's illusory remedy for any claim for damages resulting from its provisions limiting liability to the inspection fee and requiring binding arbitration costs that would exceed the amount of the liability limit" was unconscionable.

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

Importantly, Vermont's application of the unconscionability doctrine was not an expression of any generalized hostility toward arbitration itself. In *BrickKicker*, the Vermont Supreme Court relied on *Val Preda Leasing*, *Inc. v. Rodriguez*, 149 Vt. 129, 135 (1987), which dealt with a collision damage waiver in a car rental contract. When the Vermont Supreme Court applied *Val Preda*, it was applying general common law principles to the arbitration context and not a public policy against the use of arbitration. The Vermont Supreme Court's application of the unconscionability doctrine satisfied the requirements for invalidating an arbitration agreement under Section 2 of the Federal Arbitration Act. 9 U.S.C. § 2.

Here, the arbitration provision is worse than the provision in *BrickKicker*. The Purported Arbitration Agreement is substantively unconscionable because the Defendants have not waived the protection of tribal immunity. The agreement provides that any concession on venue for arbitration "shall not be construed in any way . . . as a relinquishment or waiver of the Chippewa Cree Tribe's sovereign status or immunity." Mot. to Dismiss Exhibit B. In order to waive tribal immunity, the tribe must unequivocally waive immunity for that waiver to be recognized. *Chayoon v. Chao*, 355 F.3d 141, 143 (2004). Because the Tribe has not done so, Defendants may assert immunity and avoid all liability, even if Plaintiffs win the arbitration. Thus, Defendants have an effective veto against any remedies that they determine in their sole discretion they want to avoid. The Defendants have also added another layer of protection. If the arbitrator can somehow see through the thicket of procedural defenses, Defendants will simply reinstate tribal immunity through the confirmation process in the tribal courts. Defendants have ensured the outcome by crafting Chippewa Cree law to favor loan sharking operations. By controlling the substantive law and the path to review the law, Defendants have determined the outcome of the confirmation process.

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

c.   The Proposed Arbitration Process Is Illusory Because Chippewa Cree Tribal Courts Do Not Have Jurisdiction To Determine The Questions Reserved To Them.

The Purported Arbitration Agreement specifically envisions that Chippewa Cree tribal courts will play a role in resolving certain disputes.  For example, the Purported Arbitration Agreement states that "the validity, effect and enforceability of this waiver of class action lawsuit and class wide arbitration, if challenged, are to be determined solely by a court of competent jurisdiction located with the Chippewa Cree Tribe . . . ."  TD Mot. to Dismiss Exhibit B.  Moreover, a Chippewa Cree tribal court must confirm any arbitration award.  *Id.* Since the tribal courts do not have the power to rule on the issues the Purported Arbitration Agreement reserves to them, the Purported Arbitration Agreement is illusory.

"[T]ribes do not, as a general matter, possess authority over non-Indians who come within their borders."  *Plains Commerce Bank v. Long Family Land Company*, 554 U.S. 316, 328 (2008); *see also Nevada v. Hicks*, 533 U.S. 353, 367 (2001) ("Respondents' contention that tribal courts are courts of 'general jurisdiction' is also quite wrong.").  In *Plains Commerce Bank*, the Supreme Court noted that:  "Tellingly, with only 'one minor exception, we have never upheld under *Montana* the extension of tribal civil authority over nonmembers *on non-Indian land*.'"  *Plains Commerce Bank*, 554 U.S. at 333 (referring to *Montana v. United States*, 450 U.S. 544 (1981)).  There are only two situations where tribal courts may exercise jurisdiction over nonmembers:  (1) when there is a consensual relationship on the reservation or (2) when the nonmembers' "conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Id.* at 341.  In addition, a tribal court may only exercise jurisdiction based on a consensual relationship on the reservation when the

gravel &
shea
ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

nonmembers consent and the exercise of the tribe's jurisdictional power is necessary either:
(1) to preserve tribal self-government or (2) to control internal relations. *Id.* at 337.[8]

In this case, there is no consensual relationship on the reservation that would enable the
Chippewa Cree tribal courts to exercise jurisdiction over the borrowers of the Plain Green
enterprise. The relationship between the Plain Green enterprise and borrowers is not physically
located on the reservation. Under the consensual relationship test laid out in *Plains Commerce
Bank*, the relationship must be physically located on the reservation for a tribal court to exercise
jurisdiction over a nonmember. *Strate v. A-1 Const.*, 520 U.S. 438, 456-67 (1997). Moreover,
the consensual relationship exception does not apply because the relationship that the Plain
Green enterprise established with the borrowers is fraudulent and tortious. *Strate v. A-1 Const.*,
520 U.S. 438, 456-67 (1997).

The second exception also does not apply. For the exception to apply, the nonmembers'
conduct has to "threaten[] or [have] some direct effect on the political integrity, the economic
security or the health or welfare of the tribe." *Id.* at 457-58. "Read in isolation, the *Montana*
rule's second exception can be misperceived. Key to its proper application, however, is the
Court's preface: 'Indian tribes retain their inherent power [to punish tribal offenders,] to
determine tribal membership, to regulate domestic relations among members, and to prescribe
rules of inheritance for members. . . But [a tribe's inherent power does not reach] beyond what
is necessary to protect tribal self-government or to control internal relations." *Id.* at 459 (quoting
*Montana v. United States*, 450 U.S. 544, 564 (1981)) (brackets in original).

The activity here is not of the type that the *Montana* Court felt integral to the second
*Montana* exception. A commercial enterprise directed to the outside world does not implicate

_____

[8] The burden to establish that these conditions exist is on the Tribe.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

tribal self-government. Nor does it implicate control of the Tribe's internal relations because the Tribe is loaning money to nonmembers, not members of the Tribe. Moreover, as a factual matter, the Plain Green enterprise has had a negative effect on the government of the Tribe and has resulted in further corruption and criminal behavior. Self-government and internal relations have only gotten worse during the Plain Green era.

        d.      The Purported Arbitration Agreement Is Unconscionable Because It Has Several Features That Are Both Procedurally And Substantively Unconscionable.

The Purported Arbitration Agreement has other features that are procedurally and substantively unconscionable and make it unenforceable. First, because the claims associated with the Plain Green enterprise involve small dollar amounts, an individual's incentive to bring a lawsuit is small. This is particularly true because payday loans target people in financially challenged positions who have few resources to bring a claim. Gingras Decl. ¶ 1, 11; Given Decl. ¶ 1, 11. It is also true because the Purported Arbitration Agreement has a provision for shifting costs that discourages small claims from being filed; "Unless prohibited by law, the arbitrator may award fees, costs, and reasonable attorney's fees to the party who substantially prevails in the arbitration." Mot. to Dismiss Exhibit B.[9]

Another fact that supports a finding of unconscionability is that the terms of the loan contract, including the Purported Arbitration Agreement, are not easily discovered on the Plain Green website. While there is a confusing collection of legal statements on the Plain Green website, borrowers are unable to see a copy of their loan contract, including the Purported Arbitration Agreement, before they complete an application for a loan. Preedom Aff. Exhibit 8.

---

[9] The doctrine of tribal immunity is not a doctrine that the vulnerable people in this class are likely to understand. Gingras Decl. ¶ 7; Given Decl. ¶ 7. This is yet another reason why this Court should find the Purported Arbitration Agreement to be unconscionable.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 47 -

Moreover, when there is a hint of litigation, Defendants cut off access to the borrowers' accounts so they can no longer access the documents that purport to structure the relationship between Plain Green and the borrowers. Gingras Decl. ¶ 12; Given Decl. ¶ 12. In other words, the borrowers have no access to the Purported Arbitration Agreement that supposedly governs their relationship with Plain Green.

A finding of unconscionability is also supported in this case because of the existence of inconsistent provisions in the Purported Arbitration Agreement about the powers of the arbitrator and the powers of the tribal court. Under the Purported Arbitration Agreement, the dispute between the borrowers and Plain Green is submitted to arbitration, but disputes about the validity of the purported class action waiver are to be determined by Chippewa Cree tribal courts. This section of the Purported Arbitration Agreement is difficult to read, appears to set up an impossible to follow process, and supports a finding of unconscionability. *See* TF Mot. to Compel Arb. Exhibit 10 at 8.

Another section of the Purported Arbitration Agreement that supports a finding of unconscionability is the venue clause. Defendants will only agree to arbitrate at the place of the borrower if the borrower reaffirms that tribal immunity applies. "Any arbitration under this Agreement may be conducted either on tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Chippewa Cree Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than the law of the Chippewa Cree Tribe." *Id.*

The Purported Arbitration Agreement is also unconscionable because it calls for the application of Chippewa Cree law, which is generally unavailable to the public. The 2006 version of Chippewa Cree law, the most recent version of that law, is difficult to access.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

Preedom Aff. ¶¶ 12-19.  The University of Montana Law School will only provide a copy of the 2006 version of the Chippewa Cree law to people who visit the law library in Montana.  In addition, the 2006 version of the law is not available on the internet.  Preedom Aff. ¶ 16.  The National Indian Law Library notes on their web page that for the Tribal Constitution: "The tribe has not given permission for the full-text document to be made available online here.  The tribal constitution is available online at the tribe's website."  Preedom Aff. ¶ 14.  However, the Tribe's website does not make the 2006 Chippewa Cree law available, which appears to be the purportedly operative law.[10]  In addition, as previously described, the Defendants dictated the substance of Chippewa Cree law in an attempt to shield their illegal activities.

A number of courts have held that arbitration agreements with similar features are unconscionable.  For example, the Eleventh Circuit has held that the effective unavailability of a tribal forum to resolve a dispute supported the conclusion that an arbitration provision was unconscionable.  *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, (11th Cir. 2014) *cert. denied.* 2015 U.S. Dist. LEXIS 2386 (U.S. Apr. 6, 2015).  The Seventh Circuit has held in a case involving tribal payday lending that an arbitration agreement was unconscionable because a combination of factors made the arbitration process illusory.  *Jackson*, 764 F.3d at 781.

---

[10] The relative unavailability of the governing law raises due process issues.  In the context of prison litigation, the United States Supreme Court has held that inhibiting access to the relevant law is a denial of due process.  *Bounds v. Smith*, 430 U.S. 817, 825 (1976) ("More importantly, of course, a lawyer must know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action."); *see also Jackson*, 764 F.3d at 781 (relying on the unavailability of Indian arbitration procedural rules to hold that arbitration agreement was unconscionable).  After the litigation started, Defendants provided parts of Chippewa Cree law to Plaintiffs' counsel.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 49 -

e. The Think Finance Defendants' Arguments Concerning Unconscionability Are Incorrect.

The Think Finance Defendants raise a bevy of brief arguments against Plaintiffs' unconscionability arguments. These arguments are unavailing.

The Think Finance Defendants' argument that the procedural unconscionability allegations in paragraph 121 concern the loan agreement is wrong and difficult to understand. TF Mot. to Compel. at 12. Paragraph 121 of the First Amended Complaint actually uses the phrase "Purported Arbitration Agreement." The Think Finance Defendants' argument completely ignores the FAC's allegations and asks the Court to accept their facts inconsistent with the fact pled in the FAC.

The Think Finance Defendants try to blame the victims for not printing out a copy of the Purported Arbitration Agreement. TF Mot. to Compel at 20-21. Yet, Defendants led Plaintiffs to believe that they could simply keep a copy of their loan documents, including the Purported Arbitration Agreement, in their online "account." *See* Hargrove Exhibits 1 and 3 (showing website buttons for "my account.") Then Defendants shut down Plaintiffs' access to their "accounts" as soon as Plaintiffs raised issues about the legality of the loans. FAC ¶ 121e; Given Decl. ¶ 12; Gingras Decl. ¶ 12.

The Think Finance Defendants also argue that Plaintiffs understood the loan documents and the Purported Arbitration Agreement. TF Mot. to Compel at 21. The facts show otherwise. Given Decl. ¶¶ 7-8; Gingras Decl. ¶¶ 7-8. Neither Ms. Given nor Ms. Gingras understood the concept of tribal immunity. *Id.*

The Think Finance Defendants argue that coercion must be present for a contract to be unconscionable. TF Mot. to Compel at 21. This is not true. A contract may be invalidated if there is either procedural or substantive unconscionability. *Glassford*, 2011 VT 118, ¶ 13. The

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

case that the Think Finance Defendants cite to support their position involved a claim of unconscionability associated with unequal bargaining power. *See Maglin v. Tschannerl*, 174 Vt. 39, 45 (2002). However, nothing in *Maglin* suggests that unequal bargaining power is the only type of procedural irregularity that can lead to a finding of unconscionability. *Id.* Plaintiffs identify a number of procedural irregularities and substantive concerns that support a finding of unconscionability.

*Littlejohn* does not support the Think Finance Defendants' position. *Littlejohn v. Timberquest Park at Magic, LLC*, No. 5:14-cv-200, 2015 U.S. Dist. LEXIS 94592 (July 21, 2015). As an initial matter, the court actually found the arbitration agreement in that case to be unconscionable. The Court held that picking an arbitrator with a potential bias toward the ski industry was substantively unconscionable. *Id.* at *21. The Court's finding with respect to procedural unconscionability is distinguishable. In that case, the plaintiff was on a ski vacation and could easily have walked away. There was no economic coercion present. In this case, the Defendants deliberately preyed on individuals who were in difficult financial circumstances. Plaintiffs had little or no options for credit. *See* Given Decl. ¶¶ 1, 11; Gingras Decl. ¶ 1, 11.

The Think Finance Defendants argue that Plaintiffs have not shown that they have limited financial resources. This is not true. Plaintiffs have filed affidavits establishing these facts. *See* Given Decl. ¶¶ 1, 11; Gingras Decl. ¶ 1, 11. The Think Finance Defendants' offer to cover the arbitrator's fees does not resolve the cost of traveling to Montana or hiring an attorney to represent them on an hourly basis. It also does not deal with the issue of Plaintiffs' missing additional time from work to attend an arbitration in Montana. Those costs could easily exceed the entire amount at issue in this case. The offer also does not address the futility of the

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

arbitration proceeding because the Defendants have already predetermined the outcome by buying the substance of the Chippewa Cree law.

The Think Finance Defendants' offer to waive tribal immunity is a bit too much. Clearly, because the Defendants participated in a RICO enterprise together, they have a joint defense in the case. Moreover, the Tribal Defendants have not agreed to waive tribal immunity. The Think Finance Defendants stand to benefit from the Tribal Defendants' refusal to waive tribal immunity because the Think Finance Defendants also expressly adopt the Tribal Defendants' arguments for failure to join an indispensable party (TF Mot. to Dismiss at 20), which is just another way of asserting tribal immunity. To see through the ruse, the Court need only look at the Think Finance Defendants' chief argument in a case brought by the Pennsylvania Attorney General challenging the same conduct as in this case. On the first page of Think Finance's reply brief, it argues:

> The loans are valid under governing Tribal law, and the Tribes are immune from suit. The Attorney General's solution is to sue the service providers, seeking an end run around her lack of authority over the tribal businesses. Aside from her apparent disrespect for tribal self-governance and sovereignty, her strategy runs straight into multiple insurmountable legal barriers.
>
> First, as explained in the Rule 19 Memorandum, the tribal lenders are parties to the loan agreements they made, claim an interest in those loan agreements, and therefore are necessary parties who must be joined, the suit must be dismissed.

(Think Defendants' Reply In Support of Their Motion To Dismiss at 1 in *Commonwealth v. Think Finance, Inc.*, No. 2:14-cv-7139, ECF # 82, (October 23, 2015)).

The Think Finance Defendants do not address the other instances of substantive unconscionability that Plaintiffs raise, such as the inability to obtain copies of Chippewa Cree law. They also do not address the fact that the tribal courts simply lack jurisdiction to hear the

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

claims that Defendants want them to hear. These alone are sufficient to support a finding of unconscionability.

      2.    Turmoil Within The Chippewa Cree Tribe Frustrates The Intention Of The Purported Arbitration Agreement.

Ongoing corruption at the Tribe and confusion in the tribal judiciary will frustrate the intent of the arbitration provision for a swift resolution. "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) Contracts § 265; *see also SKI*, *Ltd. v. Mountainside Props.*, 2015 VT 33, ¶ 36 n.9.

The Purported Arbitration Agreement expressly states that "Arbitration procedures are simpler and more limited than court procedures." TD Mot. to Dismiss Exhibit B. The arbitration will be neither simple nor limited because there is substantial uncertainty about who is in charge of the Tribe and the tribal judiciary. The governance of the Tribe and Plain Green is in substantial flux and turmoil. Widespread corruption has gripped the Tribe, and there is a large federal investigation into bribery at the Tribe. The uncertainty about the judiciary is ongoing. The former head of the tribe, Ken Blatt-St. Marks, fired the bulk of the tribal judiciary. The Business Committee fired him, but then voters reelected him. FAC ¶¶ 140-44. There is ongoing litigation concerning the legitimacy of the Chippewa Cree courts in the Chippewa Cree courts. *Jonathan Windy Boy v. Chippewa Cree Election Board*, 2014-CV-RO-2211.[11] The trial judge sitting on the litigation about the removal of Blatt-St. Marks said that he felt intimidated by both parties in the dispute. He issued a decision even though he felt it was contrary to the Chippewa

---

[11] Other than its existence, Plaintiffs know little about this apparently involved litigation.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

Cree Constitution because he was afraid to lose his job. AA ¶ 9. It will take substantial litigation to resolve whether the removal of Blatt-St.Marks was legitimate. Moreover, as discussed above, the tribal courts have no jurisdiction over this matter. This uncertainty will frustrate the goal of a "simpler and more limited" arbitration.

### 3. The Purported Arbitration Agreement Is Fraudulent.

The Term Sheet shows that the Purported Arbitration Agreement contains false statements that defrauded Plaintiffs. First, the Purported Arbitration Agreement states that the Lender was Plain Green, LLC. The Term Sheet reveals that this statement is false. Plain Green, LLC only received 4.5% of the revenues from 99% of the loans. FAC Exhibit 1 at 2. Plain Green also did not provide any of the actual money that was loaned: "Haynes will arrange to provide funding to the Tribe to enable it to make each of the Loans." FAC Exhibit 1 at 1.

Documents recently obtained by Plaintiffs' counsel show that Rees and Think Finance not only control Plain Green, but also the Business Committee of the Tribe.[12] In an affidavit, the former CEO of Plain Green avers that Rees and Think Finance forced the Business Committee of the Tribe to fire the Chairman of the Tribe, Ken Blatt-St. Marks, because Blatt-St. Marks sought more money for the Tribe. Preedom Aff. Exhibit 2, ¶¶ 8-11. In addition, an anonymous witness interviewed by the Department of the Interior reported that "the Business Committee removed Blatt-St. Marks as Chairman to continue to hide their wrong doings." Preedom Aff. Exhibit 3 at 4. The witness also reported that "every single one of the Business Committee members have taken something, i.e. money, equipment, vehicles." *Id.* In addition, several former tribal officials have been convicted of, or pled guilty to, embezzlement and bribery. FAC ¶¶ 132-35.

---

[12] Plaintiffs obtained these documents after they filed their First Amended Complaint. Plaintiffs believe that the First Amended Complaint states sufficient facts, but the newly received documents would add still more detail about the fraudulent scheme. As a result, Plaintiffs request leave to amend should the Court rule that the First Amended Complaint is insufficient.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

A collection of their plea agreements is attached to the Preedom Aff. at Exhibit 9. This corruption extends to Plain Green. FAC ¶¶ 138-39. An arbitration judgment and complaint from a federal court action describe the corruption that exists at Plain Green. Preedom Exhibit 4. The United States Attorney in Montana has now obtained an indictment from a grand jury against the former leaders of Plain Green. AA ¶ 6; Exhibit 5. These charges include mail fraud.

Second, the Purported Arbitration Agreement represented that the "agreement. . . shall be governed by the law of the Chippewa Cree Tribe." The Term Sheet, however, reveals that "law of the Chippewa Cree Tribe" was bought and paid for by nonmembers of the Tribe and was not "law" at all. FAC Exhibit 1 at 1. Instead, Chippewa Cree law was what Think Finance dictated. "The Tribe will adopt a finance code that is acceptable to all parties and provide for licensing of an arm of the tribe to engage in consumer lending." *Id.* at 1. The Term Sheet further provides that the Tribe must "[r]evise the Tribal Credit Transaction Code to provide for a broader array of lending products." *Id.* at 3.

Third, the Purported Arbitration Agreement states that: "Neither this Agreement nor the Lender is subject to the laws of any state of the United States." This statement is false because the loans involve off-reservation activity and Defendants are subject to state law.

The Declarations of Plaintiffs establish that they: (1) relied on the misrepresentations in determining whether they could take legal action; (2) the representations were not open to their knowledge; and (3) they were harmed as a result. Given Decl. ¶¶ 7-11; Gingras Decl. ¶¶ 7-11. Plaintiffs relied on these representations and deferred taking any legal action because of the purported legal immunity of Plain Green. Given Decl. ¶10; Gingras Decl. ¶ 10. Their forbearance resulted in harm to them. Gingras Decl. ¶ 13, 15.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

- 55 -

Under Vermont law, the Court may order rescission of a contract if there is fraud in the inducement. *Sarvis v. Vermont State Colleges*, 172 Vt. 76, 79-80 (2001). The Court may also order rescission if the promises made "were steps in a scheme to defraud the plaintiffs and were a most apt and effectual means of accomplishing the fraud." *Comstock v. Shannon*, 116 Vt. 245, 250 (1950); *Land Fin. Corp. v. Sherwin Elec. Co.*, 102 Vt. 73, 82 (1929).

4. The Purported Right To Opt Out Of Arbitration Is Just Another Illusory Dead End.

Defendants argue that the purported right to opt out means that the Purported Arbitration Agreement is not unconscionable. TD Mot. to Dismiss at 15. This position is untenable because a borrower who opts out is in an equally unconscionable situation. The Purported Arbitration Agreement states that if the borrower opts out, the Chippewa Cree courts would decide any disputes. TD Mot. to Dismiss Exhibit B. However, as previously discussed, the outcome of any proceeding in the Chippewa Cree courts has already been dictated by the Defendants' control over the substantive law. Section V.A.1.c. shows that the Chippewa Cree tribal courts do not have the power to resolve this dispute. In addition, the Chippewa Cree courts are currently in disarray and cannot offer a forum for resolving this dispute. As a result, any borrower who opts out of the Purported Arbitration Agreement cannot obtain any relief. In this case, opting out is not a practical alternative for Plaintiffs because the Purported Arbitration Agreement still requires them to file a claim in Chippewa Cree court in Montana. Given the difficulty of gaining access to the substantive law that supposedly governs the dispute, there is no possibility that Plaintiffs would be able to navigate the procedural rules of a foreign court system thousands of miles away.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

5.     The Delegation Clause Of The Purported Arbitration Agreement Is Invalid.

A delegation clause is a portion of an arbitration agreement that empowers the arbitrators to decide if the parties agree to arbitrate a particular dispute.  A court should not determine that a delegation clause exists unless there is "clear and unmistakable evidence" that the parties agreed that the arbitrator should decide the arbitrability question.  *First Options v. Kaplan*, 514 U.S. 938, 944-45 (1995).  When there is a direct attack on the delegation clause, the court determines issues of arbitrability.  *Rent-A-Center, W., Inc. v. Jackson*, 130 S.Ct. 2772, 2779 (2010); *see also id.* at 2777 n 1.

A review of the delegation clause in the Purported Arbitration Agreement shows that it is not a clear and unmistakable delegation of the power to decide whether arbitration is available:

> The arbitrator has the ability to award all remedies available under the Chippewa Cree Tribe's tribal law, whether at law or in equity, to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual Disputes between the parties.  The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide arbitration is to be determined solely by a court of competent jurisdiction located within the Chippewa Cree Tribe, and not by the arbitrator.  If the court refuses to enforce the class-wide arbitration waiver, or if the arbitrator fails or refuses to enforce the waiver of class-wide arbitration, the parties agree that the Dispute will proceed in tribal court and will be decided by a tribal court judge, sitting without a jury, under applicable courts rules and procedures and may be enforced by such court through any measures or reciprocity provisions available.

TF Mot. to Compel Arb. Exhibit 10 at 8.

First, under the terms of the Purported Arbitration Agreement, it is not clear that an arbitrator has the authority to hear this case at all.  The delegation clause says that "the arbitrator has no authority to conduct class wide proceedings."  This is a class wide case.  By removing the

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

authority to decide class wide proceedings, the parties removed all issues connected to those proceedings, including the question of arbitrability.

Second, none of the Defendants point to any provision of Chippewa Cree law that deals with arbitration. Because the power of the arbitrator supposedly comes from Chippewa Cree law, *see* TF Mot. to Compel Arb. Exhibit 10 at 8, it is entirely unclear whether the arbitrator can determine if an arbitration agreement exists. Moreover, Defendants have failed to present any Chippewa Cree law that would provide the standards for determining whether arbitration is appropriate. Instead, Defendants cite to federal law to argue that the arbitrator has the power to determine arbitrability. TD Mot. to Dismiss at 18, n.20; TF Mot. to Compel Arb. at 10.

Third, the Defendants do not explain whether the arbitrator has the power to invalidate the Purported Arbitration Agreement on the grounds outlined in Section 2 of the Federal Arbitration Act. Again, Defendants only cite to federal law regarding delegation clauses; they do not detail the grounds for invalidating a delegation clause under Chippewa Cree law. Any arbitrator operating under the Purported Arbitration Agreement would have no basis for invalidating a delegation clause because there is no Chippewa Cree law on the subject. As a result, any delegation provision is merely illusory.

Fourth, the carve outs in the delegation clause leave a confusing set of rules to determine the exact scope of the arbitrator's powers. The confusion within the delegation clause is compounded by other statements in the Purported Arbitration Agreement. For example, "the arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Chippewa Cree Tribe or express terms of this Agreement to Arbitrate, including limitations on the Arbitrator below." TF Mot. to Compel Arb. Exhibit 10 at 7. How

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

does the arbitrator determine whether there is a conflict between Chippewa Cree law and the arbitration organization's rules?  The agreement does not say.

   a.   The Tribal Defendants Incorrectly Identify The Delegation Clause.

The Tribal Defendants point to the phrase "any issue concerning the validity, enforceability, or scope of this Agreement" as being the delegation clause, but this phrase does not appear in the delegation clause.  TD Mot. to Dismiss at 18 n.19.  Instead, it appears in the definition of "Dispute."  The delegation clause must point to the powers that the arbitrator has.  *See Rent-A-Center*, 130 S.Ct. at 2776.   In *Rent-A-Center*, the Supreme Court determined that the phrase " '[t]he Arbitrator  . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable'" was the delegation clause.  130 S.Ct. at 2777.  For this case, the phrase that sets forth the powers of the arbitrator is the paragraph found at page 8 of Exhibit 10, not the phrase identified by the Tribal Defendants.

   b.   Plaintiffs Are Specifically Challenging The Delegation Clause.

The Think Finance Defendants next argument seems to be that Plaintiffs' challenge is not unique to the delegation clause.  TF Mot. to Compel at 10-12.  But under *Rent-A-Center*, the party opposing arbitration need only make a challenge that is specific to the delegation clause; it does not matter if the party also challenges other parts of the arbitration agreement.  *Rent-A-Center*, 130 S.Ct. at 2778-79.  In *Rent-A-Center*, the Court noted that the "Application of the severability rule does not depend on the substance of the remainder of the contract.  Section 2 [of the FAA] operates on the specific 'written provision' to 'settle by arbitration a controversy that the party seeks to enforce.  Accordingly, unless Jackson challenged the delegation provision *specifically*, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator."  *Id.*  (emphasis added).

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

The Court said that Jackson had to challenge the delegation provision "specifically," not "uniquely." *Id.* at 2779. In other words, if a reason exists for independently invalidating the delegation provision, it does not matter if that argument will also invalidate the arbitration agreement as a whole. *Rent-A-Center* only applies when a plaintiff's invalidation argument addresses the arbitration agreement as a whole and the plaintiff does not specifically mention the delegation clause. The Supreme Court confirmed that view when it stated: "The District Court correctly concluded that Jackson challenged ***only*** the validity of the contract as a whole. ***Nowhere*** in his opposition to Rent-A-Center's motion to compel arbitration did he even mention the delegation provision." *Id.* (emphasis added). Plaintiffs have specifically challenged the delegation clause both in their First Amended Complaint and their opposition. Accordingly, *Rent-A-Center* does not defeat Plaintiffs' arguments.

(1)      The Delegation Clause Is Fraudulent.

Defendants planned to use the delegation clause of the Purported Arbitration Agreement to prevent federal courts from examining their fraudulent practices. Defendants furthered that plan by purporting to give the right to enforce any arbitration award to the Chippewa Cree tribal courts. "The arbitrator will make written findings and the arbitrator's award may be filed with the tribal court. The arbitration award . . . may be set aside by the tribal court upon judicial review." TD Mot. to Dismiss Exhibit B. The delegation clause holds the key to keeping the entire scheme from federal review.

The Think Finance Defendants argue that Plaintiffs have identified no misrepresentations that specifically induced them to enter into the delegation clause. *See* TF Mot. to Compel at 11. This is not true. Plaintiffs have identified three misrepresentations that specifically relate to the delegation clause. First, the representation in the delegation clause that the arbitrator's powers are based in Chippewa Cree law relates specifically to the delegation provision. This

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

misrepresentation is false because the Defendants purchased Chippewa Cree law in the Term Sheet by ensuring that the law was favorable to their enterprise. FAC ¶ 125. This misrepresentation affected the essence of the delegation clause because the manipulation of the substance of the Chippewa Cree law preordains the outcome of the arbitration. It is one thing to agree to a decision before a neutral magistrate. It is a much different thing to agree to a show trial where the outcome is already determined by hidden actors who hire high priced lawyers to make sure the controversy never sees the light of day. The misrepresentations in the delegation clause were false when made, known to Defendants, not open to Plaintiffs' knowledge, and were relied upon by Plaintiffs. Given Decl. ¶¶ 7-9; Gingras Decl. ¶¶ 7-9.

Second, the claim that Chippewa Cree law governs the arbitrator's powers also incorporates the representation that the Lender in this case was immune from state and federal law. FAC ¶¶ 120, 121b, & 126. This representation was false when made and known to be false by Defendants. Plaintiffs did not know that the claim of immunity was false and they relied on that misrepresentation to their detriment. Given Decl. ¶¶ 7-9; Gingras Decl. ¶¶ 7-9.

Third, the delegation clause also misrepresents that Plain Green is the Lender. The clause says that the "**_parties_** agree that the arbitrator has no authority to conduct class-wide arbitration." FAC ¶ 124 (emphasis added). The representations that Plain Green was a party to the agreement and the "Lender" are false because the true lenders were the other Defendants, which Defendants fraudulently concealed. This representation affects the essence of the transaction. Plaintiffs had to know with whom they were dealing before they could know whom to sue. Plaintiffs did not know that hidden parties were controlling Plain Green. Plaintiffs relied on the representation that Plain Green was the true party because they did not take action earlier to invalidate the delegation clause. Given Decl. ¶¶ 7-9; Gingras Decl. ¶¶ 7-9.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

The Disarray In The Tribal Judiciary Has Frustrated The Purpose Of The Delegation Clause.

Plaintiffs specifically challenge the delegation provision because the disarray in the tribal courts has frustrated its purpose. The delegation clause specifically reserves certain issues for the Chippewa Cree tribal courts. The Think Finance Defendants argue that Plaintiffs have not alleged that the corruption extends to the tribal courts (TF Mot. to Compel at 22-23), but the corruption does not have to extend to the tribal courts for the purpose to be frustrated. All that is required is that the decisions rendered by the Court are of questionable legitimacy. The litigation surrounding the Chippewa Cree tribal courts, which Plaintiffs understand to be ongoing, would frustrate the intent of the arbitration agreement. In addition, the fact that a former Chippewa Cree judge has admitted in an interview with the Office of the Inspector General for the United States Department of the Interior that he entered a decision that he believed was improper and unconstitutional because he felt intimidated suggests that the corruption may extend to the tribal judiciary. *See* AA ¶ 9.

(3) The Delegation Clause Is Unconscionable.

The delegation clause is also unconscionable because the arbitration remedy does not provide any method for determining whether arbitration is appropriate. As discussed above, the delegation provision describes the source of the arbitrator's power as coming from Chippewa Cree law, but none of the Defendants point to any Chippewa Cree law regarding arbitration. As a result, it is unclear whether the arbitrator would be able to determine if the dispute is arbitrable or if the clause is invalid because of fraud, unconscionability, or frustration of purpose. As a result, the delegation provision is entirely illusory and unconsionable.

The Think Finance Defendants cite *Campaniello Imports*, *Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 666 (2d Cir. 1997) and argue that bare allegations of a scheme to defraud cannot

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 62 -

be a basis for challenging an arbitration clause.  TF Mot. to Compel at 11.  However,

*Campaniello* is inapposite.  First, *Campaniello* is not a case about a delegation clause; it deals

with the arbitration agreement as a whole.  Second, *Campaniello* distinguished the facts in its

case from those in *Moseley v. Eletronic & Missile Facilities, Inc.*, 374 U.S. 167 (1963).  In every

area where the *Campaniello* Court distinguished *Moseley*, the facts in this case align more

closely with *Moseley* than *Campaniello*.  For example, the *Campaniello* plaintiffs complained

that remedies in Italy were weaker than in the United States, but did not say why.  Here,

Plaintiffs have alleged that Rees and Think Finance purchased Chippewa Cree law to make it

favorable to the practice of payday lending.  FAC ¶ 125.  As Defendants have conceded, there is

no limit on the interest rates that can be charged under Chippewa Cree law.  TF Mot to Dismiss

at 15.  Thus, they have affirmed Plaintiffs' allegations that Defendants Rosette, Whitford, and

McInerney did in fact adopt laws that were favorable to payday lending.  FAC ¶ 127.

*Campaniello* also distinguished *Moseley* on the basis that the *Moseley* plaintiffs had alleged that

the arbitration clause allowed defendants to avoid federal law.  This is precisely what Plaintiffs

have alleged here.  FAC ¶ 126-127.  The Defendants want Chippewa Cree law to apply because

they do not want state and federal laws against payday lending to apply and they have

preordained the outcome of any arbitration that would occur.[13]  Finally, Plaintiffs' allegations of

fraud in the arbitration clause and the delegation clause are far more detailed than in

*Campaniello*.  FAC ¶¶ 110, 112, 118-131; s*ee also supra* at 17-21, 59-62.

---

[13] In *Moseley*, the party seeking arbitration sought to hold the arbitration in New York, even though the work was done in Georgia.  Similarly, even though the lending occurred in Vermont in this case, the Defendants are effectively seeking to require litigation in Montana.  Defendants seek to force Plaintiffs to agree to immunity prior to having any arbitration in Vermont.  That is an unacceptable tradeoff.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

6.	The Other Defendants Cannot Take Advantage Of The Purported Arbitration Agreement.

Each of the Defendants attempts to take advantage of the Purported Arbitration Agreement, but none of them is entitled to do so.  TF Mot. to Compel; Rees Mot. to Dismiss at 10; TCV Mot. to Dismiss at 17, Sequoia Mot. to Dismiss at 8.  Plaintiffs did not agree to arbitrate with any of them.  Despite the Defendants' contentions that the scope of arbitration clause is broadly worded, it does not extend to all of the Defendants.  The Purported Arbitration Agreement states:  "A 'Dispute' is any controversy or claim between you and Lender, its marketing agent, affiliates, assigns, employees, officers, managers, members or shareholders (each considered a 'Holder' for purposes of this Agreement)."  TF Mot. to Compel Exhibit 4 at 7.

"It is black letter law that an obligation to arbitrate can be based only on consent."  *Sokol Holdings*, *Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358 (2d Cir. 2008).  To determine whether a third party can estop a signatory to an arbitration agreement and require them to arbitrate, the Second Circuit employs a two-part test.  First, the factual issues of the dispute with Plain Green must be "intertwined" with the dispute with the Defendants.  *See id.* at 359.  Second, "there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying the obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement."  *Id.*  In examining the second prong of this test, defendants that come by their relationship through wrongful means cannot avail themselves of the benefits of the arbitration agreement.  *Sokol Holdings, Inc.*, 542 F.3d at 362.  In addition, any presumption in favor of arbitration that may exist does not apply to the question of whether an agreement to arbitrate has been made.  *Applied Energetics*, *Inc. v. Newoak Capital Mrkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011).  The estoppel inquiry is fact specific.  *Ross v. American Express*, 547 F.3d 137, 144 (2d Cir. 2008).

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

The Think Finance Defendants fail the second prong of this test. The relationship that Think Finance created between the Plain Green enterprise and the Think Finance Defendants was designed to further a fraud. As a result, this relationship cannot be used as a basis to sweep the Think Finance Defendants into the Purported Arbitration Agreement. The First Amended Complaint alleges that the Think Finance Defendants pretended to provide services to Plain Green as part of the fraud. To further their fraud, the Think Finance Defendants tried to make themselves look like agents. However, because they assumed this supposed role through wrongful means, they cannot qualify as Plain Green's "marketing agent, affiliates, assigns, employees, officers, managers, members or shareholders." Since they are neither named specifically in the Purported Arbitration Agreement nor fall within the general categories of the Agreement, they cannot avail themselves of any arbitration provision. "Because the arbitration agreement delineates which non-signatories may compel arbitration, [plaintiff] cannot fairly be considered to have consented to arbitration with any other entities." *Lucy v. Bay Area Credit Servs. LLC*, 792 F. Supp. 2d 320, 326 (D. Conn. 2011).

Second, none of the Defendants are agents of Plain Green. A claim of agency requires facts establishing: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking. *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 342 (D. Vt. 2010) (citations and quotations omitted). An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control. *Id.* (citations omitted); *Kimco Leasing Co. v. Lake Hortonia Properties*, 161 Vt. 425, 429 (1993) (agent must be subject to the principal's control). The party asserting that agency exists bears the burden of proof on that issue. *Id.*

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

Whatever "agent" means it does not mean an undisclosed, criminal mastermind. The First Amended Complaint does not allege that the Think Finance Defendants are agents. It alleges that the Think Finance Defendants dominated and controlled Plain Green. FAC ¶¶ 23, 54-56, 58, 69-71, 77-91. The Plaintiffs have also alleged that the Think Finance Defendants deliberately attempted to conceal their control by claiming that they were only providing "services." FAC ¶ 101. As discussed in Section IX.A.2.c.(3), the Court must accept Plaintiffs' characterization of the documents that are attached to the Complaint when Plaintiffs specifically take issue with their contents.

The Think Finance Defendants incorrectly argue that Plaintiffs have alleged that the Think Finance Defendants are the agents of Plain Green. TF Mot. to Compel. at 18. To support this claim, the Think Finance Defendants selectively cite three words from paragraph 109 of the FAC, "on behalf of." Think Finance's quotation ignores the context and meaning of that paragraph of the FAC, which alleges that Think Finance dominated and controlled the officers of Plain Green. FAC ¶¶ 23, 54-56, 58, 69-71, 77-91. Think Finance also ignores the factually specific allegations that show that when Think Finance took actions with the appearance of acting on behalf of Plain Green, they did so with the actual intent of avoiding liability. For example, Paragraph 99 alleges: "Despite their actual control of the Enterprise, Defendants Rees and Think Finance have attempted to create the appearance of separate corporate forms and attempted to distance themselves from the enterprise through the execution of various legal documents. Defendants Rees and Think Finance have also created a number of different subsidiaries like Defendants Tailwind Marketing, TC Decision Sciences, and TC Loan, to isolate and decrease any legal liability they may face." Paragraph 101 states that "Defendants Rees and Think Finance hoped to avoid liability by falsely claiming that they only provided services to

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

Plain Green, when in reality they created the whole enterprise and ran its operations through an assortment of subsidiaries and affiliates like Defendants Tailwind Marketing, TC Loan, and TC Decision Sciences." The Think Finance Defendants have not provided a fair reading of the FAC.

The other paragraphs Defendants cite do not show any agency between Plain Green and Think Finance. Paragraph 89 states that "Rees and Think Finance control and dominate Tailwind Marketing." Paragraph 90 states that "Rees and Think Finance control and dominate TC Decision Sciences." Paragraph 104 states that the "scheme to evade state laws was carried out by Defendants Rees and Think Finance through their control and domination of Plain Green and an assortment of subsidiaries and affiliates like Defendants Tailwind Marketing, TC Loan, and TC Decision Sciences." Paragraph 152 states that "[a]t the direction of Think Finance and Rees, TC Decision Sciences provides customer service, verification, and collections of customer accounts." Paragraph 153 says "[a]t the direction of Think Finance and Rees, Tailwind Marketing provides information on potential targets for the illegal lending scheme."

Instead of providing actual facts about the relationships between the parties, the Think Finance Defendants supported their motion with the Declaration of Matt Hargrove. Mr. Hargrove claims that his declaration is based on personal knowledge, which hardly seems possible. Mr. Hargrove's chief virtue seems to be that he knows nothing. Mr. Hargrove was at Think Finance for less than three months before he signed his declaration. He was not at the company during the time of Plain Green's creation. Thus, when he claims that Think Finance operates as a service provider for Plain Green, LLC, his "personal knowledge" must necessarily

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

exclude knowledge of Plain Green's formation. Mr. Hargrove also does not know about the ousting of Ken Blatt-St. Marks from his position at the head of the Tribe.[14]

The Think Finance Defendants also fail to establish that they meet any of the other categories referenced in the arbitration clause, which are "affiliates, assigns, employees, officers, managers, members or shareholders." The Second Circuit has allowed estoppel when the relationship is a formal corporate relationship. "But this Court's cases which have applied estoppel against a party seeking to avoid arbitration have tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of *corporate* relationship to a signatory party; that is, this Court has applied estoppel in cases involving subsidiaries, affiliates, agents, and other related business entities." *Ross*, 547 F.3d at 144. The Think Finance Defendants have failed to meet their burden of showing that such a relationship exists. Mr. Hargrove spends no time describing the actual relationship between the Think Finance Defendants and Plain Green. He provides none of the underlying agreements that would illuminate the relationship. Nor does he provide any of the correspondence or other documents that would clarify Think Finance's actual operation of the Plain Green enterprise. Without these documents, the Think Finance Defendants have failed to meet their burden to establish that estoppel is appropriate. *See Ross*, 547 F.3d at 144.[15]

The plain language of the Purported Arbitration Agreement also does not cover the Think Finance Defendants. The Purported Arbitration Agreement nowhere mentions any of the Think

---

[14] It also worth noting that the First Amended Complaint was sufficiently detailed to allow an employee of less than three months to find the eight specific arbitration agreements that purportedly apply to Ms. Given and Gingras. It seems that the Think Finance Defendants have fair notice of the claims against them.

[15] The insistence on the agreements is not a mere formality. The agreements may disclose important information about the relationship. *See Lucy*, 792 F. Supp. 2d at 322 (agreement disclosed that non-signatory was not "an agent or an employee").

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

Finance Defendants by name. Moreover, because the Think Finance Defendants have failed to

establish that they are in any of the categories in the dispute clause of the Purported Arbitration

Agreement, the Think Finance Defendants are not "textually linked" to the Purported Arbitration

Agreement. Thus, there is no basis to determine that Plaintiffs agreed to arbitrate with any of the

Think Finance Defendants.

The *BMO* cases are distinguishable. TF Mot. to Compel at 13. Each case involved

Originating Depository Financial Institutes ("ODFI"), the party that actually processed the wires.

*Booth v. BMO Harris Bank*, No. 13-5968, 2014 U.S. Dist. LEXIS 111053 at *3 (August 11, 2014

E.D. Pa.); *Graham v. BMO Harris Bank*, No. 3:13CV1460, 2014 U.S. Dist. LEXIS 4090548, *9-

10 (July 16, 2014 D. Conn.); *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1397-98

(S.D. Fla. 2014); *Moss v. BMO Harris Bank, N.A.*, 24 F. Supp. 3d 281, 284 (E.D.N.Y. 2014).

None of the ODFIs were in the position of Think Finance as the leader of a fraudulent criminal

enterprise. As a result, none of the cases support Think Finance's arguments here. Moreover,

the *BMO* plaintiffs did not seem aware of Think Finance's role in the fraudulent scheme and

apparently did not raise the same arguments for invalidating the Purported Arbitration

Agreement that are made here.

Finally, Think Finance attempts to argue that it is a third party beneficiary of the

Purported Arbitration Agreement. However, the Second Circuit has recognized that "[w]here, as

here, a non-signatory moves to compel arbitration with a signatory, it remains an open question

in this Circuit whether the non-signatory may proceed under any theory other than estoppel."

*Ross*, 547 F.3d at 143 n.3.

But even if the Court adopted such an approach, the Think Finance Defendants would not

meet the requirements. To be a third party beneficiary, the parties to the contract must have

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 69 -

intended to confer a benefit on the third party.  *See Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993).  As discussed above, none of the Think Finance Defendants were named in the Purported Arbitration Agreement either by name or by description. Accordingly, they cannot be considered third party beneficiaries.

Technology Crossover Ventures and Sequoia Capital are even further from being able to rely on the Purported Arbitration Agreement.  Neither Technology Crossover Ventures nor Sequoia Capital are mentioned anywhere in the Purported Arbitration Agreement.  In addition, neither of these Defendants has provided any evidence that they satisfy any of the generic categories of the scope clause.  They are not agents of Plain Green because Plain Green did not have supervisory authority over them.  They did not perform any functions for Plain Green that would support their claim that they are agents.  Technology Crossover Ventures and Sequoia Capital do not offer any evidence to suggest that they meet the definition of "affiliates, assigns, employees, officers, managers, members or shareholders."  While both Sequoia Capital and Technology Crossover Ventures had general partners that were directors of Think Finance, Sequoia and Technology Crossover Ventures have presented no evidence that they were "managers, members or shareholders" of Plain Green.

While it is true that Plaintiffs allege that all of the Defendants participated in the Plain Green enterprise, this participation occurred by wrongful means and cannot be used to sweep either Sequoia or Technology Crossover Ventures under the umbrella of the Purported Arbitration Agreement.  As the Second Circuit noted, "an obligation to arbitrate can be based only on consent."  *Sokol*, 542 F.3d at 358.  Based on the facts surrounding this particular RICO enterprise, the relationship between Plaintiffs and Defendants cannot be described as a consensual relationship.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

7. The Court Should Allow Discovery Into The Issues Related To The Invalidity Of The Purported Arbitration Agreement If It Does Not Outright Deny The Motion To Compel Arbitration.

Both the Court and Plaintiffs would benefit from discovery to investigate fully the fraudulent enterprise alleged in the First Amendment Complaint and the current corruption gripping the Chippewa Cree Tribe. Pre-arbitration discovery is available to determine whether a particular contractual arbitration provision is unconscionable. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 n.5 (3d Cir. 2013). Although it is clear that the both the Purported Arbitration Agreement and the delegation clause are unenforceable, if the Court decides not to deny the Defendants' motion to compel arbitration, the Court should, at a minimum, order pre-arbitration discovery.

8. Plaintiffs Are Entitled To A Jury Trial On The Issue Of Arbitrability.

If the resolution of the arbitration motion involves questions of fact, Plaintiffs are entitled to a jury trial to resolve those issues. 9 U.S.C. § 4. The Court can determine as a matter of law that the illusory nature of the Purported Arbitration Agreement makes the Agreement unconscionable. However, to resolve the arguments involving fraudulent intent and frustration of purpose, the Court may be faced with fact issues that a jury must resolve.

## VI.    VENUE IS PROPER IN FEDERAL COURT IN VERMONT.

Venue is proper because "a substantial part of the events or omissions giving rise to the claim occurred" in Vermont. 28 U.S.C. § 1391(b)(2). The Tribal Defendants' principal argument is that they did not do anything in Vermont. The flaw in this argument is that the Tribal Defendants are not counting any of the activities that the Plain Green enterprise conducted in Vermont. As with the issue of personal jurisdiction, the Court should consider the actions of the Plain Green enterprise in determining whether Vermont is a proper venue.


76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Under the current version of the venue statute, the mailing of a collection notice is sufficient to confer venue over a controversy involving the collection of debts. *Bates v. C& S Adjustors*, 980 F.2d 865, 868 (2d Cir. 1992). In this case, Defendants had bi-weekly contact with the State of Vermont that continued for years. In addition, both the application for the loans and interaction with the Plain Green website occurred in Vermont. This is more than sufficient to confer venue.

VII.     THE FEDERAL CLAIMS ARE ENFORCEABLE AGAINST DEFENDANTS.

Federal statutes of general applicability are enforceable against Native American tribes. *See*, *e.g.*, *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1959). The legal presumption is that the statute applies unless there is language that excludes Native American tribes.

A.     The Consumer Financial Protection Act Is Enforceable Against Defendants.

"Congressional intent is the keystone as to whether a federal private right of action exists for a federal statute." *Bellikoff v. Eaton Vance Corp.,* 481 F.3d 110, 116 (2d Cir. 2007). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). While courts "cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided," *Bellikoff*, 481 F.3d at 116, the text and legislative history of the Consumer Financial Protection Act establish the existence of a private cause of action for its violation. *See Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC,*

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

No. CV-14-2090-MWF-(PLAx), 2014 U.S. Dist. LEXIS 89022, *48 (C. D. Cal. May 27, 2014).[16]

From its title through its text, the "Wall Street Reform and Consumer Protection Act" (the "Consumer Finance Protection Act") contains rights creating language supporting the existence of a private cause of action. *See Sandoval*, 532 U.S. at 288-289; *Cannon v. University of Chicago,* 441 U.S. 677, 690 n.13 (1979). Among other things, the Consumer Financial Protection Act creates "Consumer rights to access information," which were routinely violated by Defendants when they shut down borrowers' access to their accounts when these borrowers questioned the Defendants' conduct. 12 U.S.C. § 5533. The Consumer Financial Protection Act also makes it unlawful for any covered person "to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law," to commit any act or omission in violation of Federal consumer financial law, or to engage in any unfair, deceptive, or abusive act or practice. 12 U.S.C. § 5536(a)(1).

"The court (or the Bureau, as the case may be) in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate or equitable relief." 12 U.S.C. § 5565(a)(1). Notably, most of the relief available by statute consists of remedies for injuries to individual wronged consumers, including rescission of contracts, refund of monies, restitution, disgorgement, and payment of damages. 12 U.S.C. § 5565(a)(2)(A)-(E). On the other hand, two statutory features, the express litigation authority of

---

[16] This case is currently pending before the Ninth Circuit. The Second Circuit has not yet had occasion to consider whether the CFPA provides a private right of action. *Nguyen v. Ridgewood Sav. Bank,* 2015 U.S. Dist. LEXIS 64301*3, 43-44 (E.D.N.Y. May 15, 2015) was an unpublished pro se case in which the plaintiff's claims were dismissed with prejudice in their entirety. The CFPA section is dicta because the plaintiffs "provide[d] no facts beyond conclusory statements . . . to support . . . [a] violation of the CFPA" and contains essentially no analysis. *Id.* at *34-35.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

the Bureau of Consumer Financial Protection, and the inclusion of explicit private rights of action in other portions of the larger statute, support Defendants' position. *Bellikoff*, 481 F.3d at 116 (indicating that the "express provision of one method of enforcing" a rule suggests the preclusion of others, as does the existence of an express private right of action in a different section of the statute).

The language creating rights throughout the Consumer Financial Protection Act and the inclusion of a variety of individual remedies both support the conclusion that the Consumer Financial Protection Act creates a private cause of action. This conclusion is reinforced by the legislative history of the Consumer Financial Protection Act. In the House, an amendment was added to preclude a private right of action, but that amendment was eliminated by the Senate.[17] As a result, this Court should permit Plaintiffs to proceed with an action under the Consumer Financial Protection Act.

B.  The FTC Act Is Enforceable Against Defendants.

The FTC Act is also enforceable against Defendants. *FTC v. AMG Serv.*, 2014 U.S. Dist. LEXIS 29570, *10 (D. Nev. March 7, 2014). The language of the statute, which grants "the FTC broad authority to bring suit against 'any person, partnership, or corporation' for violating 'any provision of law enforced by the FTC," makes it applicable to the Tribal Defendants. *Id.* at *13.

---

[17] More specifically, the amendment added a new section, § 4508, to H.R. 4173 after it was introduced in the House, which was later removed from the Act in the Senate. *Compare* H.R. 4173, 111th Cong. (as introduced in House, December 2, 2009) §§ 4501-4508; with H.R. 4173, 111th Cong. (as engrossed in House, December 11, 2009) §§ 4501-4509 (adding a new section 4508 titled "No Private Right of Action"); H.R. 4173, 111th Cong. (as referred in Senate January 20, 2010) §§ 4501-4509 (containing the section 4508 added by amendment in the House); 12 U.S.C. §§ 5561-5567 (excluding the section 4508 added by amendment in the House from the final codified version).

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 74 -

Defendants argue that the FTC Act does not create a mechanism to enforce the FTC Act. However, Defendants ignore the fact that the VCFA creates a mechanism to enforce the FTC Act. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 336 (2002).

C.    The First Amended Complaint States A Claim Against Defendants Under The EFTA, Which Is Enforceable Against Defendants.

The Electronic Funds Transfer Act ("EFTA") has an express right of action for consumers. 15 U.S.C. § 1693m. Defendants argue that the EFTA was not intended to apply to them. Rees Mot. to Dismiss at 16; TD Mot. to Dismiss at 27-29; TF Mot. to Dismiss at 19; TCV Mot. to Dismiss at 11; Sequoia Mot. to Dismiss at 14. The FTC has a different view. It filed suit against another Native American payday lender and its sponsors for violations of the EFTA. *See* Complaint in *FTC v. AMG Serv., Inc.*, No. 2:12-cv-00536. Preedom Aff. Exhibit 10. It alleged that the Native American entity was responsible for nearly the same type of EFTA violations that occurred in this case. *See id.* ¶¶ 61-65. The FTC's interpretation of its EFTA regulations is entitled to deference.

The District Court hearing the *AMG* case agreed that the FTC Act, and therefore the EFTA, was an act of general applicability and enforceable against Native American tribes. *FTC v. AMG Serv., Inc.*, 2014 U.S. Dist. LEXIS 29570, *16 (D. Nev. March 7, 2014) (finding that the "FTC Act is an act of general applicability without an exception for Indian tribes that therefore applies to arms of Indian tribes, their employees, and contractors"); *see also FTC v. AMG Serv., Inc.*, 2013 U.S. Dist. 185783 (D. Nev. July 16, 2013) (a magistrate decision that concluded that the EFTA applied to Native American defendants).

Defendants also argue that the statute of limitations under the EFTA has expired. Rees Mot. to Dismiss at 14; Sequoia Mot. to Dismiss at 14. Defendants are incorrect. The statute of limitations for the EFTA is subject to equitable tolling. *Apostoldis v. JP Morgan Chase & Co.*,

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

No. 11-CV-5664, 2012 U.S. Dist. LEXIS 157733, *17-18 (Nov. 2, 2012 E.D.N.Y.). To establish equitable tolling, the plaintiff must show that she: (1) acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply. *Id.* In this case, the statute of limitations is subject to equitable tolling because the Defendants repeatedly concealed the fraudulent nature of the Plain Green enterprise and even went so far as to lock Plaintiffs out of their accounts.

The facts relating to Ms. Given support equitable tolling. Ms. Given took out her last loan in July 2013. She did not receive the funds until sometime after that. Defendants cut off access to her account and the relevant documents pertaining to her loan. Given Decl. ¶ 12. When Ms. Given learned that the loan was illegal, she immediately contacted Plain Green to try to resolve the issue. She then contacted the Vermont Attorney General's Office to try to obtain legal representation for the action. Given Decl. ¶¶ 10-11. Prior to filing the Complaint, she did not learn of the true nature of the Plain Green enterprise. Given Decl. ¶¶ 8-9. The facts show that Ms. Given is entitled to equitable tolling of the statute of limitations.

Defendants argue that because their documents purportedly give borrowers an option to choose between paying with ACH or a paper check, they do not condition the extension of credit on using an ACH. Defendants' argument conflates "require" with "condition," which is the actual word in the statute. "Condition" means to "have significant influence on or determine (the manner or outcome of something)." http://www.oxforddictionaries.com/us/definition/american _english/condition. The allegations of the Amended Complaint show that the "choice" between an ACH transfer and a paper check is a false choice. FAC ¶¶189-93. The economic realities of the loan mean that people will only select a transfer of money by wire.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

In reviewing whether there is a violation of the EFTA, the Court should examine the actual reality of the situation, rather than rely on a legalistic interpretation. *FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 812 (D.S.D. September 30, 2013) ("The arguments of the lending Defendants that 'in practice' they did not condition the extension of credit on consent to EFTs ignores that in reality their loan agreements did just that."). In this case, the Defendants actually had a "significant influence on" the outcome of whether costumers would use an ACH transfer, and therefore, they conditioned the loans on the acceptance of an ACH transfer. Defendants have violated the EFTA.

Defendant Rees' EFTA argument mischaracterizes both the First Amended Complaint and the law. Rees Mot to Dismiss at 16. Plaintiffs allege that Rees himself conditioned the extension of credit on electronic fund transfers violating the EFTA by describing in detail how Rees designed and controlled electronic fund transfers harming Plaintiffs in paragraphs 10, 23, 30, 52-54, 68-70, 77-91, and 100-117 of the First Amended Complaint. In brief summary, Defendant Rees created Plain Green in an effort to purchase tribal immunity from the Chippewa Cree Tribe in exchange for 4.5% of the revenues generated by the enterprise, while providing everything needed to run the enterprise. FAC ¶¶ 10, 23.

The defendants, including Rees, required borrowers to agree to electronic fund withdrawals from their bank accounts. FAC ¶ 30; *see also* TCV Mot. to Dismiss at 10; Sequoia Mot. to Dismiss at 14-15. Defendant Rees established the plan to create Plain Green and specifically defined the terms of the loans to be made through the Term Sheet that required Plain Green to process electronic fund transactions. FAC ¶¶ 77-85. Electronic fund transfers are central to the scheme created by defendant Rees to make extortionate loans while evading state laws. FAC ¶ 100-104. Defendant Rees controlled the drafting of the lending agreements "to

gravel & shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

ensure that victims of Plain Green would opt for ACH transfers" and the term sheet for the creation of Plain Green, which is attached to the Amended Complaint, reflects the control defendant Rees had "over the use of ACH transactions." FAC ¶¶ 110-111. Plaintiffs would not have had their bank accounts debited by illegal ACH transactions but for Defendant Rees, who had access to the bank accounts of Plaintiffs, and withdrew money from them, through his control over other defendants. FAC ¶¶ 115, 52-54, 68-69.[18]

The cases cited by defendant Rees are inapposite because they involved motions to dismiss filed by defendants who made electronics fund transfers exclusively to complete undisputedly legitimate retail purchases by plaintiffs who were later subject to allegedly improper fund transfers made by other corporate entities. *See In re Easysaver Rewards Litig.,* 737 F. Supp. 2d 1159, 1181-83 (S.D. Cal. 2010) (granting a motion to dismiss filed by a flower company that withdrew funds it was authorized to withdraw to pay for flowers, where the plaintiffs were later allegedly subject to unauthorized charges by another company, while denying a motion to dismiss filed by the other company); *Van Tassell v. United Mktg. Group, LLC,* 795 F. Supp. 2d 770, 784-85 (N.D. Ill. 2011) (granting a motion to dismiss filed by a defendant to whom the Plaintiff did not challenge her payment as unauthorized).

The FTC has previously successfully sued individuals who allegedly controlled tribal and corporate entities involved in a payday lending scheme for violating, among other things, the EFTA. *See FTC v. AMG Servs.,* 29 F. Supp. 3d 1338, 1346 (D.N.V. 2014). In *AMG,* the FTC sued 17 primary defendants. The complaint identifies six as individuals and four as tribal entities. All but two of the primary defendants, including five of the six named individuals, settled the EFTA claim brought against them by the FTC. *Id.* at 1347. The EFTA claim against

---

[18] § 1693m(f) has no bearing here because Plaintiffs, unlike defendant Rees, took no actions in bad faith relating to the EFTA.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

- 78 -

the other two primary defendants, a lawyer and his law firm, is still pending. *Id.* at 1355-57.

Similarly, an individual who planned a series of frauds nominally executed by a corporate entity

he controlled was recently found individually liable for EFTA violations "because of his

personal involvement in concocting and carrying out the several schemes that violated the EFTA

. . . ." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1097, 1104 (9th Cir. 2014).

## VIII.  THE VERMONT CONSUMER FRAUD ACT IS ENFORCEABLE AGAINST DEFENDANTS.

As discussed in Sections II.B. and V.A.1.c., state statutes of general applicability are

enforceable against off-reservation activity.  The Vermont Consumer Fraud Act ("VCFA") is a

statute of general applicability.  *Sawyer v. Robson*, 2006 VT 136, ¶12.  The VCFA reaches

anyone who violates the act.  "The plain meaning of 'other violator' is anyone engaged in an

unfair or deceptive commercial practice in violation of the CFA's prohibition on such activity.

Stated another way, our focus in determining applicability of the CFA is the nature of the alleged

violator's activities, not whether the violator falls into a defined statutory category."  *Id.*

Tribal Defendants argue that Plaintiffs fail to meet the standing requirements for a

private right of action under the VCFA because Plaintiffs must show either reliance on a

deceptive act or damage or injury from an unfair or deceptive action.  TD Mot. to Dismiss at 27-

28.  Plaintiffs allege both.  Plaintiffs relied on the deceptive statements made by Defendants that

the loans were legitimate emergency loans, that Plain Green was a legitimate sovereign entity,

and that Plain Green was immune from prosecution.  FAC ¶¶ 129-30; Given Decl. at ¶¶ 7-10;

Gingras Decl. at 7-10.[19]

---

[19] "Actual injury" is not necessary to prove a violation of the VCFA.  *Peabody v. P.J. Auto Village*, 153 Vt. 55, 58 (1989).

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

Plaintiffs also alleged injury from an unfair or deceptive action. Section 2481w(b) of Title 9 makes any loan by an unlicensed lender an unfair and deceptive act under the VCFA. The injury is self-evident: Plaintiffs took an illegal loan and were forced to pay it back with interest that exceeded any legal limit. Defendants have not returned either the principal or any part of the interest. In addition, Plaintiffs are suffering reputational damage to their credit because of the false reporting of the loans and their payment status. These harms were alleged in the original Complaint, but Plaintiffs have elected to add additional allegations that make them even more explicit. FAC ¶¶ 47-51, 60-63, 66-67.

Tribal Defendants also argue that Vermont Consumer Fraud Rule 104.05 authorizes charging triple digit interest rates. TD Mot. to Dismiss at 31. The language that Defendants rely on to justify their criminal conduct is "expressly authorized by the agreement creating the obligation and is legally chargeable to the debtor." But an interest rate in excess of the state maximum is not "legally chargeable to the debtor" under 9 V.S.A. § 41a, which establishes numeric ceilings for interest rates. Section 2233 of Chapter 8 expressly states: "No such loan for which a greater rate of interest, discount, consideration or charges than is authorized by section 41a or 46 of Title 9 has been charged, contracted for, or received shall be enforced in this state, and every person in any way participating therein in this state shall be subject to the provisions of this chapter." Defendants violate the Vermont Consumer Fraud Act and Vermont Consumer Fraud Rule 104.05 provides no defense.

The Vermont Consumer Fraud Act provides a private right of action to enforce violations of the FTC Act. 9 V.S.A. § 2453(b). However, the VCFA is not limited to violations of federal law. The General Assembly only said that interpretation should be "guided by" the FTC Act. That does not mean that FTC Act determines the outcome of the VCFA claim. *Caldor*, *Inc. v.*

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

*Heslin*, 215 Conn. 590, 598 (1990) (holding that the "guided by" language in the Connecticut statute did not preclude more extensive protection of consumers by the Connecticut statute). Moreover, the Vermont Supreme Court has departed from federal law when it thought it was necessary to vindicate the purpose of the Vermont Consumer Fraud Act. *See Elkins v. Microsoft*, 174 Vt. 328, 341 (2002) (holding that Vermont law allowed indirect purchaser actions where federal law did not).

    A.    <u>Sequoia And Technology Crossover Venture Provided "Direct Aid" And Are Therefore Liable Under The Vermont Consumer Fraud Act</u>.

Sequoia and Technology Crossover Ventures argue that they cannot be held liable under the Vermont Consumer Fraud Act because they did not directly participate in the fraud. TCV Mot. to Dismiss at 11; Sequoia Mot. to Dismiss at 15-16. The standard set forth in *Knutson v. Dion*, 2013 VT 106, ¶ 13 is that "derivative liability for consumer fraud could not be imposed 'absent direct participation in the unfair or deceptive acts, direct aid to the actor, or a principal/agent relationship." The FAC alleges that both Sequoia and Technology Crossover Ventures provided direct aid to the Plain Green enterprise. "Defendants Sequoia and Technology Crossover provide money that is used to start the illegal lending process." FAC ¶ 154. Without the money, there is no lending. As a result, Sequoia's and Technology Crossover Venture's participation in the scheme easily qualifies as "direct aid." In fact, in far less direct circumstances, the Vermont Supreme Court has already held financiers liable for their participation in unfair and deceptive acts. *State v. Custom Pools*, 150 Vt. 533, 536-37 (1988) ("The Legislature intended to place the burden of the cost of seller misconduct violative of the Consumer Fraud Act on the financing parties to the transaction. Such parties, unlike consumers, are in a position both to police the activities of the seller and to protect themselves against misconduct.").



76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

In addition, both Technology Crossover Ventures and Sequoia had one of their general partners serve on the Board of Directors of Think Finance. This further embroiled both Sequoia and Technology Crossover Ventures in the fraudulent scheme and constitutes "direct aid" under the Vermont Consumer Fraud Act.

Sequoia and Technology Crossover Ventures are also directly liable under the VCFA because they are within the chain of commerce for the transaction at issue. In *Elkins v. Microsoft Corp.*, the Vermont Supreme Court determined that there was no direct purchaser limitation on the VCFA. *Elkins*, 174 Vt. 331. Here, the item in commerce is money. While Plaintiffs may not have taken money directly from Sequoia or Technology Crossover Ventures, they did so indirectly. That is sufficient to satisfy the Vermont Consumer Fraud Act.

B.    <u>Defendant Rees Provided "Direct Aid" And Is Therefore Liable Under The Vermont Consumer Fraud Act</u>.

Rees's attempt to avoid liability under the VCFA is equally unavailing. Rees Mot. to Dismiss at 19. Rees provided direct aid to the Plain Green enterprise. *See supra* (listing the specific allegations against Rees). In fact, Rees established the actor who violated the Vermont Consumer Fraud Act when he created the Term Sheet that started the Plain Green enterprise. He also provided all of the support that the actor needed.[20] As a result, Rees can be held liable under the Vermont Consumer Fraud Act.

IX.    PLAINTIFFS HAVE ADEQUATELY ALLEGED RICO CLAIMS.

To state a claim for a violation of RICO, Plaintiffs must allege: (1) a substantive RICO violation under 18 U.S.C. § 1962, (2) injury to Plaintiffs' business or property, and (3) that such

---

[20] Rees's contention about the statute of limitations is incorrect because there has clearly been fraudulent concealment of Rees's role in the scheme for years and the acts are continuing acts for which the statute does not begin to run until the last act is completed. Rees has also cited no law establishing that 12 V.S.A. § 512 governs this case.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

injury was by reason of the substantive RICO violation. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 83 (2d Cir. 2015). Defendants spend a great deal of time trying to erect more hurdles for Plaintiffs to clear. However, the Supreme Court has expressly disapproved of this tactic. In *Sedima*, the Supreme Court rejected attempts to add elements to RICO that were not set forth in the text of the statute. *Sedima, S.P.R.L. v. Imrex, Inc.*, 473 U.S. 479, 495 (1985) ("There is no room in the statutory language for an additional, amorphous 'racketeering injury' requirement."). Defendants should not be allowed to rewrite the text of the RICO statute and insert new elements for stating a claim.

A.     Plaintiffs Have Alleged A Claim Under 18 U.S.C. § 1962(c).

To state a claim under Section 1962(c), a plaintiff may allege either: (1) collection of an illegal debt ***or*** (2) racketeering. *Goldsmith v. Massad*, 494 B.R. 119, 147 (Bankr. D. Mass. 2013) (emphasis added). Section 1962(c) states that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1961(6) defines an unlawful debt as "a debt (A) . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of laws related to usury, and (B) which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

In this case, Plaintiffs allege both an illegal debt collection claim *and* a racketeering claim. Defendants spend much of their briefs attacking the racketeering claim, but largely ignore the collection of unlawful debt claim. To the extent that Defendants address the unlawful debt

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

claim, many of their arguments improperly add pleading elements not supported by the Second Circuit.

> 1.      Plaintiffs Have Alleged A Claim For RICO Collection Of An Unlawful Debt.

Illegal debt collection "is at the heart of the conduct targeted by the RICO statute." *United States v. Minicone*, 960 F.2d 1099, 1107 (2d Cir. 1992); *see also United States v. Turkette*, 452 U.S. 576, 589-90 (1981) (stating that loan sharking was "among the very crimes that Congress specifically found to be typical of the crimes committed by organized crime"). The unlawful debt section of RICO was specifically designed to target loan sharks. *Durante Bros & Sons, Inc.*, 755 F.2d at 248. In enacting RICO, Congress intended to stop loan sharking "by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." *Id.* at 248 (quoting Organized Crime Control Act, Pub. L. No. 91-452 (1970) (Statement of Findings and Purpose)); *see also United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994) (rejecting equal protection challenge to the unlawful collection of debt portion of RICO and stating that "Congress' statement of purposes . . . gives some reason to believe that Congress" decided that collections of unlawful debt were central to evils at which RICO was directed).

Proving a violation of Section 1962(c) for collection of an unlawful debt is less complex than proving racketeering activity. To state a claim for collection of an unlawful debt, Plaintiff must allege: (1) the debt was unenforceable in whole or part because of state or federal law relating to usury; (2) the debt was incurred in connection with the business of lending money at a usurious rate; (3) the usurious rate was at least twice the enforceable rate; and (4) as a result of the above confluence of factors, he or she was injured in his or her business or property. *Sundance Land Corp. v. Community First Federal Sav. & Loan Assoc.*, 840 F.2d 653, 666 (2d

gravel &
shea  | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

Cir. 1988).  In contrast to a racketeering claim, the party with the burden of proof need only demonstrate a single collection to support a claim for collection of unlawful debt.  *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991); *see also United States v. Weiner*, 3 F.3d 17, 23 (1st Cir. 1993).  Moreover, the unlawful debt allegations need only satisfy Rule 8 of the Federal Rules of Civil Procedure.  *See Durante Bros & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 249 (2d Cir. 1985).[21]

Here, Plaintiffs have alleged all elements of an unlawful debt claim.  First, Plaintiffs have alleged that the debt Plaintiffs owed was illegal under Vermont law.  FAC ¶¶ 197-199, 216, 219.  The rates alleged are unlawful under other states' laws as well.  FAC ¶¶ 146.  Second, Plaintiffs have alleged that the Defendants were involved in the "business of lending money" at usurious rates.  FAC ¶¶ 2-3, 21-23, 25, 27-31, 83-85, 92-93, 148, 222.  Defendants lent millions of dollars to thousands of different borrowers.  FAC ¶ 101, 104.  Third, Defendants charged interest in the hundreds of percent, easily surpassing the two times limit specified in RICO.  FAC ¶¶ 25, 48-49, 60-62, 72-75, 220.  Fourth, Plaintiffs were injured by these usurious loans.  FAC ¶¶ 115-16, 149, 213, 222.  The first and most obvious injury is that Plaintiffs paid money in excess of the legal limit set for interest.  FAC ¶¶ 25, 48-49, 60-62, 72-75, 115-16, 149, 213, 220.  In addition, Plaintiffs suffered harms such as being unable to afford things like legal services to challenge the activity here.  FAC ¶¶ 121d.  Plaintiffs had their credit ratings damaged.  FAC ¶ 213.  They also lost valuable financial information when Defendants cut off access to their financial accounts.  FAC ¶¶ 121e.  Moreover, Plaintiffs incurred extra costs by having to reassemble their financial information by other means.  FAC ¶¶ 46, 59.

---

[21] *Durante*'s description of the elements of "Count 5" is an amalgamation of violations of the "unlawful debt" under 1962(c) and a RICO conspiracy under 1962(d).

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

While Plaintiffs allege a RICO violation against all Defendants for unlawful debt collection, most of the Defendants seek to avoid liability under this prong by minimizing their role in the loan sharking operation. However, other courts have not allowed defendants to dodge responsibility in this way. In *United States v. Oreto*, the First Circuit rejected an argument made by two enforcers of a loan sharking business who sought to minimize their role by claiming that they did not make decisions for the operation. 37 F.3d 739, 750 (1st Cir. 1994). The First Circuit stated that: "*Reeves* defines 'participate' as 'to take part in' 113 S. Ct. at 1170, and nothing in the Court's opinion precludes our holding that one may 'take part in' the conduct of an enterprise by knowingly implementing decisions, as well as by making them." *Id.* (citing *Reeves v. Ernst & Young*, 507 U.S. 170 (1992)). In discussing the importance Congress placed on eradicating loan sharking, the First Circuit recognized that: "Congress intended to reach all who participate in the conduct of that enterprise, whether they are generals or foot soldiers." *Oreto,* 37 F. 3d at 751.

        a.        Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt Against Rees.

Citing the Third Circuit's case of *United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991), Rees argues that Plaintiffs have not alleged that Rees took "a single act which would tend to induce another to repay on an unlawful debt incurred in the business of lending money." Rees Mot. to Dismiss at 29. That is simply not true. Plaintiffs allege that Rees took many acts that were designed to induce the repayment of an unlawful debt. In fact, Plaintiffs allege that Rees "was the mastermind of the illegal scheme." FAC ¶ 23. Rees "approached the Chippewa Cree Tribe with a deal." FAC ¶ 23. He offered to "provide everything the Tribe needed to run a successful payday loan enterprise if the Tribe would let [Rees and Think Finance] use the concept of tribal immunity to stymie state and federal regulators." *Id.* Rees "prepared a Term

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

Sheet that reflected the essentials of the transaction . . . ." FAC ¶ 78.  He required that the Tribe

adopt law that was favorable to payday lending.  FAC ¶ 79.  He defined the precise type of loan

to be offered by Plain Green, including the amount to be lent, the repayment period, and the

interest rate to be charged.  FAC. ¶¶ 83-84.  Rees established the ACH system that Plain Green

would use and the U.S. Bank relationship that would handle the ACH transactions.  FAC ¶ 85.

Rees also established a system of companies to avoid liability, including TC Decision Sciences

that provided "*collections of customer accounts* for Plain Green."  FAC ¶ 90 (emphasis added).

In addition to establishing TC Decision Sciences, Rees also "ran [Plain Green's] operations

through an assortment of subsidiaries like "Defendants Tailwind Marketing, TC Loan, and TC

Decision Sciences."  FAC ¶ 101.  Finally, Plaintiffs allege that Rees collected unlawful debt

multiple times from both Jessica Gingras and Angela Given.  FAC ¶¶ 47-49, 54, 60-63, 69.

Defendant Rees also argues that Plaintiffs have not alleged that Rees "engaged in the

predicate act of collecting an unlawful debt."  Rees Mot. to Dismiss at 29.  Rees's conception of

the collection of unlawful debt as being merely a predicate act is incorrect.  It is not a predicate

act; it is an independent basis to impose liability under Section 1962(c).  A single collection of an

unlawful debt for a "business of lending money" is sufficient in itself to give rise to a Section

1962 violation.  To support his interpretation, Rees relies on an errant use of "predicate act" in

*United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991).[22]  However, the term "predicate act"

refers to the acts necessary to establish a "pattern of racketeering."  As the text of Section

---

[22] *Eufrasio*'s use of predicate act to describe the collection of an unlawful debt likely
comes from *United States v. Pepe*, 747 F.2d 632 (11th Cir. 1984).  *Eufrasio*'s confusion likely
arose because several predicate acts in *Pepe* were the *extortionate* collection of unlawful debt, a
separate crime under 18 U.S.C. § 892, and also a separate predicate act under 18 U.S.C. §
1961(1).  *See Pepe*, 747 F.2d at 644 nn. 6 & 7, 645, nn.12 & 13.  Because of its complex nature
and use of both collection of unlawful debt and the extortionate collection of unlawful debt, *Pepe*
should be read with great care.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

1962(c) makes clear, a violation exists if two or more predicate acts establish a "pattern of racketeering" *or* if there is a single "collection of an unlawful debt." *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991) ("Unlike a 'pattern of racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's 'collection of unlawful debt' definition the government need only demonstrate a single collection."); *Pepe*, 747 F.2d at 661 ("A pattern of racketeering activity consists of two predicate acts of racketeering activity, . . . The government, however, was required to prove only one collection of unlawful debt.") Thus, if Plaintiffs establish a single collection of an unlawful debt by an entity in the business of usurious loans, then they have established a violation of Section 1962.

> b. Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt Against The Think Finance Defendants.

The Think Finance Defendants argue that Plaintiffs must, but have not, alleged that: (1) any of the Think Finance entities "induced" the repayment of debt; (2) *each defendant* was lending money at a rate that is usurious under state or federal law; (3) each defendant was in the business of usurious lending, and (4) each defendant collected a debt. TF Mot. to Dismiss at 17-18.

Think Finance's first argument is wrong. Plaintiffs do not need to allege that the Defendants "induced" the repayment of unlawful debt. Defendants' attempt to create this additional "inducement" requirement is directly contrary to the text of Section 1962(c) and binding Second Circuit law. *Sundance Land Corp.*, 840 F.2d at 666. It also ignores the Supreme Court's admonition in *Sedima* not to engraft additional elements onto RICO. 473 U.S. at 495. [23]

---

[23] The Think Finance Defendants cite *Pepe*, a nonbinding Eleventh Circuit case, to support their argument. However, they misread that decision. *Pepe* did not limit the scope of extortionate collection of debt under 18 U.S.C. § 892, which is a separate crime from 18 U.S.C. § 1962. Instead *Pepe* rejected a challenge to jury instructions. In *Pepe*, the Third Circuit recognized that Congress "ordered that 'the provisions of RICO shall be liberally construed to

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 88 -

Moreover, even though they did not need to, Plaintiffs have alleged that the Think Finance Defendants induced the repayment of unlawful debt from Plaintiffs. FAC ¶¶ 54, 69. There can be no more direct way of "inducing" repayment of a debt than directly taking money out of Plaintiffs' bank accounts. *See id.* In addition, Think Finance actually set up the structure for the entire enterprise by: creating Chippewa Cree law that authorizes the transactions (FAC ¶ 79); providing software, underwriting assistance, payment processing, and ongoing customer service support (FAC ¶ 80); creating intermediaries to do various acts of collection (FAC ¶ 101); and directing victims, through written agreements and the website, to select ACH transactions so that the Defendants could more easily take money from the victims (FAC ¶ 110). Tailwind Marketing provided "approved borrowers," which are borrowers more likely to repay. FAC ¶ 89. TC Decision Sciences "administers" accounts and provides services like "customer service," which means the people on the phone trying to get people to make payments and "collections of customer accounts." FAC ¶ 90. Accordingly, each of the Think Finance Defendants induced repayment of the debt.

The Think Finance Defendants' second argument that "each" defendant must lend money ignores the text of the RICO statute and Second Circuit case law. RICO only requires that the person be "employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . the collection of an unlawful debt." 28 U.S.C. § 1962(c). There is no requirement that each defendant personally lend any money, only that they participate, *directly or indirectly*. *Sundance Land Corp.*, 840 F.2d at 666. Plaintiffs have alleged that TC Loan, TC Decision Sciences, and Tailwind Marketing all

effectuate its remedial purpose.'" 747 F.2d at 674 *citing* Organized Crime Control Act of 1970, Statement of Findings and Purpose, Pub. L. 91-452, 1970 U.S. Code Cong. & Ad News (84 Stat.) at 1073. As a result, the *Pepe* Court adopted a broad definition of "collection" as "induc[ing] in *any way* any person to make repayment." *Id.* at 674 (emphasis added).

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

participated in the collection of unlawful debt and that they undertook their actions at the direction of Rees and Think Finance.  That is sufficient to establish participation for purposes of RICO.  *Napoli v. United States*, 45 F.3d 680, 683-684 (2d Cir. 1994) (holding that private investigators working for law firm by bribing witnesses met *Reeves*'s "operation or management" test); *United States v. Wong*, 40 F.3d 1347, 1373  (2d Cir. 1994) ("*Reeves* makes it clear that a defendant can act under the direction of superiors in an RICO enterprise and within the meaning of § 1962(c)); *MCM Partners v. Andrews-Bartlett & Assoc.*, 62 F.3d 967, 979 (7th Cir. 1995) ("Thus, even if A-B and FDC may have been reluctant participants in a scheme devised by "upper management," they still knowingly implemented management's decisions, thereby enabling the enterprise to achieve its goals").

The Think Finance Defendants' third argument -- that each defendant must be in the business of usurious lending once again -- attempts to create a requirement for alleging a RICO violation that does not exist.  The only requirement of the statute is that "debt" be "incurred in connection with . . . the business of lending money."  18 U.S.C. § 1961(6).  The purpose of this restriction was to prevent the statute from applying to the occasional transaction completed by an unwary business.  *See Durante Bros & Sons, Inc.*, 755 F.2d at 250.  However, the illegal enterprise in which the Think Finance Defendants participated did not involve an occasional transaction that accidentally ran afoul of the law.  On the contrary, Plaintiffs allege that Defendants deliberately set out to create a loan sharking business that could evade both state and federal law and have loaned hundreds of millions of dollars to thousands of borrowers.  This is precisely the type of operation that Congress intended to stop by enacting RICO.  And it would be inconsistent with Congress's intent to allow a loan sharking operation to divide itself into small pieces to avoid liability.  *See Schadt v. Brown*, 711 F.2d 1343, 1360 (7th Cir. 1983)

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

("Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise.").

Finally, the Think Finance Defendants' fourth argument -- that each defendant must collect the debt -- is also incorrect. Binding Second Circuit law holds to the contrary. In *United States v. Biasucci*, 786 F.2d 504, 507 (2d Cir. 1986), the Second Circuit affirmed convictions of several players in an illegal loan sharking scheme, even though those loan sharks did not actively collect the loan. Two Defendants "made funds available . . . to operate the loansharking business and shared in the illicit profits collected from the business's customers." *Id.* Another Defendant "brought one of the enterprise's victims" to the loan sharking scheme, just like Tailwind Marketing does. *See id.*

        c.        Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt Against The Tribal Defendants.

The Tribal Defendants argue that: (1) Chippewa Cree law applies and (2) federal RICO law is inapplicable because RICO is state law and therefore unenforceable against the Tribal Defendants on tribal property. Tribal Mot. to Dismiss at 38-40. As an initial matter, it is not clear what actually constitutes "Chippewa Cree law." Plaintiffs have alleged in the Complaint that Rees and Think Finance were able to purchase access to the Chippewa Cree law and mold it to whatever was convenient for their illegal enterprise. FAC ¶ 125. As a result, Chippewa Cree law became just another part of the Defendants' fraudulent scheme. After the filing of the Complaint in this case, Plaintiffs' counsel learned of additional facts that support the allegation that Rees and Think Finance control Chippewa Cree law. The former Chief Executive Officer of Plain Green, Neal Rosette, filed an affidavit detailing Think Finance's control over Plain Green. Preedom Aff. Exhibit 2, ¶¶ 9-10. Among other things, Rosette described how the Chief of the Chippewa Cree Tribe, Ken Blatt-St. Marks, tried to renegotiate the terms of the deal between

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

- 91 -

Plain Green and Think Finance. After he engaged in this activity, Think Finance met with the Chippewa Cree Tribal Council and told them that the Tribe needed to remove Blatt-St. Marks or Think Finance would pull out of its business arrangement. Think Finance specifically instructed the Council Members to impeach Blatt-St. Marks. Blatt-St. Marks was then fired as the head of the Tribe. Plaintiffs' counsel has also discovered documents that indicate that members of the Chippewa Cree Business Committee received bribes. AA ¶ 8. In addition, John Chance Houle, the former Chairman of Plain Green, has pled guilty to bribery of a Chippewa Cree tribal official. AA ¶ 7. It would be a miscarriage of justice to apply a "law" in this case that is being manipulated by an illegal enterprise to suit its own needs.

The Tribal Defendants' argument that RICO is unenforceable because it is state law is incorrect on any number of levels. First, RICO is a federal law. Federal law that incorporates state law is federal law, not state law. *See United States v. Sharpnack*, 355 U.S. 286, 294 (1957) ("Rather than being a delegation by Congress of its legislative authority to the States, it is a deliberate continuing adoption by Congress for federal enclaves of such unpreempted offenses and punishments as shall have been already put in effect by the respective States for their own government."). Federal laws of general applicability apply to on-reservation activity. *See* Section VII.

Second, the Tribal Defendants' argument about the location of the loan sharking is factually incorrect. The Tribal Defendants argue that the "hornbook law" of the Restatement (Second) of Conflict of Laws, § 188 cmt. e (1971) means that Chippewa Cree law should apply because the loan business was an "on-reservation activity." However, the payday lending business described in the Complaint was "off-reservation activity." Moreover, Defendants' hornbook law is directly contrary to controlling authority in the Second Circuit. The Second

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

Court has held that a District Court did not err in finding that payday lending occurred "entirely off tribal land." *Otoe Missouria Tribe of Indians*, 769 F.3d at 114.[24]

Third, the Tribal Defendants' citation of *White Mountain Apache Tribe* and *Williams* fails to recognize that the Supreme Court has shifted its view of tribal sovereign immunity. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980); *Williams v. Lee*, 358 U.S. 217 (1959). The Supreme Court has recently recognized that federal law applies not only to off-reservation activity, but also to activity that occurs on the reservation. *Nevada v. Hicks*, 533 U.S. 353, 362-64 (2001) (holding that state officer may execute on tribal land a search warrant related to off-reservation activity); *Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 26 (1st Cir. 2006) ("the Supreme Court already has adopted the approach of permitting the exercise of state jurisdiction within Indian lands where the exercise of such jurisdiction had not been preempted by federal law"). As a result, the Tribal Defendants cannot escape federal fraud liability by pointing to a choice of law clause in a purported contract.

> d. Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt Against Technology Crossover Ventures.

Technology Crossover Ventures argues that: (1) the debt is not unlawful; (2) it did not induce the collection of debt; (3) Technology Crossover Ventures did not participate in the affairs of Plain Green; (4) lending money to an enterprise does not mean that it participated in the enterprise's affairs; and (5) the Court should not ignore the corporate form in deciding whether to impose liability. TCV Mot. to Dismiss at 12-15.

First, Technology Crossover Ventures argues that the debt is not unlawful and attempts to use the tribal immunity, if it exists, of the Tribal Defendants. However, tribal immunity is not

---

[24] The Tribal Defendants' citation to *White Mountain Apache Tribe* and *Williams* is inapposite because both of these cases dealt with on-reservation activity. *See White Mountain Apache Tribe*, 448 U.S. at 137; *Williams*, 358 U.S. at 223.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

transferrable.  *See* Section II.C.  Technology Crossover Ventures is neither a tribal entity nor an agent of Plain Green.  *See* Section V.A.5.b.(3).

Second, as discussed above, Plaintiffs do not have to allege that Technology Crossover Ventures induced the collection of a debt.  But even if that was a requirement, Plaintiffs' allegations would satisfy it.  As an equity investor in Think Finance, Technology Crossover Ventures provided the capital to Think Finance that allowed Think Finance to fund its collection efforts.  FAC ¶ 154.  That investment satisfies the minimal requirements of inducement that were discussed in *Pepe*.

Third, Technology Crossover Ventures is concerned that there is not enough factual support to show that it participated in the enterprise's activities.  Allegations for a violation Section 1962's unlawful debt prong need only satisfy Rule 8.  Plaintiffs' allegations against Technology Crossover Ventures more than satisfy this requirement.  FAC ¶¶ 154 & 155.  In particular, Technology Crossover Ventures provided money to start the illegal loan process.  FAC ¶ 154.  Technology Crossover Ventures also shared in the profits of the illegal enterprise.  *Id.*  Technology Crossover Ventures's knowledge was gained through its use of modern corporate due diligence practices.  *Id.* Plaintiffs have also described how funds from the illegal enterprise flowed through the Cayman Islands to escape regulatory scrutiny.  FAC ¶¶ 86-88.

Nevertheless, if the Court feels that more allegations are needed, then Plaintiffs are prepared to provide them.  For example, John C. Rosenberg, a General Partner and Head of Europe for Technology Crossover Ventures, has been a member of the Board of Directors of Think Finance since 2009.  AA ¶ 1.  As a director, he was fully aware of the illegal loansharking enterprise, Plain Green, and through his leadership of Think Finance, perpetuated the scheme.  *Id.*  In addition, Mr. Rosenberg directed the strategy that Think Finance followed, including its

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 94 -

domination and control of Plain Green. AA ¶ 2. For example, he was a director at the time that Think Finance threatened to end its relationship with the Chippewa Cree unless the Business Committee fired Ken Blatt-St. Marks. *Id.*. As a director, he was responsible for this decision and participated indirectly in the conduct of the Plain Green enterprise.

Fourth, Technology Crossover Ventures did more than provide banking services to the enterprise. As a result, the case law that Technology Crossover Ventures cites does not support its position. In fact, *Sumitomo v. Chase Manhattan Bank* actually supports Plaintiffs' position. In that case, the Court denied the motion to dismiss because it was "the fraudulent financing operation which is itself the RICO enterprise, and the complaints sufficiently allege the particular defendant's participation in its affairs." 2000 U.S. Dist. LEXIS 15707, 3-*4 (S.D.N.Y. Oct. 30, 2000). Plaintiffs have alleged that Plain Green, the fraudulent financing operation, is the RICO enterprise and Technology Crossover Ventures participated in Plain Green's affairs.

*Rosner v. Bank of China* also supports imposing liability against Technology Crossover Ventures. In the *Bank of China* litigation, Courts treated two financial institutions differently based on their roles. Bank of China, which merely provided wires and accounts services, was held not to have sufficiently participated in the scheme. 528 F. Supp. 2d 419, 422-23, 430-31 (S.D.N.Y. 2007). However, a previous court held Sociedade Commercial Siu Lap Limitada liable for more than $100 million in treble damages because it had funded the fraudulent scheme and reaped rewards from the scheme. *See id.* at 422. *Bank of China* is not a reason to dismiss the claim against Technology Crossover Ventures. On the contrary, Technology Crossover Ventures functioned just like Sociedade Commercial Siu Lap Limitada by funding Plain Green's operation and reaping rewards from the fraudulent scheme.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

The other cases cited by Technology Crossover Ventures involve financial institutions that merely offered basic banking services like providing a bank account or accepting wire transfers. *See Berry v. Deutsche Bank Trust Co. Ams.*, No. 07 Civ. 7634, 2008 U.S. Dist. LEXIS 91561 (S.D.N.Y. Oct. 21, 2008) (Defendants "loan[ed] money in an arms-length commercial transaction"); *Industrial Bank of Latvia v. Baltic Fin. Corp.*, No. 93 Civ. 9032, 1994 U.S. Dist. LEXIS 8580 (S.D.N.Y. June 24, 1994) (dismissing defendants that allowed enterprise to have a bank account and accepted wire transfers on behalf of enterprise). In this case, Technology Crossover Ventures did more than simply provide banking services, it actually financed and received the benefits of the fraudulent scheme.[25]

Fifth, Technology Crossover Ventures's argument concerning piercing the corporate veil rests on a faulty premise. Technology Crossover Ventures assumes that Plaintiffs are only seeking to impose liability on Technology Crossover Ventures because of the actions of others. This is not true. Technology Crossover Ventures is liable to Plaintiffs because of its own actions. Technology Crossover Ventures financed the payday lending scheme that preyed on Plaintiffs, and Technology Crossover Ventures received a financial benefit from participating in this scheme. As a result, the Court need not engage in an analysis of whether a corporate veil should be pierced. *LSJ Inv. Co. v. O.L.D., Inc.*, 167 F.3d 320, 324 (6th Cir. 1999).

But even if the Court engages in a veil piercing analysis, Technology Crossover Ventures should not be allowed to hide behind a corporate structure to escape liability in this case. Veil piercing is available both as a matter of federal common law and state corporation law. While it is true that "[l]imited liability is the rule, not the exception," "there are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied."

---

[25] The Second Circuit has affirmed the criminal convictions of people who lent money to loan sharking operations. *United States v. Biasucci*, 786 F.2d 504, 507 (2d Cir. 1986).

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

*Anderson v. Abbott*, 321 U.S. 349, 362 (1944). "Mr. Justice Cardozo stated that a surrender of that principle of limited liability would be made when the sacrifice is essential to the end that some accepted public policy may be defended or upheld." *Id.* Fraud is one of the occasions when limited liability should be ignored. *Id.* Moreover, "[i]t has often been held that the interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement." *Id.* at 362-63. It is also important to note that state corporation law cannot stand as a barrier to achieving federal legislative goals set by Congress. "[N]o State may endow its corporate creatures with the power to place themselves above the Congress of the United States and defeat federal policy concerning national banks which Congress has announced." *Id.* at 365.

Fortunately, the Court need not resolve any conflict between state and federal law because Delaware corporate law supports piercing the corporate veil as well. "Delaware law permits a court to pierce the corporate veil where there is fraud or where the corporation is in fact a mere instrumentality or alter ego of its owner." *NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 176 (2d Cir. 2008). In fact, "fraud is a sufficient reason to pierce the corporate veil." *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, Civ. Action No. 1131, 1989 Del. Ch. LEXIS 114, *14 (Del. Ch. Sept. 19, 1989); *Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, (Del. 1968) ("[Piercing the corporate veil] may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of the corporation require it, are involved.").

RICO also creates a statutory method for disregarding the corporate form. RICO created remedies specifically designed to overcome corporate formalities. "If the one-man band incorporates, it gets some legal protections from the corporate form, such as limited liability; and

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

it is just this sort of legal shield for illegal activity that RICO tries to pierce." *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985). For example, Section 1964 empowers the District Court to issue "appropriate orders, including but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise, . . . or ordering the dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons." 18 U.S.C. § 1964(a). The findings and purpose section of the Public Law 91-452 shows that Congress meant to create "new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Congress passed RICO precisely to address the type of defense raised by Technology Crossover Ventures.

In the end, even if Technology Crossover Ventures was somehow protected by its corporate form, this is precisely the type of case where courts ignore corporate formalities. Plaintiffs have alleged a fraudulent payday lending scheme that is both a fraud and a crime. The fact that Technology Crossover Ventures financed this illegal operation and received financial benefits from participating in this enterprise obviates any technical argument that Technology Crossover Ventures tries to erect based on its corporate form.[26]

> e.    Plaintiffs Have Stated A Claim For Collection Of Unlawful Debt
>        Against Sequoia Capital.

Plaintiffs have alleged a claim against Sequoia for collection of unlawful debt. Relying on *Durante*, Sequoia argues that there are eight elements to a claim for collection of unlawful debt. Sequoia misapprehends the law in the Second Circuit. The section of *Durante* cited by

---

[26] TCV is correct that Plaintiffs do not have the documents that would show which particular TCV entity made the relevant investments. As a result, Plaintiffs cannot add these particular details to the complaint. TCV is incorrect in assuming that the claims will be limited to just the entity that made the investment. Plaintiffs' claims are aimed at all entities that had responsibility for the violation of the law regardless of the corporate formalities under which the investment was made.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 98 -

A PROFESSIONAL CORPORATION

Sequoia refers to a substantive claim under Section 1962(a) for the investment proceeds of an enterprise into a legitimate business. Because the details of the disposition of the funds from Plain Green are currently unavailable to Plaintiffs, Plaintiffs are not attempting to make a claim under Section 1962(a). Instead, Plaintiffs are asserting a claim under Section 1962(c). The elements for that claim are set forth in *Sundance Land Corp. v. Community First Federal Sav. & Loan Assoc.*, 840 F.2d 653, 666 (2d Cir. 1988).

Sequoia makes three arguments against the unlawful debt claim: (1) Plaintiffs did not allege that Sequoia was associated with the enterprise, (2) Plaintiffs did not allege that Sequoia participated in the collection of unlawful debt, and (3) Plaintiffs did not allege that Sequoia "induced" the repayment of debt. Sequoia Mot. to Dismiss at 17.

First, Sequoia is associated with the enterprise. The phrase "employed by or associated with" "should be broadly interpreted and should include outsiders associated with the enterprise as well as enterprise insiders." *Virden v. Graphics One*, 623 F. Supp. 1417, 1433 (C.D. Cal. 1985). "[T]he substantive proscriptions of the RICO statute apply to insiders and outsiders – those merely 'associated with' an enterprise – who participate directly and *indirectly* in the enterprise's affairs through a pattern of racketeering activity. Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *Schadt v. Brown*, 711 F.2d 1343, 1360 (7th Cir. 1983); *see also United States v. Turkette*, 452 U.S. 576 (1981) (adopting a broad interpretation of "enterprise" in part because of the broad meaning of "association in fact"); *United States v. Lavin*, 504 F. Supp. 1356, 1359 (N.D. Ill. 1981) (holding that defendants' suggested narrow construction of "associated with" was inconsistent with "the explicit congressional mandate to broadly construe the legislation but also with the plain meaning of the term 'associate'").



76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

Sequoia's quotation of *Blue Cross & Blue Shield of N.J., Inc.*, 113 F. Supp. 2d 345, 366 (E.D. N.Y. 2000) is misleading. Sequoia's quotation makes it seem that one can only be "associated with" an enterprise if he or she "engages in predicate act violations with other members of the enterprise." While engaging in predicate acts is sufficient to establish that a defendant is "associated with" the "enterprise," it is not necessary. At the beginning of that same paragraph, the District Court said that one could be "associated with" the enterprise if he or she was merely involved with "any of the alleged wrongdoing." *Id.* Sequoia was involved with the alleged wrongdoing in this case because it financed Plain Green's illegal payday lending scheme.

Second, because Rule 8 governs the unlawful debt allegations, Plaintiffs have alleged sufficient facts to establish that Sequoia participated in the enterprise. Plaintiffs have alleged that Sequoia provided the money for the enterprise to lend. FAC ¶ 154. Plaintiffs have also alleged that Sequoia obtained significant profits from its investment in the enterprise. FAC ¶ 154. Plaintiffs have also alleged that Sequoia was associated with the enterprise by alleging that it had agreements with Rees and Think Finance. FAC ¶ 155. Those allegations are sufficient because an indirect relationship is enough to satisfy the association test. *Schadt*, 711 F.2d at 1360. Plaintiffs have also stated that the confidentiality clauses in these agreements prevent Plaintiffs from alleging more details. FAC ¶ 155.

But once again, if the Court feels that more details of Sequoia's involvement in the Plain Green enterprise are needed, Plaintiffs are prepared to provide more facts. Just like Technology Crossover Ventures, Sequoia had a director on the Board of Directors of Think Finance. AA ¶ 3. Michael L. Goguen, a General Partner at Sequoia, served as a director for Think Finance. As a director, he was fully aware of the illegal payday enterprise, Plain Green, and through his leadership of Think Finance, he perpetuated the fraudulent scheme. *Id.* In addition, Mr. Goguen

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

directed the strategy that Think Finance followed, including its domination and control of Plain

Green. AA ¶ 4. For example, he was a director at the time that Think Finance threatened to end

its relationship with the Chippewa Cree unless the Business Committee fired Ken Blatt-St.

Marks. *Id.* As a director, he is responsible for this decision and participated indirectly in the

conduct of the Plain Green enterprise.[27]

Third, even though they do not need to allege "inducement," Plaintiffs have alleged that

Sequoia participated in and induced the repayment of debt. Just like Technology Crossover

Ventures, Sequoia provided the funds that enabled Plain Green to engage in its collection of

unlawful debt. FAC ¶¶ 154 & 155. That sort of activity has been sufficient to uphold criminal

convictions under RICO. *United States v. Biasucci*, 786 F.2d 504, 507 (2d Cir. 1986).

> f. Plaintiffs Have Alleged A Conspiracy To Collect An Unlawful
> Debt.

Although it does not contain a separate count so stating, the First Amended Complaint

also alleges the existence of a RICO conspiracy to collect unlawful debt among Think Finance,

Rees, Sequoia, and Technology Crossover in violation of 18 U.S.C. § 1962(d). "'[To

demonstrate a RICO conspiracy, the plaintiff must show] that the defendant agreed to commit

the substantive racketeering offense . . . through agreeing to participate in two predicate acts, . . .

that he [knew] the general nature of the conspiracy and that the conspiracy extended beyond his

individual role.'" *In Re Motel 6 Sec. Litig.*, 1997 U.S. Dist. LEXIS 3909 *14 (S.D.N.Y. April 2,

1997) (quoting *United States v. Rastelli,* 870 F.2d 822, 828 (2d Cir. 1989)). Think Finance and

Rees participated in the creation of the enterprise, creating a term sheet reflecting the essential

elements of their agreement to participate in a conspiracy to commit a substantive RICO offense,

---

[27] These additional allegations would also supply further support for the inducement that
Defendants contend must exist.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

the collection of unlawful debt. FAC ¶¶ 76-90. Think Finance and Rees agreed to commit thousands of predicate acts of unlawful debt collection with full awareness of the general nature of the conspiracy, which they designed. *Id.* ¶¶ 76-90, 100-117.

Sequoia and Technology Crossover agreed to commit the substantive RICO offense of unlawful debt collection, documenting many aspects of their agreements with Rees and Think Finance in writing. AC ¶ 155. They participate in the unlawful debt collection by providing money used to start the illegal lending process and reaping significant rewards following the debt collection. AC ¶ 154. Sequoia and Technology Crossover are fully aware of the general nature of the conspiracy and its illegality by virtue of the "substantial due diligence" they perform "including legal review of the activities of their investment vehicle." AC ¶ 154.

> 2.      Plaintiffs Have Stated A Claim For RICO Racketeering.

Plaintiffs allege a RICO racketeering claim against Defendants Rees and Think Finance for money damages and for injunctive relief against Defendants Rosette, Whitford, and McInerney. To establish a racketeering violation, Plaintiffs must show that: (1) the defendants conducted or participated in the conduct of (2) an enterprise's affairs (3) through a pattern of racketeering. *In re Sumitomo Copper Litig.*, 995 F. Supp. 451 (S.D.N.Y. 1998).

> a.      RICO's Management And Operations Test Is A Relatively Low Hurdle For Plaintiffs To Clear.

To be subject to a RICO racketeering claim, a defendant must have conducted or participated, directly or indirectly, in the operation or management of the enterprise. Without citing authority, Think Finance argues that *Reeves* has an "exacting operations and management test." The language of *Reeves* itself shows that is not true. In *Reeves v. Ernst & Young*, the Supreme Court explained the meaning of "conduct" and "participate" in Section 1962(c). 507 U.S. 170, 179 (1992). The Court understood "the word 'conduct' to require some degree of

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

direction and the word 'participate' to require some part in that direction." *Id.* "Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." *Id.* The Supreme Court also made clear that liability is not limited to just the upper management. "We agree that § 1962(c) is not limited to upper management, but we disagree that the 'operation and management' test is inconsistent with this proposition. An enterprise is 'operated' not just by upper management' but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* at 184.

Other courts agree that the *Reeves* test is not exacting at all. "In this Circuit, the 'operation or management' test typically has proved to be a relatively low hurdle for plaintiffs to clear." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004); *De Sole v. Knoedler, LLC*, No. 12 Civ. 2313, 2015 U.S. Dist. LEXIS 134146 (S.D.N.Y. Sept. 30, 2015).

> b.　　Plaintiffs Have Alleged That The Think Finance Defendants Participated In The Conduct Of The Enterprise.

The Think Finance Defendants argue that Plaintiffs use of the word "services" in the First Amended Complaint somehow absolves them of any liability for their participation in the RICO enterprise. TF Mot. to Dismiss at 12. In making this argument, Think Finance appears to have deliberately misquoted paragraph 80 of the First Amended Complaint. Think Finance maintains that the word "service" in paragraph 80 is "Plaintiffs' word." That is not true. Paragraph 80 contains a direct quotation of the Term Sheet that Think Finance created as a way to control Plain Green: "They provided 'risk management, application processing, underwriting assistance,

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

payment processing, and ongoing customer service support coterminous with the software

license agreement and market[ing] and/or indentif[ication of] access channels for consumer loans

on the Tribe's behalf (jointly 'Services')."  To avoid any confusion about the source of the quote,

a picture of that quote from the Term Sheet (Compl. Exhibit A) appears below:

<u>Transaction</u>

TF will license its software to the Tribe pursuant to a software license agreement
acceptable to the parties.  TF will also provide risk management, application processing,
underwriting assistance, payment processing, and ongoing customer service support coterminous
with the software license agreement and market and/or identify access channels for consumer
loans on the Tribe's behalf (jointly "Services").

As the picture of the Term Sheet makes plain, "Services" is Think Finance's word, not Plaintiffs'

word.

The arguments that the Think Finance Defendants advance in their Motion to Dismiss

show exactly why they would want people to believe that they are just service providers.  By

making this argument, they hope to avoid liability by claiming that they are simply an "agent" or

just providing "services."  The FAC alleges detailed facts explaining why these claims are false.

Plaintiffs allege that Think Finance exercised control over Plain Green through a variety of

methods.  Indeed, in paragraph 101, Plaintiffs allege precisely the opposite of what Think

Finance claims in its Motion to Dismiss:  "Defendants Rees and Think Finance hoped to avoid

liability by falsely claiming that they only provided services to Plain Green, when in reality they

created the whole enterprise and ran its operations through an assortment of subsidiaries and

affiliates like Defendants Tailwind Marketing, TC Loan, and TC Decision Sciences."

Setting aside Think Finance's attempt to misdirect the Court to one word in a forty-two

page, two hundred paragraph complaint, the Court should focus on the actual substantive

allegations of the First Amended Complaint.  Those allegations show in great detail the

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 104 -

participation and control that Kenneth Rees and Think Finance had over the enterprise. Among

other things, Rees approached the Tribe with the deal. FAC ¶ 23. Rees provided everything that

was needed to run a payday lending business if the tribe sold its sovereignty. FAC ¶ 23. Rees

and Think Finance prepared the Term Sheet that outlined the essentials of the transaction. FAC

¶ 78. They required that the tribe adopt new laws that favored payday lending. FAC ¶ 79. They

provided software, risk management, application processing, underwriting assistance, payment

processing and marketing. *Id.* ¶ 80. Rees and Think Finance used subsidiaries to run other

operations of Plain Green and to insulate themselves from liability. *Id.* ¶ 81. They defined the

type of loan that could be offered and the interest rates that would be charged. They required the

enterprise to enter into banking and attorney client relationships. *Id.* ¶ 85, 87.

    None of the case law that Think Finance cites changes the fact that Plaintiffs have stated

a claim. In fact, one of the cases cited by Think Finance, *Allstate Ins. Co. v. Seigel*, 312 F. Supp.

2d 260, 274 (D. Conn. 2004), actually supports Plaintiffs' position. *Allstate* involved a

fraudulent scheme by a doctor and his professional corporation to defraud a variety of parties by

billing for medical services not delivered. *Id.* at 261-262. The *Allstate* Court denied a motion to

dismiss a Section 1962(c) claim based on a far more abstract theory than the one described in the

First Amended Complaint. *Id.* at 276. In the count under scrutiny, Plaintiff Allstate alleged that

Allstate itself was the enterprise. Defendants argued that it was not possible for the doctor's

office to control or participate in plaintiff's business. The Court disagreed. In this case, the

control and participation is far more direct. Accordingly, under the holding of *Allstate*, the Court

should deny the motion to dismiss.

    The other cases Think Finance cites do not support its position. In *AARP v. Am. Family

Prepaid Legal Corp.*, 604 F. Supp. 2d 785, 795 (M.D.N.C. 2009), the AARP failed to show that

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

the defendants participated in the enterprise not because they were offering "services" to the enterprise, but because there was no enterprise in that case. "Though AARP alleges a conspiracy to commit the predicate acts of mail fraud and trademark counterfeiting, a conspiracy without more does not rise to the level of a RICO claim. There must be sufficient facts alleged from which to fairly infer an entity that exists separately in structure." *Id.* at 797. That is not the case here. Think Finance concedes that Plaintiffs have identified Plain Green, LLC as the enterprise. TF Mot. to Dismiss at 12.[28] As described above, Think Finance participated in and controlled that distinct enterprise, Plain Green.

Similarly, *Jubelirer v. Mastercard Int'l, Inc.*, 68 F. Supp. 2d 1049, 1051 (W.D. Wis. 1999) involved a claim that Mastercard had committed a RICO violation because it let the plaintiff use its card to place bets in an online casino. In that case, the plaintiff did *not* allege that the casino was in fact the enterprise "perhaps because there is no basis to allege that either defendant conducted the business of the casino." *Id.* at 1052. Instead, he attempted to allege an amorphous association in fact. The Court held that plaintiff's allegations were insufficient to establish an enterprise. *Id.* Again, there is no dispute in this case that Plaintiffs have sufficiently alleged an enterprise.

*In re Agape Litig.*, 681 F. Supp. 2d 352, 369 (S.D.N.Y. 2010) also provides no support for Plaintiff's position. In that case, the District Court dismissed the RICO claim because "[t]here [was] no allegation that BOA recommended certain courses of fraudulent behavior. Nor [was] there an allegation that BOA had the power to influence Cosmo or Agape." *Id.* Think

---

[28] On this page, Think Finance again misquotes the First Amended Complaint. Think Finance claims that: "The FAC identifies Plain Green, which is a 'tribal entity wholly owned by the Chippewa Cree Tribe," as the purported RICO enterprise." Paragraph 2 actually says that: "Plain Green, LLC ("Plain Green") *purports to be* a "tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation." FAC ¶ 2 (emphasis added).

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 106 -

Finance's attempt to compare itself to MasterCard or Bank of America is feckless. In this case, not only did Think Finance recommend certain courses of fraudulent behavior, it required that they be carried out according to its own design. Think Finance ran all of the operations of Plain Green. It developed the entire scheme by planning and executing the creation of Plain Green, the enterprise. The allegations contained in the First Amended Complaint show that Think Finance continued to exercise control and participate in the management of Plain Green after it was created. This has been corroborated by the newly discovered affidavit from Neal Rosette, the former Chief Executive of Plain Green, that claims that Think Finance insisted that the Chief of the Tribe be fired because he dared to question the arrangements that Think Finance put in place.

Think Finance also argues that there are insufficient allegations that it acted with fraudulent intent with respect to the predicate acts. However, not all predicate acts need to be alleged with fraudulent intent. Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fraudulent intent need only be alleged generally as long as there is some factual basis for the allegation. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49 (2d Cir. 1987). "We apply the more general standard for the simple reason that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000). In this case, Plaintiffs have adequately alleged that Think Finance acted with fraudulent intent.

There are three ways to allege fraudulent intent: (1) direct knowledge; (2) motive and opportunity; and (3) reckless disregard of the truth. Here, there is direct evidence that Think Finance knew that the statements made over the wires were false. The Purported Arbitration Agreement represents that Plain Green was the lender, but the Term Sheet that Think Finance signed shows that this was not true.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

Another way to allege fraud is known as the motive and opportunity. "A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so." *Beck*, 820 F.2d at 50. Plaintiffs have alleged sufficient facts to show that Think Finance had the motive and opportunity to commit fraud. Think Finance's motive for committing fraud is simple: self-preservation. After federal regulators ended Think Finance's relationship with First Bank of Delaware, Think Finance had to establish another scheme or face its extinction. FAC ¶¶ 36-44. Think Finance also had the motive of making money. Obtaining financial benefit is sufficient to establish a motive for fraud. *Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994) ("defendants had a motive for committing the alleged fraud – a desire to avoid repaying the loans and to end the earlier litigation"); *BC Liquidating, LLC v. Weinstein*, 519 B.R. 394, 423 (Bankr. E.D.N.Y. 2014) ("One method to demonstrate motive is through receipt of funds"). It is illegal to operate a payday lending business in Vermont and other states. *See* FAC ¶ 199. By adopting a tribal immunity model, Think Finance hoped to avoid Vermont law and have the market to itself. FAC ¶ 44. Think Finance made hundreds of millions of dollars that it would not have otherwise made without the fraud at the center of this scheme. FAC ¶ 17.[29]

Think Finance also had a clear opportunity to commit the fraud. This opportunity arose with the Chippewa Cree Tribe, which was willing to sell its sovereignty to Think Finance and agree to particularly onerous terms so that Think Finance could operate its scheme. FAC ¶¶ 77-

---

[29] The motive to make enormous profits stands in stark contrast to the plaintiffs' failure to allege knowledge in *O'Brien* where an accounting firm's written disclaimers directly contradicted the alleged fraudulent statements that plaintiffs sought to ascribe to them. *Compare O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676-677 (2d Cir. 1991). There is really no comparison between this case and *O'Brien*.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

87.  In addition, the Think Finance entities had opportunity to commit fraud because they exercised control over nearly every aspect of the lending ostensibly done by Plain Green.

Think Finance argues that the Second Circuit has held that earning normal compensation for professional services does not establish fraudulent intent.  TF Mot. to Dismiss at 16 *citing MLSMK Invs. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137 (S.D.N.Y. 2010). However, taking 95% of the revenue from an entity is not "normal" compensation for professional services.

> c.    Plaintiffs Have Alleged That Kenneth Rees Participated In The Conduct Of The Enterprise.

Kenneth Rees argues that (1) Plaintiffs have failed to allege that Rees participated in any predicate act of mail or wire fraud, (2) Rees did not control the enterprise through either the collection of unlawful debt or acts of mail and wire fraud, and (3) Rees was merely providing services to an enterprise.  Rees Mot. to Dismiss at 24-33.

The elements of the offense of mail fraud under 18 U.S.C. § 1341 are:  (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing a scheme.  *Pereira v. United States*, 347 U.S. 1, 8 (1953).  Consistent with *Pereira*, the "Second Circuit has held that 'to prove a violation of 18 U.S.C. § 1341, one need only show that a defendant was one of the participants in a scheme to defraud, and that the mails were used in furtherance of that scheme." *De Sole*, 2015 U.S. Dist. LEXIS 134146, at *39.[30]  Likewise, to prove a violation of the wire fraud statute, plaintiffs need only plead that "a defendant was one of the participants in a fraudulent scheme which was furthered by the use of interstate transmission facilities."  *Id.* at *39.  One need not actually mail the letter him or herself.  It is sufficient if he or she "caused"

---

[30] "The term 'scheme to defraud' is measured by a non-technical standard.  It is a reflection of moral uprightness, of fundamental honesty, fair play and right doing in the general and business life of members of society." *Sumitomo Copper Litig.*, 995 F. Supp. at 455.  The scheme alleged here qualifies as a scheme to defraud.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

the mailing. 18 U.S.C. § 1341. "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira*, 347 U.S at 8-9. As a result, the facts regarding Rees's participation in the Plain Green scheme are sufficient to allege that he caused another to wire the money or mail a piece of correspondence. *See* Rees Mot. to Dismiss at 32.

> (1) Plaintiffs Have Adequately Alleged That Kenneth Rees
> Participated In Mail And Wire Fraud.

Plaintiffs have alleged that Rees and Think Finance were participants in a scheme to defraud and knew that the mails would be used to further the scheme.[31] Rees was the mastermind of the scheme. FAC ¶ 23. Federal regulators had shut down his former business, Think Cash. *Id.* Rees and Think Finance then approached the Chippewa Cree Tribe with everything it needed to run a payday loan enterprise in exchange for the Tribe providing its sovereignty. *Id.* The scheme itself was "to defraud thousands of people in financially challenged position [*sic*] by extending loans at illegally high and extortionate interest rates, while at the same time claiming that the business was legitimate and in compliance with the law." FAC ¶ 101.

Plaintiffs have also alleged that Rees and Think Finance used the wires and mails for the purpose of furthering the scheme in four principal ways. First, the entire scheme rests on the ability to move money quickly inside and outside the United States. Rees and Think Finance used the wires to place money in victims' accounts. FAC ¶ 53, 68. Rees and Think Finance used the wires to take money out of the accounts of Ms. Gingras and Ms. Given. FAC ¶¶ 54, 69.

---

[31] Think Finance also argues the Plaintiffs have not allege that it participated in the wire and mail fraud in its Motion to Dismiss at page 15. Plaintiffs have answered that argument here.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 110 -

Rees and Think Finance required Plain Green to enter into a relationship with a U.S. Bank to process loan transactions using the ACH systems. FAC ¶¶ 85-86, 92. Rees and Think Finance then also used the wires to send the money that was collected to GPL. FAC ¶ 87-88. Defendants Rees and Think Finance used the wires to execute thousands of transactions to further the common scheme of evading state laws, defrauding people in financially challenged positions, and making profits. FAC ¶ 104.

Second, Rees and Think Finance used the wires to interact with and entice the victims. Rees and Think Finance used the wires to negotiate the purported fraudulent contract with Jessica Gingras in Vermont. FAC ¶ 55, 70. The Plain Green website collects information from individuals to execute ACH transfers to the individuals and to debit the people's accounts in purported repayment of their illegal debts. FAC ¶ 93. The website also uses the wires to transmit the Purported Arbitration Agreement to potential victims. FAC ¶ 105. The website also transmits a number of misrepresentations through the wires. FAC ¶ 106-07; *see also* Section III.B. *supra*. Rees and Think Finance exercise control over and operate all elements of the website. FAC ¶¶ 100-108.

Third, Rees and Think Finance also used the wires to implement the agreement reflected in the Term Sheet that created Plain Green. FAC Exhibit 1 at 3. Money was wired to attorneys' trust accounts and to pay attorneys legal fees. *Id.*

Fourth, Rees and Think Finance used the mail to collect payments from targets. FAC ¶ 100. They also used the mail to coordinate the various elements of the Plain Green enterprise. FAC ¶ 100. The use of the wires and the mail was reasonably foreseeable because the form documents that Rees and Think Finance created, like the Purported Arbitration Agreement, call for the use of the wires and the mail. FAC ¶ 103, 118-132.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

While Rees and Think Finance express concern that they are unaware of the specific

conduct in which they participated, they spend no time addressing these detailed and specific

allegations concerning the use of the wires and the mails.  Instead, their approach is to ignore

these allegations simply because more than one person did the act alleged.  But ignoring these

allegations will not make them disappear.

> (2)  Although Not Required, Plaintiffs Have Adequately
> Alleged That Kenneth Rees Controlled The Enterprise
> Through Racketeering.

Rees's argument that a Defendant must control or direct the enterprise through acts of

racketeering is incorrect.  Rees Mot. to Dismiss at 30-33.  The RICO statute only requires that

the defendant "participate" in the affairs of the enterprise through a pattern of racketeering.

Section 1962(c) makes it illegal "to conduct or participate, directly or indirectly, in the conduct

of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful

debt." 18 U.S.C. § 1962(c).  The statutory language does not use the word "control."

In most circumstances, it would be unusual to control an enterprise through racketeering

offenses because many of the racketeering crimes are directed outward toward a victim.  For

example, mail fraud based on a fraudulent statement is designed to deceive the recipient, not the

enterprise.  However, there are circumstances where the racketeering acts do result in control of

the enterprise.  One example is bribery.  *Reeves*' use of the word "control" comes in the context

of a predicate act of bribery, which is a crime directed at the internal operations of the

organization:

> We agree that liability under § 1962(c) is not limited to upper
> management, but we disagree that the "operation or management"
> test is inconsistent with this proposition.  An enterprise is
> "operated" not just by upper management but also by lower rung
> participants in the enterprise who are under the direction of upper
> management.  An enterprise also might be "operated" or

gravel &
shea  | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

> "managed" by others "associated with" the enterprise who exert
> control over it as, for example, by bribery."

*See Reeves*, 507 U.S. at 184. As the quote demonstrates, *Reeves*'s discussion of control is meant to be an example of "operation and management" not a requirement.

*Cummings* also does not support the "control" rule that Rees suggests. *United States v. Cummings*, 395 F.3d 392, 400 (7th Cir. 2005). In *Cummings*, the court reversed RICO convictions. The Third Circuit held that the government could have satisfied the "operation or management" test, but that the government had charged the wrong enterprise in the indictment. "We might conclude differently if, for example, the government had charged Morris's skip tracing business as the RICO enterprise. Then the operation or management test would be satisfied and there might be sufficient evidence to support a RICO conspiracy conviction." *Cummings*, 395 F.3d at 400. Prior to reaching this conclusion, the Third Circuit expressly disclaimed the spin that Rees seeks to put on the case: "It is true that lower-level participants in an enterprise may violate RICO if it can be shown that they have 'facilitated the activities of those who are operating the enterprise in an illegal manner.'" *Cummings* does not create a "control" test.

In contrast to Rees's proposed "control" test, the Second Circuit has applied the management and operation test leniently. "In this Circuit, the 'operation or management' test typically has proved to be a relatively low hurdle for plaintiffs to clear." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004). *First Capital* shows how easy it is to satisfy the test. Plaintiffs alleged that a bankruptcy estate was the enterprise. Allegations that the debtor fraudulently transferred certain assets prior to the bankruptcy were sufficient to satisfy the "operations or management" test. *Id.* at 177. Moreover, similar transfers by the debtor's mother were also deemed sufficient to satisfy the test. *Id.* at 178. The bankruptcy court and the


gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

trustee in a Chapter 7 bankruptcy have the formal legal control of the estate, but the debtor can influence the estate through fraud without having control. "Here, Plaintiffs' allegations – taken as true, as they must be – paint a picture of a mother helping her son to defraud the bankruptcy court and trustee. We have concluded that where a bankruptcy estate is a RICO enterprise, a debtor who engages in bankruptcy fraud conducts or participates in the conduct of the affairs of the enterprise; thus, it is no great leap to find that one who assists in the fraud also conducts or participates in the conduct of the affairs of the enterprise." *Id.* at 178; *see also De Sole v. Knoedler, LLC,* No. 12 Civ. 2313, 2015 U.S. Dist. LEXIS 134146 (S.D.N.Y. Sept. 30, 2015) (holding that the management or operations test was satisfied when a managing member of art gallery allowed the gallery to sell fraudulent art work and accept part of the proceeds); *City of New York v. Lasership, Inc.*, 33 F. Supp. 3d 303 (S.D.N.Y. 2014) (holding that the management or operations test was satisfied when a delivery service had actual knowledge that it was delivering untaxed cigarettes).

Again, while not required, Plaintiffs have alleged that both Defendants Rees and Think Finance participated in *and controlled* the enterprise through a pattern of racketeering. As discussed in the section immediately above, Rees and Think Finance participated in the racketeering. However, both Rees and Think Finance also used the racketeering acts and the collection of unlawful debt to control the Plain Green enterprise. By maintaining control over ACH transactions and the website, they controlled the essential functions of the enterprise. Rees and Think Finance wired funds to victims and then took money out of their accounts through the wires. FAC ¶¶ 52, 54, 58, 69, 70, 71, 101. In particular, Plaintiffs allege that "thousands of ACH transactions served the common scheme of evading state law, defrauding people in financially challenged positions, and making profits. Defendants Rees and Think Finance

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

carried out the scheme to evade state law through their control and domination of Plain Green and an assortment of affiliates like Defendants Tailwind Marketing, TC Loan, and TC Decision Sciences." FAC ¶ 104.

Rees and Think Finance controlled the ACH transactions of the enterprise by dictating the U.S. Bank that the enterprise would use. FAC ¶ 85. Rees and Think Finance also forced the enterprise to set up a reserve account that would not be controlled by the Tribe, but by attorneys under their control. FAC ¶ 86.

Rees and Think Finance also controlled the drafting of the Purported Arbitration Agreement. FAC ¶ 110. They even controlled the law that would supposedly apply to the Purported Arbitration Agreement by insisting that Chippewa Cree law be acceptable to them and actually drafting that law. *Id.* ¶ 79, 127. They controlled the selection of counsel for Plain Green by forcing the tribe to accept Pepper Hamilton as their attorneys, up through and including as counsel in this case. See FAC Exhibit A at 3. Rees and Think Finance distributed the Purported Arbitration Agreement through the website and the internet. Rees and Think Finance control all elements of the website. *Id.* ¶ 108. The deal that set all of these arrangements in place was also consummated using the wires. See FAC Exhibit A at 3.

Rees and Think Finance also controlled the enterprise through the collection of unlawful debt. They never let the Tribe actually control the funds. They took the money from Plaintiffs' accounts. FAC ¶ 54. They then routed the money to GPL Servicing in the Cayman Islands. FAC ¶ 87-88. They also forced the enterprise to surrender 99% of the loans to GPL within two days of the loans being made. From the Cayman Islands, they could not only control the money, but also discipline the enterprise if it started to get independent ideas about how it wanted to

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

- 115 -

operate.  This control is also sufficient to show that Rees and Think Finance caused the mails and wires to be used to commit fraud.  *Pereira*, 347 U.S. at 8-9.

Rees and Think Finance's control is not mere speculation, but sworn fact.  New documents obtained after Plaintiffs filed the First Amended Complaint show that Rees and Think Finance extensively participated in and controlled the operation and management of Plain Green. *See supra.*

The allegations against Rees exceed those that Court found sufficient in *Mayfield v. Asta Funding, Inc.*, No. 14-cv-2591, 2015 U.S. Dist. LEXIS 43236 (S.D.N.Y. March 31, 2015).  The *Asta* Court held that there were sufficient allegations against the CEO, Gary Stern, where the plaintiff alleged that the scheme was Stern's idea and that he personally orchestrated, supervised, and maintained it.  *Id.* at *26.  Here, Plaintiffs have alleged far more.

In Section III(C)(5)(b)(3), Rees also raises the issue of whether the enterprise is related to the racketeering.  Rees Mot. to Dismiss at 32.  This argument is hard to fathom given the factual allegations in the First Amended Complaint.  The Plain Green enterprise is after all an illegal internet based payday lender operating in contravention of federal and state laws.  It literally could not function without the use of the wires.  The enterprise is undoubtedly connected to the racketeering acts.

Rees's concluding sentences sum up his position:  "In short, Rees is not alleged to have personally collected a debt nor to have participated in any acts of mail or wire fraud.  As such, even if the enterprise engaged in acts of racketeering, without an allegation that Rees controlled or directed the enterprise through acts of racketeering, liability under RICO cannot result. Because the FAC does not establish the requisite nexus between acts of racketeering and Rees's control of an enterprise, Counts Five and Six must be dismissed."  Rees Mot. to Dismiss at 32.

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

As discussed above, this conception of RICO is wrong for the following reasons.  First, Plaintiffs need only allege that Rees participated in the enterprise through racketeering acts. That only requires that Rees "cause" the wires to be used, not that he sit at a computer and push the button to initiate the wire transaction.  Second, Plaintiffs do not need to allege, but have alleged, that Rees controlled the RICO enterprise through the wires.

(3)     Kenneth Rees Is Doing More Than Providing Services.

Rees's argument that the language of the Term Sheet should trump the allegations of the First Amended Complaint is incorrect.  Rees Mot. to Dismiss at 33.  The allegations of the First Amended Complaint are that the Term Sheet itself was a fraud designed to conceal the actual realities of the transaction.  If Rees's argument was correct, then anyone could avoid a fraud by simply writing a "contract" with an affiliated party that characterized the fraud as a legitimate business and avoid liability for the fraud.  Calling a prostitution ring a massage parlor does not make it less of a prostitution ring.  This is true even if the owner and the masseuse sign a contract describing the employee benefits the masseuse would received for employment.  Common sense dictates that this cannot be the rule.  Fortunately, the Second Circuit recognizes the error in Rees's position:

> Both the district court and the defendants assume that Rule 10(c) requires a plaintiff to adopt as true the full contents of any document attached to a complaint or adopted by reference.  Courts have found that, if the appended documents . . . reveal facts which foreclose recovery as a matter of law, dismissal is appropriate.  An appended document will be read to evidence what it incontestably shows once one assumes that it is what the complaint says it is (or, in the absence of a descriptive allegation, that it is what it appears to be).  For example, a written contract appended to the complaint will defeat invocation of the Statute of Frauds, and a document that discloses what the complaint alleges it concealed will defeat the allegation of concealment.  By the same token, however, a libel plaintiff may attach the writing alleged in the complaint to be libelous without risk that the court will deem true all libels in it. Similarly, a receipt for goods alleged in the pleading to have been

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

forged, may or may not evidence forgery on its face, but it does not
concede delivery of goods for pleading purposes.

*Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674 (2d Cir. 1995).

Plaintiffs have alleged that the Defendants' claim that they are only providing services is

false: "Defendants Rees and Think Finance hoped to avoid liability by falsely claiming that they

only provided services to Plain Green, when in reality they created the whole enterprise and ran

its operations through an assortment of subsidiaries and affiliates like Defendants Tailwind

Marketing, TC Loan, and TC Decision Sciences."  FAC ¶ 101.

Indeed the Term Sheet itself shows that Rees and Think Finance were doing far more

than delivering services:

- The Tribe only received approximately 5% of revenues:  "GPLS shall pay the Tribe 4.5% of cash revenue received on account of the Loans for which GPLS has acquired a participation interest each month . . ."  FAC Exhibit A at 2.

- "The Tribe will adopt a finance code that is acceptable to all parties and provide for the licensing of an arm of the tribe to engage in consumer lending." *Id.* at 1.

- Think Finance provided everything the Tribe need to operate the loan sharking operation, including "risk management, application processing, underwriting assistance, payment processing, and ongoing customer service support coterminous with the software license agreement and market[ing] and/or identif[ication of] access channels for consumer loans on the Tribe's behalf (jointly 'Services')"  *Id.* at 1.

- The Term Sheet required that Pepper Hamilton be the attorneys for the Tribe.  *Id.* at 3.  Despite purporting to represent the Tribe, Think Finance paid Pepper Hamilton.  *Id.*  The payment included a success fee, which placed Pepper Hamilton in an impossibly conflicted position.  Pepper Hamilton had never represented the Tribe before.  Preedom Aff. Exhibit 2 ¶ 11.

- Defendants Rees and Think Finance defined precisely the type of loan Plain Green would offer to customers and the terms on which the loan would be offered.  They required the loans to be an installment loan with a maximum amount of $2,500 and a minimum repayment period of two months and a maximum repayment period of two years.  FAC Exhibit A.



- The Term Sheet created by Rees and Think Finance dictated that Plain Green would charge interest rates that were illegal and usurious. The interest rates were to vary from an annual percentage rate of 60% to 360%. *Id.* at 1.

- Defendants Rees and Think Finance required that Plain Green enter into a relationship with a U.S. bank to process loan transactions using the ACH system. In addition, they required that Plain Green develop the capacity to process remote checks. *Id.* at 2.

- Defendants Rees and Think Finance also directed Plain Green to establish a reserve account to "deal with any regulatory issues, lawsuits or other controversies involving the Tribe or its lending activities." *Id.* at 2. Defendants Rees and Think Finance, however, did not allow Plain Green to control the account. Instead, the account was under the control of Jones & Keller, PC, a law firm that the Term Sheet required Plain Green to use. *Id.* at 3.

- Defendants Rees and Think Finance also arranged for 99% of the loans made by Plain Green to be purchased within two days by a Cayman Islands loan servicing company, GPL Servicing, Ltd. ("GPL"). GPL was incorporated in February 2011, a month before Think Finance agreed to work with the Chippewa Cree Tribe. *Id.* at 2.

While all of these facts are inconsistent with merely providing services, retaining 95% of an enterprise's revenue surely indicates that Think Finance and Rees were doing more than providing "services".

Rees contests the fact that the enterprise retained control of "developing documentation for the lending process" and "implementing underwriting criteria." Rees Mot. to Dismiss at 35. Rees's partial quotation is again revealing. The Term Sheet reads that "[t]he Tribe will develop documentation for the lending process including an application, a loan agreement, an adverse action letter, and other related documents ***that comply with the federal consumer credit code including the Truth in Lending Act, the Equal Credit Opportunity Act, and the Electronic Funds Transfer Act.***" FAC Exhibit A. at 1 (emphasis added). When the quoted phrase is seen in the context of the whole sentence, the Term Sheet is imposing another restriction on the Tribe rather than preserving the Tribe's freedom of operation. Moreover, Pepper Hamilton is the actual party that is going to ensure compliance. It is clear that Pepper Hamilton was acting at the

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

- 119 -

behest of Think Finance, not Plain Green.  With respect to implementing the underwriting criteria, Plain Green was merely, at most, going to apply the criteria developed by Think Finance.  *See id.*

Rees also argues that the allegations of the FAC are based solely on Rees's former position as CEO of Think Finance.  As discussed elsewhere, the allegations are based on his personal knowledge and involvement in the fraudulent scheme.

> d.      The Tribal Defendants Are Not Entitled To Municipal Immunity.

The Tribal Defendants make an additional argument that relates to the racketeering and collection of unlawful debt arguments.  The Tribal Defendants attempt to analogize Plain Green to a municipality and then argue that municipalities are exempt from RICO because they lack the *mens rea* for RICO.  TD Mot. to Dismiss at 33.  The Tribal Defendants then attempt to argue that the officers of Plain Green also lack *mens rea*.

A detailed examination of the Tribal Defendants' case law once again reveals that it is irrelevant.  The Tribal Defendants cite *Frooks v. Town of Cortlandt*, 997 F. Supp. 438 (S.D.N.Y.), which relies upon *Gentry v. RTC*, 937 F.2d 899 (3d Cir. 1991) and *Newport v. Fact Concerts*, 453 U.S. 247 (1981).[32]  Neither *Gentry* nor *Newport* supports the Tribal Defendants' argument.  In *Gentry*, the Third Circuit determined that the tremble damages remedy in RICO did not apply to municipal corporations.[33]  The Third Circuit relied upon *Newport*, which

---

[32] *Frooks* improperly extended *Gentry* and *Newport* by relying on *Rini v. Zwirn*, 886 F. Supp. 270, 295 (S.D.N.Y. 1995), which incorrectly assumed that the *mens rea* of an agent not being implied to a municipality meant that an agent could not have *mens rea*.  *Newport* expressly recognizes that officers of a municipality can act with *mens rea* and that this can provide the basis for an award of punitive damages.

[33] *Gentry* is also incorrect because it only considered the availability of treble damages and did not consider the availability of attorney's fees, a declaration that the entity violated the law, and the availability of equitable relief.

gravel & shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 120 -

decided that punitive damages were not available against a municipal corporation under Section 1983. In that case, the Supreme Court rejected imposing punitive damages against a municipality because of the common law presumption against the awarding of punitive damages. *Newport*, 453 U.S. at 259. But the bar on awarding punitive damages did not apply to the individual officers of the municipal corporation. In fact, *Newport* relied on the *availability* of punitive damages against individual officials (and the ability of officials to have the *mens rea* for punitive damages) to support its conclusion that they were unavailable from the municipality. "By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute directly advances the public's interest in preventing repeated constitutional deprivations." *Id.* at 269. Indeed, the entire inquiry in *Newport* proceeded after the individual officers were found by the jury to have the required mental state for an award of punitive damages. *See id.* at 253 (discussing award of punitive damages against municipal officials). Thus, neither *Gentry* nor *Newport* provide any support for the proposition that a municipality's inability to form the *mens rea* for punitive damages under RICO or Section 1983 means that the officers cannot have the *mens rea* for a claim under RICO.

The Tribal Defendants' *mens rea* argument is also based on several incorrect premises. Plain Green was fraudulently created to generate illegal profits. It is not a legitimate "governmental" entity. Moreover, if necessary, the Court should ignore its corporate form because of the massive fraud that it perpetuated. *See* Section IX.A.1.d. Second, Plain Green should be considered a limited liability company, not a municipality, for the purposes of determining whether *mens rea* exists. Both *Newport* and *Gentry* primarily based their decision on the fact that taxpayers would have to pay any punitive damages to a plaintiff that was already

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

fully compensated by damages. Those considerations do not exist here. Plain Green does not

obtain its funding from taxpayers. The rational for extending common law immunity in *Gentry*

and *Newport* does not exist here. In fact, *Gentry* recognized that corporate entities can form the

requisite *mens rea* to violate RICO. *Gentry*, 937 F.2d 899, 909 (3d Cir. 1991) ("Courts long

have held ordinary corporations civilly and criminally liable for the malicious torts or crimes of

their high officers, particularly when the corporation benefits from the officers' offensive

conduct."). Third, Plaintiffs seek equitable relief and attorney's fees from the Tribal Defendants.

Thus, the relief that Plaintiffs seek entirely avoids the concerns of *Gentry* and *Newport* about the

award of punitive damages.[34]

      3.      Plaintiffs Have Adequately Alleged An Enterprise.

The Second Circuit construes the enterprise element liberally. *In re Sumitomo Copper*

*Litig.*, 995 F. Supp. 451 (S.D.N.Y. 1998). "The language and the history of [RICO] suggest that

Congress sought to define the term as broadly as possible." *United States v. Indelicato*, 865 F.2d

1370, 1382 (2d Cir. 1989). Section 1961(4) states that an "enterprise includes any individual,

partnership, corporation, association, or other legal entity, and any union or group of individuals

associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A racketeering enterprise is

proven through evidence of an ongoing organization, formal or informal, and by evidence that

various associates function as a continuing unit. *Boyle v. United States*, 556 U.S. 938, 945

(2009); *De Falco v. Bernas,* 244 F.3d 286, 307 (2d Cir. 2001). The enterprise must be distinct

from the defendants. *De Falco*, 244 F.3d at 307. Under RICO, an enterprise can be a

governmental entity. *Id.* "Both the purpose and the legislative history of the Act reflect concern

about the infiltration of local government units." *Id.* at 308.

---

[34] Section II details why Plaintiffs may obtain equitable relief against Tribal Officials.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

Here, Plain Green is alleged to be an enterprise. Plaintiffs allege that it was formed in or around March 2001 with the execution of the Term Sheet between Think Finance and the Business Committee of the Tribe. *See* FAC ¶ 76. This in itself should be sufficient, but Plaintiffs allege a great deal more about the enterprise. FAC ¶¶ 77-99. No Defendant disputes that Plaintiffs have sufficiently identified an enterprise, so Plaintiffs will not belabor the point.

4.      Plaintiffs Have Adequately Alleged A Pattern of Racketeering Activity.

Section 1961(5) defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). Section 1961(1) defines a long list of crimes, both state and federal. Relevant to this case are: mail fraud under 18 U.S.C. § 1341, (2) mail fraud under 18 U.S.C. § 1343, (3) the travel act, 18 U.S.C. § 1952, and (4) federal bribery under 18 U.S.C. § 201.

To establish a "pattern," Plaintiffs must show that "at least two acts of racketeering [were] committed within a 10-year period." *De Falco v. Bernas*, 244 F.3d 286, 320 (2d Cir. 2001). In addition, Plaintiffs must establish that the predicate acts are related and that they amount to or pose a threat of continued criminal activity. *Id.* The continuity can be addressed by either open-ended or closed-ended continuity. *Id.* To establish closed-ended continuity, Plaintiffs must establish that the activity occurred over a substantial period of time (more than two years). *Id.* at 321. To establish open-ended continuity, Plaintiffs must establish that there was a threat of continuing criminal activity going beyond the period during which the predicate acts were performed. *Id.* at 322-23.

5.      Plaintiffs Have Adequately Alleged That Their Injury Was "By Reason of"
        a RICO Violation.

Defendants argue that Plaintiffs cannot show that their injury was "by reason of" a RICO violation. That is incorrect. Rees Mot. to Dismiss at 22, TD Mot. to Dismiss at 32-33.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

The United States Supreme Court recently revisited statutory claims in *Lexmark Int'l v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014). The *Lexmark* Court identified two issues that the Court should examine in determining whether a claim comes within the ambit of a statutory claim.[35] First, in evaluating statutory claims, the Court should examine whether the claim comes within the zone of interests the statute was designed to protect. In analyzing this first issue, the Supreme Court looked to the statute's statement of purpose. *Id.* at 1388. Next, the Court should examine the issue of proximate causality. In analyzing this second prong, the Supreme Court conveniently relied on its jurisprudence for RICO proximate causation. *Id.* at 1390-91. The Court simplified the complex issues before it with a simple question: "Does the cause of action in § 1125(a) extend to plaintiffs like Static?" *Id.*

To answer the "by reason of," inquiry here, the Court should ask the same question: "Does the cause of action in 18 U.S.C. § 1964 extend to plaintiffs like Ms. Gingras and Ms. Given?" There is only one answer to that question: Of course, it does. Just like in *Lexmark*, Congress set forth the purpose of RICO in "Statement of Findings and Purpose" in Public Law 91-452, which includes an express reference to loan sharking:

> The Congress finds that: . . . (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, ***loan sharking***, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; and (5) organized crime continues to grow because of defects in the evidence gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact."

---

[35] In identifying these two issues, the Court meant to exclude prior confusing jurisprudence on statutory claims, such as the jurisprudence for statutory standing.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

18 U.S.C. § 1961, Historical and Statutory Notes; Pub. L. 91-452, 84 Stat. 923 (1970) (emphasis added).  The legislative history of RICO also makes it clear that loan sharking was a principal focus of RICO:

> "The core of organized crime activity is the supplying of illegal goods and services – gambling, *loan sharking,* narcotics, and other forms of vice – to countless numbers of citizen customers."   In many ways organized crime is the most sinister kind of crime in America.  The men who control it have become *rich and powerful* by encouraging the needy to gamble, by luring the troubled to destroy themselves with drugs, by extorting profits of honest and hard-working businessmen, *by collecting usury from those in financial plight,* by maiming or murdering those who oppose them, by bribing those who are sworn to destroy them.  Organized crime is not merely a few preying upon a few.  In a very real sense it is dedicated to subverting not only American institutions, but the very decency and integrity that are most cherished attributes of a free society."

Organized Crime Control Act of 1969, Report of the Committee of the Judiciary of the United States Senate, S. Rep. 91-167 at 206 (Statement of Tydings) (quoting The President's Crime Commission, "The Challenged of Crime in a Free Society at 187, 209 (1967)).

Indeed, courts have repeatedly recognized the importance that Congress placed on loan sharking in enacting RICO.  *United States v. Minicone*, 960 F.2d 1099, (2d Cir. 1992) (holding that illegal debt collection activity "is at the heart of the activity targeted by the RICO statute"); *see also United States v. Turkette*, 452 U.S. 576, 589-90 (1981) (stating that loan sharking was "among the very crimes that Congress specifically found to be typical of the crimes committed by organized crime"); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994)(in rejecting equal protection challenge to the unlawful collection of debt portion of RICO, stating that "Congress' statement of purposes . . . gives some reason to believe that Congress" " decided that collections of unlawful debt were central to evils at which RICO was directed).  As a result, there is no

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

doubt that the victims of an illegal loan sharking scheme fall within the zone of interest protected by the RICO statute.

Plaintiffs also have alleged that the collection of unlawful debt and racketeering were the proximate causes of Plaintiffs' injuries. To establish proximate cause under RICO, a "plaintiff is required to show that a RICO predicate offense 'not only was a 'but for cause' of his injury, but was the proximate cause as well.'" *Hemi, LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268 (1992)). "Proximate cause for RICO purposes, we made clear, should be evaluated in the light of its common law foundations: proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged'" *Id.*

There is compelling evidence that Congress felt that borrowers of usurious debt meet the proximate cause test for RICO. RICO's legislative history recognizes that Congress determined borrowers from loan sharking are the direct victims that the statute intended to protect: "One of the principal means of expansion is foreclosure on debts to loan sharks and the small, marginal businessman in the concentrated areas of urban poor is the primary victim of organized crime loan sharking. These and other organized criminal enterprises yearly take large sums from ***their direct victims*** . . ." Organized Crime Control Act of 1969, Report of the Committee of the Judiciary of the United States Senate, S. Rep. 91-167 at 212 (emphasis added). This alone should be sufficient to meet the proximate cause test.

If more were needed, the Second Circuit has held that paying an excessive amount of money for something is sufficient to establish proximate cause and injury under RICIO. *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 349 (2d Cir. 2003). *Desiano* involved a claim by health insurers that they paid excessive amounts for a drug called Rezulin that had been inappropriately

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Sheet
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

promoted as a safe drug while simultaneously causing an unacceptable risk of liver failure. "Thus the damages – the excess money Plaintiffs paid Defendants for the Rezulin that they claimed they would not have purchased 'but for' Defendants' fraud – were in no way 'derivative of damage to a third party.'" *Id.* Moreover, the case law that Rees cites recognizes that financial loss is sufficient to establish injury under RICO. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) ("[T]he injury to business or property element of *section 1964(c)* can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss.").

Plaintiffs' allegations satisfy the proximate cause test. Plaintiffs have alleged that money was the object of the conspiracy. FAC ¶ 104. They have laid out detailed allegations as to the amount of monetary damages they have suffered. FAC ¶¶ 46-63. These allegations include the interest charged, the amount of payments made, the amount of money still owing on the extortionate loans, and the maximum interest rate allowed. *Id.*

With respect to the unlawful debt claim, causation is simple. If plaintiffs were not lent money at extortionate interest rates, they would not have paid extortionate interest. FAC ¶ 116, 222. This satisfies both the but for and proximate causation tests.

For the racketeering claim, causation also exists. The racketeering acts pervade the entire loan sharking operation. Mail and wire fraud were used from the very beginning to establish the enterprise. FAC Exhibit A. Mail and wire fraud were used to distribute the misrepresentations on the website that tricked plaintiffs into taking out loans. FAC ¶¶ 21-23. Mail and wire fraud were used to induce Plaintiffs to enter into the Purported Arbitration Agreement and to defer taking legal action against Defendants. FAC ¶¶ 112. Plaintiffs also suffered injury because the increase financial strain limited their ability to do other things in their lives.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

- 127 -

Kenneth Rees argues that: (1) Plaintiffs have not alleged an injury cognizable under RICO, and (2) Plaintiffs have failed to allege that they relied on representations made by Kenneth Rees. Rees Mot. to Dismiss at 22-23. But Rees ignores the most obvious injury to Plaintiffs: they paid excessive interest that they should not have paid.[36] "Plaintiffs were injured when Defendants Rees and Think Finance chose to defraud them and collect extortionate and usurious interest rates far in excess of the legal limit. The withdrawal of money by Defendants Rees and Think Finance, part of the Racketeering activity and itself a predicate act, cause[d] Plaintiffs' injury." FAC ¶ 116. As discussed above, this satisfies the most stringent requirements for showing injury.

6.         RICO Does Not Require Reliance.

Rees's reliance argument fails on many levels. First and most simply, Plaintiffs have alleged that they relied on his misrepresentations. Plaintiffs allege that "Defendants Rees and Think Finance exercise[d] control over the drafting of the lending and arbitration agreements through their close association with the attorneys drafting the documents." FAC ¶ 110. Under *Pereira*, Rees is responsible for the fraudulent representations. Plaintiffs also allege that "Defendants Rees and Think Finance used a lending agreement and an arbitration agreement as tools to further deceive Plaintiffs." FAC ¶ 112. Plaintiffs allege that they actually believed the representations. FAC ¶ 129. Finally, Plaintiffs allege that they "relied on these representations by failing to take legal action against the responsible parties and continuing to make payments on the illegal loans." FAC ¶ 130.

Second, Plaintiffs allege RICO claims that do not relate to wire fraud based on a misrepresentation. Plaintiffs' collection of unlawful debt claim does not require proof of the use

---

[36] The Tribal Defendants also make this argument. TD Mot. to Dismiss at 32.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

of the wires at all. In addition, Plaintiffs have alleged a racketeering claim that does not rely on misrepresentations because of the many non-fraudulent wire transactions used to take money from Plaintiffs' accounts.

Third, there is no reliance requirement under RICO. After reading Rees's brief, one is left with the impression that reliance is a requirement of RICO. Rees creates that impression by misstating the holdings of several cases. Rees starts with *Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 141 (D.D.C. 2008). Rees claims that this case supports the following statement: "Though actual reliance is not an essential element of predicate mail and wire fraud violations, to adequately allege proximate causation so as to confer civil RICO standing, a plaintiff must allege reliance by someone on a misrepresentation." Rees Mot. to Dismiss at 22. The actual quote from the case is much different: "Although first party reliance is not a necessary element of a civil RICO claim based on mail fraud, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), a plaintiff claiming fraud as a predicate act must nonetheless allege 'a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury' to satisfy the proximate cause requirement." *Ficken*, 578 F. Supp. at 141. The quote does not support the idea that Plaintiffs must allege reliance.

Rees then argues that the Supreme Court recently confirmed that reliance was a necessary pleading element for stating a RICO claim. Rees Mot. to Dismiss at 23. The holding of *Bridge* is actually the opposite of what Rees proposes. In *Bridge*, the Supreme Court rejected the argument that a plaintiff had to prove first party reliance. The *Bridge* Court stated that the question presented was "whether a plaintiff asserting a RICO claim predicated on mail fraud must plead and prove that it relied on the defendant's alleged misrepresentations." 553 U.S. 639, 641 (2008). The Supreme Court then went on to answer its question immediately: "Because we

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

agree with the Court of Appeals that a showing of first party-reliance is not required, we affirm."
*Id.* Throughout the opinion, the Court stated again that reliance was not required. Of particular
note, the Supreme Court rejected the argument that a plaintiff needed to establish reliance to
establish proximate cause under RICO. Labeling the argument "twice flawed," the Supreme
Court stated "[h]aving rejected petitioners' argument that reliance is an element of a civil RICO
claim based on mail fraud, we see no reason to let that argument in through the back door by
holding that proximate cause analysis under RICO must precisely track the proximate cause
analysis of a common law fraud claim." *Id.* at 655.

Having failed to gain entry through the front and back doors, Rees tries to crawl in
through the window. Rees points to one sentence of *dicta* in *Bridge*, but neglects the context of
the entire passage. The point that the Supreme Court was making was that as a practical matter,
a plaintiff may have to prove reliance to be able to make out a case of proximate causation, but
that reliance is not a required pleading element: "Accordingly, it may well be that a RICO
plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third party
reliance in order to prove causation. 'But the fact that proof of reliance is often used to prove an
element of the plaintiff's cause of action, such as the element of causation, does not transform
reliance itself into an element of the cause of action." *Bridge*, 553 U.S. at 659 (citation omitted).

Rees's citation to *Biggs* is not only wrong, but deceptive. Rees Mot. to Dismiss at 23.
The District Court in *Biggs* did say "The Court agrees with Countrywide that *Bridge* did not
eliminate reliance as an element of a RICO claim predicated on mail fraud", but contrary to
Rees's representations (Rees Mot. to Dismiss at 23), the Fourth Circuit did not affirm on that
point. Instead, the Fourth Circuit went out of its way to *reverse* on that point: "Therefore, we
agree with the Biggses that *Bridge*'s holding eliminates the requirement that a plaintiff prove

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 130 -

reliance in order to prove a violation of RICO predicated on mail fraud." *Biggs v. Eaglewood Mortg.*, *LLC*, 353 Fed. Appx. 864, 867 (4th Cir. 2009). The analysis that the Fourth Circuit employed to reach that result is similar the analysis above. *See id.* at.

Rees's attempt to read an element of reliance into RICO after the Supreme Court has explicitly rejected it is ill-advised and unsupported. It also represents a metaphor for the entire Plain Green fraudulent scheme; Defendants will go to any lengths to avoid responsibility for what is an illegal and criminal enterprise that is designed to steal money from the poorest people and give it to the wealthiest members of society.

## X.     THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT.

Defendants Rees, Sequoia, and Technology Crossover Ventures all argue that Plaintiffs have not stated a claim against them for unjust enrichment because Plaintiffs have not alleged that these Defendants received a benefit. Rees Mot. to Dismiss at 36, TCV Mot. to Dismiss at 12, Sequoia Mot. to Dismiss at 21. In Vermont, the reach of an unjust enrichment claim is broad. "Under the doctrine of unjust enrichment, a party who receives a benefit must return the benefit if retention would be inequitable. Unjust enrichment applies if in light of the totality of the circumstances, equity and good conscience demand that the benefitted party return that which was given." *Kellogg v. Shushereba*, 2013 VT 76, ¶ 22. "It is a familiar principle of equity that a trust is implied whenever the circumstances are such, that the person taking legal estate, whether by fraud or otherwise, cannot enjoy the beneficial interest without violating the rules of honesty and fair dealing." *Legault v. Legault*, 142 Vt. 525, 529 (1983). In addition, unjust enrichment provides matter reason to avoid the arbitration agreement and the delegation clause.

It is difficult to think of a circumstance more deserving of a claim of unjust enrichment than the criminal enterprise that forms the basis of this case. Defendants, which include some of

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 131 -

the wealthiest institutions in this world, deliberately set out to prey on Plaintiffs who were in difficult financial circumstances. The Defendants intentionally designed a scheme to lend money to this vulnerable population so that they could reap huge financial rewards. The Defendants knew that they were violating both state and federal law so they deliberately tried to shield themselves from legal liability by relying on a "rent-a-tribe" scheme and an arbitration agreement that is nothing more than a sham. Defendants reaped hundreds of millions of dollars in profits and thought they would escape all liability for their egregious acts. Yet somehow, Defendants still complain that there is not a detailed enough description of the benefit that they received.

Plaintiffs have alleged that Rees received a benefit. Think Finance was Rees's company. FAC ¶ 23. Rees has confirmed that he is a shareholder in Think Finance. Rees Mot. to Dismiss at 19 n.11. Think Finance retains 95% of the revenue from the illegal loan sharking scheme. FAC ¶ 23. As an owner of the company, Rees received a benefit in the form of profits that Think Finance generated from the illegal loan sharking scheme. Rees also occupied the position of President and Chief Executive Officer of Think Finance. FAC ¶ 10. He continues to be Chairman of Think Finance. FAC ¶ 10. Rees's focus on the final three paragraphs of the FAC ignores the two hundred plus paragraphs that detail how Rees received a benefit that he did not deserve. The Court should return that benefit to Plaintiffs.

Plaintiffs have also alleged that Sequoia and Technology Crossover Ventures received a benefit. Plaintiffs have alleged that Sequoia and Technology Crossover Ventures "reap rewards through obtaining significant returns on the investment of their funds in the enterprise." FAC ¶ 154. Plaintiffs have alleged that those funds come from Plaintiffs through GPL in the Cayman Islands. FAC ¶¶ 88-89.

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

A PROFESSIONAL CORPORATION

The Defendants misread *Ray Reilly's Tire Mart v. F.P. Elnicki, Inc.*, 149 Vt. 37, 39

(1987).  The key reason that the Court did not order unjust enrichment in that case was that the

defendant had not received an inequitable benefit in the form of free tires.  The defendant had

already paid for those tires in a transaction with a third party.  Because the defendant had already

paid for the tires, it did not receive a benefit inequitably.  In closing, the Court noted that the

"most important element is injustice."  *Id.*  To the extent that *Ray Reilly* holds otherwise, it was

superseded by the holding in *Kellogg v. Shushereba*, 2013 VT 76, ¶ 22, which requires the Court

to look at the totality of the circumstances.[37]

<u>Conclusion</u>

The Sheriff of Nottingham would be proud of Defendants' fraudulent scheme.  After

suffering under Robin Hood's regime of stealing from the rich to give to the poor, Nottingham

would appreciate Defendants' reverse scheme of robbing from the poor to give to the rich.  But

even the Sheriff had to eventually answer for his crimes.  In this case, the allegations of the First

---

[37] *Mount Snow* is also inapposite because in that case, Mount Snow brought a specific claim for contract implied in law.  It did not rely on the larger equitable doctrine of unjust enrichment.  *Mount Snow, Ltd. v. ALLI*, 2013 U.S. Dist. LEXIS 118604, *22 (August 21, 2013 D. Vt.).

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 133 -

Amended Complaint and the evidence show that Defendants intentionally violated the law.

Accordingly, the Court should deny the Motions to Dismiss.

Dated:  Burlington, Vermont
     November 13, 2015

           */s/ Matthew B. Byrne*
           Matthew B. Byrne, Esq.
           Gravel & Shea PC
           76 St. Paul Street, 7th Floor, P. O. Box 369
           Burlington, VT  05402-0369
           (802) 658-0220
           mbyrne@gravelshea.com
           For Plaintiffs



gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION