UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| JESSICA GINGRAS, *et. al* ) | |
|    Plaintiffs ) | |
| ) | |
|      v. ) | Civil Action No. 1:15-cv-00101-jgm |
| ) | |
| JOEL ROSETTE, *et. al* ) | |
|    Defendants ) | |

**STATE OF VERMONT'S MEMORANDUM OF LAW, AS AMICUS CURIAE, IN OPPOSITION TO TRIBAL DEFENDANTS' MOTION TO DISMISS**

The State of Vermont, as amicus curiae, opposes Tribal Defendants' Motion to Dismiss (ECF No. 66). As explained below: (1) Plaintiffs' claims are not barred by Defendants' proffered immunity defenses; and (2) Plaintiffs' claims are cognizable under the Vermont Consumer Protection Act.

**<u>The State's Interests in Protecting Vermonters from Predatory Lending</u>**

The Vermont Consumer Protection Act ("the Act" or "VCPA") was enacted "to protect the public" from "unfair or deceptive acts or practices." Vt. Stat. Ann. tit. 9, § 2451. The Vermont Attorney General is authorized to enforce the Act. *Id.* § 2458. In May 2012, the Act was amended to add a section explicitly making it an unfair and deceptive act for any lender to make a loan in Vermont without complying with Vermont's lending laws. *Id.* § 2481w(b). Those laws include, among others, that the lender be licensed by Vermont's Department of Financial Regulation (Vt. Stat. Ann. tit. 8, § 2201) and that loans not exceed Vermont's interest rate limits of 12-24% per annum (Vt. Stat. Ann. tit. 9, § 41a(b)). These requirements specifically apply to loans made via electronic means, such as the internet. Vt. Stat. Ann. tit. 8, § 2233(b) ("A loan solicited or made by mail, telephone, or electronic means to a Vermont

resident shall be subject to the provisions of this chapter notwithstanding where the loan was legally made. No person shall engage in the business of soliciting or making loans by mail, telephone, or electronic means to residents of this state unless duly licensed.").

Despite Vermont's restrictions on unlicensed, high-interest lending, online lenders continue to make illegal loans via the internet to borrowers in Vermont. Since 2007, over 120 consumers have filed complaints with the State regarding unlicensed lenders. *Illegal Lending: Facts and Figures* (Report by Vermont Attorney General's Office, April 23, 2014), at 3.[1] The harms from such unlicensed, high-interest loans are significant. *Id.* (such loans are "designed to trap individuals in long-term debt" and have a "devastating impact on families' financial well-being.").

Online lenders pose a particular threat to consumers, charging even higher interest rates (often exceeding 500-700% APR), along with higher rates of abusive collection practices, fraud and privacy breaches, unauthorized transactions, and less oversight and regulation than exists for traditional loans. *See* Pew Charitable Trusts (2014) *Fraud and Abuse Online: Harmful Practices in Payday Lending*, at 1-2.[2] Online lenders are profiting immensely from their activities. *See id.* at 3 (online lending revenue has tripled from $1.4 billion in 2006 to $4.1 billion in 2013). Online lenders have long sought to avoid state regulation and "the most recent model to emerge involves lenders claiming sovereign immunity from state or federal laws on the basis of affiliation with a Native American tribe." *Id.* at 23 (noting further that "it is often not clear whether the tribe is sufficiently involved in the ownership or operation of the lending

---

[1] *Available at:* http://ago.vermont.gov/focus/consumer-info/money-and-credit/personal-loans/illegal-lending-report-april-2014.php (hereafter "Illegal Lending Report").

[2] *Available at:* http://www.pewtrusts.org/~/media/Assets/2014/10/Payday-Lending-Report/Fraud_and_Abuse_Online_Harmful_Practices_in_Internet_Payday_Lending.pdf .

business to justify such claims. In many cases, a nontribal lender partners with and pays a small share of its proceeds—as little as 1 percent—to a tribe for the privilege of claiming immunity.").

The Attorney General's Office has taken significant action to enforce Vermont's laws against illegal online lenders. *Illegal Lending Report* at 8-10 (describing numerous settlements, lawsuits, and outreach efforts to curb illegal online lending to Vermonters). The Attorney General specifically sent a cease-and-desist letter to Plain Green Loans, LLC, the lending company that made loans to Plaintiffs, advising the company to immediately cease making and collecting on all loans made to Vermont borrowers. The company ignored the letter and continues to operate its lending business in violation of Vermont law.

Plaintiffs' allegations describe precisely the kinds of loans that the Vermont Legislature has decided are unlawful. Plaintiffs allege that Defendants made loans without a Vermont lending license and have charged and collected interest at annualized rates of up to 371%, among other illegal practices.

**Argument**

Tribal Defendants' motion to dismiss should be denied. Tribal Defendants, as individual officers of an online lending company, do not enjoy any immunity (tribal or otherwise) from a lawsuit seeking injunctive and equitable relief. Further, as corporate officers who are responsible for the lending activities, Defendants are subject to suit under the VCPA for making unlicensed and usurious loans in violation of several statutory provisions.

**A. Tribal Immunity Does Not Bar Plaintiffs' Suit**

Defendants Rosette, Whitford, and McInerney assert tribal immunity as a defense to Plaintiffs' claims, including Plaintiffs' claim under the VCPA. Defendants' contention is unpersuasive and does not merit dismissal. First, Defendants' conclusory arguments in support

of tribal immunity are insufficient to show that immunity actually applies to Plain Green's lending activities. Second, tribal immunity would not in any event protect these individual defendants from suit.

    1. <u>Tribal Defendants Have Not Shown That Tribal Immunity Applies to Plain Green's Lending Activities</u>

For tribal immunity to have any relevance to this case, Tribal Defendants must establish that Plain Green is either a tribal entity or an arm of a tribe and that the doctrine of tribal immunity applies to its lending activities. This is a threshold issue: if Plain Green is not an arm-of-the-tribe for immunity purposes, Defendants cannot attempt to invoke the defense for themselves. And as the party asserting the defense, the burden is on Defendants to establish that Plain Green is a true arm of the Chippewa Cree Tribe, and "thus entitled to immunity." *Gristede's Foods, Inc. v. Unkechuage Nation*, 660 F.Supp.2d 442, 466 (E.D.N.Y. 2009) ("the burden of proof for an entity asserting immunity as an arm of a sovereign tribe is on the entity to establish that it is, in fact, an arm of the tribe."). Tribal Defendants' showing on this point is conclusory and inadequate.

  Whether Plain Green is an arm-of-the-tribe is a complex legal determination that requires a searching and multi-factored review by a court. *E.g.*, *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006); *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184-85 (10th Cir. 2010) (courts "must first determine the appropriate test to measure the relationship between an Indian tribe and its economic entities, and then decide whether the [latter] are subordinate economic entities that share in the Tribe's immunity.").

There is no nationally-coherent arm-of-the-tribe doctrine. Neither the Second Circuit nor the U.S. Supreme Court has enunciated a test for determining arm-of-the-tribe status. The

NY Court of Appeals, drawing on cases from numerous courts, has articulated the factors deemed generally relevant:

> Although no set formula is dispositive, in determining whether a particular tribal organization is an 'arm' of the tribe entitled to share the tribe's immunity from suit, courts generally consider such factors as whether: [1] the entity is organized under the tribe's laws or constitution rather than Federal law; [2] the organization's purposes are similar to or serve those of the tribal government; [3] the organization's governing body is comprised mainly of tribal officials; [4] the tribe has legal title or ownership of property used by the organization; [5] tribal officials exercise control over the administration or accounting activities of the organization; and [6] the tribe's governing body has power to dismiss members of the organization's governing body. More importantly, courts will consider whether [7] the corporate entity generates its own revenue, whether [8] a suit against the corporation will impact the tribe's fiscal resources, and whether [9] the subentity has the power to bind or obligate the funds of the tribe.

*Sue/Perior Concrete & Paving, Inc. v. Lewiston Golf Course Corp.*, 25 N.E.3d 928, 24 N.Y.3d 538, 546-47 (N.Y. 2014).

The Tenth Circuit has enunciated a similar set of factors based on several federal appellate court decisions:

> [T]he following factors are helpful in informing our inquiry: (1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity; and (5) the financial relationship between the tribe and the entities. . . . Furthermore, our analysis also is guided by a sixth factor: the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities.

*Chukchansi Gold Casino*, 629 F.3d at 1187.

Thus, "common among these factors is that the tribal entity operates not as a mere business, but rather as an extension of the tribe's *own* economic activity, so that its activities are properly deemed to be those of the tribe itself." *Gristede's Foods*, 660 F.Supp.2d at 478 (quotations omitted and emphasis added).

5

Here, Tribal Defendants have not met their burden to show that Plain Green is entitled to tribal immunity, either as a tribal lending entity or as a true arm-of-the-tribe. Defendants do not allege that Plain Green is a tribal company. Defendants' motion only cursorily mentions that Plain Green was intended to operate as an economic "arm-of-the-tribe." Defs.' Mot. 3. Defendants rely on the company's Articles of Incorporation, which state that Plain Green's purpose is to "increase Tribal revenues," and a tribal resolution also describing Plain Green's economic purpose and the Tribe's intent to confer immunity on Plain Green. But these documents are not dispositive absent critical details about Plain Green's operations. The Tribe's intent to share immunity with Plain Green and the economic purpose of Plain Green are only two factors to prove arm-of-the-tribe. Defendants provide no details regarding how much or how often revenue flows to the tribe (either in absolute terms or relative to the company's gross income), or what tribal programs or operations the funds support. Defendants have not shown that the Tribe has legal control or title over Plain Green's assets and property, that tribal officials have the power to dismiss members of Plain Green, or that the Tribe controls any of the administrative and governing aspects of Plain Green.

In short, Tribal Defendants explain nothing about how Plain Green is performing critical tribal functions such that its activities may be deemed to be those of the tribe itself. Defendants' lack of support for how Plain Green performs essential tribal functions is enough for this Court to avoid the tribal immunity issue altogether, because Defendants have not met their burden to show that Plain Green is entitled to such immunity (let alone whether that immunity could possibly extend to the individual Defendants of this case). Defendants' mere reliance on the Tribe's intent in creating Plain Green and its purpose to promote tribal revenue is insufficient to show that Plain Green is actually an arm-of-the-tribe. *Dixon v. Picopa Const. Co.*, 772 P.2d

1104, 1110 (Ariz. 1989) (purpose of tribal corporation did not weigh in favor of finding sovereign immunity when the corporation "was not formed to aid the [tribe] in carrying out tribal governmental functions" and appeared to be "simply a for-profit corporation").

Moreover, Plaintiffs have alleged facts – undisputed here by Tribal Defendants – sufficient to show that Plain Green is *not*, in fact, a true arm-of-the-tribe. Plain Green's stated purpose and function is a purely commercial one—to generate revenue by marketing high-interest loans to the general public over the internet. As Plaintiffs point out, it appears that 95% of the profits and control of Plain Green are in the hands of non-tribal third parties. Pls.' Opp. 27. This lack of meaningful profit-sharing and true control over operations and decisions illustrates that Plain Green is not effectively performing activities of the Chippewa Cree Tribe.

Therefore, Plain Green is not "the kind of tribal entity, analogous to a governmental agency, which should benefit from the defense of sovereign immunity"; rather, it is "more like . . . [a] commercial business enterprise, instituted solely for the purpose of generating profits for [its] private owners" and thus not entitled to immunity. *Chukchansi Gold Casino*, 629 F.3d at 1184 (quoting *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 293 (Minn.1996)); *see also Gristede's Foods*, 660 F.Supp.2d at 478 (no immunity for an entity that operates "as a mere business"). In this case, conferring immunity on a commercial lending company that provides 95% of its profits to third parties and is controlled by a majority of non-tribal members would not serve the purposes of tribal immunity. *Am. Prop. Mgmt. Corp. v. Superior Court*, 206 Cal.App.4th 491, 505 (Cal. 2012) (finding that purposes of tribal immunity were not served for a construction company created by Indian tribe because, in part, "the tribal government does not manage the corporation.").

Lastly, Plaintiffs have alleged that Plain Green was created solely to avoid state law regulation. *See* Pls.' First Amended Compl. Accepting these allegations as true, then this Court need not wade into whether tribal immunity applies at all, for as the Second Circuit recently noted, "a tribe has no legitimate interest in selling an opportunity to evade state law." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Services*, 769 F.3d 105, 114 (2d Cir. 2014) (upholding denial of preliminary injunction that Indian tribe sought against New York Department of Financial Services). The Second Circuit in *Otoe-Missouria* avoided ruling on tribal immunity because of the heavy and unanswered factual questions involved. This Court should do the same here and deny any defense of tribal immunity because Tribal Defendants have not proffered sufficient facts to determine such immunity.

2. <u>Tribal Immunity Does Not Protect the Individual Tribal Defendants From Suit</u>

Even if Plain Green is found to enjoy tribal immunity as an "arm-of-the-tribe" entity, tribal immunity does not protect individual tribal members, like several of the Tribal Defendants,[3] from lawsuits that seek to enjoin unlawful conduct. *Michigan v. Bay Mills Indian Cmty*, 572 U.S. ——, 134 S.Ct. 2024, 2035 (2014) ("tribal immunity does not bar suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct") (emphasis original); *Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 172 (1977) ("The doctrine of sovereign immunity . . . does not immunize the individual members of the Tribe.").

Here, Plaintiffs have properly brought suit against the individuals who are responsible for making online loans in violation of numerous federal and state laws. Plaintiffs seek injunctive and equitable relief against those individuals. Plaintiffs' lawsuit is therefore entirely

---

[3] Only Defendants Joel Rosette and Ted Whitford claim to be enrolled members of the Chippewa Cree Tribe. *See* Defs.' Mot. Ex. A (ECF No. 66-1).

8

proper pursuant to the Supreme Court's distinction regarding individual tribal members. *See, e.g.*, *Bess v. Spitzer*, 459 F.Supp.2d 191, 202 (E.D.N.Y. 2006) ("Principles of tribal immunity do not apply to individual Indians in the same way that they apply to Indian tribes.") (citing *Puyallup*, 433 U.S. at 173). As Plaintiffs' Opposition (at 22) correctly points out, Tribal Defendants' failure to address the Supreme Court's precedents distinguishing a tribe's immunity from individual members is a fatal omission for Defendants' argument.

Next, Defendants are wrong that Plaintiffs' action must be brought under *Ex Parte Young*. As Plaintiffs note in their Opposition, *Ex Parte Young* has merely been used as an analogy in tribal immunity cases, *see, e.g.*, *Bay Mills*, 134 S.Ct. at 2035. But *Ex Parte Young* is not the official doctrine to be applied in a tribal matter—tribal immunity is its own doctrine created by the federal courts. *Kiowa Tribe of Okla. v. Mfg. Tech., Inc.*, 523 U.S. 751, 752 (1998) (explaining how "the tribal immunity doctrine developed almost by accident" by the federal courts); *Bay Mills*, 134 S.Ct. at 2045 (dissent) (same, describing "the judge-invented doctrine of tribal immunity").

Because *Ex Parte Young* is not controlling, Plaintiffs are not limited to asserting violations of federal law. *Cf.* Defs.' Mot. 5-6 (arguing that *Ex Parte Young* "is applicable only to violations of federal – not state – law."). As the Supreme Court has recognized, plaintiffs may assert state-law claims against individual tribal members for violating *state* laws outside the reservation. In *Puyallup*, the lawsuit was to enjoin violations of state law by individual tribal members fishing off the reservation: "[a]s such, it is analogous to prosecution of individual Indians for crimes committed off reservation lands," for which immunity does not apply. 433 U.S. at 171. In *Bay Mills*, the Supreme Court explained that a plaintiff "could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say,

9

gambling without a license." 134 S.Ct. at 2035. In that case, gambling without a license was a state-law issue.

Similarly, Plaintiffs have alleged that Tribal Defendants reached out to Plaintiffs via the internet and made high-interest loans to Vermonters without a state lending license and in violation of several other state laws, including Vermont's usury law. These are neutral laws that apply to all persons who make loans into Vermont, regardless of the lender's location or affiliation. *See* 8 V.S.A. § 2233(b) (a loan made by "electronic means to a Vermont resident shall be subject to the provisions of this chapter notwithstanding where the loan was legally made."); *Otoe-Missouria Tribe*, 769 F.3d at 117 (finding that "New York's usury laws apply to all lenders, not just tribal lenders.").

Accordingly: (1) Tribal Defendants must comply with Vermont's laws, *Otoe-Missouria Tribe*, 769 F.3d at 113 ("Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] . . . otherwise applicable to all citizens of [that] State.") (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973)); and (2) Plaintiffs are entitled to bring their case and seek injunctive relief against Defendants' individual noncompliance with those laws. *Bay Mills*, 134 S.Ct. at 2035; *Puyallup*, 433 U.S. at 171. Tribal immunity does not bar these claims.

**B. Tribal Defendants May Be Sued For Violating Vermont's Consumer Protection Act and Consumer Protection Rule 104**

1. <u>Defendants' Undisputed Unlicensed and Usurious Lending Practices Are a *Per Se* Unfair and Deceptive Act</u>

Tribal Defendants argue (at 30-31) that Plaintiffs failed to specify how the loans and collection practices are unfair or deceptive and how Plaintiffs were injured. Not so. Plaintiffs adequately alleged that Tribal Defendants violated the VCPA. Taking as true that Defendants

are not licensed in Vermont and charged usurious interest, these are *per se* unfair and deceptive practices. The Vermont Legislature explicitly made unlicensed and usurious lending a *per se* unfair and deceptive act under Vt. Stat. Ann. tit. 9, § 2481w(b) ("It is an unfair and deceptive act and practice in commerce for a lender directly or through an agent to solicit or make a loan to a consumer by any means unless the lender is in compliance with all provisions of 8 V.S.A. chapter 73"). This is not a case of amorphous or undefined acts or practices. Here, there is an express statutory prohibition within the VCPA making Defendants' practices *per se* unfair and deceptive. "A *per se* unfair trade practice exists when a statute has been violated and such violation has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce." *Villella v. Pub. Employees Mut. Ins. Co.*, 725 P.2d 957, 964 (Wash. 1986). Washington is similar to Vermont law, in that Washington's "usury statute expressly declares the Consumer Protection Act is violated by entry into a usurious contract." *Cuevas v. Montoya*, 740 P.2d 858, 862 (Wash. 1987).

Similarly, by alleging that Tribal Defendants violated the specific statutory provisions of Vt. Stat. Ann. tit. 9, § 2481w, Plaintiffs have pled a valid VCPA claim. *See, e.g.*, *Williams v. Delray Auto Mall, Inc.*, 916 F.Supp.2d 1294, 1300 (S.D. Fla. 2013) (Plaintiff stated a *per se* consumer protection claim under Florida's consumer protection act by alleging that car title lender violated statutory provisions, including state usury caps); *Pettit v. Hampton and Beech, Inc.*, 922 A.2d 300, 307 (Conn. 2007) (failure to register as home contractor was *per se* violation of Connecticut's consumer protection statute, because the consumer protection statute explicitly contained a provision requiring such registration).

Further, Plaintiffs have shown injury from Tribal Defendants' unlawful loan practices. *See* Compl. ¶¶ 47-51, 60-63, 66-67 (Plaintiffs paid thousands of dollars in excessive interest and

charges). These are significant injuries. *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F.Supp.2d 79, 90 (S.D.N.Y. 2004) (paying fees or interest on usurious loans is an injury); *Hines v. Wells Fargo Home Mortg., Inc.*, 2014 WL 5325470, at *4 (E.D. Cal. Oct. 17, 2014) (plaintiff "suffered injury by entering into the high-cost and usurious loan"). Plaintiffs have therefore pled a valid VCPA claim.

  2. <u>CP Rule 104 Prohibits Collecting Interest in Excess of Vermont's Usury Cap</u>

Vermont Consumer Protection Rule 104.05(c) states that it is an unfair act to collect or attempt to collect "any interest or other charge, fee, or expense incidental to the principal obligation unless such interest or incidental fee, charge, or expense is expressly authorized by the agreement creating the obligation and is legally chargeable to the debtor, or is legally chargeable under state law." That is, the lender may collect interest in only two circumstances: (1) the interest is expressly contained in the contract *and* the interest is lawful to charge in Vermont; or (2) the interest is not stated in the agreement, but state law would allow collecting the interest. The latter distinction accounts for those situations where the written agreement is silent on interest but a borrower might be required to pay some interest, regardless of the contract not containing an express interest rate.

Tribal Defendants wrongly contend that excessive interest is allowable simply because their loan agreements and tribal law would allow it. Defs.' Mot. 31. Rule 104.05 expressly limits interest to those rates that are "legally chargeable," and Defendants may not decide for themselves what is "legally chargeable." In this case, the interest was *not* legally chargeable because Defendants made these loans without a state license and charged usurious interest. Under numerous Vermont laws, Tribal Defendants were never legally entitled to make the loan or collect the interest and charges in the first place. *See* Vt. Stat. Ann. tit. 8, § 2233(b) (cited at

Pls.' Opp. 80); *id.* § 2215(d)(1) ("the lender shall have no right to collect or receive any interest or charges whatsoever" for making an unlicensed loan); and Vt. Stat. Ann. tit. 9, § 50 (b) ("the lender shall have no right to collect any interest or charges whatsoever" for knowingly or willfully charging interest "in excess of the legal rate as set forth in section 41a of this title.").[4] Because the loans were essentially *void ab initio*, Tribal Defendants had no legal basis to charge and collect *any* interest, let alone the highly-excessive interest collected from Plaintiffs. Therefore, Plaintiffs have shown a violation of Vermont's debt collection rule for collecting on an unenforceable and usurious loan contract.

Lastly, under the federal Fair Debt Collection Practices Act ("FDCPA"), federal courts have held that it is unfair and deceptive to claim that interest is "permitted by law" if a state usury cap limits the interest to a lesser amount. *See, e.g.*, *Madden v. Midland Funding, LLC*, 786 F.3d 246, 254 (2d Cir. 2015) (denying summary judgment to debt collector and holding that it is possible to violate the FDCPA by claiming to be legally entitled to collect interest at a rate higher than state law allowed); *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 407 (3d Cir. 2000) (interest and charges were not "permitted by law as they are in direct violation of a state statute" limiting interest to 10%). Although Plaintiffs have not brought a federal FDCPA claim here, Plaintiffs have alleged that Defendants misrepresented the amount of interest they were legally entitled to collect. That is a proper cause of action under CP Rule 104.05, which is analogous to the federal authorities cited above pursuant to

---

[4] In the context of usury, "knowingly or willfully" simply means a deliberate intent to charge the interest rate as opposed to an accidental or clerical mistake; it does not mean knowingly violating the law. *See e.g.*, *Pacific Mortg. and Inv. Group, Ltd. v. Horn*, 641 A.2d 913, 923 (Md. 1994) (defining willfully in state usury statute as "intentional, or knowing, or voluntary, as distinguished from accidental" and holding that because the lender did not accidentally charge points on their loans, it acted "willfully."); *Citizens Fin. Services v. Leo,* No. 07CV104149, 2009 WL 6496473 (Ohio Mun. Ct. July 28, 2009) ("the borrower need not show that the lender knew its act violated the law, but only that it intended to impose the charge which violates the act.").

Vermont's CPA. *See* Vt. Stat. Ann. tit. 9, § 2453(b) (Vermont courts are "guided by the construction of similar terms" contained in the federal statutes and courts).

**Conclusion**

Vermont's lending laws were enacted to protect Vermonters from predatory and unscrupulous practices. *Klein v. Wolf Run Resort Inc.,* 659 A.2d 1153, 1158 (Vt. 1995) ("It is clear that the purpose of small loan laws, like Vermont's Licensed Lender Law, was rooted in strong public policy concerns, namely, to protect the public from loan-sharking.").

Plaintiffs' suit is an important tool to protect the public interest. National online lending is a billion-dollar industry and states do not have the resources to pursue every illegal online lender. Plaintiffs are thus appropriately bringing "the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources [are often] inadequate." *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 151 (1987); *see also Carlsen v. Freedom Debt Relief, LLC*, 2010 WL 1286616, at *10 (E.D. Wash. Mar. 26, 2010) ("The individual consumer action to enforce [the Consumer Protection Act] and vindicate the public interest is a significant aspect of a dual enforcement scheme under the CPA, which provides for individual private actions in addition to enforcement actions brought by the attorney general."). That principle also applies to class actions like this one. *Id.* ("class suits are an important tool for carrying out the dual enforcement scheme of the CPA."). Plaintiffs have properly alleged a violation of the VCPA and their case should be allowed to proceed.

Respectfully submitted,

Dated:   December 9, 2015                STATE OF VERMONT

WILLIAM H. SORRELL
ATTORNEY GENERAL

<pre>
                              by: /s/ *Justin E. Kolber*
                                  Justin E. Kolber
                                  Assistant Attorney General
                                  Vermont Attorney General's Office
                                  109 State Street
                                  Montpelier, VT 05609
                                  (802) 828-5620
                                  justin.kolber@vermont.gov
</pre>

## CERTIFICATE OF SERVICE

This is to certify that on December 9, 2015, the foregoing State of Vermont's Amicus Brief was filed with the Clerk of Court using the CM/ECF system, which will send notification to all parties, as follows:

Matthew B. Byrne, Esq., Gravel & Shea, P.C.
(for *Plaintiffs*)

Andre D. Bouffard, Esq., Downs Rachlin Martin PLLC
(for *Defendants Rosette, McInerney, and Whitford*)

Ritchie E. Berger, Esq., Dinse, Knapp & McAndrew, P.C.
(for *Defendants Think Finance, TC Loan Service, LLC, TC Decision Sciences, LLC, Tailwind Marketing, LLC*)

Stephen D. Ellis, Esq., Ellis Boxer & Blake PLLC
(for *Defendant Kenneth Rees*)

Richard C. Carroll, Esq., Phillips, Dunn, Shiver & Carroll, P.C.
(for *Defendant Sequoia Capital Operations, LLC*)

<pre>
                              by:   /s/ *Justin E. Kolber*
                                    Justin E. Kolber
                                    Assistant Attorney General
                                    Vermont Attorney General's Office
                                    109 State Street
                                    Montpelier, VT 05609
                                    (802) 828-5620
                                    Justin.kolber@vermont.gov
</pre>