UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 MAY 18  PM 3: 53

CLERK

BY_____
DEPUTY CLERK

JESSICA GINGRAS and ANGELA C.       )
GIVEN, on behalf of themselves and all  )
others similarly situated,                )
                                         )
            Plaintiffs,                  )
                                         )
      v.                                 )          Case No. 5:15-cv-101
                                         )
JOEL ROSETTE, TED WHITFORD, TIM   )
MCINERNEY, THINK FINANCE, INC.,   )
TC LOAN SERVICE, LLC, KENNETH E.  )
REES, TC DECISION SCIENCES, LLC,  )
TAILWIND MARKETING, LLC,          )
SEQUOIA CAPITAL OPERATIONS, LLC   )
and TECHNOLOGY CROSSOVER          )
VENTURES,                         )
                                         )
            Defendants.                  )

**OPINION AND ORDER RE: CROSS MOTION FOR JURISDICTIONAL DISCOVERY
AND MOTIONS TO DISMISS AND TO COMPEL ARBITRATION**
(Docs. 43, 64, 65, 66, 67, 76, 77)

Plaintiffs have filed a class action against individuals and companies involved in an

online lending venture operated by the Chippewa Cree Tribe of the Rocky Boy's Indian

Reservation in Montana (the Tribe).  They claim that the "payday" loans offered by Plain Green,

LLC violate federal and state law because of the usurious interest rates (between 198 and 376%

annually) and other unlawful features of the loans such as the lender's automatic access to the

consumer's bank account to facilitate repayment.

All Defendants have filed motions to dismiss or to compel arbitration.  (Docs. 64, 65, 66,

67, 76, 77.)  Also pending is Plaintiffs' Motion for Jurisdictional Discovery on the issues of

subject-matter jurisdiction and arbitration.  (Doc. 43.)  The court heard argument on all of the

pending motions on December 16, 2015.  Plaintiffs filed Supplemental Authority and Supplemental Documents on January 18, 2016 (Doc. 107) and April 8, 2016 (Doc. 114), at which time the court took the motions under advisement.

### Background

The facts as they appear in Plaintiff's 43-page First Amended Complaint ("FAC") (Doc. 18) may be summarized as follows.[1]

Plaintiffs are Vermont residents who have borrowed money from Plain Green, LLC. Plain Green holds itself out as a "tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation." (Doc. 18 ¶ 2.)  The reservation is located in Montana.

Plain Green operates its lending business over the internet.  It has no physical place of business in Vermont or any property or employees in Vermont.  Instead, borrowers reply to an internet site and apply for credit through an online application process. (*Id.* ¶ 21.) Within the banking industry, these loans are commonly called "payday loans" because they are frequently marketed as loans sufficient to tide the borrower over until the next paycheck.  Plain Green employs subsidiaries of Think Finance, Inc. to market, administer, and collect its loans.  (*Id.* ¶ 57.)

Plaintiffs borrowed relatively small sums of money from Plain Green for periods of up to one year.  Frequently one loan would follow close on the heels of the repayment of the previous loan.

In July 2011, Plaintiff Jessica Gingras borrowed $1,050 from Plain Green at a rate of 198.17%.   She repaid this loan with interest.  During July and August 2012, she borrowed a total of $2,900 at a rate of 371.82%.  She has not repaid the second loan.  (*Id.* ¶¶ 48–50.)[2]

---

[1] Additional factual allegations are recited as necessary in the discussion below.

Plaintiff Angela Given borrowed $1,250 from Plain Green in July 2011.  She completed repayment a year later.  The annual interest rate was 198.45%.  (*Id.* ¶ 60.)  Within a few days, in July 2012, she borrowed $2,000.  She completed repayment a year later in July 2013 at an annual interest rate of 159.46%.  (*Id.* ¶ 61.)  She also borrowed $250 in May 2013 which she repaid within a few weeks at an annual interest rate of 376.13%.  In July 2013, she borrowed $3,000 at 59.83%.  She has not completed repayment of the most recent loan.

Plaintiffs allege that the high interest rates violate Vermont's usury laws which permit a maximum rate of interest of 24%.  *See* 9 V.S.A. § 41a.  The loan agreements contain other provisions which Plaintiffs say violate state and federal law, including the provision for automatic access to the borrower's bank account in violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693k(1).  (Doc. 18 ¶¶ 181–195.)

Plaintiffs have not sued Plain Green.  Instead, they have sued Joel Rosette, who is the Chief Executive Officer of Plain Green, and Ted Whitford and Tim McInerney (the "Tribal Defendants"), who are members of Plain Green's Board of Directors.  All three are sued in their official capacity for declaratory and injunctive relief only pursuant to the authority expressed in *Ex Parte Young*, 209 U.S. 123 (1908).

Plaintiffs have also sued Think Finance, Inc. ("Think Finance" or "TF") and its former President, Chief Executive Officer, and Chairman of the Board Kenneth Rees.  Think Finance is a Delaware corporation.  Kenneth Rees is a citizen of Texas.  The FAC alleges that these defendants developed a plan to make loans through a tribal entity in order to take advantage of tribal immunity from state banking laws.  (Doc. 18 ¶ 80.)  They control the operations of Plain

---

[2]  In addition to loans taken out from Plain Green, Jessica Gingras borrowed $1,200 from FBDLoans in March 2000.  This loan was transferred to ThinkCash (a company operated by Kenneth Rees) and later transferred to Plain Green.  (*Id.* ¶ 47.)

Green.  They dictated the terms of the Tribe's finance code.  In Plaintiffs' view, Plain Green is a shell company created by Think Finance and Mr. Rees in order to provide a layer of legal protection for a lending business which the Federal Trade Commission and state banking regulators have determined to be illegal.  (*See id.* ¶ 3; *see also id.* ¶ 37 ("Plain Green's very existence is an effort to avoid liability.").)  Plaintiffs allege that the tribal law relevant to this lending business and the tribal courts with potential jurisdiction over any dispute have been subverted by the money generated by Plain Green.

The next group of defendants are subsidiaries of Think Finance which perform various tasks in connection with the payday lending operation.  These include TC Decision Sciences, LLC, Tailwind Marketing, LLC, and TC Loan Service, LLC.  (These defendants, together with Think Finance, Inc., are referred to as the "Think Defendants.")

Finally, Plaintiffs have sued two of the financial institutions which they claim provide the funding for loans made by Plain Green.  These are Sequoia Capital Operations, LLC (Sequoia) and Technology Crossover Ventures (TCV).[3]

Both of the loan agreements between Plain Green and Plaintiffs contain arbitration clauses.  The clauses are detailed and cover several pages of the parties' loan agreements.[4]  The arbitration provisions require the borrowers to submit any dispute to binding arbitration, including disputes with "related third parties."  (Doc. 13-5 at 50.)  The borrower may opt out of the arbitration provision within 60 days of the receipt of loan funds.  (*Id.* at 49.)  The borrower

---

[3] At the December 16, 2015 hearing, counsel for TCV remarked that "Technology Crossover Ventures" does not exist, and that Plaintiffs presumably intended to name "TCV V" as a defendant.  The court treats TCV V as the defendant in question, and refers to it as "TCV." Counsel for Sequoia Capital Operations, LLC remarked that that entity is an operations organization that makes no investments, and that Plaintiffs presumably intended to name Sequoia Capital.  The court treats Sequoia Capital as the defendant in question, and refers to it as "Sequoia."

[4] The FAC incorporates the agreements by reference.  (*See* Doc. 18 ¶ 118.)

may select the procedures of the American Arbitration Association or JAMS and the arbitration may occur on the reservation or within 30 miles of the borrower's residence at the choice of the borrower.  Plain Green will bear the cost of the arbitration including the filing fee and the arbitrator's costs.  Each side pays its own attorneys fees.  The arbitrator may award attorneys fees to the prevailing party.

The arbitrator is required to apply Chippewa Cree tribal law to the dispute.  He or she is not authorized to hear class-wide claims.  He or she must refer any dispute over class arbitration to a tribal court of the Chippewa Cree Tribe.  The arbitrator must make written findings to support an award.  Any award must be supported by substantial evidence and must be consistent with the loan agreement.  The tribal court has authority to aside an award if these conditions are not met.  The arbitration agreement and the loan agreement as a whole are subject to tribal law and are not subject to the laws of any state.

<u>**Analysis**</u>

## I.      Subject-Matter Jurisdiction

The pending motions to dismiss or to compel arbitration invoke almost all of the categories of defenses outlined in Fed. R. Civ. P. 12(b).  The court begins with Rule 12(b)(1)— the defense of lack of subject-matter jurisdiction.[5]  "A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it . . . .'"  *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*,

---

[5] The various motions to compel arbitration raise an issue that is also of great importance, but the court's first obligation is to satisfy itself that it has jurisdiction. *See Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 213 (2d Cir. 2014) (addressing jurisdiction prior to arbitrability); *Bergman v. Spruce Peak Realty, LLC*, 847 F. Supp. 2d 653 (D. Vt. 2012) (noting that, "[o]rdinarily, subject matter jurisdiction must 'be established as a threshold matter'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998))).

201 F.3d 110, 113 (2d Cir. 2000)).  A court lacks constitutional power to adjudicate a case where "the plaintiff lacks constitutional standing to bring the action." *Id.*

"The plaintiff bears the burden of 'alleg[ing] facts that affirmatively and plausibly suggest that it has standing to sue.'" *Id.* (alteration in original) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).  "In resisting a motion to dismiss under Rule 12(b)(1), plaintiffs are permitted to present evidence (by affidavit or otherwise) of the facts on which jurisdiction rests." *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004).  "[C]ourts generally require that plaintiffs be given an opportunity to conduct discovery on these jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party." *Id.*

Plaintiffs assert the following five bases for federal subject-matter jurisdiction: (1) federal question jurisdiction under 28 U.S.C. § 1331; (2) diversity jurisdiction under 28 U.S.C. § 1332; (3) class action jurisdiction under 28 U.S.C. § 1332; (4) jurisdiction under RICO, 18 U.S.C. § 1965; and (5) jurisdiction under the Federal Consumer Financial Law, 12 U.S.C. § 5481.  (Doc. 85 at 28.)  Plaintiffs assert federal-question jurisdiction on the basis of claims arising under the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a) and 5536(a), the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693k(1).  They also assert a civil RICO claim pursuant to 18 U.S.C. § 1962(c).

The Tribal Defendants seek dismissal under Rule 12(b)(1) asserting that: (1) the action is barred by tribal sovereign immunity, and (2) the Plaintiffs lack Article III standing.  Plaintiffs argue that tribal immunity and subject-matter jurisdiction are distinct concepts.  They also assert that they have Article III standing.

A.      **Tribal Sovereign Immunity**

The first issue is whether tribal sovereign immunity is a jurisdictional question at all.

Plaintiffs assert that *Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024 (2014), stands for

the proposition that tribal immunity and federal subject-matter jurisdiction are entirely separate

concepts.  The court disagrees.  In *Bay Mills*, the Supreme Court observed that no provision of

the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq., limited the grant of jurisdiction

under the general federal-question statute, 28 U.S.C. § 1331.  *Bay Mills*, 134 S. Ct. at 2029 n.2.

But that observation related to the initial question of whether federal-question jurisdiction

existed, not the subsequent question of whether tribal sovereign immunity might destroy subject-

matter jurisdiction.  *See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*,

207 F.3d 21, 28 (1st Cir. 2000) (noting that a federal court can address tribal sovereign immunity

only after it confirms that subject-matter jurisdiction exists).

Courts in the Second Circuit have held that Rule 12(b)(1) is a proper vehicle for invoking

tribal sovereign immunity.  *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84 (2d Cir. 2001)

(analyzing tribal sovereign immunity as an issue of subject-matter jurisdiction); *City of New York

v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966(CBA), 2009 WL 705815, at *2 (E.D.N.Y.

Mar. 16, 2009) ("'[A] motion to dismiss based on tribal immunity is appropriately examined

under Fed. R. Civ. P. 12(b)(1).'" (quoting *Bassett v. Mashantucket Pequot Museum & Research

Ctr. Inc.*, 221 F. Supp. 2d 271, 276 (D. Conn. 2002))).  Decisions from outside the Second

Circuit—some post-dating *Bay Mills*—are in accord.[6]  The court therefore analyzes the Tribal

Defendants' sovereign-immunity claim in the Rule 12(b)(1) context.

---

[6] *See Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) (tribal sovereign immunity is
"quasi-jurisdictional" and may be decided under Rule 12(b)(1)); *Fort Yates Pub. Sch. Dist. No. 4
v. Murphy ex rel. C.M.B.*, 786 F.3d 662, 670 (8th Cir. 2015) ("Tribal sovereign immunity is a

"Indian tribes are domestic dependent nations that exercise inherent sovereign authority." *Bay Mills*, 134 S. Ct. at 2030 (internal quotation marks omitted). "Among the core aspects of sovereignty that tribes possess . . . is the 'common-law immunity from suit traditionally enjoyed by sovereign powers.'" *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)). Tribal immunity applies to suits brought by States as well as those brought by individuals. *Id.* at 2031. Tribal immunity also applies "for suits arising from a tribe's commercial activities, even when they take place off Indian lands." *Id.* (citing *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751 (1998)).[7]  Generally, a plaintiff "cannot circumvent tribal immunity by merely naming officers or employees of the Tribe when the complaint concerns actions taken in defendants' official or representative capacities and the complaint does not allege they acted outside the scope of their authority." *Chayoon v. Chao*, 355 F.3d 141, 143 (2d Cir. 2004) (per curiam).

The answer to the Tribal Defendants' sovereign-immunity claim stems from an exception to the general rule stated in *Chayoon*.  As individuals sued for injunctive and declaratory relief in their official capacity, the Tribal Defendants are subject to suit by analogy to *Ex Parte Young*.

---

'jurisdictional threshold matter.'" (quoting *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999))); *Furry v. Miccosukee Tribe of Indians of Fla.*, 685 F.3d 1224, 1228 (11th Cir. 2012) ("Tribal sovereign immunity is a jurisdictional issue."); *Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 920 (6th Cir. 2009) (dismissal for lack of jurisdiction proper if entity enjoyed tribal sovereign immunity); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 28 (1st Cir. 2000) ("[T]ribal sovereign immunity is jurisdictional in nature . . . .").

[7] Four dissenting Justices in *Bay Mills* opined that *Kiowa* was wrongly decided and has led to "inequities" and "mounting consequences." *Bay Mills*, 134 S. Ct. at 2045–46 (Thomas, J., dissenting).  Notably, the dissenters gave one example of particular interest in this case, stating: "payday lenders (companies that lend consumers short-term advances on paychecks at interest rates that can reach upwards of 1,000 percent per annum) often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality." *Id.* at 2052.

The Supreme Court has recognized the application of the doctrine to tribe members. *See Bay Mills*, 134 S. Ct. at 2035 (under analogy to *Ex Parte Young*, tribal immunity does not bar suit "for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct"); *Santa Clara Pueblo*, 436 U.S. at 59.

The Second Circuit in *Garcia* noted two important "qualifications" limiting a plaintiff's ability to obtain injunctive relief when she invokes the *Ex Parte Young*-type exception. First, any law under which a plaintiff seeks injunctive relief "must apply substantively" to the tribe. *Garcia*, 268 F.3d at 88. An example of a circumstance in which a law does not "apply substantively" to a tribe is when the law specifically exempts "an Indian tribe" from its prohibitions. *See id.* (citing 42 U.S.C. § 2000e(b)). Second, a plaintiff "must have a private cause of action to enforce the substantive rule." *Id.* The Tribal Defendants assert that Plaintiffs' federal claims fail on both counts. However, the court does not read the "qualifications" articulated in *Garcia* as components of the *jurisdictional* analysis. The court treats the Tribal Defendants' arguments on these points as necessary below.[8]

The Tribal Defendants argue that Plaintiffs seek more than prospective injunctive or declaratory relief, and actually seek money damages from the Tribal Defendants—a remedy not available under the *Ex Parte Young*-type exception. (*See* Doc. 66 at 19 n.5.) The FAC does indeed assert (apparently without excepting the Tribal Defendants) that "funds should be returned to the people who fell victim to Defendants' illegal scheme"; and further requests an "[e]quitable surcharge seeking return of all interest charged above a reasonable rate and any financial charges associated with the loan" and also "[a] constructive trust over funds obtained

---

[8] Similarly, the court addresses below the Tribal Defendants' assertion that Plaintiffs' EFTA claim is time-barred, as well as Defendants' argument that RICO's civil remedies provision does not authorize equitable relief.

illegally." (Doc. 18 at 42–43.)  The court concludes that, to the extent the FAC seeks money

damages against the Tribal Defendants, that relief is unavailable.[9]

Finally, the Tribal Defendants assert that the *Ex Parte Young*-type exception applies only

to violations of *federal* law, and that as a result all of Plaintiffs' state-law claims fail.  (Doc. 66

at 23.)  *Ex Parte Young* is itself "inapplicable in a suit against state officials on the basis of state

law."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).  Thus under the *Ex*

*Parte Young* doctrine, "a federal court's grant of injunctive relief against a state official may *not*

be based on violations of state law."  *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 595 (2d Cir.

1990) (citing *Pennhurst*, 465 U.S. at 106).  Extending that reasoning to tribal cases, the court in

*Frazier v. Turning Stone Casino* held that *Ex Parte Young* "only allows an official acting in his

official capacity to be sued in a federal forum to enjoin conduct that violates *federal* law."

254 F. Supp. 2d 295, 310 (N.D.N.Y. 2003) (emphasis added).

*Frazier* might have been persuasive authority prior to the Supreme Court's decision in

*Bay Mills*.  But in *Bay Mills* the Supreme Court stated that, if a tribe were to set up an off-

reservation casino, the state "could bring suit against tribal officials or employees (rather than the

Tribe itself) seeking an injunction for, say, gambling without a license."  134 S. Ct. at 2035.

That is because "a State, on its own lands, has many other powers over tribal gaming that it does

not possess (absent consent) in Indian territory," and because, when not on Indian lands, tribal

officials "are subject to any generally applicable state law."  *Id.* at 2034.  Thus, as other courts

have recognized, *Bay Mills* establishes that "tribal officials may be subject to suit in federal court

---

[9] As a practical matter, Plaintiffs claim that only a tiny percentage of the revenues
generated by Plain Green remain with the Tribe.  The term sheet outlining the discussion of
revenues allocates 5% to the Tribe.  The rest goes to Think Finance and other non-tribal
companies.  (Doc. 18-1.)

for violations of state law under the fiction of *Ex Parte Young* when their conduct occurs outside

of Indian lands." *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015).[10]

Plaintiffs assert that "the activities of the Plain Green enterprise occurred outside the

reservation." (Doc. 85 at 32.)  The Tribal Defendants disagree (at least in part), maintaining that

the loan agreements at issue were formed on the Tribe's reservation.  (Doc. 66 at 32.)  In support

of that argument, the Tribal Defendants cite 2 *Williston on Contracts* § 6:62 (4th ed.): "[I]f the

acceptance is not made simultaneously with the offer, and is made in a different place, . . . the

place of the contract is the place where the last act necessary to the completion of the contract is

done . . . ."  The Tribal Defendants then rely on the following assertion in Joel Rosette's

affidavit:  "The act triggering the release of a loan to a borrower is Plain Green's final

assessment of the consumer's loan application.  Plain Green undertakes this final determination

from its office," which is on the Tribe's Reservation.  (Doc. 66-1 ¶¶ 6, 9.)

The Tribal Defendants do not explain why the "final assessment" of a consumer's loan

application is an "acceptance" in the language of contract-formation.  In any case, even if the

contract was formed on the Tribe's reservation, a substantial part of the events giving rise to

Plaintiffs' claims occurred outside the reservation.[11]  The Second Circuit made a similar

observation in *Otoe-Missouria Tribe of Indians v. New York State Department of Financial

Services*, concluding that the plaintiff-tribes in that case (which were also involved in making

short-term internet loans) had "provided insufficient evidence to establish that they are likely to

---

[10] Even prior to *Bay Mills*, the Supreme Court had held that sovereign immunity did not prevent suit to enjoin off-reservation violations of state law by individual tribe members. *Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.*, 433 U.S. 165, 171 (1977).

[11] The court reaches the same conclusion in its analysis of the venue issue, *infra*.

succeed in showing that the internet loans should be treated as on-reservation activity." 769 F.3d

105, 115 (2d Cir. 2014).

As the court observed in *Otoe-Missouria*:

Much of the commercial activity at issue takes place in New York.  That is where
the borrower is located; the borrower seeks the loan without ever leaving the state,
and certainly without traveling to the reservation.  Even if we concluded that the
loan is made where it is approved, the transaction . . . involves the collection as
well as the extension of credit, and that collection clearly takes place in New
York.   The loan agreements permit the lenders to reach into the borrowers'
accounts, most or all of them presumably located in New York . . . .

*Id.*  Here, the circumstances are similar and the Tribal Defendants have presented no more

evidence than the tribes in *Otoe-Missouria*.  Thus, at least for the purposes of the motions to

dismiss, the result predicted in that case is the same in this one: the relevant conduct occurred

outside of Indian lands.  The Tribal Defendants may thus be subject to suit under the *Ex Parte

Young* analogy.

Finally, the Tribal Defendants assert that nothing in *Bay Mills* authorizes suits by *private

citizens* based on violations of state law.  (Doc. 92 at 16.)  It is true that Plaintiffs in this case are

private citizens, whereas in *Bay Mills* and *PCI Gaming* the plaintiffs were States.  But *Bay Mills*

does not explicitly limit the application of the *Ex Parte Young* analogy to suits brought by States.

In fact, the Court stated that, "[u]nless federal law provides differently, Indians going beyond

reservation boundaries are subject to *any generally applicable state law*."  *Bay Mills*, 134 S. Ct.

at 2035 (internal quotation marks omitted; emphasis added).  That plain language includes state

laws that may be enforced by private citizens. *See* Am. Indian Law Deskbook § 7:4 (noting that

tribal officer-capacity suits under *Bay Mills* are a "potential remedy for states *and other parties*" (emphasis added)).[12]

Ultimately, tribal sovereign immunity may limit the shape and nature of the relief against the Tribal Defendants, but it is not a complete bar to a lawsuit against them.

## B.      Standing

The Tribal Defendants, joined by the Think Defendants and TCV, contend that Plaintiffs lack standing because they have not yet incurred injury or damages and because they do not seek redress for injuries they have sustained personally. (Doc 66 at 24–27.)[13]  Plaintiffs respond that they continue to owe money on unlawful loans and suffer reputational harm through credit reporting of non-payment. The court agrees with Plaintiffs that the FAC contains sufficient allegations to support individualized standing for each Plaintiff. There is little dispute that both borrowed money on terms which would violate Vermont's usury laws. (*See* Doc. 91 at 12, Amicus brief filed by the Office of the Vermont Attorney General.) Whether Plain Green is subject to these laws is in dispute, but Plaintiffs' status as people alleging injury through violations of state law is not.

Defendants' arguments that no injury is sustained because a person has an outstanding loan balance which has not been reduced to judgment or otherwise affected her interests is contrary to the allegations of the FAC, which the court accepts as true at this stage of the case. The specific relief sought by Plaintiffs demonstrates their direct, personal stake in the dispute. They seek declaratory relief under statutes including the Vermont Consumer Fraud Act. Such

---

[12] These conclusions make it unnecessary to consider the Vermont Attorney General's argument (Doc. 91 at 4) that Plain Green is not a tribal entity or an "arm of the Tribe" to which tribal immunity might apply in the first place.

[13] The Think Defendants and TCV incorporate the Tribal Defendants' standing argument. (Doc. 65 at 20; Doc. 76 at 26.)

relief could relieve them of any future repayment obligation.  They seek repayment of any interest collected above a legal rate.  And they seek an injunction shielding them from future collection efforts.  (Doc. 18 at 43.)  As these claims make clear, Plaintiffs' interest in the subject matter of this lawsuit and the clear potential for relief in their individual cases confers standing for purposes of Article III.

## II.        Personal Jurisdiction

The next step is to consider Rule 12(b)(2): whether the court has personal jurisdiction over each of the Defendants.  The Tribal Defendants, Mr. Rees, Sequoia, and TCV all assert that the court lacks personal jurisdiction over them.  (Doc. 66 at 32; Doc. 67-2 at 16; Doc. 77-1 at 4; Doc. 76 at 14.)  As with the subject-matter jurisdiction issues, the personal-jurisdiction issues require some relatively extensive analysis.

"On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendants."  *Dodge v. Manchester Police Dep't*, No. 5:13-CV-228, 2014 WL 4825632, at *4 (D. Vt. Sept. 25, 2014).  "In the absence of jurisdictional discovery, the court presumes the truth of the complaint's allegations and construes the complaint in the light most favorable to the plaintiff."  *Id.*  "A plaintiff must make a *prima facie* showing of jurisdiction."  *Id.*

Personal jurisdiction may be either general or specific in nature.  Plaintiffs do not contend that any of the defendants has a presence in Vermont which would support general jurisdiction for all purposes.  They argue that the specific acts alleged in the FAC give rise to personal jurisdiction for purposes of claims arising out of those acts.

The exercise of personal jurisdiction over non-resident defendants raises issues of due process because of the potential unfairness of compelling these parties to defend actions in

distant jurisdictions.  The Due Process Clause of the Fourteenth Amendment limits the assertion of personal jurisdiction in diversity cases.  In federal question cases, similar protection is afforded by the Due Process Clause of the Fifth Amendment.  *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).

Within the structure of the Federal Rules of Civil Procedure, the permissible scope of effective service is co-extensive with the limits of personal jurisdiction.  As amended in 1993, Fed. R. Civ. P. 4(k) provides for service and therefore the exercise of personal jurisdiction over persons subject to the jurisdiction of state courts of general jurisdiction and "when authorized by a federal statute."  A variety of federal statutes, including the RICO statute, provide for nationwide service of process.  *See* 18 U.S.C. § 1965.  The extension of personal jurisdiction in these federal question cases remains subject to the constitutional limits of due process.

With this background in mind, the questions the court must answer in resolving the personal jurisdiction issues in this case are:

1.  Would Defendants be subject to personal jurisdiction in the courts of general jurisdiction in Vermont under principles of due process expressed in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)?

2.  Alternatively, does the provision for nationwide service of process in the RICO statute support the court's exercise of personal jurisdiction over Defendants?

3.  Does the exercise of the jurisdiction over the state-law claims fall within the doctrine of pendent personal jurisdiction?

### A.   Officials of Plain Green—the Tribal Defendants

Plaintiffs have sued three tribal members who play important roles in Plain Green.  These are Mr. Rosette, the chief executive officer, and Ted Whitford and Tim McInerney, two board

members.  All three are residents of Montana.  They serve as proxies in this case for Plain Green, and suit is filed against them in their official capacity to avoid the defense of tribal sovereign immunity.  *See supra*; *see also Bay Mills*, 134 S. Ct. at 2035 (recognizing the application of *Ex Parte Young* to suits against tribal leaders).

The FAC alleges that Mr. Rosette is "responsible for all operations of Plain Green." (Doc. 18 ¶ 6.)  As CEO, he "is responsible for and can stop the illegal activity described in this Complaint."  (*Id.*)  Mr. Whitford and Mr. McInerney are board members.  The FAC alleges that the board of directors "has the power to fire the CEO of Plain Green and appoint a new CEO who will comply with the law."  (*Id.* ¶¶ 7, 8.)

Personal jurisdiction over state or tribal officials in an *Ex Parte Young* case raises special issues in "minimum contacts" analysis.  Is the court considering the contacts between Vermont and the individuals, or the contacts between the state and Tribe and Vermont?  *See* Tracy O. Appleton, Note, *The Line Between Liberty and Union: Exercising Personal Jurisdiction Over Officials From Other States*, 107 Colum. L. Rev. 1944 (Dec. 2007).  The lower courts have differed on this issue, and it has not been resolved by the Supreme Court.  *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 180–81 (1979) (by-passing issue in order to resolve case on non-constitutional grounds).

One line of authority looks to contacts between the forum and the defendant state or tribe. In *Great Western United Corp. v. Kidwell*, the Fifth Circuit held that specific jurisdiction existed in Texas over an Idaho official because of the effects of Idaho regulations on business conducted in Texas.  577 F.2d 1256, 1267–68 (5th Cir. 1978), *rev'd on other grounds sub nom.*, *Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979); *see also Ass'n for Molecular Pathology v. U.S. Patent and Trademark Office*, 669 F. Supp. 2d 365 (S.D.N.Y. 2009), *aff'd in part, rev'd in part*,

16

653 F.3d 1329 (Fed. Cir. 2011) (holding that state university officials in Utah were subject to suit in New York due to the actions of a university foundation in seeking to enforce patents in the forum state).  In these cases, whether an individual official had personal contact with the forum state was not necessary to a determination that the court had jurisdiction.  Personal jurisdiction for officials sued in a representative capacity arose from the conduct of their state or agency.

The Second Circuit considered these issues in *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005), *cert. denied*, 549 U.S. 951 (2006).  In *Pryor*, parties challenging the action of 30 state attorneys general in reaching a master settlement in the nationwide cigarette litigation of the 1990s filed suit in New York.  The Second Circuit held that personal jurisdiction over state officials was present as a result of the trips they or their representatives made to New York City to negotiate the settlement.  The decision followed traditional "minimum contacts" analysis in predicating personal jurisdiction on physical presence of the named defendants within the forum state.   Had the master settlement agreement been negotiated in Chicago, the federal courts in New York State would have had no basis for jurisdiction over the state attorneys general from other states.  Although the effects of the master settlement agreement would still have been felt in New York State (and every other state which joined in the settlement), personal jurisdiction over state officials would not be present except as a result of the contacts of individuals with the forum state.

Plaintiffs make no claim that the Tribal Defendants ever visited Vermont or communicated with anyone in Vermont.  Instead, they rely on Plain Green's contacts with Vermont.  They allege that Plain Green operated a website which advertised loans across the United States, including Vermont.  Once Plaintiffs replied to the advertisement from their homes in Vermont, Plain Green sent them a series of emails and a loan application.  Following approval

of the loan, Plain Green transferred the loan principal to their bank accounts in Vermont. These frequent contacts would have been sufficient to subject Plain Green to personal jurisdiction in Vermont at least for causes of action, like this one, which arise out of the particular contacts and resulting loan transaction. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) (internet sales of handbags from California to New York residents satisfies minimum contacts requirements); *Blue Compass Corp. v. Polish Masters of Am.*, 777 F. Supp. 4, 5 (D. Vt. 1991) (California defendant who advertised his business in at least one national magazine and obtained one Vermont customer had sufficient contacts with Vermont to support personal jurisdiction).

But Plain Green's contacts with Vermont are not vicariously attributed to its officials any more than directors of a corporation are subject to suit personally in any forum where the actions of the corporation satisfy the minimum contacts test. *See Dumont v. Corr. Corp. of Am.*, No. 2:14-cv-209, 2015 WL 3791407, at *5 (D. Vt. June 17, 2015) (citing cases). In following *Pryor*, the court rules that the absence of contacts between Vermont and the Tribal Defendants means that these Defendants would not be subject to suit in a Vermont state court of general jurisdiction. The first of the two potential bases for personal jurisdiction is not present.

The court turns now to the question of whether the grant of nationwide service within the RICO statute provides a second basis for personal jurisdiction. Section 1965(a) of Title 18 provides for suit in any district court in which a defendant "resides, is found, has an agent, or transacts his affairs." Section 1965(b) permits a suit for civil remedies to be filed in "any district court of the United States in which it is shown that ends of justice require that other parties residing in any other district be brought before the court . . . ."

The Second Circuit has never interpreted these provisions to provide for nationwide personal jurisdiction over any defendant named in a RICO complaint.  In *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65 (2d Cir. 1998), the court held that § 1965(a) by its express terms required traditional "minimum contacts" within the forum state for at least one defendant.  Section 1965(b) permits other defendants to be brought in from distant jurisdictions upon a showing of necessity despite the absence of minimum contacts.  "There is no impediment to prosecution of a civil RICO action in a court foreign to some defendants if it is necessary, but the first preference, as set forth in § 1965(a), is to bring the action where suits are normally expected to be brought."  *PT United*, 138 F.3d at 71–72.   This restrictive reading has withstood the test of time, and is still the law in this Circuit.  *See Pincione v. D'Alfonso*, 506 Fed. App'x 22 (2d Cir. 2012).

In the context of this case, § 1965(a) and (b) require that at least one Defendant meet the minimum contacts test before parties not otherwise subject to suit in Vermont can be sued here.  None of the three Tribal Defendants meet "minimum contacts" tests in Vermont.  Unless the presence of other defendants triggers the "ends of justice" provision of § 1965(b), the absence of contact between the Tribal Defendants and Vermont places them outside the scope of the nationwide jurisdiction permitted under certain circumstances by the RICO statute.

**B.**     **Kenneth Rees and the Think Defendants**

Plaintiffs allege that Mr. Rees and the companies which he controls performed the actual work of Plain Green, including making the loans provided to Plaintiffs.  Assuming this to be true for purposes of the motions to dismiss, the role of Rees and the Think Defendants in providing the leadership, underwriting, marketing, and servicing for the Plain Green loans subjects them to personal jurisdiction.  They cannot avoid personal jurisdiction for these actions by acting in the

name of Plain Green.  If, as Plaintiffs allege, these Defendants were the critical actors in making loans on illegal terms to Vermont residents, then they are subject to personal jurisdiction for claims arising out of the acts they performed.

The use of the internet is an important factor in analyzing the minimum contacts test for Rees and the Think Defendants.  Although Mr. Rees has visited Vermont rarely and never for reasons related to Plain Green, (*see* Doc. 67-1 ¶ 9), the Think Defendants have entered the Vermont marketplace by creating a website which is accessible to any Vermont consumer with an internet connection.  The Second Circuit has recognized that this degree of "interactivity"— the direct connection between an internet business located at a great remove from the forum state and its customers within the forum state—is a factor which supports a finding of minimum contacts.  *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 252 (2d Cir. 2007) (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997)).

Turning to the specific allegations, the FAC alleges that Mr. Rees "personally designed and directed the business activity described in the Complaint."  (Doc. 18 ¶ 10.)  After federal regulators shut down his former business known as ThinkCash, Inc., Mr. Rees renamed the business Think Finance, Inc.  With a new identity in hand, he approached the Tribe and offered to "provide everything the Tribe needed to run a successful payday loan enterprise if the Tribe would let them use the concept of tribal immunity to stymie state and federal regulators." (*Id.* ¶ 23.)  The Tribe created Plain Green in order to join with Mr. Rees and Think Finance in the payday lending business.  (Doc. 18-1 (Term Sheet for Think Finance-Chippewa Cree Transaction).)

The FAC charges Rees and the Think Defendants with using their control over Plain Green to violate state and federal law.  These include seeking to avoid state usury limits;

blocking access to information about borrowers' accounts; and misrepresenting the nature of the Plain Green loans to credit reporting agencies. (Doc. 18 ¶¶ 32–35.) In Plaintiffs' words, "[d]efendants Rees and Think Finance intentionally and willfully dominated and still dominate the operations of Plain Green. Other than the sovereignty that they attempted to purchase, Rees and Think Finance provided everything that the enterprise needed to operate." (*Id.* ¶ 80.)

These allegations are neither conclusory nor implausible. They are factually detailed—at least as detailed as is possible without the advantages of discovery. They include a description of a similar business venture involving Mr. Rees and the First Bank of Delaware which was dissolved following an FDIC enforcement action and consent decree concerning similar practices. (*Id.* ¶¶ 38–40.) They are consistent with similar allegations in a case brought by the Pennsylvania Attorney General's office against Think Finance, Inc. and other parties in the Eastern District of Pennsylvania. *See Pennsylvania v. Think Finance, Inc.*, No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016).

The critical issue for a determination of the court's personal jurisdiction over Rees and the Think Defendants is whether their activities satisfy the minimum contacts test. Defendants assert that Mr. Rees has had few personal contacts with Vermont, owns no property in the state, and has not visited since 1999 and then for non-business reasons. But a personal, physical presence in the state is not required to satisfy the minimum contacts test. Plaintiffs allege that Mr. Rees and the companies which he controls developed a nationwide, illegal lending scheme which resulted in predatory loans to Vermont residents. According to the FAC, the actions he took in other states led to predictable results in Vermont and other states where borrowers responded to the website and took out loans. This is typical of jurisdiction based on "minimum contacts" arising from activities in one state which is directed into others. *See Calder v. Jones*,

465 U.S. 783 (1984) (employees of a national publication subject to personal jurisdiction for libel claim in the forum where the results of targeted intentional conduct were felt).

The same analysis applies to the Think Defendants. According to the FAC, all of these companies joined in developing, marketing, and operating the loan operation. As designed by Mr. Rees and as executed by his companies, the loans were made over the internet to residents of many states, including Vermont. They were marketed through Plain Green in order to skirt state consumer protections. The affiliated corporations which provided specific services such as marketing and underwriting expected their efforts to result in loans made in states including Vermont. The misconduct alleged by Plaintiffs is entirely intentional and directed into Vermont (as well as many other states). That Rees and the Think Defendants might have to respond in court to defend their practices in a state like Vermont where they enabled Plain Green to lend money is hardly surprising or unfair.

The court concludes that Plaintiffs have made plausible allegations sufficient to support a determination of minimum contacts for purposes of personal jurisdiction for the specific claims made in this case against Rees and the Think Defendants. As the court's discussion indicates, they could have been sued on these claims in the Vermont state courts on the basis of their actions in developing the payday loan which they operated through Plain Green and which they directed into Vermont. Such conduct satisfies both the minimum contacts test and the related requirement of due process that the exercise of personal jurisdiction meet general standards of fairness.

### C.   Sequoia Capital and Technology Crossover Ventures

The court has an insufficient basis for making a ruling about minimum contacts and due process requirements with respect to Sequoia and TCV because Plaintiffs allege very little about

their respective roles in the Plain Green operation.  As the following discussion of personal jurisdiction under RICO makes clear, however, they are potentially subject to suit as additional defendants subject to the court's jurisdiction in the interests of justice.  *See* 18 U.S.C.  § 1965(b).  The court returns to the question of personal jurisdiction over Sequoia and TCV in the course of its RICO analysis below.

### D.    Nationwide Jurisdiction Under RICO

Because the court has determined that Rees and the Think Defendants are subject to personal jurisdiction, it returns to the question of whether 18 U.S.C. § 1965(b) permits the Tribal Defendants to be sued in Vermont.  The Second Circuit has interpreted § 1965(b) to permit the exercise of jurisdiction over parties who do not meet the minimum contacts test so long as at least one other defendant meets the test and the exercise of jurisdiction is required by the "ends of justice." *PT United*, 138 F.3d at 71 n.5.  The standard is one of necessity and of last resort.  "There is no impediment to prosecution of a civil RICO action in a court foreign to some defendants if it is necessary, but the first preference, as set forth in § 1965(a), is to bring the action where suits are normally expected to be brought.  Congress has expressed a preference in § 1965 to avoid, where possible, haling defendants into far flung fora." *Id.* at 71–72.

The court concludes that the ends of justice fairly require jurisdiction in Vermont against the Tribal Defendants pursuant to 18 U.S.C. § 1965(b).   Several reasons support this conclusion.  First, the impact of this lawsuit on the Tribal Defendants is modest.  There is no claim against them for money damages.  They are being asked only to cease violating federal and state consumer protections.  This court has no jurisdiction over Plain Green and understands that Plaintiffs seek only injunctive relief against its officials in the form of an order requiring them to obey state and federal laws that regulate lending in Vermont.

Second, it is not clear that there is another forum in which all defendants can be sued (except pursuant to § 1965(b)).  Only the Tribal Defendants are citizens of Montana.  The other parties and Mr. Rees are from different states.  While the record is not fully developed on this point, no party has offered an alternative forum in which personal jurisdiction is present for all parties.

Third, there is nothing inherently unfair or unjust about requiring representatives of a lender doing business in Vermont to appear to defend their practices in this state.  These Defendants are already ably represented by highly qualified counsel.  The payday lending business gives every indication of being a highly lucrative business which can afford to appear through counsel in the states in which it operates.

Finally, there is the issue of the viability of the RICO claims.  "Ends of justice" RICO jurisdiction can only be exercised if the allegations state a viable RICO claim.  *See 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13 Civ. 981(PGG), 2015 WL 1514539, at *7 n.2 (S.D.N.Y. Mar. 31, 2015) (citing cases).  For the reasons discussed in detail below, the court concludes that the FAC states viable RICO claims against the Tribal Defendants.  This case qualifies as one in which 18 U.S.C. § 1965(b) extends the personal jurisdiction of the federal court to RICO claims against the Tribal Defendants, who would not otherwise be subject to suit in Vermont.  Once the Tribal Defendants are before the court on this basis, the doctrine of pendent personal jurisdiction permits the court to hear the other claims against them which arise from state law or federal statutes other than RICO.

The court cannot reach the same conclusion as to Sequoia and TCV.  For the reasons discussed below, the court concludes that the FAC fails to state a viable RICO claim against those Defendants.  Absent RICO jurisdiction over those Defendants, the court reiterates its

observation that there is an insufficient basis for making a ruling about minimum contacts and due process requirements with respect to them because Plaintiffs allege very little about their respective roles in the Plain Green operation.  The court, will, however, exercise its discretion to permit discovery on the question of personal jurisdiction over Sequoia and TCV.  *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (court may permit discovery in aid of Rule 12(b)(2) motion).

## III.    Arbitration and Arbitrability

The court comes now to the question raised by all Defendants: does this dispute belong in arbitration instead of in court?  Each Defendant asserts that the dispute must go to arbitration. (Doc. 64 at 2; Doc. 66 at 27–31; Doc. 67-2 at 23; Doc. 77-1 at 8–10; Doc. 76 at 26–30.) Plaintiffs maintain that the purported arbitration agreement is unenforceable as, among other things, "unconscionable" and "fraudulent."  (*See* Doc. 85 at 48–78.)

Neither Plaintiff made use of the "opt out" provision during the first 60 days following receipt of her loan.  Both seek to apply state and federal consumer loan protections to this case. Neither wishes to go to arbitration.  And both seek to serve as class representatives.  For these reasons, the first issue for the court is to determine whether Plaintiffs are bound by the arbitration clause and the related choice-of-law clause.  The questions which must be answered are:

1. What law governs the issue of arbitrability?

2. Does tribal law govern the enforceability of the arbitration clause with respect to issues of unconscionability?

3. Can individual borrowers in Vermont who are not normally subject to tribal law become subject to tribal law through their consent to an arbitration clause?

4. Is the tribal law, including its enforcement through the arbitration clause, unenforceable on grounds of unconscionability?

5. Are there other reasons raised by Plaintiffs which prevent enforcement of the arbitration clause?

6. Are all Defendants subject to the arbitration clause?

The court begins with the question of the law that governs.

### A.    What law governs?

The parties agree that the Federal Arbitration Act, 9 U.S.C. § 1 et seq., (the "FAA") applies to the parties' dispute.  This case concerns two transactions in interstate commerce, conducted over the internet between a lender located on an Indian reservation in Montana and borrowers in Vermont.  Section 2 of the FAA provides for the enforceability of arbitration clauses which appear in contracts subject to the Act "save upon such grounds as exist at law or in equity for the revocation of any contract."  This "savings clause" requires the court to turn to state law (or possibly tribal law) to resolve claims of unconscionability and the other grounds for avoidance of contracts.  *Littlejohn v. TimberQuest Park at Magic, LLC*, 116 F. Supp. 3d 422, 430 (D. Vt. 2015) (claims of unconscionability "are matters arising under state substantive law"); *see also Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003) (per curiam) ("[Q]uestions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA.").

"[G]enerally, a choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50 (2d Cir. 2004).  In this case, the arbitration agreement includes a provision requiring the application of

Chippewa Cree tribal law to any dispute, including disputes over arbitrability.[14]  In considering

whether to follow the Chippewa Cree law as it relates to enforcement of arbitration provisions,

the court is guided by several considerations.  All of these favor the application of Vermont

law—the law of the forum—instead of tribal law to this limited question.

The primary obstacle to the adoption by contract of the Chippewa Cree law of arbitration

is that no court has ever been able to determine what that law is or where it can be found.  In a

series of cases cited by Defendants, other federal trial courts rejected claims that the Chippewa

Cree law concerning the arbitrability of claims against non-signatories provided a different rule

of decision than the laws of the forum state because plaintiffs were unable to produce evidence

of a different rule under tribal law.[15]  In those cases, plaintiff-borrowers sought to invoke tribal

law on a question of arbitrability.  They were unable to demonstrate any difference between the

law of the forum state and tribal law because there was no source of tribal law (with the limited

---

[14]  Both arbitration agreements include the following choice-of-law provision:

> This Agreement and the Agreement to Arbitrate are governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Chippewa Cree Tribe.  We do not have a presence in Montana or any other state of the United States of America.  Neither this Agreement nor the Lender is subject to the laws of any state of the United States.

(Doc. 13-5 at 52.)

[15]  *See Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1400 (S.D. Fla. 2014) ("Luckily, the Court need not delve into the nuances of tribal or Delaware law, as Gunson has not demonstrated that there is a conflict with Florida law."); *Booth v. BMO Harris Bank, N.A.*, Civil Action No. 13-5968, 2014 WL 3952945, at *4 n.4 (E.D. Pa. Aug. 11, 2014) ("Plaintiff has not alleged that any true conflict exists, and according to [the defendants] no conflict does exist because the applicable tribal law allows estoppel."); *Graham v. BMO Harris Bank, N.A.*, No. 3:13cv1460(WWE), 2014 WL 4090548, at *5 (D. Ct. July 16, 2014) ("To the extent that plaintiffs maintain that tribal law may apply to this controversy, the Court notes that plaintiffs have not demonstrated a conflict with Connecticut law on estoppel.  In fact, plaintiffs state that they do not take a position on the applicability of any foreign law but only point out that defendants have not addressed the issue in their memoranda.").

exception of the *Booth* case in which counsel represented that tribal law allowed for the doctrine of estoppel).

This case is no different.  Although Defendants seek to apply the Chippewa Cree law concerning arbitration, they cannot direct the court to any specific provisions of that law.  In an extended footnote, the Tribal Defendants argue that "Chippewa Cree law provides a standard for evaluating unconscionability, which may be supplemented by Montana or federal law."  (Doc. 92 at 18 n.13.)  Although they refer to the *Gunson* decision, that is a decision in which the judge rejected a similar claim due to a lack of showing of the substance of Chippewa Cree law. *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1400 (S.D. Fla. 2014).

The Tribal Defendants also cite section 10-3-602 of the Tribal Lending Code which bars arbitration clauses which are "oppressive, unconscionable, unfair, or in substantial derogation of a Consumer's rights."  (Doc. 92-1 at 11.)  This section adopts the standards of the American Arbitration Association ("AAA") as presumptive proof that an arbitration clause does not violate the Lending Code.  The rules and standards promulgated by the AAA provide neutral procedures which govern the arbitration hearing itself.  These standards do not define "unconscionability" or otherwise provide rules of decision for when a decision is subject to arbitration.  The reference to AAA standards provides no insight into the substantive content of the tribal law.

The denunciation of oppressive and unconscionable arbitration clauses in the tribal lending law tells the court nothing about what those terms might be.  Section 10-3-602 of the tribal finance code represents a potential starting point.  It is an invitation to regulators or tribal courts to develop a body of law defining the content of "unconscionability."  But Defendants offer no evidence that such a body of law exists.

The court intends no disrespect to the tribal law or to the judges of the tribal courts of the Tribe.  The entry of the Tribe into payday lending appears to be relatively recent.  The use and enforcement of arbitration provisions under tribal law do not appear to have been a topic which the tribal lawmakers had reason to consider in the past.  The parties have not directed the court to any prior decisions by the tribal courts on the enforcement of agreements to arbitrate.  At least on the record provided to the court through the parties' memoranda, Chippewa Cree law is almost entirely silent on questions of arbitrability of disputes.

The absence of a body of tribal law means that a reference to tribal law within the contract does little to establish the terms of the parties' agreement.  If this body of law is uncertain or not yet developed, the reference to it fails to add anything to the parties' agreement. In the absence of evidence of the content of tribal law, the court reaches two conclusions.  The first is that it cannot enforce the contractual choice-of-law provision because neither the court nor the parties have been able to determine the content of the tribal law.  The court cannot adopt by reference an unknown body of law.

The second is that the only remaining choice for substantive rules of decision about unconscionability and the enforcement of the arbitration clause is Vermont law.  There is no viable alternative.  But additionally, as the brief submitted by the Vermont Attorney General makes clear, Vermont has a strong interest in the issues of consumer protection raised in this case.  The two plaintiff-borrowers are Vermont residents.  They entered into the loan agreements from their homes in Vermont.  They seek to vindicate banking rules under Vermont law as well as federal law.  The choice of Vermont law concerning the potential unconscionability of the arbitration clauses is neither surprising nor inherently unfair.

**B.      Who decides whether the claims made in this case are subject to arbitration?**

The parties disagree over whether the court or the arbitrator have the authority to decide whether the claims of unlawful lending practices are subject to arbitration.  Most commonly, the validity of an arbitration agreement is an issue for determination by the courts.  *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  Delegation of such questions to the arbitrator herself is permitted on the basis of clear and unmistakable evidence that the parties have chosen to give such questions to an arbitrator.  *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010).  In this case, Defendants rely upon language in the arbitration agreement which indicates that the question of arbitrability has been delegated to the arbitrator.  Specifically, they direct the court's attention to the definition of "disputes" subject to arbitration which includes the following provision:  "A Dispute [subject to arbitration] includes . . . any issue concerning the validity, enforceability or scope of this loan or the Agreement to Arbitrate."  (Doc. 13-5 at 50.)

In response, Plaintiffs argue that the delegation clause does not really place the arbitrator in charge with respect to issues concerning arbitrability.  Disputes concerning any claim for class-wide arbitration are reserved to "a court of competent jurisdiction located within the Chippewa Cree Tribe, and not by the arbitrator."  (Doc. 13-5 at 51.)  Since the claim in this case is a class-wide claim, the arbitrator is without authority to consider the scope of his or her authority as an arbitrator.  Plaintiffs also contend that Defendants have failed to provide proof of the content of Tribal law concerning arbitration, including the extent of the arbitrator's authority to invalidate an arbitration agreement pursuant to § 2 of the FAA.  They also point to the inherent conflict within the arbitration provisions between the authority of the arbitrator and the

broad scope of review and appellate supervision to be exercised by the tribal court over any arbitration award.

The court agrees with Plaintiffs that issues concerning the validity of the arbitration clause should be decided by the court for two reasons.

First, the arbitration clause does not explicitly delegate authority on this subject to the arbitrator. Questions related to the arbitrability of class action claims are sent instead to the tribal court. More broadly, all decisions by the arbitrator are subject to plenary review by the tribal court. The arbitration provisions include a statement—remarkable in the context of arbitration law—that "[t]he arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by the tribal court upon judicial review." (Doc. 13-5 at 51.)[16] This provision removes much of the arbitrator's independent authority to make binding determinations on any issue, including legal issues concerning the scope of the arbitration agreement. It effectively refers these questions to the tribal court which has broad authority to review for legal and factual error. The arbitrations conducted pursuant to this agreement more closely resemble bench trials with a right of appellate review rather than binding arbitrations.

Second, Plaintiffs' challenge to the arbitration provision is separate and distinct from their attack on the payday loan agreement. The challenge to the payday loan agreement is one of illegality. Plaintiffs allege that the exceedingly high interest rates and related loan terms violate substantive restrictions on consumer lending imposed at the state and federal levels. The challenge to the arbitration clause is different. Plaintiffs allege that the tribal law and the tribal

---

[16] It is difficult to imagine what this means in practice. It appears to anticipate that a record of the proceedings will be kept and the transcript reviewed for evidentiary support of the outcome. It also contemplates written findings of fact and conclusions of law since a one-line award could not be reviewed by the tribal court for consistency with tribal law.

court system have been corrupted by large investors from outside the reservation.  The claim is plausible for purposes of federal pleading standards since Plaintiffs have alleged a variety of facts which bring into question the independence and objectivity of the tribal legal system.  (The court makes no determination on this issue on a motion to dismiss, but the claim—still unproven—is sufficient to support discovery and, potentially, proof of these allegations at trial.)

This separate attack on the arbitration clause satisfies the majority's test in *Rent-A-Center*.  Plaintiffs have attacked the arbitration clause directly and the delegation clause specifically.  In paragraph 131 of the FAC, Plaintiffs allege that "[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent." (Doc. 18 ¶ 131.)  Plaintiffs identify the right of review in the tribal courts of any decision by the arbitrator as a basis for invalidity because Defendants "had the ability to control the Tribe's law and presumably could control actions taken by the tribal court.  As a result, any review by the tribal court would be nothing more than a sham." (*Id.*)  Unlike the attack on the contract as a whole which the Supreme Court identified as subject to arbitration in *Rent-a-Center*, this is a focused claim that the delegation clause itself is unconscionable.

Since Plaintiffs have made a specific attack on the delegation clause as unconscionable, the court, not the arbitrator, must determine whether the arbitration clause is valid.  It is hard to see how the outcome could be different.  If Plaintiffs are able to prove that the tribal legal system, both with respect to its law and to its judiciary, are subject to improper influence and control by Defendants, then delegating the question of arbitrability to the very system under attack is unlikely to result in a fair evaluation of Plaintiffs' claim that the tribal justice cannot fairly evaluate claims of its own shortcomings.  It is an elementary principle of justice that no one should serve as the judge in their own cause.  *Nemo iudex in causa sua.*

**C.   Have Plaintiffs identified a sufficient basis for a decision by the court that the arbitration award is unconscionable?**

Payday lending over the internet by lenders located on Indian reservations has increased sharply in recent years.[17]   Arbitration agreements very similar to the one in this case have become common.  Such agreements typically require arbitration which is governed by tribal law and conducted in a manner which permits the tribe to exert influence or control over the outcome.  Such arbitration agreements commonly require the application of tribal law in a manner calculated to defeat state and federal consumer protections.  Appellate courts hearing these cases have become increasingly candid in refusing to enforce the arbitration clauses because these clauses represent an obvious effort to deprive consumers of legal protections from unlawful lending and collection practices.

In *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016), the Fourth Circuit struck down an arbitration clause on facts relatively similar to those in this case.  The lender—Western Sky—was an online lender owned by a member of the Cheyenne River Sioux Tribe.  Its offices were located on the Cheyenne River Indian Reservation in South Dakota.  As in this case, Western Sky issued short-term, extremely high interest loans over the internet.  Western Sky stopped issuing loans following FTC enforcement action and numerous private lawsuits.  *See FTC v. Payday Fin. LLC*, 989 F. Supp. 2d 799, 822 (D.S.D. 2013) (disgorgement of profits in the amount of $417,740).  Before going out of business, Western Sky assigned its loan service and collection work to Delbert Services Corp.  Delbert sought dismissal of a borrower's action

---

[17] *See Illegal Lending: Facts and Figures* (Report by Vermont Attorney General's Office, Apr. 23, 2014), at 5, *available at* http://ago.vermont.gov/assets/files/Consumer/Illegal_Lending/Illegal%20Lending%20Report%20April%202014.pdf (noting that, increasingly, online lenders claim affiliation with Indian tribes).

33

complaining of illegal loan collection activities by relying upon the arbitration clause in the loan agreement.

In a strongly worded decision, the Fourth Circuit held that an arbitration agreement which attempts to preclude a consumer's recourse to federal consumer law protecting borrowers rendered the arbitration provision invalid and unenforceable. The offending provision, like the arbitration language at issue in this case, stated that the arbitration agreement shall be governed by tribal law. The court recognized that the FAA favors arbitration as a legitimate exercise of the right to form private contracts. However, said the court:

> [R]ather than use arbitration as a just and efficient means of dispute resolution, Delbert seeks to deploy it to avoid state and federal law and to game the entire system. Perhaps in the future companies will craft arbitration agreements on the up-and-up and avoid the kind of mess that Delbert is facing here.

*Hayes*, 811 F.3d at 676.

The facts of the *Hayes* case differ in some respects from this case. Delbert—a debt collector—was not located on an Indian reservation or in some other way subject to tribal law. The arbitration clause required arbitration by an authorized representative of the tribe subject to the borrower's right to select AAA, JAMS, or another arbitration organization to "administer the arbitration." *Id.* at 670. The arbitration clause stated that "no United States state or federal law applies to this Agreement." *Id.*

The present case is a little different. The arbitration is not merely administered but actually conducted by an AAA or JAMS arbitrator at a location convenient for the borrower. There is no express disclaimer of all federal law although there is such language with respect to state law. But these differences are minor and do not reach the heart of the *Hayes* decision, which is that an arbitration agreement crafted to preclude federal and state consumer protections is unenforceable as unconscionable. As in *Hayes*, the arbitration clause states that it is governed

34

by the Indian Commerce Clause and "the laws of the Chippewa Cree Tribe." (Doc. 13-5 at 52.)[18] By its express terms, therefore, the arbitration clause authorizes the arbitrator—bound by her oath to implement the terms of the parties' contract—to follow a body of law which Plaintiffs claim does not include basic federal and state protections against predatory loan practices because it was drafted in order to avoid such regulation.

The Western Sky arbitration agreement fared no better before the Seventh Circuit. In *Jackson v. Payday Financial, LLC*, 764 F.3d 765 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1894 (2015), the appellate panel refused to enforce what it termed an "illusory" arbitration clause which required arbitration before a tribal elder or three members of the tribal council with the borrower's participation by phone or videoconference. *Id.* at 768. In sharply critical terms, the court held the agreement to be unconscionable both because it referred to arbitration procedures on the reservation which did not exist and because it was drafted to ensure partiality. *Id.* at 779.

In the present case, the referral to AAA or JAMS arbitration avoids the criticism that the arbitration forum does not really exist. But the same fundamental criticism applies. By incorporating the tribal financial law and making all arbitrations reviewable by the tribal court on both the law and the facts, the defendants have effectively insulated themselves from claims that they have violated state and federal lending laws. Those are Plaintiffs' claims, in any event, and Plaintiffs are entitled to an opportunity to prove that they are true.

## IV.     Forum Non Conveniens, Venue, and Indispensable Parties

Having determined that Defendants are properly before the court and that Plaintiffs have alleged facts which could render the arbitration clause unenforceable, the court turns to

---

[18] The reference to the Indian Commerce Clause is an irrelevancy which is repeated in many of the tribal lending agreements. That clause is a grant of legislative authority to Congress to regulate commerce "with the Indian Tribes." It has nothing to do with the authority of tribes to enact their own laws.

remaining issues related to the court's authority to hear this case. These are the claims of forum non conveniens, venue (Rule 12(b)(3)), and absence of indispensable parties (Rule 12(b)(7)).

A.    **Forum Non Conveniens**

The Tribal Defendants argue that, if the court declines to enforce the arbitration agreements, the court should enforce the agreements' forum-selection clauses and dismiss the case under the doctrine of forum non conveniens. (Doc. 66 at 31 n.20.) Mr. Rees joins in that argument. (Doc. 67-2 at 23.) Forum non conveniens allows a court to dismiss a case when "the forum chosen by the plaintiff is so completely inappropriate and inconvenient that it is better to stop the litigation in the place where brought and let it start all over again somewhere else." *Grammenos v. Lemos*, 457 F.2d 1067, 1074 n.5 (2d Cir. 1972). However, "since the enactment of 28 U.S.C. § 1404(a), 'the federal doctrine of *forum non conveniens* has continuing applicability only in cases where the alternative forum is abroad.'" *Saunders v. Morton*, 269 F.R.D. 387, 400 (D. Vt. 2010) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 449 n.2 (1994)). No party proposes a foreign jurisdiction where this case should be brought; thus forum non conveniens does not apply.

The Tribal Defendants' request is, apparently, that the case be transferred to the District of Montana. Transfer "[f]or the convenience of parties and witnesses" and "in the interest of justice" is authorized under 28 U.S.C. § 1404(a), but Defendants raise no real "convenience" argument. Their objections to the presence of the case in this district as opposed to some other court are either related to personal jurisdiction or arbitrability. The court has already rejected dismissal on these grounds.  The court will not dismiss the case on forum non conveniens grounds or transfer the case under § 1404.

### B.    Venue

Venue in this case is predicated on 18 U.S.C. § 1965 and the general venue statute at 28 U.S.C. § 1391(b)(2).  Either is a sufficient basis for venue in this court.  Section 1965(a) authorizes a civil RICO suit to be filed in any district in which the defendant "transacts his affairs."  Section 1391(b)(2) authorizes venue in any district where "a substantial part of the events or omissions giving rise to the claim occurred."  Plaintiffs' allegations—that as a result of the actions of Rees and the Think Defendants, Plain Green entered into multiple illegal loan transactions with Plaintiffs—satisfies either standard.   Venue is proper in the District of Vermont.

### C.    Indispensable Parties

The Tribal Defendants seek dismissal under Rules 12(b)(7) and 19 because Plaintiffs have not brought suit against Plain Green or the Tribe itself.  They argue that since the FAC seeks to declare Plain Green's lending model to be illegal, the lawsuit cannot proceed in the absence of Plain Green and the Tribe which formed it.  On that theory, since Plain Green and the Tribe enjoy sovereign immunity, the claims against the other Defendants must be dismissed.  Plaintiffs respond that the doctrine of *Ex Parte Young* permits suit against tribal officials and satisfies concerns about the effect of this court's ruling on an absent defendant.

The short answer to the claim of indispensable party is that the presence of the Tribal Defendants in this case satisfies the requirements of Rule 19.  The essential purpose of the *Ex Parte Young* doctrine is to permit suits for injunctive relief against entities such as state agencies which would otherwise be subject to sovereign immunity.  In the case of tribes, the courts have long recognized that tribal interests may be adjudicated through *Ex Parte Young*.  *See Bay Mills*, *supra*.  The application of *Ex Parte Young* to suits against tribal officials extends to claims

arising under state as well as federal law.  *See Puyallup Tribe, Inc. v. Dep't of Game of State of Washington*, 433 U.S. 165 (1977) (tribal officials subject to suit to enjoin violations of state law).

## V.    Plausibility and "Group Pleading"

The Think Defendants contend that Plaintiffs have failed to allege plausibly that the Think Defendants have engaged in unlawful conduct, and that Plaintiffs' "group pleading" allegations are insufficient to state a claim against TC Loan Service, TC Decision Sciences, and Tailwind Marketing.  (Doc. 65 at 2.)  Thus, before considering the motions to dismiss in the context of individual causes of action, the court considers the plausibility of Plaintiffs' allegations under principles expressed in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Many of the allegations in the case are undisputed.  All parties agree that Plaintiffs took out a series of loans from Plain Green at interest rates greatly in excess of the 24% maximum allowed by Vermont's usury law.  The parties agree that Think Finance, Inc. provided services and support which enabled the Tribe to form Plain Green and enter into the internet-lending business.  (Doc. 18-1.)   In exchange for its participation, the Tribe would receive approximately 5% of cash revenue generated by the loans.  (*Id.*)  Plain Green entered into loan agreements with borrowers which permitted electronic access to the borrowers' accounts.  These allegations are entirely plausible since they are undisputed.

Where the parties disagree most sharply is over the issue of whether Defendants are engaged in an illegal business.  Defendants view Plain Green as a sovereign entity exempt from state usury requirements.  There is no limit on interest rates under the law of the Tribe.  For many years, banks operating in the United States have avoided state usury laws by establishing

themselves in states such as South Dakota and Delaware which do not have usury restrictions.[19]

Through the doctrine of federal preemption, banks providing credit card services and other loans

have avoided the effects of state law.  (*See* Doc. 18 ¶ 38.)[20]  Defendants seek similar treatment

for Plain Green through tribal immunity.  Whether this argument succeeds presents a mixed

question of law and fact.  Factual issues may include the claim that the tribal lending law and the

courts that enforce it are corrupt or that the law does not exist in important areas.  The principal

legal issue concerns the conflict of tribal law and Vermont consumer protections in the context

of loans made through the internet.   These issues do not raise questions about the plausibility of

the pleadings.

A second area where the parties disagree concerns the role of Mr. Rees and the Think

Defendants in the Plain Green loan business.  The FAC alleges that Mr. Rees "personally

designed and directed the business activity described in this Complaint."  (Doc. 18 ¶ 10.)  The

FAC describes this business activity as an "illegal scheme" and "a new way to prey on

unsuspecting people."  (*Id.* ¶ 23.)   The FAC describes Mr. Rees as the former President and

CEO (and current Chairman of the Board) of Think Finance and the current CEO of Elevate

Credit, Inc.  He is alleged to maintain a "controlling interest and operational role in Think

Finance."  (*Id.* ¶ 10.)  Plaintiffs allege that Mr. Rees and Think Finance "created the whole [Plain

Green] enterprise and ran its operation through an assortment of subsidiaries and affiliates like

Defendants Tailwind Marketing, TC Loan, and TC Decision Sciences."  (*Id.* ¶ 101.)

---

[19] *See* Mark Furletti, *The Debate Over the National Bank Act and the Preemption of State Efforts to Regulate Credit Cards*, 77 Temp. L. Rev. 425, 443 (2004) (reporting that in 2003, South Dakota, Delaware, and four other states were home to national banks holding approximately 70% of all credit card debt in the United States.).

[20] *See also Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 313 (1978) (under the National Bank Act, 12 U.S.C. § 85, bank located in Nebraska could charge out-of-state credit-card customers the lending rate allowed by Nebraska).

Rees and the Think Defendants describe their role in less colorful terms.  Mr. Rees describes himself as a former Chairman of the Board of Think Finance from September 2005 until May 2015 and a former President and CEO of TC Loan Service during the same period. (Doc. 67-1, Affidavit of Kenneth Rees, ¶¶ 2–3.)  He denies having been a majority shareholder and as of the date of his affidavit in September 2015, did not have an "operational role" in Think Finance.  The Think Defendants are described as companies providing services through "the usual relationship between a lender and its service providers."  (Doc. 65 at 3.)  One might recall the words of the police officer, "Nothing to see here, folks.  Move along."

Determining which side is right is beyond the scope of a motion to dismiss.  But in weighing plausibility, the court finds the FAC to be a plausible and coherent account of otherwise inexplicable facts.  No defendant offers a reason why Think Finance would join with a tribe in Montana to form an internet lending business except as a means of avoiding financial regulation under the flag of sovereign immunity.  There may be other reasons, but they do not appear on this record.

The Tribal Defendants offer no reason why their tribe would form an internet lender in exchange for a 4.5% share of revenue.  One plausible reason is that by adopting a tribal lending code tailored to the needs of Think Finance and Mr. Rees, they could offer some measure of immunity from state regulation.  It may be that the adoption of the tribal lending law in 2013 had no connection with the confidential "Term Sheet for Think Finance-Chippewa Cree Transaction" signed in 2011.  Such a proposition appears unlikely since the second paragraph of the term sheet calls for the Tribe to "adopt a finance code that is acceptable to all parties and provide for the licensing of an arm of the tribe to engage in consumer lending."  (Doc. 18-1 at 1.)  In short, whether Plaintiffs can prove their allegations is a question for another day, but the allegations are

40

specific and plausible in their description of a plan to avoid financial regulation of consumer lending.

The court also finds that the claim of "group pleading" does not require dismissal of the case. The FAC contains specific allegations against Tailwind Marketing and TC Decision Sciences. Tailwind Marketing provides approved borrowers for Plain Green. (Doc. 18 ¶ 89.) TC Decision Sciences provides "customer service, verification and collections of customer accounts" for Plain Green. (*Id.* ¶ 90.) Both are controlled by Mr. Rees and Think Finance. There is no uncertainty about the allegations against these two companies which would support dismissal.

## VI.    Substantive Claims

We have arrived, at last, in the world of Rule 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 8(a)(2). Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000). In addition to considering the pleadings, the court may refer to "statements or documents incorporated into the complaint by reference" and to "documents possessed by or known to the plaintiff and upon which [she] relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Applying that standard, the court addresses below the motions to dismiss specific substantive claims.

A.      **Consumer Financial Protection Act (Count One)**

Defendants are correct in their claim that the Consumer Financial Protection Act

("CFPA"), 12 U.S.C. § 5481 et seq., does not provide for a private cause of action.  Although

reported cases on this issue are scarce, the structure and specific provisions of the CFPA makes it

clear that Congress did not intend to create a private cause of action.  It is Congressional intent

which determines whether a statute, otherwise silent on the point, authorizes private lawsuits.

*See M.F. v. State of N.Y. Exec. Dep't Div. of Parole*, 640 F.3d 491, 495 (2d Cir. 2011) (analysis

focuses on congressional intent).  The CFPA is explicit in the creation of a new federal agency,

the Bureau of Consumer Financial Protection, which acts as both the rulemaking body and the

federal enforcement agency for federal consumer laws previously entrusted to multiple agencies.

*See* 12 U.S.C. § 5491(a) ("There is established in the Federal Reserve System, an independent

bureau to be known as the 'Bureau of Consumer Financial Protection', which shall regulate the

offering and provision of consumer financial products or services under the Federal consumer

financial laws.").  The Bureau has broad authority to file civil actions in federal court to enforce

the provisions of the federal consumer protection laws.  *Id.* § 5564.

The CFPA contains no express authority for its enforcement through private lawsuits.  It

authorizes enforcement actions by state attorneys general and state regulators.  *Id.* § 5552.  But it

is entirely silent regarding private remedies.  Legislative silence on such an issue is most

frequently regarded by courts as an expression of legislative intent to exclude private remedies.

*See Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007) (courts "cannot ordinarily

conclude that Congress intended to create a right of action when none was explicitly provided").

Courts in this circuit have held that the CFPA creates no private right of action.  *See Nguyen v.

Ridgewood Sav. Bank*, Nos. 14-CV-1058 (MKB), 14-CV-3464 (MKB), 14-CV-3989 (MKB),

2015 WL 2354308, at *11 (E.D.N.Y. May 15, 2015) ("Plaintiffs provide no statutory basis, and the Court can find none, for finding a private right of action under these provisions of the statute, which outlines duties, authorities and enforcement powers of the CFPB.").

The absence of a private remedy is unsurprising because the CFPA's primary purpose is to place responsibility for enforcing many different federal consumer protection statutes with a single newly formed regulator.  12 U.S.C. § 5492.  The CFPA itself contains few new substantive protections.  Plaintiffs direct the court's attention to one: section 5533 which provides in part that "[s]ubject to rules prescribed by the Bureau, a covered person shall make available to a consumer, upon request, information . . . concerning  [any consumer transaction]." *Id.* § 5533(a).  To date the Bureau has not issued rules to implement this provision.  The obvious intent of the provision is to prompt the adoption of a detailed regulatory system for placing information about a financial transaction in the hands of the consumer.  The court sees no indication that this provision was enacted in order to create a new private right to sue for damages whenever information is withheld by an entity subject to the CFPA.

For these reasons, the court concludes that the CFPA does not create a new private cause of action.  Count One of the FAC is DISMISSED.

**B.      Federal Trade Commission Act (Count Two)**

For similar reasons, it has long been settled that the Federal Trade Commission Act, 15 U.S.C. § 41 et seq., does not authorize a private cause of action.  Like the CFPA, the FTCA creates an enforcement agency and delegates specific powers to the agency to define the scope of unfair methods of competition through its rule-making authority, to conduct administrative hearings to punish and prevent unfair practices, and to file civil actions for violations of its rules and orders.  15 U.S.C. §§ 57a and 57b.  The Second Circuit has long held that this grant of

authority to the federal agency does not also create a private cause of action. *See Alfred Dunhill*

*Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir. 1974) ("[T]he provisions of the Federal

Trade Commission Act may be enforced only by the Federal Trade Commission. Nowhere does

the Act bestow upon either competitors or consumers standing to enforce its provisions."); *see

also Naylor v. Case & McGrath, Inc.*, 585 F.2d 557, 561 (2d Cir. 1978).

Since the FTCA does not authorize a private cause of action, Count Two of the FAC is

DISMISSED.

**C.     Electronic Funds Transfer Act (Count Three)**

In contrast to the CFPA and FTCA, the Electronic Funds Transfer Act ("EFTA"),

15 U.S.C. § 1693 et seq., creates individual rights and provides a private remedy. The EFTA

specifically authorizes private lawsuits, including class action lawsuits as ruled appropriate by

the courts hearing those cases. 15 U.S.C. § 1693m. Congress included a specific statement of

purpose for the statute at section 1693: "It is the purpose of this title to provide a basic

framework establishing the rights, liabilities, and responsibilities of participants in electronic

fund and remittance transfer systems. The primary objective of this title, however, is the

provision of individual consumer rights." *Id.* § 1693(b). Section 1693m authorizes lawsuits for

damages in the federal courts. The provision specifically contemplates class actions to the extent

ruled appropriate by individual courts. *Id.* § 1693m(a).

The specific claim is that Defendants violated § 1693k(1) by conditioning the extension

of short-term credit to Plaintiffs on their authorization of electronic fund withdrawals from their

accounts as the mandatory method of making repayment. (Doc. 18 ¶¶ 182–193.) Such conduct

would violate the EFTA and related regulations. Defendants contend, however, that Plaintiffs'

claims under the EFTA are too late and are foreclosed by the language of the loan agreement.[21] Defendant Rees argues that he cannot be held vicariously liable for the actions of the lender.

### 1.    Statute of Limitations

The EFTA provides a one-year statute of limitations for private lawsuits. 15 U.S.C. § 1693m(g). Plaintiffs do not dispute that they filed suit in May 2015—more than a year after the loans at issue were made. But the limitations period is subject to equitable tolling. *Apostolidis v. JP Morgan Chase & Co.*, No. 11-CV-5664(JFB)(WDW), 2012 WL 5378305, at *7 (E.D.N.Y. Nov. 2, 2012). Plaintiffs contend that equitable tolling is appropriate in this case. (Doc. 85 at 83.)

Equitable tolling is a fact-specific doctrine. Plaintiff Gingras offer no reason for the application of equitable tolling to her claim. Plaintiff Given, on the other hand, claims that Plain Green blocked access to her account during the limitations period and that there are other facts which would support tolling the limitations period so as to preserve her claim.

The EFTA claim of Plaintiff Gingras is DISMISSED as beyond the statute of limitations. The court cannot rule on the timeliness of Plaintiff Givens' EFTA claim because she has raised facts which may support a determination that her claim is timely.

---

[21] The Tribal Defendants also assert that the EFTA does not apply substantively to the Tribe (or to them, by extension) because tribal sovereigns "are not expressly included among the 'persons' or entities subject" to the EFTA. (Doc. 66 at 20 n.7.) Section 1693k prohibits conduct by "person[s]." The EFTA itself does not define "person," but the regulations implementing the EFTA define "person" as "a natural person or an organization, including a corporation, government agency, estate, trust, partnership, proprietorship, cooperative, or association." 12 C.F.R. § 1005.2(j). That broad interpretation is entitled to deference, and—for reasons similar to those discussed below regarding "persons" suable under RICO—the court concludes that the Tribal Defendants may be sued under the EFTA.

### 2.     Conditioning the Loan on Electronic Fund Withdrawals

The loan agreements signed by Plaintiffs include two ways in which the loan may be funded and repaid. The first is by electronic fund authorization. Funding by electronic transfer ("as soon as the next business day") is conditioned on ACH Authorization (electronic withdrawal from the customer's account). (Doc. 13-5 at 31.) Funding by postal mail ("up to 7 to 10 days" in the language of the loan agreement) is conditioned on payments by money order or certified check. (*Id.*)

Plaintiffs allege that the choice offered to consumers between funding "as soon as the next business day" which is conditioned on electronic fund authorization and the much longer process offered for people electing to pay by mail is a false choice. Defendants respond that since electronic fund authorization was not the *only* way to obtain a loan, the EFTA does not apply.

The court sees this issue as fact-specific and not one which can be resolved through a motion to dismiss. It is possible that Plaintiffs are correct that Defendants have so obstructed the choice of repayment by check with delay ("up to 7 to 10 days" plus the expiration of a "right of rescission") that the option is a false choice. Given the nature of the loan itself—immediate cash at very high interest rates—it seems unlikely that Defendants ever funded a loan to any borrower with repayment by check. It remains for discovery and for fact-finding to determine if the loan agreement is drafted so as to skate around the restrictions of EFTA.

### 3.     Mr. Rees's Role

Mr. Rees contends that Plaintiffs seek to hold him vicariously liable for the actions of Plain Green. The court reads the FAC differently. Plaintiffs seek to hold Mr. Rees liable for any EFTA violation because they claim that he developed the entire scheme, including the alleged

violation of EFTA, and is responsible as the principal in an unlawful business arrangement.  This

is an issue which cannot be resolved on a motion to dismiss.

The EFTA claim of Plaintiff Gingras only is DISMISSED because she does not assert

that her claim is subject to equitable tolling or for some other reason timely.  The motion to

dismiss the EFTA claim of Plaintiff Given is DENIED.

### D.      Vermont Consumer Fraud Act (Count Four)

In contrast to the FTCA, the Vermont Consumer Fraud Act ("VCFA"), 9 V.S.A. § 2451

et seq., provides a private cause of action.  Section 2461(b) of Title 9 authorizes suits for

damages including attorneys' fees and punitive damages.  A violation of the FTCA is one of the

potential bases for liability under the VCFA.  In defining "unfair methods of competition in

commerce and unfair or deceptive acts or practices in commerce"—which may form the basis for

liability—the Vermont legislature stated:  "It is the intent of the Legislature that in construing

[this provision,] the courts of this State will be guided by the construction of similar terms

contained in Section 5(a)(1) of the Federal Trade Commission Act . . . ."  *Id.* § 2453(b).

In effect, the VCFA provides a state-law private remedy for violations of the FTCA (as

well as for claims of fraud in businesses beyond the scope of the FTCA).  In the setting of this

case, the VCFA restores the claims which the court dismissed under the FTCA for lack of a

private cause of action.  *See Vt. Mobile Home Owners' Ass'n, Inc. v. Lapierre*, 131 F. Supp. 2d

553, 558 (D. Vt. 2001) (court applying VCFA would be guided by the construction given to the

FTCA).  The FTC itself has filed enforcement actions in other states against other payday lenders

which seek to avoid regulation by locating themselves on Indian reservations.  *See, e.g.*, *FTC v.

AMG Servs., Inc.*, No. 2:12-CV-00536-GMN, 2014 WL 910302, at *6 (D. Nev. Mar. 7, 2014)

(holding, in case where FTC alleged violations of the FTCA, the Truth in Lending Act, and the

EFTA, that "the FTC Act is a federal statute of general applicability that . . . grants the FTC authority to regulate arms of Indian tribes, their employees, and their contractors"). These claims are similar to the claims made by the private plaintiffs in this case. The determination of the FTC that internet lending of this nature violates the FTCA is a strong indication that these practices also violate the VCFA.

Although the VCFA follows the FTCA in many respects, it is not limited to federal violations. As the amicus brief submitted in this case by the State of Vermont through the Vermont Attorney General's Office demonstrates, Vermont has enacted its own measures which define unfair and deceptive actions for purposes of the VCFA. These include 9 V.S.A. § 2481w(b), which addresses loans by unlicensed lenders and loans with interest rates in excess of Vermont's usury limits of 12–24%. *See* 8 V.S.A. § 2201 (requiring lenders to be licensed) and 9 V.S.A. § 41a(b) (setting interest rate limits).

Vermont consumer law specifically identifies internet lenders as subject to state regulation. 8 V.S.A. § 2233(b). In a 2014 report, the Vermont Attorney General's Office describes the harm caused by unlicensed, high-interest loans.[22] In the case of Plain Green, the Vermont attorney general sent a cease and desist letter which failed to change the company's lending practices. (Doc. 91 at 3.)

The court therefore rejects the Tribal Defendants' contention (Doc. 66 at 43) that Plaintiffs have failed to allege any unfair or deceptive acts.

Mr. Rees argues that any potential liability is vicarious and not based upon actionable conduct by him. The short answer is two-fold:

---

[22] *See Illegal Lending: Facts and Figures* (Report by Vermont Attorney General's Office, Apr. 23, 2014), at 3, *available at* http://ago.vermont.gov/assets/files/Consumer/Illegal_Lending/Illegal%20Lending%20Report%20April%202014.pdf.

1.  Plaintiffs have alleged Rees was a critical participant in an unlawful plan.  Mr. Rees provided the leadership and experience in the payday lending business.  Plaintiffs allege that he is the principal architect of the business built around Plain Green.  (Doc. 18 ¶ 23 (describing Mr. Rees as "the mastermind of this illegal scheme").)  There could have been little doubt that the business was one of doubtful legality.  *See Bay Mills*, 134 S. Ct. at 2052 (Thomas, J., dissenting) (noting "questionable legality").  Internet lenders providing loans at these interest rates and on these terms are the subject of suit and enforcement action by prosecutors and regulators.  *See* Indictment, *United States v. Hallinan*, No. 2:16-cr-130-ER-1 (E.D. Pa. Mar. 31, 2016) (charges against individuals involved in alleged "rent-a-tribe" payday lending scheme); Indictment, *United States v. Tucker*, No. 1:16-cr-91-PKC (S.D.N.Y. Feb. 8, 2016) (same).[23]

2.  At the stage of the motion to dismiss, the court accepts the allegations described above as true.  Plaintiffs have come forward with detailed, plausible allegations of wrongdoing.  Whether these can be proved is an issue for another day.  The motion to dismiss fails because the FAC contains plausible allegations that Mr. Rees developed Plain Green, negotiated the term sheet which governs the business arrangements, and enabled the alleged violations of Vermont law to occur.

### E.    Unjust Enrichment (Count Seven)

In Count Seven, Plaintiffs allege that "Defendants have been unjustly enriched by their continued possession of funds illegally taken from people in financially challenged positions."

---

[23] The Office of the Vermont Attorney General says that it "specifically sent a cease-and-desist letter to Plain Green Loans, LLC . . . advising the company to immediately cease making and collecting on all loans made to Vermont Customers."  (Doc. 91 at 3.)

(Doc. 18 ¶ 224.)  Mr. Rees argues that Plaintiffs have failed to state a claim for unjust enrichment.  (Doc. 67-2 at 49.)[24]

In Vermont, "[a] claim for unjust enrichment requires that (1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) it would be inequitable for defendant not to compensate [plaintiff] for its value." *Unifund CCR Partners v. Zimmer*, 2016 VT 33, ¶ 21.[25] "Unjust enrichment applies if 'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given." *Kellogg v. Shushereba*, 2013 VT 76, ¶ 22, 194 Vt. 446, 82 A.3d 1121 (quoting *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 41, 178 Vt. 244, 882 A.2d 1177).  "The common remedy for unjust enrichment is imposition of a constructive trust, where the person with the legal title cannot enjoy the beneficial interest without violating the rules of honesty and fair dealing." *Mueller v. Mueller*, 2012 VT 59, ¶ 29, 192 Vt. 85, 54 A.3d 168 (internal quotation marks omitted).[26]

Rees asserts that the FAC fails to allege that he received or accepted any benefit from Plaintiffs.  He contends that Plaintiffs obtained a loan from *Plain Green* and repaid those loans to *Plain Green*.  (Doc. 67-2 at 49.)  Plaintiffs say that they have alleged that Rees received a benefit

---

[24] The Think Defendants and the Tribal Defendants do not appear to join this argument. Rees argues that Count Seven only recites the bare elements of a claim without any factual allegations. (Doc. 67-2 at 49; Doc. 77-1 at 21.)  The court rejects that argument because Count Seven explicitly incorporates by reference all of the factual allegations in the FAC.  (Doc. 18 ¶ 223.)

[25] These are the elements for what has also been termed a claim on a contract "implied in law." *Mount Snow Ltd. v. ALLI, the Alliance of Action Sports*, No. 1:12-cv-22-jgm, 2013 WL 4498816, at *8 (D. Vt. Aug. 21, 2013).  A separate claim, for "contract implied in fact," requires different elements, including "mutual intent to contract and acceptance of the offer." *Id.* Plaintiffs raise the former claim here, and the court therefore rejects TCV's contention (Doc. 76 at 21) that Plaintiffs must prove "mutual intent."

[26] As described above, Plaintiffs' remedies against the Tribal Defendants are limited to prospective injunctive or declaratory relief.  That would rule out the constructive trust remedy for any unjust-enrichment claim.

as an investor-owner of Think Finance, which retains 95% of the revenue from the lending operation. (Doc. 85 at 139.)

The court concludes that the FAC adequately alleges that Rees benefitted from Plain Green's transactions with Plaintiffs. The FAC alleges that he is a substantial investor in Think Finance, and that Think Finance retained almost all of the revenue produced from Plain Green's lending operation. That is a sufficient "benefit" for the purposes of unjust enrichment. *See Powell v. H.E.F. P'Ship*, 793 F. Supp. 91, 92–93, 96 (D. Vt. 1992) (declining to dismiss unjust enrichment claim against major lender for its role in allegedly fraudulent development project); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d ("Restitution is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth. Subject to that limitation, the benefit that is the basis of a restitution claim may take any form, direct or indirect.").

Rees further contends that unjust enrichment does not apply where the parties have entered into an express contract, and that Plaintiffs in fact did enter into contracts—namely, the loan agreements with Plain Green. (Doc. 67-2 at 50.) The Vermont Supreme Court has recognized that "it can hardly be equitable to impose a contract on the parties that completely undermines the contractual relationships that the parties themselves have created." *DJ Painting, Inc. v. Baraw Enters., Inc.* 172 Vt. 239, 245, 776 A.2d 413, 419 (2001); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 2(1) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment."). However, Plaintiffs have plausibly alleged that the loan agreements are not valid because they are unlawful, as part of a plan to avoid financial regulation. If Plaintiffs prove that,

then relief under an unjust enrichment theory is not foreclosed.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 32.

### F.    Civil RICO Claims (Counts Five and Six)

Plaintiffs allege that Defendants are liable under the federal RICO statute, 18 U.S.C. § 1961 et seq., because they took part in "collection of unlawful debt" as well as "racketeering" activities.  *See* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.").[27]  "The requirements of section 1962(c) must be established as to each individual defendant."  *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).  There are multiple elements required to state a RICO claim; and Defendants raise challenges related to almost every element.[28]

### 1.    Equitable Relief is Available in Private RICO Actions

As against the Tribal Defendants, Plaintiffs seek only equitable relief for the alleged RICO violations.  (Doc. 18 ¶¶ 207, 215.)  The Tribal Defendants argue that RICO's civil remedies provision, 18 U.S.C. § 1964, authorizes recovery for money damages only—not equitable relief.  (Doc. 66 at 21.)  It is true that 18 U.S.C. § 1964(c) authorizes recovery of

---

[27] Plaintiffs' two RICO counts both appear to be claims under § 1962(c): one claim premised on an alleged pattern of racketeering activity (Count Five), and one claim premised on alleged collection of unlawful debt (Count Six).  Plaintiffs assert (Doc. 85 at 108) that the FAC alleges a RICO conspiracy under § 1962(d), but also concede that the FAC does not contain a count alleging such a conspiracy.  The court accordingly limits its analysis to § 1962(c).

[28] Some elements—for example, that Plain Green is an "enterprise" or that it is engaged in or affects interstate commerce—are not challenged by any Defendant.  The discussion that follows is organized according to the elements that are contested, with analysis of each individual Defendant's argument on each of those elements.

damages without mentioning injunctive relief. But the court disagrees with the Tribal

Defendants' narrow reading of the relief available in private RICO actions.

The Tribal Defendants concede that the Second Circuit has not expressly decided whether

equitable relief is available in private RICO actions. (Doc. 66 at 21.)[29]  Other circuits have

reached differing conclusions on the issue.[30]  District courts within the Second Circuit are also

divided.[31]  For largely the reasons stated by Judge Kaplan in *Chevron Corp. v. Donziger*,

974 F. Supp. 2d 362 (S.D.N.Y. 2014), this court concludes that equitable relief is available in

private RICO actions. The court must read the subsections of § 1964 together, and that reading

reveals that subsections (b) and (c) "provide remedies in addition to, and not in place of, the

remedies provided for in Section 1964(a)." *Donziger*, 974 F. Supp. 2d at 569.

### 2. "Persons" Suable under RICO

The Tribal Defendants assert that RICO does not apply substantively to the Tribe (or to

them, by extension) because tribal sovereigns "are not expressly included among the 'persons' or

entities subject" to RICO. (Doc. 66 at 20 n.7.)  Section 1962(c) applies to "person[s]."  The

---

[29] In dicta, the Second Circuit has expressed "doubts as to the propriety of private party injunctive relief" under RICO. *Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28 (2d Cir. 1983). *See also Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482, 489 n.20 (2d Cir. 1984) ("It . . . seems altogether likely that § 1964(c) as it now stands was not intended to provide private parties injunctive relief."), *rev'd on other grounds*, 473 U.S. 479 (1985).

[30] *Compare Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1080–89 (9th Cir. 1986) (concluding that RICO's legislative history forecloses injunctions for private plaintiffs), *with Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001) (concluding that "the text of the RICO statute, understood in the proper light, itself authorizes private parties to seek injunctive relief"), *rev'd on other grounds*, 537 U.S. 393 (2003).

[31] *Compare Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 568–70 (S.D.N.Y. 2014) (concluding that equitable relief is available in private RICO actions), *with Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 446 (S.D.N.Y. 2008) ("Based upon the weight of Second Circuit authority and Congress's failure to address the issue within the statutory language itself, this Court will not infer that the right to injunctive and declaratory relief exists for private litigants under Section 1964 of RICO.").

statute defines "person" to include "any individual *or entity* capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3) (emphasis added). That broad definition contains no specific exemption for tribes. *Cf.* 42 U.S.C. § 2000e(b) (specifically excluding Indian tribes from the definition of "employer" for the purposes of Title VII of the Civil Rights Act).

According to one prominent treatise, governmental entities "are not subject to RICO liability as defendants." Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 11(A). "There is some disparity in the case law as to whether governmental entities should be deemed not to be 'persons' or should be recognized as 'persons' but simply immune ones." *Id.* For most purposes, "[t]he result is the same: they cannot successfully be sued." *Id.* The Tribal Defendants' argument, however, requires a decision on the precise rationale.[32]

The court concludes that, for the purposes of RICO, tribes are "persons" but that they enjoy immunity. This follows from the natural reading of the broad definition of "person" in § 1961(3)—it includes *any* "entity" capable of holding an interest in property. Sovereign governments like state governments are governmental entities. Entity, *Black's Law Dictionary* (10th ed. 2014). It follows that tribal governments are also "entities." And there is no dispute that such entities are capable of holding an interest in property.

As discussed above, tribes enjoy immunity. But, as also discussed above, the immunity of tribal officials in their official capacity is limited by the analogy to *Ex Parte Young*. The court

---

[32] In many contexts, it may be sensible to conclude that it is unnecessary to determine the precise rationale for immunity because, absent immunity, a successful RICO claim against a governmental entity could heap duplicative financial harm on taxpayers who might already have been harmed. *See id.* That concern plays no role in this case, however, because the Tribal Defendants cannot be liable for money damages.

therefore concludes that tribal officials in their official capacity may be sued for injunctive relief for conduct occurring outside of Indian lands that violates 18 U.S.C. § 1962.

### 3.   Mens Rea

The mens rea requirement in RICO is coextensive with the mens rea requirement found in the predicate crimes. *United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986). The Tribal Defendants contend that Plaintiffs cannot establish the requisite mens rea for a RICO violation. (Doc. 66 at 46.) Plaintiffs maintain that the Tribal Defendants' argument is "irrelevant" and "based on several incorrect premises." (Doc. 85 at 127–28.)

The Tribal Defendants' argument might be persuasive if the rationale for the Tribe's immunity were that, as a governmental entity, the Tribe is incapable of forming the mens rea necessary for a predicate RICO act. Some courts have indeed rested on similar rationales. *See Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404 (9th Cir. 1991) (RICO claims failed because "government entities are incapable of forming a malicious intent"); *Andrade v. Chojnacki*, 65 F. Supp. 2d 431, 449 (W.D. Tex. 1999) (same; quoting *Lancaster*); *see also* Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 11(A) ("Most courts reason that state and local governments are immune from RICO liability because they are incapable of forming the mens rea necessary to commit a predicate act." (collecting cases)). That rationale, however, is unpersuasive. As the Third Circuit has observed, it "does not distinguish adequately those situations where municipal corporations are indeed held liable for the tortious or criminal acts of [their] officials, even where such acts require a malicious, willful or criminal intent." *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 909 (3d Cir. 1991).

The Tribal Defendants also contend that the FAC fails to allege that any of them "intended to defraud the Plaintiffs as required by the mail and wire fraud statutes." (Doc. 66

at 48 n.36.)   According to the Tribal Defendants, the FAC alleges that Mr. Rees and Think Finance entered into agreements with the Tribal Defendants' *predecessors*, not the Tribal Defendants themselves.  (*See id.* (citing FAC ¶ 209).)   That argument, however, ignores the fact that the Tribal Defendants are sued in their official capacity—as the individual official representatives who, according to the FAC, have authority to stop the allegedly illegal conduct. The "intent" to be analyzed is the intent of the entity that the Tribal Defendants represent.

### 4.   Injury; Causation

To establish a RICO claim, a plaintiff must prove, among other things, that she suffered "an injury to business or property."  *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001).  The Tribal Defendants argue that Plaintiffs cannot demonstrate that they have suffered any such injury.  (Doc. 66 at 45.)  Mr. Rees argues the same.  (Doc. 67-2 at 34.)  The court rejects those arguments for the same reasons that it concludes that Plaintiffs have constitutional standing: they have a direct, personal stake in the dispute.  They explicitly claim that they paid excessive interest.  (Doc. 18 ¶ 115.)  Their claims demonstrate their interest in the subject matter of this lawsuit and the clear potential for relief in their individual cases.

The "by reason of" language in § 1964(c) "require[s] a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 86 (2d Cir. 2015) (alteration in original) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).  The proximate cause requirement "mandates 'some direct relation between the injury asserted and the injurious conduct alleged' that is not 'too remote.'"  *Id.* (quoting *Holmes*, 503 U.S. at 268).

Mr. Rees contends that Plaintiffs have failed to allege that their harm was proximately caused by any alleged RICO violation. (Doc. 67-2 at 35.) He argues that "[n]owhere in the FAC is it alleged that Plaintiffs or anyone else relied upon any misrepresentations by Rees in deciding to enter into the loans." (*Id.* at 36.) "And, nowhere in the FAC are there facts alleged demonstrating that it was a misrepresentation or fraudulent conduct by Rees that *caused* plaintiffs to suffer their injury." (*Id.*) Plaintiffs insist that, as borrowers of usurious debt, they meet the proximate cause test for RICO. (Doc. 85 at 133.)

Here, the FAC alleges that "Plaintiffs would not have had their bank accounts debited with illegal ACH transactions in excess of any legal amount of interest but for Defendants Rees and Think Finance establishing and running the corrupt enterprise of Plain Green." (Doc. 18 ¶ 115.) Of course, alleging but-for causation does not necessarily establish proximate causation. But the allegations of the FAC sufficiently claim a relation between the allegedly injurious conduct and the injury that is not "too remote." The conduct at issue includes the alleged marketing and collection of usurious interest rates. The injury is the alleged payment of interest at excessive rates. That is a sufficiently direct relationship to satisfy proximate cause. Mr. Rees's argument that Plaintiffs have failed to allege reliance on any misrepresentation does not alter that conclusion and, as discussed below, fails to address the core of the scheme alleged in the FAC.

### 5.        Enterprise; Distinctiveness

The FAC alleges that Plain Green is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). (Doc. 18 ¶ 76.) That is a legal conclusion, not a factual allegation. But no Defendant challenges the "enterprise" element of Plaintiffs' RICO claim insofar as Plaintiffs claim that Plain Green is the "enterprise" at issue.

The Tribal Defendants do contend, however, that Plaintiffs' RICO theory violates the "distinctiveness" requirement.  (Doc. 66 at 47 n.35.)  According to the Tribal Defendants, by suing them in their official capacities as officers and directors of Plain Green, Plaintiffs are functionally suing Plain Green.  Thus, according to the Tribal Defendants, Plaintiffs have designated Plain Green as both the RICO defendant and enterprise, which the Tribal Defendants say is fatal to Plaintiffs' RICO theory.  (*Id.*)

It is true that, "[u]nder section 1962(c), a defendant and the enterprise must be distinct." *DeFalco*, 244 F.3d at 307.  However, Plaintiffs are suing the Tribal Defendants not solely as directors of Plain Green, but also as official representatives of the Tribe.  (*See* Doc. 18 ¶ 209.) The Tribal Defendants concede that the Tribe and Plain Green are distinct entities.  (Doc. 92 at 19 n.14.)  The court concludes that the allegations in the FAC do not violate RICO's distinctiveness requirement.

### 6.      Management and Operation

A necessary element for liability under § 1962(c) is that the defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs."  18 U.S.C. § 1962(c).  Interpreting that provision, the Supreme Court has held that such conduct or participation requires that a defendant "participate in the operation or management of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  Under that "operation or management" test, "participation" requires a defendant to have "some part in directing" the enterprise's affairs, and thus RICO liability for "participation" is "not limited to those with primary responsibility for the enterprise's affairs."  *Id.*  Liability under § 1962(c) is not limited to "upper management"; an enterprise may be "operated" "not just by upper management but also

by lower rung participants in the enterprise who are under the direction of upper management."

*Id.* at 184.  The court discusses whether each set of Defendants meets this test.[33]

### a.    Mr. Rees and the Think Defendants

Mr. Rees and the Think Defendants contend that the FAC does no more than allege that they provided *services* to the alleged enterprise, and that such allegations fall short of alleging their "operation or management."  (Doc. 65 at 14; *see also* Doc. 67-2 at 46.)  It is true that, in the term sheet, Think Finance described what it brought to the deal with the Tribe as "services":

> TF will license its software to the Tribe pursuant to a software license agreement acceptable to the parties.  TF will also provide risk management, application processing, underwriting assistance, payment processing, and ongoing customer service support coterminous with the software license agreement and market and/or identify access channels for consumer loans on the Tribe's behalf (jointly "Services").

(Doc. 18-1 at 1.)  Plaintiffs note that the FAC explicitly asserts that Think Finance did more than provide "services."  (*See* Doc. 18 ¶ 101 ("Defendants Rees and Think Finance hoped to avoid liability by falsely claiming that they only provided services to Plain Green, when in reality they created the whole enterprise and ran its operation through an assortment of subsidiaries and affiliates like Defendants Tailwind Marketing, TC Loan, and TC Decision Sciences.").)  According to the Think Defendants, that allegation is merely conclusory.  (Doc. 96 at 4.)

Evaluating the factual allegations in the FAC, the court concludes that Plaintiffs have plausibly alleged that Rees and Think Finance "participated" in the operation or management of the enterprise.  The FAC alleges that Rees and Think Finance prepared the term sheet (Doc. 18 ¶ 78), which required the Tribe to "adopt a finance code that is acceptable to all parties and

---

[33] The Tribal Defendants raise no argument on this RICO element; presumably because, as directors of Plain Green, they would indisputably meet the operation or management test.

provide for the licensing of an arm of the tribe to engage in consumer lending" (*id.* ¶ 79).[34]   The

FAC further asserts that Rees and Think Finance "intentionally and willfully dominated and still

dominate the operations of Plain Green" and "provided everything that the enterprise needed to

operate." (*Id.* ¶ 80.)  Rees and Think Finance also "defined precisely the type of loan Plain

Green would offer to customers and the terms on which the loan would be offered," (*id.* ¶ 83),

and required the enterprise to enter into certain banking and attorney-client relationships (*id.*

¶¶ 85, 87).  The court concludes that Plaintiffs have plausibly alleged that both Think Finance

and Mr. Rees have played at least some part in directing the affairs of the enterprise.

The court cannot reach the same conclusion with respect to TC Loan Service, LLC, TC

Decision Sciences, LLC, and Tailwind Marketing, LLC.  The FAC alleges that Mr. Rees and

Think Finance created those entities as subsidiaries (*id.* ¶ 99), and that Mr. Rees and Think

Finance "control and dominate" them (*see id.* ¶¶ 89, 90).  No allegations in the FAC describe

those entities as having any role in directing the affairs of the enterprise.  The court will

accordingly DISMISS the RICO claim against those Defendants.

### b.   TCV and Sequoia

TCV and Sequoia each argue that the FAC fails to allege that they conducted or

participated in the enterprise's affairs.  (Doc. 76 at 22; Doc. 77-1 at 19.)  The principal factual

allegations against these two Defendants are as follows:

> Defendants Sequoia and Technology Crossover Ventures provide money that is
> used to start the illegal lending process.  They reap rewards through obtaining
> significant returns on the investment of their funds in the enterprise.  Sequoia and
> Technology Crossover were fully aware of the practices of the enterprise and
> knew that the practices violated the law.  Sequoia and Technology Crossover do

---

[34] Rees points out that he is not a party to the term sheet, nor is he a signatory to it.  (Doc. 98 at 16.)  Inspection of the term sheet (Doc. 18-1) reveals that to be true, but does not foreclose the plausible allegation that Rees prepared the term sheet (or caused it to be prepared) for execution by the parties to that document.

not make investments without substantial due diligence into their investments, including legal review of the activities of their investment vehicle.

(Doc. 18 ¶ 154.)  The FAC also asserts that Sequoia and TCV "executed a series of agreements that documented their relationship with Defendants Rees and Think Finance" but that "[t]hey have concealed these arrangements through confidentiality clauses in the agreements" and have refused to comment on their role in the RICO enterprise.  (*Id.* ¶ 155.)  None of those allegations describe TCV or Sequoia as having any role in directing the affairs of the enterprise.

Allegations that TCV and Sequoia provided financing to the RICO enterprise are not sufficient to show that they conducted or participated in the enterprise's affairs.[35]  Allegations that TCV and Sequoia are "investors" (shareholders) in Think Finance, or obtained returns on those investments, are similarly insufficient.  Neither would TCV and Sequoia be RICO "participants" just because they were "fully aware" of Plain Green's practices.  *See Rosner v. Bank of China*, 528 F. Supp. 2d 419, 423, 431 (S.D.N.Y. 2007) (despite allegations that bank "knew about the fraudulent scheme and its role in the fraudulent scheme," bank's provision of banking services did not qualify as participation in a RICO enterprise); *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 468 (S.D.N.Y. 1996) ("One can 'knowingly participate' in fraud without having 'some part in directing the affairs of the enterprise.'").

---

[35] *See Alkhatib v. N.Y. Motor Grp. LLC*, No. CV-13-2337(ARR), 2015 WL 3507340, at *18 (E.D.N.Y. June 3, 2015) (bank did not satisfy operation or management test where its only alleged activities were "summarily granting the loan applications created by the dealership defendants, failing to investigate the plaintiffs' claims of fraud, and collecting the payments due under the allegedly fraudulent loans"); *Berry v. Deutsche Bank Tr. Co. Americas*, No. 07 Civ. 7634(WHP), 2008 WL 4694968, at *6 (S.D.N.Y. Oct. 21, 2008) ("Lending money to an enterprise does not establish a role in 'directing the enterprise's affairs.'"); *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007) (Bank of China's alleged provision of banking services that aided in the perpetration of a fraudulent scheme did not qualify as participation in a RICO enterprise); *Sumitomo Corp. v. Chase Manhattan Bank*, No. 99Civ.4004(JSM), 2000 WL 1616960, at *1 (S.D.N.Y. Oct. 30, 2000) ("[M]erely providing financing to a RICO enterprise did not constitute participation in the affairs of the enterprise." (citing *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 347 (S.D.N.Y. 1998))).

Plaintiffs argue that *Sumitomo* and *Rosner*—cited in the footnote above—actually support their position. The court disagrees. In *Sumitomo*, the plaintiff, Sumitomo Corporation, sued two major banks, alleging that they participated in a scheme to defraud Sumitomo "by structuring certain transactions so that they appeared to be normal copper transactions without disclosing other related transactions that transformed these transactions into bank loans of which plaintiff was unaware." *Sumitomo*, 2000 WL 1616960, at *1. The "enterprise" in that case was a former Sumitomo employee, Hamanaka, and each of the two banks. The court recognized that merely providing financing to a RICO enterprise would not constitute "participation" in the affairs of the enterprise, but held that the complaints sufficiently alleged "participation" because "it is the fraudulent financing operation which is itself the RICO enterprise, and the complaints sufficiently allege the particular defendant's participation in its affairs." *Id.* Here, the FAC does allege a fraudulent financing operation (Plain Green), but that operation extends financing to consumers like Plaintiffs. TCV and Sequoia are not themselves alleged to be the RICO "enterprise"; nor are they alleged to directly make loans to consumers.

*Rosner* is similarly unpersuasive. The court in that case referenced an earlier related action—*Commodity Futures Trading Commission v. International Financial Services (New York), Inc.*, 323 F. Supp. 2d 482 (S.D.N.Y. 2004)—in which Sociedade Comercial Siu Lap Limitada (Siu Lap) was a defendant held liable for fraudulently and without authorization engaging in transactions in foreign currency futures contracts.[36] Siu Lap's role in the fraudulent scheme involved funding codefendant International Financial Services, Inc. *See Rosner,*

---

[36] The claims against Siu Lap were not resolved in the 2004 decision. The court had entered default judgment against Siu Lap in 2002. *See* Order of Default Judgment, *Int'l Fin. Servs.*, No. 1:02-cv-5497-GEL (S.D.N.Y. Aug. 15, 2002), ECF No. 19.

528 F. Supp. 2d at 422.  That was not Siu Lap's only role,[37] but even assuming it was, Siu Lap was held liable not under RICO, but under the Commodity Exchange Act (CEA).  *Int'l Fin. Servs.*, 323 F. Supp. 2d at 485.  Plaintiffs do not explain how Siu Lap's liability under the CEA has any bearing on the "operation or management" element that appears in RICO.

Plaintiffs say they have "additional allegations" (not appearing in the FAC) regarding TCV and Sequoia's "participation" in the affairs of the enterprise.  (Doc. 85 at 101, 107; Doc. 85-1.)  Plaintiffs assert that TCV General Partner John Rosenberg has served on the Think Finance Board since 2009.  (Doc. 85-1 ¶ 1.)  Plaintiffs also say that Sequoia General Partner Michael Goguen previously served as a director of Think Finance.  (*Id.* ¶ 3.)  Plaintiffs allege that both Rosenberg and Goguen were "fully aware" of the Plain Green enterprise (*id.* ¶¶ 1, 3), and that they both "directed the strategy that Think Finance followed, including its domination and control of Plain Green" (*id.* ¶¶ 2, 4).

TCV and Sequoia both contend that Plaintiffs' reliance on allegations not appearing in the FAC is procedurally improper.  (Doc. 97 at 12; Doc. 99 at 8.)  The court agrees.  *See Sherman v. Ben & Jerry's Franchising, Inc.*, No. 1:08-CV-207, 2009 WL 2462539, at *8 (D. Vt. Aug. 10, 2009) (supplementary allegations that did not appear in the Amended Complaint were improper because "parties may not amend the complaint through supportive memoranda" (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998))).  The court's analysis is limited to the FAC as it stands currently.

However, since the court is permitting discovery as to TCV and Sequoia's minimum contacts with Vermont, the court will also permit Plaintiffs to discover facts related to the

---

[37] Siu Lap also "hired inexperienced currency traders as independent contractors, grouped the traders by their ethnicity, and encouraged them to solicit customers from their respective ethnic communities."  *Id.*  The independent contractors then misled customers.  *See id.*

"additional allegations."  To defeat a jurisdiction-testing motion after such discovery, Plaintiffs

will be required to aver "facts that, if credited by the trier, would suffice to establish jurisdiction"

over TCV and Sequoia.  *Dorchester*, 722 F.3d at 85 (quoting *Ball v. Metallurgie Hoboken-*

*Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Meanwhile, the court will defer ruling on any

of the claims against Sequoia and TCV.

### 7.    Racketeering

Under RICO, "racketeering activity" includes "any act which is indictable under . . .

[18 U.S.C.] section 1341 (relating to mail fraud), [or] section 1343 (relating to wire fraud)."

18 U.S.C. § 1961(1)(B).  "A complaint alleging mail and wire fraud must show (1) the existence

of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and

(3) the use of interstate mails or transmission facilities in furtherance of the scheme."

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).  Defendants

argue that Plaintiffs have failed to state a racketeering claim for a variety of reasons.

### a.    Scheme to Defraud

"The mail and wire fraud statutes do not define 'scheme to defraud,' but it has been

described as a plan to deprive a person 'of something of value by trick, deceit, chicane or

overreaching.'"  *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quoting *McNally v.*

*United States*, 483 U.S. 350, 358 (1987)).  "It is characterized by a departure from community

standards of 'fair play and candid dealings.'"  *Id.* (quoting *United States v. Ragosta*, 970 F.2d

1085, 1090 (2d Cir. 1992)).  "[M]ateriality of falsehood" is an element of a scheme to defraud.

*Neder v. United States*, 527 U.S. 1, 25 (1999).

Plaintiffs' theory is that Mr. Rees and Think Finance "had a plan or scheme to defraud

thousands of people in a financially challenged position by extending loans at illegally high and

extortionate interest rates, while at the same time claiming that the business was legitimate and in compliance with the law." (Doc. 18 ¶ 101.) According to Plaintiffs, Rees and Think Finance used Plain Green and the Tribal Defendants as "intermediaries" and Tailwind, TC Loan, and TC Decision Sciences as "subsidiaries and affiliates" to advance the scheme. (*Id.*) The FAC outlines alleged misrepresentations in furtherance of the alleged scheme as including: (1) that Plain Green was the lender; (2) that Chippewa Cree law governed; (3) that the lender was not subject to any state or federal laws; (4) that Plain Green loans are less expensive than a payday loan; (5) that Plain Green charges low fees. (Doc. 18 ¶¶ 106, 107, 124, 125, 126.) According to the FAC, those alleged misrepresentations appear on Plain Green's website and in the arbitration agreements. (*See id.*)

The parties devote considerable energy to discussing whether those five statements are true, whether they are material, and whether they are sufficiently specific under Rule 9(b). All of those arguments distract from the real question. *Representations* that Think Green's business model is legal or that it offers a good deal are not at the core of the alleged scheme. Rather, the alleged plan—as the court understands it—was to avoid financial regulation of consumer lending. That is the alleged "falsehood" at issue; the court need not focus on any specific alleged false statements. *See United States v. Woods*, 335 F.3d 993, 999 (9th Cir. 2003) (concluding that the Supreme Court in *Neder* "addressed the materiality of misrepresentation, not the specificity"), *cert. denied*, 540 U.S. 1025 (2003). As the court concluded above, the allegations of the FAC are specific and plausible in their description of such a plan.

### b.      Fraudulent Intent; Participation in Scheme

Mr. Rees and Think Finance contend that the FAC fails to allege that they had any fraudulent intent. (Doc. 65 at 16; Doc. 67-2 at 42.) Plaintiffs do not dispute that they need to

plead fraudulent intent, but assert that such intent may be alleged generally under Rule 9(b), and that the FAC alleges Think Finance's direct knowledge and also that it had motive and opportunity. (Doc. 85 at 114.)

Although Rule 9(b) permits intent to be alleged generally, Plaintiffs must still "allege facts that give rise to a *strong* inference of fraudulent intent." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999)). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

The court concludes that the FAC pleads sufficient facts to give rise to a strong inference of fraudulent intent. The FAC alleges that Rees, the Think Defendants, and the Tribal Defendants had motives to commit the alleged fraud. According to the FAC, federal regulators had shut down Rees's former "rent-a-bank" internet payday business. (Doc. 18 ¶¶ 23, 37–41.) Rees's new venture, Think Finance, is allegedly a different kind of law-avoidance scheme that uses a "rent-a-tribe" model. (*Id.* ¶ 42; *see also id.* ¶ 82.) Thus, as the FAC puts it, the motive for Rees and the Think Defendants was to find a business model that would be profitable and that would avoid the legal issues that doomed the previous "rent-a-bank" model. According to the FAC, the Tribe (represented by the Tribal Defendants) also had a motive: it would receive 4.5% of the revenues from the operation. (*Id.* ¶ 23.) The opportunity for Rees, the Think Defendants, and the Tribal Defendants arose in March 2001 when, according to the FAC, Rees and Think

Finance approached the Tribe regarding formation of a tribal entity to conduct an internet-lending operation. (*Id.* ¶ 77.)

Mr. Rees contends that the FAC fails to allege that he "participated" in any mail or wire fraud. (Doc. 67-2 at 38.) He asserts that a RICO claim against him "cannot be based on allegations that *the enterprise* simply engaged in acts of mail fraud, wire fraud, or the collection of unlawful debt." (Doc. 98 at 22 (emphasis added).) Citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993), Rees argues that "[c]onclusory allegations that Rees somehow controlled the individual Tribal Defendants to take unspecified actions do not suffice." (Doc. 67-2 at 40.)

It is true that "[t]he focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d) [RICO's conspiracy provision]." *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987). But the FAC alleges that Rees (and Think Finance), "through their control over" the Tribal Defendants, wired money into and out of Plaintiffs' bank accounts (Doc. 18 ¶¶ 53, 54, 68, 69, 100), and used the mail to collect payments and communicate with other parts of the Plain Green enterprise (*id.* ¶ 100). The FAC includes more than just bare allegations that Rees was in "control"—it alleges that he (and Think Finance) actually designed the system under which the wire and mail transactions occurred. (*See* Doc. 18 ¶¶ 23, 81.)[38] If that is not an allegation of "participation," it is hard to imagine what might be.

---

[38] Rees describes as "ludicrous" and "incredible" any allegation that he personally deposited funds into or withdrew funds from Plaintiffs' accounts. (Doc. 98 at 16.) The court does not read the FAC as alleging that, but instead as alleging that he designed a system under which such transactions would occur. (*See* Doc. 18 ¶ 10 (alleging that Rees "personally designed and directed the business activity described in this Complaint").)

### c.   Use of Mails or Wires

The Tribal Defendants contend that the FAC "wholly fails" to establish their liability under a mail fraud theory, and that the FAC "fails to state how the mails were used to further the scheme to defraud." (Doc. 66 at 50 & n.37.) The FAC does indeed allege relatively few facts about the mail; perhaps the most detailed factual allegation is that Defendants Rees and Think Finance "use[d] the mail to collect payments and communicate with other parts of the Plain Green enterprise." (Doc. 18 ¶ 100.) Plaintiffs have clarified that they do not allege that any misstatements were communicated through the mail, but allege mail fraud "solely based on it advancing the fraudulent scheme." (Doc. 85 at 22 n.2.) Therefore, "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998). The court concludes that Plaintiffs have alleged a connection between the scheme and the mails. The court therefore rejects the Tribal Defendants' argument that the FAC is insufficiently detailed with respect to the allegations of mail fraud.

Plaintiffs assert that they allege wire fraud "based both on Defendants' fraudulent statements and based on the wiring being merely incidental to a larger fraudulent scheme." (Doc. 85 at 22 n.2.) For the reasons stated above, the court concludes that the inquiry need not focus on the five alleged misrepresentations that Plaintiffs say were transmitted over wires. However, Plaintiffs have alleged a detailed description of the scheme, and have also alleged a connection between the scheme and the wires.

### 8.    Collection of Unlawful Debt

Section 1962(c) of Title 18 identifies "collection of unlawful debt" as one of the specific

offenses which may give rise to civil liability under the RICO statute.  Unlawful debt is defined

as a debt:

> (A) incurred or contracted in gambling activity which was in violation of the law
> of the United States, a State or political subdivision thereof, or which is
> unenforceable under State or Federal law in whole or in part as to principal or
> interest because of the laws relating to usury, and (B) which was incurred in
> connection with the business of gambling in violation of the law of the United
> States, a State or political subdivision thereof, or the business of lending money or
> a thing of value at a rate usurious under State or Federal law, where the usurious
> rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6).  To state a claim for collection of an unlawful debt, Plaintiffs must allege

that:

> [1] the debt was unenforceable in whole or in part because of state or federal laws
> relating to usury, [2] the debt was incurred in connection with the "business of
> lending money . . . at a [usurious] rate," . . . [3] the usurious rate was at least twice
> the enforceable rate . . . [4] as a result of the above confluence of factors, it was
> injured in its business or property.

*Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 666 (9th Cir. 1988)

(alterations and omissions in original) (quoting *Durante Bros. & Sons, Inc. v. Flushing Nat'l

Bank*, 755 F.2d 239, 248 (2d Cir. 1985)).

### a.    Unenforceable Debt

The Tribal Defendants assert that there was no "unlawful debt" in this case because the

Tribe's governing law imposes no interest rate cap.  (Doc. 66 at 52.)[39]  The Tribal Defendants

further contend that no state usury laws can be enforced against them because doing so "would

amount to an improper state regulation of on-reservation activity in contravention of well-

established preemption and infringement principles."  (*Id.*)

---

[39] TCV joins this argument.  (Doc. 76 at 22.)

The court rejects the Tribal Defendants' arguments.  For the reasons stated above, the court has concluded that, at least on the present record, the relevant conduct occurred *outside* of the Tribe's lands.  *See Otoe-Missouria*, 769 F.3d at 115.  The interest rates charged may not have violated Chippewa Cree law, but under *Bay Mills* the Tribal Defendants can be sued for injunctive relief if their off-reservation commercial activities violate state law.

### b.      Business of Lending Money at a Usurious Rate

The Think Defendants contend that the FAC fails to allege that any Defendant was in the "business of lending money at a usurious rate." (Doc. 65 at 19.)  According to the Think Defendants, the only entity alleged to be in the "business" of lending money is the alleged RICO enterprise (and non-party) Plain Green.  (*Id.* at 19 n.9.)  Plaintiffs argue that they do not have to show that every defendant lent money because RICO only requires that a defendant "conduct or participate, directly or indirectly" in the enterprise's affairs.  (Doc. 85 at 96.)  In their reply, the Think Defendants return to the refrain that Plaintiffs have failed to satisfy *Reve's* "operation and management" test.  (Doc. 96 at 7.)   For the reasons stated above, the court agrees that TC Loan Service, LLC, TC Decision Sciences, LLC, and Tailwind Marketing, LLC do not satisfy the "operation and management" test, but that Mr. Rees and Think Finance do.

Mr. Rees and Think Finance also assert that the FAC fails to allege that they themselves acted to "collect" any unlawful debt.[40]  Think Finance relies on *Durante*, in which the Second

---

[40] Rees and the Think Defendants assert that the proper definition of "collection" for purposes of § 1962(c) is "to induce in any way any person to make repayment thereof." *United States v. Pepe*, 747 F.2d 632, 674 (11th Cir. 1984).  Plaintiffs object that the Think Defendants are inappropriately seeking to add an additional "inducement" element onto RICO.  (Doc. 85 at 95.)  Plaintiffs argue that, in any case, they have alleged that the Think Defendants "induced" repayment.  (*Id.* at 96.)  To the extent that there is an "inducement" element, the court concludes that it is alleged in the FAC by the allegations that funds were actually electronically collected directly from Plaintiffs' bank accounts.  (*See* Doc. 18 ¶¶ 30, 54, 69, 100.)

Circuit—tracking the language of § 1962(c)—listed as an element that "the individual defendants participated in the conduct of the affairs of the enterprise *through collection of unlawful debt*." *Durante*, 755 F.2d at 248 (emphasis added).  Rees contends that a RICO claim against him "cannot be based on allegations that *the enterprise* simply engaged in acts of mail fraud, wire fraud, or the collection of unlawful debt."  (Doc. 98 at 22 (emphasis added).)  Thus, both Rees and Think Finance argue that the FAC fails to allege that they *individually* took any actions constituting collection of unlawful debt.  Plaintiffs insist that "[t]here is no requirement that each defendant personally lend any money, only that they participate, *directly or indirectly*."  (Doc. 85 at 96.)[41]

   As noted above, "[t]he focus of section 1962(c) is on the individual [acts] engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d) [RICO's conspiracy provision]."  *Persico*, 832 F.2d at 714.  For largely the same reasons stated above regarding racketeering, the court concludes that the FAC adequately alleges that Rees and Think Finance participated in the collection of allegedly unlawful debt.  The FAC alleges that Rees and Think Finance designed the system under which borrowers would be charged allegedly usurious interest rates.  That is plainly an allegation of "participation."

---

[41] Plaintiffs also assert that they have alleged that Rees and Think Finance "took many acts that were designed to induce the repayment of an unlawful debt."  (Doc. 85 at 93.) Referring to the allegations that Rees and Think Finance controlled the Tribal Defendants (Doc. 18 ¶¶ 54, 69), Plaintiffs maintain that the FAC does allege that Rees and Think Finance "collected unlawful debt multiple times from both Jessica Gingras and Angela Given."  (Doc. 85 at 94, 96.)

### c.   Twice the Enforceable Rate

This element does not appear to be in dispute.  The FAC alleges that the rates charged were between 198 and 376% annually—well in excess of twice the rate enforceable under Vermont law.

### d.   Injury to Business or Property

For the reasons discussed above, the FAC alleges the requisite injury.

### Conclusion

All Defendants' motions to compel arbitration (Docs. 64, 66, 67, 77, 76) are DENIED.

The Tribal Defendants' Motion to Dismiss (Doc. 66) is GRANTED IN PART and DENIED IN PART.  On all counts against the Tribal Defendants, Plaintiffs can obtain only prospective injunctive or declaratory relief.  Counts One and Two are DISMISSED.  Count Three is DISMISSED as to Plaintiff Gingras; but remains as to Plaintiff Givens.  The Vermont state-law claims (Counts Four and Seven) survive against the Tribal Defendants.  The RICO claims (Counts Five and Six) remain in the case.  The unjust enrichment claim (Count Seven) also remains.

The Think Defendants' Motion to Dismiss (Doc. 65) is GRANTED IN PART and DENIED IN PART.  Counts One and Two are DISMISSED.  Count Three is DISMISSED as to Plaintiff Gingras, but remains as to Plaintiff Givens.  The VCFA claim (Count Four) remains against the Think Defendants.  The RICO claim (Count Six) as against TC Loan, TC Decision, and Tailwind Marketing is DISMISSED, but remains as against Think Finance.  The Think Defendants have not sought dismissal of the unjust enrichment claim (Count Seven), so that claim remains against them.

Kenneth Rees's Motion to Dismiss (Doc. 67) is GRANTED IN PART and DENIED IN PART.  Counts One and Two are DISMISSED.  Count Three is DISMISSED as to Plaintiff Gingras, but remains as to Plaintiff Givens.  The VCFA claim (Count Four) remains against Mr. Rees.  The RICO claims (Counts Five and Six) remain against Mr. Rees.  The unjust enrichment claim (Count Seven) remains.

TCV and Sequoia's Motions to Dismiss (Docs. 76, 77, respectively) are DENIED without prejudice, and may be renewed following discovery on the issue of personal jurisdiction.

Plaintiffs' Motion for Jurisdictional Discovery (Doc. 43) on the issues of subject-matter jurisdiction and arbitration is MOOT.

Dated at Rutland, in the District of Vermont, this 18 day of May, 2016.

_____
Geoffrey W. Crawford, Judge
United States District Court

73