UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 MAR 31  PM 4: 46

CLERK

BY ⎯⎯⎯⎯⎯⎯
DEPUTY CLERK

| | | |
|---|---|---|
| JESSICA GINGRAS and ANGELA C. GIVEN, on behalf of themselves and all others similarly situated,       Plaintiffs<br><br>v.<br><br>KENNETH E. REES SEQUOIA CAPITAL OPERATIONS, LLC, SEQUOIA CAPITAL FRANCHISE PARTNERS, L.P., SEQUOIA CAPITAL IC, L.P., SEQUOIA CAPITAL ENTREPRENEURS ANNEX FUND, L.P., SEQUOIA CAPITAL GROWTH FUND III, L.P., SEQUOIA CAPITAL GROWTH FUND III PRINCIPALS FUND LLC, SEQUOIA CAPITAL FRANCHISE FUND, L.P., SEQUOIA CAPITAL GROWTH PARTNERS III L.P., SEQUOIA CAPITAL IX, L.P., SCFF MANAGEMENT LLC, SC IX.I MANAGEMENT, LLC, SCGF III MANAGEMENT, LLC, TECHNOLOGY CROSSOVER VENTURES, TCV V L.P. TCV MEMBER FUND, L.P., and TECHNOLOGY CROSSOVER MANAGEMENT V LLC,       Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Docket No. 1:15-cv-101<br><br><br>**COMPLAINT – CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Nature of Action

1.      This is a class action for damages and equitable relief against a payday lender that has taken advantage of people who are struggling financially by charging extortionate interest rates and engaging in illegal lending practices.  The Second Amended Complaint is comprised of three sections.  First, the allegations in paragraphs 38 to 166 are nearly identical to the allegations of the First Amended Complaint, which survived several motions to dismiss in this Court.[1]  Second, paragraphs 183 to 457 contain detailed facts obtained during the Think Finance bankruptcy.  Finally, paragraphs 458 to 626 describe the participation of TCV and Sequoia.

2.      Plain Green, LLC ("Plain Green") purports to be a "tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation." (https://www.plaingreenloans.com).  The officers and directors of Plain Green were sued in their official capacity for equitable relief.  *See Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024 (2014).

3.      Plain Green was created after existing payday lenders approached the Chippewa Cree Tribe of the Rocky Boy's Reservation (the "Tribe") and requested that the Tribe become involved in a payday lending scheme.  In the United States, stringent laws have been enacted to

---

[1] To the extent that any of these allegations remain written in the present tense, this is to indicate what was occurring at the time this lawsuit was originally filed.  Because the Court has already sustained these allegations, Plaintiffs chose to keep the language the same so that this Court would not need to reexamine the same allegations.  This amended complaint does not assert claims against any of the current or former directors or officers of Plain Green, LLC (including Former Defendants Rosette, McInerney, and Whitford), Think Finance, Inc. (or Think Finance, LLC), TC Loan Service, LLC, TC Decision Sciences, LLC, Tailwind Marketing, or Victory Park Capital Advisers (or any of its subsidiaries or affiliates, including but not limited GPL Servicing, Ltd.).

prescribe how loans can be made and to prevent lenders from preying on indigent people.  By involving the Tribe in the payday lending scheme, the lenders hoped to circumvent these laws and take advantage of legal doctrines, such as tribal immunity, to avoid liability for their actions.  After its creation, Plain Green engaged in a series of predatory loan practices that violate the law and that have injured numerous people who are struggling financially. [2]

<u>Parties</u>

4.      Jessica Gingras is a citizen of Vermont who took out payday loans from Defendants.

5.      Angela Given is a citizen of Vermont who took out payday loans from Defendants.

6.      Former Defendant Joel Rosette was the Chief Executive Officer of Plain Green and was sued in his official capacity.[3]  Rosette was responsible for all operations of Plain Green.  Article 7.6 of the current Articles of Organization of Plain Green, LLC granted Rosette the power "to manage the Company on a daily basis."  Rosette also had the authority to "hire and terminate employees when necessary."  *Id.*  As a result, Rosette was responsible for and could have stopped the illegal activity described in this Complaint.  In his position as Chief Executive Officer,

---

[2] At all relevant times, the Sequoia Entities, the TCV Entities, the Think Finance entities, Kenneth Rees, Victory Park, GPLS, and Haynes Investments, LLC were members and associates of an internet payday lending enterprise (the "<u>Payday Lending Organization</u>").  This Payday Lending Organization, the Plain Green Enterprise, and the Great Plains Lending Enterprise are collectively referred to as the "<u>Enterprises</u>."

[3] "Former Defendant" refers to the various defendants from the First Amended Complaint that have settled with Plaintiffs and/or have been voluntarily dismissed.  They are identified as Former Defendants herein.  The inclusion of allegations referencing any Former Defendant(s) should not be interpreted as Plaintiffs asserting claims against any Former Defendant.

Rosette had the authority to prevent the credit reporting and illegal keeping of a loan balance for the Plaintiffs. Rosette is a citizen of Montana and not a citizen of Vermont.

7.    Former Defendant Ted Whitford was a member of Plain Green's Board of Directors and was sued in his official capacity. The Board of Directors had the power to fire the CEO of Plain Green and appoint a new CEO who would have complied with the law. Whitford is a citizen of Montana and not a citizen of Vermont.

8.    Former Defendant Tim McInerney was a member of Plain Green's Board of Directors and was sued in his official capacity. The Board of Directors had the power to fire the CEO of Plain Green and appoint a new CEO who would have complied with the law. McInerney is a citizen of Montana and not a citizen of Vermont.

9.    Former Defendant Think Finance, Inc. ("Think Finance") was a Delaware corporation headquartered at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. It formerly had the name ThinkCash, Inc.

10.    Defendant Kenneth E. Rees is the former President and Chief Executive Officer and Chairman of the Board of Think Finance. Until recently, he served as the Chief Executive Officer of Elevate Credit, Inc. Mr. Rees maintained a controlling interest and operational role in Think Finance. He has personally designed and directed the business activity described in this Complaint. He is a citizen of Texas and not a citizen of Vermont.

11.    Former Defendant TC Loan Service, LLC ("TC Loan") is a Delaware limited company located a 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. Its principal place of business is outside the State of Vermont.

12.     Former Defendant TC Decision Sciences, LLC ("TC Decision Sciences") is a Delaware limited liability company with offices at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109.  Its principal place of business is outside the State of Vermont.

13.     Former Defendant Tailwind Marketing, LLC ("Tailwind Marketing") is a Delaware limited liability company with offices at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109.  Its principal place of business is outside the State of Vermont.

14.     Defendant Sequoia Capital Operations, LLC ("Sequoia Capital") is a Delaware limited liability company with its principal place of business at 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

15.     Defendant Sequoia Capital Franchise Partners, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

16.     Defendant Sequoia Capital IC, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

17.     Defendant Sequoia Capital Entrepreneurs Annex Fund, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

18.     Defendant Sequoia Capital Growth Fund III, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

19.    Defendant Sequoia Capital Growth III Principals Fund, LLC is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

20.    Defendant Sequoia Capital Franchise Fund, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

21.    Defendant Sequoia Capital Growth Partners III L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

22.    Defendant Sequoia Capital IX, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

23.    Defendant SCFF Management, LLC is the general partner of Sequoia Capital Franchise Partners, L.P. and Sequoia Capital Franchise Fund, L.P.  The managing members of SCFF Management are Douglas M. Leone, Michael J. Moritz and Mark Stevens of Sequoia Capital.  The mailing address for SCFF Management, LLC is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

24.    Defendant SC IX.I Management, LLC is the general partner of Sequoia Capital IX, L.P. and Sequoia Capital Entrepreneurs Annex Fund, L.P.  The managing members of SC IX.I Management, LLC are Douglas M. Leone, Michael J. Moritz and Mark Stevens of Sequoia Capital.  The mailing address for SC IX.I Management, LLC is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

25.     Defendant SCGF III Management, LLC is the general partner of Sequoia Capital Growth Partners III, L.P. and Sequoia Capital Growth Fund III, L.P. and is the managing member of Sequoia Capital Growth III Principals Fund, LLC.  The managing members of SCGF III Management, LLC are Roelof Botha, James J. Goetz, Douglas M. Leone and Michael J. Moritz of Sequoia Capital.

26.     Defendants Sequoia Capital Franchise Partners, L.P., Sequoia Capital IC, L.P., Sequoia Capital Entrepreneurs Annex Fund, L.P., Sequoia Capital Growth Fund III, L.P., Sequoia Capital Growth III Principals Fund, LLC, Sequoia Capital Franchise Fund, L.P., Sequoia Capital IX, L.P., Sequoia Capital Growth Partners III L.P., SCFF Management, LLC, SC IX.I Management, LLC, and SCGF III Management, LLC are collectively referred to as the "Sequoia Entities" or "Sequoia."

27.     Defendant Technology Crossover Ventures is a Delaware corporation with its principal place of business located at 528 Ramona Street, Palo Alto, California, 94301.

28.     Defendant TCV V L.P. is a member fund of Technology Crossover Ventures whose address is c/o Technology Crossover Ventures, 528 Ramona Street, Palo Alto, California 94301.

29.     Defendant TCV Member Fund, L.P. is a member fund of Technology Crossover Ventures whose address is c/o Technology Crossover Ventures, 528 Ramona Street, Palo Alto, California 94301.

30.     Defendant Technology Crossover Management V LLC ("TCM V") is the general partner of TCV V L.P. and TCV Member Fund.  TCM V's address is c/o Technology Crossover Ventures, 528 Ramona Street, Palo Alto, California 94301.

31.     Defendants Technology Crossover Ventures, TCV V L.P., TCV Member Fund, L.P., TCM V are collectively referred to herein as the "TCV Entities" or "TCV."

Jurisdiction and Venue

32.     This Court has jurisdiction over this dispute pursuant to the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a) and 5536(a), and the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act").  This Court has federal question jurisdiction under 28 U.S.C. § 1331.  The Court also has jurisdiction because this case is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1).  The Court has jurisdiction over this action pursuant to 18 U.S.C. § 1965.

33.     In addition, this Court has diversity jurisdiction because diversity of citizenship exists between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332.  Plain Green paid approximately $13 million to a loan servicer that participated in its payday loan scheme.  These payments demonstrate that the amount of the payday loans is in excess of $13 million.

34.     Additionally, this Court also has jurisdiction under the Class Action Fairness Act. 28 U.S.C. § 1332.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

35.     This Court may enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2202.

36.     This Court has personal jurisdiction over Defendants Sequoia, TCV, and Rees due to the fact that Sequoia, TCV, and Rees, through their roles in the Enterprises – including through Sequoia and TCV's participation on the Think Finance Board of Directors – directed or affirmed the direction of the making of loans to borrowers in the State of Vermont during the Class Period, or otherwise were aware of the fact that Plain Green and other lenders within the Enterprises

issued loans to Vermont borrowers during the Class Period.  This is evidenced by, among other things, quarterly graphs of state-by-state loans outstanding provided to the Think Finance Board, members of which included the designees of Defendants Sequoia and TCV.

37.    Venue is proper in this Court under 18 U.S. C. § 1965 and 28 U.S.C. § 1391(b)(2).

<u>Facts</u>

38.    Plaintiffs Jessica Gingras and Angela Given fell victim to a sophisticated loan sharking operation that was specifically designed by the Defendants to ensnare unsuspecting victims.  Ms. Gingras and Ms. Given visited a bright and cheerful website, https://www.plaingreenloans.com, which promised to help them secure a loan.  This website informs visitors that with an easy online application, they can obtain an answer within a matter of seconds:



39.    The website proclaims that Plain Green is a better option than a payday loan:



40.     However, the cheerful cartoon characters do not tell the whole story.  The reality of Defendants' operation is far different than these shiny, innocent looking characters suggest. The Plain Green enterprise (the "<u>Plain Green Enterprise</u>") was created when Kenneth Rees, the mastermind of this illegal scheme, had his former business, ThinkCash, shut down by federal regulators.  Rees was undeterred by this setback and sought a new way to prey on unsuspecting people.  Rees believed that tribal immunity was the answer.  So, Rees and his rebranded company, Think Finance, approached the Chippewa Cree Tribe with a deal.  Rees and Think Finance would provide everything the Tribe needed to run a successful payday loan enterprise if the Tribe would let them use the concept of tribal immunity to stymie state and federal regulators.  In return, the Tribe would receive 4.5% of the revenues.

<u>The Payday Lending Industry</u>

41.     Payday lending takes advantage of people's need for money.  While marketed as a short-term loan for emergency cash, the loans are usually not short term at all.  A typical borrower cannot repay the entire amount of the loan right away.  Instead, to avoid default, the borrower will often roll the loan over into another loan or take out a loan from an alternative lender.  As interest continues to accrue on these loans, borrowers get stuck in a vicious debt trap

from which they cannot escape.  More of the borrowers' limited resources are diverted to interest on the payday loans, and borrowers struggle to meet their basic needs, such as food, shelter, and medical care.

42.     A typical payday loan has an extortionate interest rate of 200% or more.  For example, Plain Green's website states that it lends at rates of 299.17 to 378.95% for first time borrowers.  This type of loan causes people who are struggling financially to pay more in interest within one year than they originally borrowed in principal.

43.     Payday lenders justify these exceptionally high interest rates by pointing to the allegedly short term nature of the loans and the supposedly higher risk profile of poor borrowers.

44.     However, payday lenders, like Plain Green, do not examine the borrower's ability to repay the loan in a short period of time.

45.     Instead, payday lenders, such as Plain Green, create a repayment plan that is designed to extend the repayment period so that the lender can obtain substantial amounts from the high interest payments.

46.     The risk to payday lenders, like Plain Green, has been exaggerated because payday lenders take advantage of a variety of techniques to insure that they are repaid.

47.     For example, Plain Green creates financial arrangements so that it has automatic access to a borrower's bank account and can withdraw money without further action from the borrower.  Defendants require that borrowers agree to Automatic Clearing House ("ACH") withdrawals from their accounts before extending credit.  This financial arrangement substantially reduces the risk of non-payment.

48.     Plain Green also lends to people who have established periodic payments that are deposited into bank accounts, such as social security, disability, and veterans' benefits.  After

Plain Green has access to a borrower's bank account, it can simply remove these deposits from the account and insure that it is paid.

49.    Rees and Think Finance through their control over Rosette, Whitford, and McInerney use various contractual provisions to keep these usurious practices from review. These contract provisions include phony choice of law provisions and provisions claiming tribal immunity.  These contractual provisions are unconscionable and unenforceable.

50.    In some cases, Rees and Think Finance through their control over Rosette, Whitford, and McInerney have blocked borrowers' access to their Plain Green accounts so that the borrowers cannot determine what they have paid.  In these cases, these Defendants have refused to allow the borrowers to have access to the documents that purportedly create a binding contractual relationship between the borrowers and Plain Green.

51.    Rees and Think Finance through their control over Rosette, Whitford, and McInerney also misrepresent that their loans are intended to be short term loans.  For example, the Defendants state that "Plain Green loans are designed to help you meet your emergency borrowing needs."  Contrary to these representations, the loan repayment schedule is not designed to be a short term loan.

52.    Rees and Think Finance through their control over Rosette, Whitford, and McInerney also misrepresent that their loans are legitimate loans by reporting loan information to credit rating agencies.  When certain borrowers fail to make payments, even on illegal loans, these Defendants report the failure to make a payment as if it were a failure to make a payment on a legitimate loan.

<u>Defendants' Efforts to Avoid Liability</u>

53.     Defendants have gone to great lengths to avoid any responsibility for their actions and have created structures to try to prevent the proper application of law.

54.     In fact, Plain Green's very existence is an effort to avoid liability.  Plain Green's predecessors in interest were not tribal entities.  ThinkCash, Inc. (n/k/a Think Finance, Inc.) is a Delaware corporation.  ThinkCash was formed in or around 2001 as a payday lender that operated over the Internet.

55.     To avoid state limits on interest rates, ThinkCash used a lending model known in the money lending industry as "rent-a-bank."  Payday lenders that were prohibited by state laws from making extortionate loans partnered with a bank so that the bank was the nominal lender.  At the same time, the payday lender would market, fund, and collect the loan.  The payday lender also performed other lending functions.  Because the banks were insulated from state laws by federal bank preemption, the payday lenders were able to use the rent-a-bank scheme to avoid state laws.

56.     During this time, First Bank of Delaware ("FBD") developed a specialty in providing banking services to payday lenders.  FBD developed a relationship with ThinkCash that enabled ThinkCash to offer high interest rate loans and represent itself as "ThinkCash by First Bank of Delaware."

57.     ThinkCash and FBD continued this relationship despite enforcement and regulatory efforts to stop the activity.  The FDIC instituted an enforcement action in 2008 that culminated in a consent order.  That consent order required FBD to end its relationship with a number of entities that had used it in the rent-a-bank scheme, including ThinkCash.

58.    FBD is no longer in business.  In 2012, its shareholders voted to dissolve the bank.  Soon thereafter, the United States Department of Justice announced a $15 million civil penalty to be paid by FBD.

59.    After its "rent-a-bank" scheme ended, ThinkCash developed plans for another law avoidance scheme called "rent-a-tribe."

60.    The concept behind the "rent-a-tribe" scheme is to take advantage of tribal immunity in the same way that ThinkCash attempted to take advantage of federal bank preemption.  Under the scheme, the loans are made in the name of a lender affiliated with the tribe, but ThinkCash provides the marketing, funding, underwriting, and collection of the loans.

61.    Using the "rent-a-tribe" scheme, ThinkCash exploits its customer base to generate future loans.  The first "rent-a-tribe" scheme that ThinkCash started involved Plain Green. ThinkCash transferred the existing ThinkCash loans and the ThinkCash customer database to Plain Green.  In addition, ThinkCash designed the web platform used by Plain Green so that existing ThinkCash customers visiting the ThinkCash website would be routed automatically to the Plain Green website.

<u>Jessica Gingras's Payday Loans from Plain Green</u>

62.    Jessica Gingras has taken out a number of payday loans, but has an incomplete record of those loans.

63.    Rosette, Whitford, and McInerney have blocked Jessica Gingras's access to her Plain Green account.  The following descriptions are based on her reconstruction of the loans from other information that is available to her and recently filed loan documents.

64.    Jessica Gingras took out a payday loan from FBDLoans.com on March 16, 2000 in the amount of $1,200.  She made a total of 30 payments.  The payments were $97.09, except

that the last payment was $137.15. She paid a total of $2,952.76. FBDLoans.com transferred her loan to ThinkCash. ThinkCash transferred her loan again to Plain Green.

65.     Rosette, Whitford, and McInerney gave Jessica Gingras a payday loan on July 6, 2011 for $1,050. She made a total of 13 payments in the amount of $110.31. She paid a total of $1,434.03. The loan documents indicate that these Defendants charged her an annual percentage interest rate of 198.17%.

66.     Rosette, Whitford, and McInerney gave Jessica Gingras a payday loan on July 24, 2012 for $500. She made two payments for $92.25 before she took out an additional loan for $2,400. She then made payments in the amount of $131.90. She paid a total of $4,801. The loan documents indicate that these Defendants charged her an annual percentage interest rate of 371.82%.

67.     An outstanding balance remains on Ms. Gingras's loan. Ms. Gingras is suffering irreparable injury because if she pays off the loan, she is likely to never see her funds returned from Defendants because they have claimed and likely will claim tribal immunity. Moreover, Ms. Gingras is suffering irreparable injury because her loan continues to be reported to credit rating agencies as a legitimate and open loan. This reporting negatively impacts her ability to obtain financing from other lenders.

68.     Ms. Gingras has suffered these injuries due to the illegal conduct of the Defendants described in this Complaint. A declaration that the loans are illegal and an injunction ordering Defendants to correct their statements concerning the legal nature of these loans and to stop defaming the credit of Ms. Gingras will alleviate the infliction of irreparable harm.

69.     Rosette, Whitford, and McInerney required Jessica Gingras to agree to ACH withdrawals from her bank account before it would give her a loan. Rees and Think Finance

through their control over Rosette, Whitford, and McInerney had automatic access to her bank account and continued to withdraw money from her account even after they had recouped the principal and a reasonable amount of interest.

70.    Jessica Gingras has never been to the Rocky Boy's Reservation.  She applied for the loans at her residence in Vermont.  Rees and Think Finance through their control over Rosette, Whitford, and McInerney wired the money into her account in Vermont.

71.    Rees and Think Finance through their control over Defendants Rosette, Whitford, and McInerney withdrew money from her account in Vermont by ACH withdrawal.

72.    Rees and Think Finance through their control over Rosette, Whitford, and McInerney negotiated the purported and fraudulent contract with Jessica Gingras in Vermont.

73.    Rees and Think Finance through their control over Rosette, Whitford, and McInerney directed their fraudulent representations to Jessica Gingras in Vermont.

74.    None of Plain Green's loan activity actually occurs on the Rocky Boy's Reservation.  Plain Green uses third parties to carry out all of the administrative tasks.  The third party performs all of these tasks off of the reservation.

75.    Rees and Think Finance through their control over Rosette, Whitford, and McInerney have extended similar loans to thousands of people.

<u>Angela Given's Payday Loans from Plain Green</u>

76.    Rosette, Whitford, and McInerney gave Angela Given a number of payday loans.  Because they have blocked access to her Plain Green account, the following descriptions are based on Ms. Given's reconstruction of the loans from other information that is available to her and recently filed loan documents.

77.     Rosette, Whitford, and McInerney gave Angela Given a payday loan on July 19, 2011 for $1,250.  She made payments every two weeks for 26 weeks.  She paid off the loan on July 19, 2012 with a final payment of $197.67.  She paid a total of $2,968.75.  The loan documents indicate that these Defendants charged her an annual percentage interest rate of 198.45%

78.     Rosette, Whitford, and McInerney gave Angela Given a payday loan on July 24, 2012 for $2,000.  The payments were $138.12 every two weeks.  She made 14 payments and paid one lump sum in the amount of $1,801.73 on July 20, 2013.  She paid a total of $3,735.41.  The loan documents indicate that these Defendants charged her an annual percentage interest rate of 159.46%.

79.     Rosette, Whitford, and McInerney gave Angela Given a payday loan on May 20, 2013 for $250.  The payments were $56.43 every two weeks.  She made three payments of $56.43.  She paid off the loan with a lump sum payment of $203.50.  She paid a total of $372.34.  The loan documents indicate these Defendants charged her an annual percentage interest rate of 376.13%.

80.     Rosette, Whitford, and McInerney gave Angela Given a payday loan on July 17, 2013 for $3,000.  The payments were $119.68.  She made 25 payments.  With the 15th payment, she included an extra $600 toward the principal.  She still had five payments remaining when she called Plain Green.  The loan documents indicate that these Defendants charged her an annual percentage interest rate of 59.83%

81.     Angela Given has taken out other loans from Defendants and their predecessors in interest.  A predecessor entity gave Angela Given's borrowing history and contact information to Plain Green for the purpose of evading the law.

82.      Rosette, Whitford, and McInerney required Angela Given to agree to ACH withdrawals from her bank account before they would give her a loan.  They had automatic access to Ms. Given's bank account and continued to withdraw money from her account even after they had recouped the principal and a reasonable amount of interest.

83.      An outstanding balance remains on Ms. Given's last loan.  Ms. Given is suffering irreparable injury because if she pays off the loan, she is likely to never see her funds returned from Defendants because they have claimed and will claim tribal immunity.  Moreover, Ms. Given is suffering irreparable injury because her loan continues to be reported to credit rating agencies as a legitimate and open loan.  This reporting negatively impacts her ability to obtain financing from other lenders.

84.      Ms. Given has suffered these injuries due to the illegal conduct of the Defendants described in this Complaint.  A declaration that the loans are illegal and an injunction ordering Defendants to correct their statements concerning the legal nature of these loans and to stop defaming the credit of Ms. Gingras will alleviate the infliction of irreparable harm.

85.      Angela Given has never been to the Rocky Boy's Reservation.  She applied for the loans at her residence in Vermont.   Rees and Think Finance through their control over Rosette, Whitford, and McInerney wired the money into her account in Vermont.

86.      Rees and Think Finance through their control over Rosette, Whitford, and McInerney withdrew money from Ms. Given's account in Vermont by ACH withdrawal.

87.      Rees and Think Finance through their control over Rosette, Whitford, and McInerney negotiated the purported and fraudulent contract with Ms. Given in Vermont.

88.      Rees and Think Finance through their control over Rosette, Whitford, and McInerney directed their fraudulent representations to Ms. Given in Vermont.

RICO

The Enterprises

89.     The Think Finance Payday Lending Organization, Plain Green, Great Plains Lending (the "Great Plains Enterprise"), and Mobiloans are all enterprises within the meaning of 18 U.S.C. § 1961(4).  As described below, Great Plains Lending and Mobiloans are also schemes to defraud that attempt to take advantage of tribal immunity by associating with Native American tribes.

90.     In or around March 2011, Rees and Think Finance approached the Chippewa Cree Tribe of the Rocky Boy's Reservation about forming a tribal entity to conduct an illegal lending scheme over the Internet.

91.     As part of those negotiations, Rees and Think Finance prepared a term sheet that reflected the essentials of the transaction (the "March 2011 Term Sheet").  (Exhibit A.)  The scope of the enterprise was to be "on a nationwide basis through the internet."  *Id.* at 1.

92.     The March 2011 Term Sheet required that the Tribe adopt new law that would be favorable to Rees and Think Finance and the practice of illegal payday lending.  The March 2011 Term Sheet required that: "The Tribe will adopt a finance code that is acceptable to all parties and provide for the licensing of an arm of the tribe to engage in consumer lending."  *Id.* at 1.

93.     Rees and Think Finance intentionally and willfully dominated the operations of Plain Green.  Other than the sovereignty that they attempted to purchase, Rees and Think Finance provided everything that the enterprise needed to operate.  They provided software to determine whether a particular loan would be profitable.  They provided "risk management, application processing, underwriting assistance, payment processing, and ongoing customer

service support coterminous with the software license agreement and market[ing] and/or identif[ication of] access channels for consumer loans on the Tribe's behalf (jointly 'Services')." Term Sheet at 1.

94.     In his positions as Chief Executive Officer and Chairman of the Board of Think Finance, Defendant Kenneth Rees intentionally and willfully dominated the operations of Plain Green.  He established the plan to create Plain Green.  Defendant Rees also established the web of different companies designed to insulate Think Finance and himself from liability.

95.     In public comments, Defendant Rees has stated that he closed his former company, ThinkCash, because of the burden of complying with various state laws regulating and banning payday lending.  Rees created the Plain Green enterprise to take advantage of the doctrine of tribal immunity for the express purpose of trying to avoid these various state law restrictions.

96.      Rees and Think Finance defined precisely the type of loan Plain Green would offer to customers and the terms on which the loan would be offered.  They required the loans to be an installment loan with a maximum amount of $2,500 and a minimum repayment period of two months and a maximum repayment period of two years.  *Id.* at 1.

97.     The March 2011 Term Sheet created by Rees and Think Finance dictated that Plain Green would charge interests rates that were illegal and usurious.  The interest rates were to vary from an annual percentage rate of 60% to 360%.  *Id.* at 1.

98.      Rees and Think Finance required that Plain Green enter into a relationship with a U.S. bank to process loan transactions using the ACH system.  In addition, they required that Plain Green develop the capacity to process remote checks.  *Id.* at 2.

99.     Rees and Think Finance also directed Plain Green to establish a reserve account to "deal with any regulatory issues, lawsuits or other controversies involving the Tribe or its lending activities."  *Id.* at 2.   Rees and Think Finance, however, did not allow Plain Green to control the account.  Instead, the account was under the control of Jones & Keller, PC, a law firm that the March 2011 Term Sheet required Plain Green to use. *Id.* at 3.

100.    Rees and Think Finance also arranged for 99% of the loans made by Plain Green to be purchased within two days by a Cayman Islands loan servicing company, GPL Servicing, Ltd. ("GPLS").  GPLS was incorporated in February 2011, a month before Think Finance agreed to work with the Chippewa Cree Tribe.  *Id.* at 2.

101.    Rees and Think Finance established GPLS in the Cayman Islands as an offshore haven for funds generated from the RICO enterprise.  The Cayman Islands has a well-known reputation for being an offshore tax and financial haven.

102.    Plain Green pays $100 for every approved borrower that Former Defendant Tailwind Marketing provides.  Rees and Think Finance have said that Tailwind Marketing is one of their entities.  Rees and Think Finance controlled and dominated Tailwind Marketing.

103.    Plain Green pays $5 a month for each active account that TC Decision Sciences administers.  TC Decision Sciences provided services like customer service, verification, and collections of customer accounts for Plain Green.  Rees and Think Finance controlled and dominated TC Decision Sciences.

104.    The March 2011 Term Sheet created by Rees and Think Finance required that Plain Green enter into an attorney client relationship.  It stated that: "Pepper Hamilton, LLP ("Pepper") and Jones & Keller, PC ("J&K") shall be counsel to the Tribe."  *Id.* at 3.

105.    Rosette, Whitford, and McInerney entered into payday lending relationships with banks to process ACH transactions.  Those bank relationships enabled Plain Green to process ACH transactions for Ms. Gingras and Ms. Given.  The ACH transactions involved interstate commerce because they flowed through Rosette, Whitford, and McInerney in Montana, Plaintiffs in Vermont, other targets of the illegal lending scheme in Pennsylvania, Connecticut, and Georgia, and different intermediaries in different parts of the United States.

106.    Plain Green operated a website at https://www.plaingreenloans.com.  The website furthers the illegal financial transactions.  The website allowed individuals to enter information to execute ACH wire transfers to the individual and to debit the person's account in the purported repayment of the illegal debt.  The website involved transactions in interstate commerce.

107.    Rees and Think Finance have established relationships with other Native American Tribes, including the Otoe-Missouria Tribe of Indians located in Red Rock, Oklahoma and the Tunica-Biloxi Tribe of Louisiana.

108.    The Otoe-Missouria Tribe maintained a payday lending website at the web address:  www.greatplainslending.com.  The lending front company was known as Great Plain Lending ("Great Plains Lending").

109.    The Tunica-Biloxi Tribe maintains a payday lending website at the web address:  www.mobiloans.com.  The lending front company is known as Mobiloans.

110.    Great Plains and Mobiloans offered payday loans and other loans at interest rates that are more than double the legal limits set by states.  For example, Great Plains states on its website, under the title "Easy, Affordable Payments": "With a Great Plains loan, you'll repay your loan with easy, affordable installment payments!  Your terms can range from 4 to 15

months, depending on your loan amount, and there's no prepayment penalty. For example, a $500 loan at 448.78% APR, will have 12 bi-weekly payments of $101.29."

111.    Mobiloans offers "lines of credit" that include fixed finance charges and transaction fees. The effective annual percentage rate for these loans is in the hundreds of percent a year.

112.    Plain Green is distinct from Rees, Think Finance, the Sequoia Entities, and the TCV Entities. Despite their actual control of the Plain Green Enterprise, Rees and Think Finance have attempted to create the appearance of separate corporate forms and attempted to distance themselves from the enterprise through the execution of various legal documents. Rees and Think Finance have also created a number of different subsidiaries like Tailwind Marketing, TC Decision Sciences, and TC Loan, to isolate and decrease any legal liability they may face.

<u>Racketeering Activity</u>

113.    Rees and Think Finance intentionally and willfully committed mail fraud and wire fraud through the use of ACH transactions to put money into Plaintiffs' and putative class members' bank accounts, by withdrawing funds from the accounts of Plaintiffs and putative class members while maintaining that those withdrawals were legitimate, by using the Internet to obtain consent to a fraudulent lending agreement and arbitration agreement, and by using the mail to collect payments and communicate with other parts of the Plain Green enterprise.

114.    Defendant Rees and Think Finance had a plan or scheme to defraud thousands of people in a financially challenged position by extending loans at illegally high and extortionate interest rates, while at the same time claiming that the business was legitimate and in compliance with the law. To advance this scheme, Rees and Think Finance established intermediaries like the Plain Green enterprise and Rosette, Whitford, and McInerney to initiate wire transfers and

mailings and to operate the website through which information was collected from the victims of the scheme and purported agreements were exchanged with targets of the scheme. Rees and Think Finance hoped to avoid liability by falsely claiming that they only provided services to Plain Green, when in reality they created the whole enterprise and ran its operation through an assortment of subsidiaries and affiliates like Tailwind Marketing, TC Loan, and TC Decision Sciences.

115.    Rees and Think Finance intended to defraud the victims of the scheme.

116.    The use of the mail and wires was reasonably foreseeable because the form documents that Defendant Rees and Think Finance created specifically called for the use of ACH transactions or mail to make payments on the illegal loans.

117.    The racketeering activity is related and continuous. The thousands of ACH transactions served and continue to serve the central scheme created by Rees and Think Finance to make illegal loans at extortionate interest rates. The thousands of ACH transactions served the common scheme of evading state laws, defrauding people in financially challenged positions, and making profits. The scheme to evade state laws was carried out by Rees and Think Finance through their control and domination of Plain Green and an assortment of subsidiaries and affiliates like Tailwind Marketing, TC Loan, and TC Decision Sciences.

118.    The use of the Plain Green website was also related and continuous. The website was used to deceive the victims into believing that the transactions were legitimate and consistent with the law. The website collects personal data that is then used to take money from individuals who have fallen victim to the fraudulent scheme. The website transmits and transmitted the lending and arbitration agreements to potential victims through the wires.

119.     The website also made a number of misrepresentations.  For example, the website created the impression that the loans are a good option for short term financing by making the claim that the loans are "less expensive than a payday loan."

120.     The website also made a deceptive comparison between the interest rates paid to the Defendants and the payment of various late fees, such as reconnect fees from utilities or overdraft fees from banks.  The website compares its loans, which have repayment periods of months or years, to the reconnect and overdraft fees, which Defendants arbitrarily state have a 14 day repayment period.  This is not an accurate comparison.  The comparison makes the misleading claim that the interest rates charged by the Defendants are actually cheap.  This is false and misleading.

121.     Rees and Think Finance exercised control over and operated all elements of the website.  Their software determined which loan requests generated through the website would be accepted by Plain Green and which loan requests would be declined.

122.     Rees and Think Finance also performed the function of customer service, verification of accounts, and collection of debt on behalf of Plain Green.

123.     Rees and Think Finance exercised control over the drafting of the lending and arbitration agreements through their close association with the attorneys drafting the documents.  Rees and Think Finance did so in order to ensure that victims of Plain Green would opt for ACH transfers to accept money and then Defendants would be able to take money from the victims' bank accounts.  Directing the targets of the fraudulent scheme to choose ACH transfers increases the chances of being able to take money from the targets of the scheme on a regular basis.  With an authorization to take money from the bank accounts, Rees and Think Finance did not have to rely on the targets sending money to them.  In addition, by creating an ACH authorization, Rees

and Think Finance forced the targets of the fraudulent scheme to take many actions to stop the transfers. The additional time needed to complete these tasks meant that Rees and Think Finance could extract additional periodic payments before their authorization was revoked.

124. The March 2011 Term Sheet reflects the control that Rees and Think Finance had over the use of ACH transactions as part of the scheme to defraud and the control that they exercised over the process.

125. Rees and Think Finance used a lending agreement and an arbitration agreement as tools to further deceive Plaintiffs. They used both the website and the ACH transactions in conjunction with each other to further the enterprise and the fraudulent schemes.

126. The illegal activity started in or around March 2011 and continued for over four years.

127. Had Rees and Think Finance not established and ran the corrupt enterprise of Plain Green, they would not have ensnared Plaintiffs in the illegal scheme and obtained Plaintiffs' personal information, including access to their bank accounts, through Plain Green's website.

128. Plaintiffs would not have had their bank accounts debited with illegal ACH transactions in excess of any legal amount of interest but for Rees and Think Finance establishing and running the corrupt enterprise of Plain Green.

129. Plaintiffs were injured when Rees and Think Finance chose to defraud them and collect extortionate and usurious interest rates far in excess of the legal limit. The withdrawal of money by Rees and Think Finance, part of the Racketeering activity and itself a predicate act, caused Plaintiffs' injury.

130.    Rees and Think Finance chose Plaintiffs as the intended targets for the enterprise and the racketeering activity.  Rees and Think Finance targeted Plaintiffs because they met sophisticated underwriting criteria that showed they badly needed money in the short term, but could pay off small amounts over the long term.  Rees and Think Finance used sophisticated computer algorithms to make that determination.

<u>The Arbitration Agreement</u>

131.    Another device that Rees and Think Finance have employed to try to avoid legal liability is a purported arbitration agreement, *see* Exhibit B to Mot. to Dismiss, (the "<u>Purported Arbitration Agreement</u>").  To be clear, none of the Plaintiffs in this action can access any of the records relating to their loans from Plain Green, including any purported arbitration agreement.

132.    That Purported Arbitration Agreement is unenforceable because it is unconscionable, its purpose has been frustrated, and it is fraudulent.

133.    The Purported Arbitration Agreement does not waive and attempts to preserve tribal immunity, and it claims to give all Defendants the ability to void any arbitration award by simply asserting tribal immunity after the fact.  Thus, the Purported Arbitration Agreement provides a remedy that is entirely illusory.

134.    For this reason alone, the Purported Arbitration Agreement is unconscionable. There are, however, several additional indications that the agreement is unconscionable, including the following:

  a. Because the monetary damages suffered by each Plaintiff and other members of the Class is small, the individual incentive to bring an action is extremely limited, particularly since payday loans target people who have few resources to bring a claim.

b.    The doctrine of tribal immunity is a complicated legal doctrine with which the vulnerable people in this Class are unfamiliar.

c.    The terms of the purported contract are not easily discovered on the Plain Green website.  The terms of the Purported Arbitration Agreement change from when a person applies for the loan to when the terms are presented after the application process.  The terms are presented on a take it or leave it basis with no possibility of negotiation.

d.    The parties also have a great imbalance in negotiating leverage. Defendants have highly paid attorneys from Pepper Hamilton LLP and Hogan Lovells US LLP representing them in litigation.  Plaintiffs lack the resources to hire such esteemed counsel.

e.    When there is a hint of litigation, Plain Green cuts off access to the borrower's account, so that the borrower can no longer access the documents that purport to structure the relationship with Plain Green.

f.    The Purported Arbitration Agreement has a provision for shifting costs. That provision effectively prohibits borrowers from making low dollar claims.

g.    Defendants will only agree to have arbitration where the borrower resides if the borrower reaffirms that tribal immunity applies.

135.    A dispute about who is the appropriate chief judge of the Tribe will frustrate the intent of the Purported Arbitration Agreement for a swift resolution.  The Purported Arbitration Agreement states that arbitration procedures are simpler and more limited than court procedures. However, the Purported Arbitration Agreement requires that certain matters be resolved by tribal

courts.  Due to the corruption described below, there is no guarantee that Plaintiffs will receive a fair, complete, simple, or final resolution from the tribal courts.

136.    The Purported Arbitration Agreement is fraudulent and an important part of the scheme to defraud because it aims to deter victims from filing claims and to prevent federal court review of the illegal practices of the enterprise.  The Purported Arbitration Agreements makes several material misstatements of fact.

137.    First, the Purported Arbitration Agreement states that the Lender was Plain Green, LLC.  The March 2011 Term Sheet reveals that this statement is false.  Plain Green only received 4.5% of revenues from 99% of the loans.  Exhibit A at 2.  Plain Green also did not provide any of the actual money that was loaned: "Haynes will arrange to provide funding to the Tribe to enable it to make each of the Loans."  *Id.* at 1.

138.    Second, the Purported Arbitration Agreement represented that the agreement "shall be governed by the law of the Chippewa Cree Tribe."  However, the March 2011 Term Sheet reveals that "law of the Chippewa Cree Tribe" was bought and paid for by non-members of the Tribe and was not "law" at all.  Under the March 2011 Term Sheet, Chippewa Cree law became whatever Rees and Think Finance dictated.  Specifically, the March 2011 Term Sheet stated that: "The Tribe will adopt a finance code that is acceptable to all parties and provide for licensing of an arm of the tribe to engage in consumer lending."  *Id.* at 1.  The March 2011 Term Sheet further provided that the Tribe must "[r]evise the Tribal Credit Transaction Code to provide for a broader array of lending products."  *Id.* at 3.

139.    Third, the Purported Arbitration Agreement states that "[n]either this Agreement nor the Lender is subject to the laws of any state of the United States."  This statement is false because the loans involve off reservation activity and are thus subject to state law.

140.     Rees and Think Finance required that Rosette, Whitford, and McInerney adopt laws that were favorable to Rees and Think Finance and the fraudulent scheme that they sought to perpetrate.  Rosette, Whitford, and McInerney did adopt those laws.

141.     Rosette, Whitford, and McInerney restricted access to the laws of the Chippewa Cree Tribe by not making the law available to the general public through the Internet or other means.  Organizations – like law school libraries – will not provide a copy of the Chippewa Cree law by remote access because Rosette, Whitford, and McInerney have not granted them the right to do so.

142.     Plaintiffs actually believed that the representations in the arbitration agreement and the lending agreement were true, including that their loans were legitimate "short term" loans, that Plain Green was the lender of the funds, and that Plain Green was a legitimate enterprise of the Chippewa Cree Tribe of the Rocky Boy's Reservation.  Plaintiffs also actually believed that their loans were legitimate and legal loans.

143.     Plaintiffs relied on these representations by failing to take legal action against the responsible parties and continuing to make payments on the illegal loans.

144.     The delegation provision of the Purported Arbitration Agreement is also fraudulent.  That provision attempts to include within the scope of the arbitration agreement "any issue concerning the validity, enforceability, or scope of this loan or the Agreement to Arbitrate." Defendants planned that delegation provision to shield Defendants' widespread fraudulent practices from federal court review.  Defendants furthered that plan by purporting to give the right to enforce an arbitration award to the tribal court.  The Purported Arbitration Agreement states that: "The arbitrator will make written findings and the arbitrator's award may be filed with the tribal court.  The arbitration award . . . may be set aside by the tribal court upon judicial

review." By attempting to force any review of the arbitration into tribal court, Rees and Think Finance sought to prevent any federal court from reviewing any arbitration decision. By adding multiple steps prior to federal court review, Rees and Think Finance made any claim against them economically impossible to pursue and tried to ensure that no one could prevail against them. Through the terms of their arrangement with Rosette, Whitford, and McInerney, Rees and Think Finance had the ability to control the Tribe's law and presumably could control actions taken by the tribal court. As a result, any review by the tribal court would be nothing more than a sham.

### Governance of the Tribe and Plain Green

145.    The governance of the Tribe and Plain Green is in substantial flux and turmoil. Widespread corruption has gripped the Tribe. There is a large federal investigation into bribery at the Tribe, and several former tribal officials have been convicted of, or pled guilty to, embezzlement and bribery.

146.    John Chance Houle (former Chairman of Plain Green), Tony James Belcourt, Tammy Kay Leischner, James Howard Eastlick, Mark Craig Leischner, and Haily Lee Belcourt were indicted in a 17-count indictment on April 18, 2013. The indictment relates to the spending of federal funds from the stimulus bill or the American Recovery and Reinvestment Act of 2009 ("ARRA"). At the time, Houle was also a member of the Chippewa Cree Business Committee, which purportedly runs the Tribe. Houle was recently sentenced to five and a half years in prison for his corruption.

147.    In connection with that case, Tony James Belacourt, as an agent of the tribal government (CEO of the Chippewa Cree Construction Company), pled guilty to embezzlement

of federal funds, Tammy Kay Leischner pled guilty to theft from an Indian Tribal Government receiving federal funds, and James Howard Easterlick pled guilty to the same offense.

148.    In a separate case, John Chance Houle pled guilty to embezzling funds from the Chippewa Cree Rodeo Association.  In yet another case, John Chance Houle pled guilty to theft from an Indian tribal organization, obstruction of justice, and impeding a grand jury investigation related to embezzlement and kickback schemes involving the ARRA and Chippewa Cree Rodeo Association funds.  Finally, in a different case, John Chance Houle pled guilty to income tax evasion related to the illegal money that he received from his various embezzlement and bribery schemes.

149.    Interestingly, John Chance Houle signed the March 2011 Term Sheet with Think Finance that established the Plain Green criminal enterprise.

150.    The federal investigation is continuing.

151.    The corruption extends to Plain Green.  In an arbitration involving Plain Green, an arbitrator found that its former Chief Executive Officer, Neal Rosette, and its former Chief Operating Officer, Billi Anne Morsette, were involved in a fraudulent kick-back scheme with an entity called Encore Services, LLC ("Encore").  Encore manages payday lending business for the Tribe.

152.    In the scheme, Encore charged a 15% management fee of all gross revenues of the tribal online lending business, but immediately sent 5% of those revenues to Rosette and Morsette.  The purpose of the structure was to conceal the payments to Rosette or Morsette.

153.    It is presently uncertain who is actually the head of both the Tribe and the Tribal Judiciary.  Ken Blatt-St. Marks had been elected Chairman until the Business Committee dismissed him.  Before he was removed, Blatt-St. Marks fired the acting Chief Judge Micelle

Ereaux and unilaterally appointed Duane Gopher.  In addition, Blatt-St. Marks also apparently terminated several other judges of the tribal courts.

154.    Based on the actions with respect to the Chief Judge and other serious charges of embezzlement, the Business Committee removed Blatt-St. Marks on March 2, 2015.

155.    Blatt-St. Marks won election for a fourth time on June 30, 2015, but it remains unclear if the Business Committee will attempt to remove him again.

156.    The Tribe has apparently tried to remove Blatt-St. Marks in the past.  In March 2013, the Business Committee fired him, but the United States Department of the Interior said that the Tribe had to reinstate him because he was protected by federal whistleblower statutes.

157.    The question of who is actually running the Tribe and its judicial system is in flux and is not likely to be resolved in the near future.

<u>Unlawful Debt</u>

158.    The debts incurred by Ms. Given and Ms. Gingras are unenforceable under Vermont law.  The interest rates on the debt that they incurred exceed the Vermont limit under 9 V.S.A. § 41a.  In fact, the interest charged was more than twice the interest rate allowed under Vermont law.

159.    Other jurisdictions have limits on the amount of interest that a lender may charge. *See*, *e.g.*, Conn. Gen. Stat. § 36a-563; Md. Code Ann. Com. Law§ 12-306; 209 Mass. Code Regs. § 26.01; N.C. Gen. Stat. § 53-173; N.H. Rev. Stat. Ann. § 399-A:12.

160.    The interest rates charged to class members exceed the rate caps in these states by more than twice the legal limit.

161.    Plain Green is in the business of lending money at a usurious rate.  The March 2011 Term Sheet demonstrates that Plain Green's entire existence is for the purpose of lending at

usurious rates with the goal of avoiding state laws related to usury. Plain Green's website demonstrates that it is continuing in the business of lending at usurious rates. The website states that Plain Green lends at rates of 299.17 to 378.95% for first time borrowers. The Plain Green website details how its other loans range from 60% to 378.95% based on the amount of money taken out.

162.    Ms. Given and Ms. Gingras were injured in their property by the collection of unlawful debt in violation of 18 U.S.C. § 1962(c) in that Defendants took their money from them through ACH transactions to pay loans that were illegal under Vermont law.

163.    Each of the Defendants was associated with the enterprise through the collection of unlawful debt as described below.

164.    Think Finance created the entire enterprise and continues to run all aspects of the enterprise through a number of shell companies, including the companies listed below.

165.    At the direction of Think Finance and Rees, TC Decision Sciences provides customer service, verification, and collections of customer accounts.

166.    At the direction of Think Finance and Rees, Tailwind Marketing provides information on potential targets for the illegal lending scheme. As discussed above, Rosette, Whitford, and McInerney pay Tailwind Marketing a fee for each of the targets it provides to the enterprise.

167.    Defendants Sequoia and TCV provided money to Think Finance to obtain an ownership interest in Think Finance. Sequoia and TCV exerted control over Think Finance and directed the affairs of the Enterprises. Sequoia and TCV were fully aware of the practices of the Enterprises and knew that the practices violated the law. Sequoia and TCV do not make

investments without substantial due diligence into their investments, including legal review of the activities of their investment vehicle.

168.    Sequoia and TCV executed a series of agreements that documented their relationship with Rees and Think Finance.  They have concealed these arrangements through confidentiality clauses in the agreements.  Sequoia and TCV have refused to comment on their role in the RICO Enterprises when people have asked questions about it.

<u>Class Allegations</u>

169.    Plaintiffs bring this action on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a) and 23(b)(1), (b)(2), and (b)(3) on behalf of all members of the following Class:

170.    All persons who took out payday loans from Defendants.

171.    Plaintiffs do not know the exact number of class members because such information is in the exclusive control of Defendants.  Based on information and belief and information obtained from publicly available sources, Plaintiffs believe that there are thousands of members of the Class as a whole.  The exact number of class members and their identities is known or may be ascertained by Defendants.

172.    The Class is so numerous that joinder of all members is impracticable.

173.    There are questions of law and fact common to the Class, including:

    a.    Whether Defendants have a practice of investigating a borrower's ability to repay a loan before extending credit;

    b.    Whether Defendants set the periodic repayment amounts to maximize collection of interest on loans;

c.  Whether the interest rates charged by Defendants violate the CFPA's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]";

d.  Whether Defendants' other payday lending practices violated the CFPA's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]";

e.  Whether Plain Green, LLC is an enterprise;

f.  Whether Rees and Think Finance engaged and/or are engaging in a pattern of racketeering in violation of 18 U.S.C. § 1962(c);

g.  Whether Rees, Think Finance, TC Loan, TC Decision Sciences, Tailwind Marketing, Sequoia, and Technology Crossover engaged and/or are engaging in the collection of an unlawful debt in violation of 18 U.S.C. § 1962;

h.  Whether Defendants are liable to Plaintiffs and other class members for disgorgement or other equitable remedies and, if so, in what amount; and

i.  Whether Defendants are liable to Plaintiffs and other class members for reasonable attorney's fees.

174.  Plaintiffs are members of the Class.  Their claims are typical of the claims of the Class, and they will fairly and adequately protect the interests of the Class.

175.  Plaintiffs are represented by counsel who is competent and experienced in handling *Ex Parte Young* cases, financial actions, and class action litigation.

176.  The prosecution of separate actions by individual members of the Class would create a risk that adjudications with respect to individual members would, as a practical matter, be dispositive of the interests of the other members who are not parties to the individual

adjudications, or it would substantially impair or impede the class members' ability to protect their interests.

177.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

178.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist. Prosecution of class member claims as a class action will eliminate the possibility of repetitious litigation.  Treatment of the controversy as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. This class action presents no difficulties in management that would preclude maintenance as a class action.

## STATEMENT OF ADDITIONAL FACTS

A.    Think Finance Knew That The Tribal Loans Were Illegal And That Think Finance Could Be Found Liable.

183.    Think Finance knew that the loans issued in the names of the tribal lenders were illegal under state law.  Think Finance's General Counsel said as much: "To be honest, the loans today violate state consumer finance laws."  TF-VA0734291.  (*See* M-1200.)

184.    In April 2014, Think Finance estimated that there was a "60%" probability that "Courts [would] determine that state law applies to tribal lending operations."  TF-VA0727512 at 514.  (*See* M-1172.)  In March 2014, there was a California State Bar panel where an enforcement attorney for the Consumer Financial Protection Bureau ("CFPB"), who was involved in an investigation of Think Finance, stated that tribal lending was "abusive" and "in

violation of state law." TF-VA0705604. (*See* M-229.)[4] Think Finance senior executives

discussed these statements that were made by the enforcement attorney.

185.    Think Finance understood that it had liability for "aiding and abetting" tribal

lending. In a December 26, 2012 presentation, Mr. Jason Harvison, Chief Operating Officer of

Think Finance, said he was "concern[ed] that although tribes have sovereign immunity, service

providers (*e.g.* us) may have potential liability" and that "States may claim that the loans are

illegal (even if tribal lenders have sovereign protection)." TF-VA0734743. (*See* M-1227.)[5]

--------------------------------------------------

[4]    *See also* TK-PA-308918 (M-643) (Rees forwarding Michelle Nguyen an article about
the "CT lawsuit with Otoe Missouria" and seeking confirmation that Think Finance's interest
rates were really between 200%-450%); TF-VA0520713 (M-1013) (email thread between Think
Finance employees and Rick Eckman (Pepper Hamilton) about all the "letters" they've gotten
from Massachusetts, discussing threatened litigation and how "they are not backing down about
the need to register"); TF-PA-040695 (M-564) (internal email of list of "no loan states");
TF-VA0305167 (M-967) (November 25, 2014 email thread discussing decision to stop lending
in Pennsylvania).

[5]    Victory Park Capital ("VPC"), a provider of capital for the illegal enterprise, also knew
about the illegality of the interest rates being charged and was involved in creating a list of states
where loans would not be issued called the "no-state" list. *See*, *e.g.*, TF-PA-244554 at 556
(M-451) (September 2013 e-mail thread discussing feedback from VPC on "no state" decisions);
TF-PA-267158 (M-193 & M-404) & (April 2013 emails between VPC and Think Finance
discussing the no-state list and the decision to not exit California; Lutes says "with yesterday's
article we will take another look"); GPLP00520229 (M-1101) (December 2013 email thread
between VPC and investors, explaining regulatory actions against tribal lenders and the Board's
decision to stop originating new customer loans); GPLP00523704 (M-1102) (VPC investor
update for quarter ending Dec. 31, 2013, attributing Think Finance's declining revenue to
increased regulatory scrutiny); GPLP00526002 at 003 (M-1107) (VPC weekly update,
discussing pending litigation in New York and VPC's discomfort with issuing new loans in New
York in the absence of a favorable ruling); GPLP00102112 at 147 (M-523) (VPC quarterly
report, describing regulatory action against Think Finance); GPLP00246107 at 130 (M-526)
(same).

Other investors and banks also expressed concerns about the legality of tribal lending and
how ongoing litigation in other tribal lending matters would impact Think Finance. *See*
GPLP00085131 (M-119) (August 13, 2013 email thread between Think Finance and Active
Investment Strategies, in which investor asks for an update on the impact of recent news stories
covering tribal lending litigation); GPLP00084079 (M-120) (email thread between Think
Finance and SF Capital Group asking if Think Finance had been "affected by any of the recent

186.    Think Finance had extensive knowledge of the restrictions imposed by state law around the country.  Prior to launching its Great Plains Lending and Plain Green tribal lending products, Think Finance offered a direct lending product called Payday One. Dep-1, Smith Penn. Dep. at 21.

187.    The Payday One product was offered "in a state-specific way to respond to the different laws that existed across the country."  Dep-1, Smith Penn. Dep. at 23-24.

188.    One of the jobs of the Compliance Department at Think Finance was to make sure that the loan products Think Finance was offering in a state conformed to the laws of that state. Dep-1, Smith Penn. Dep. at 24.  Accordingly, the people who worked in the Compliance Department would have to familiarize themselves with the state usury laws and licensing requirements.  Dep-1, Smith Penn. Dep. at 24-26.

189.    Payday One was not offered in every state.  Dep-1, Smith Penn. Dep. at 28.

190.    However, when Think Finance began issuing tribal products, it did not take the same degree of care in analyzing state law.  Mr. Stephen Smith, the head of the Think Finance Compliance Department, cannot recall any compliance training with regard to tribal sovereignty or tribal law.  Dep-1, Smith Penn. Dep. at 72-73.

---

noise" regarding litigation in New York against Western Sky); TF-PA-228363 (M-141 & M-405) (email thread between TF and BMO discussing the "no state" list and an article on a recent lawsuit against U.S. Bank for ACH processing of payday loans); TF-VA0428977 at 978 (M-150) (memo to Board members (which includes investor representatives) regarding February 2014 performance that discusses ongoing litigation with CFPB and Bank of Montreal's decision to stop providing ACH processing for tribal lending); GPLP00102160 (M-164) (email thread between Think Finance and VPC regarding California's enforcement actions against banks processing unlicensed lenders asking why Think Finance chose to exit New York but not California); TF-PA-678633 (M-184) (email thread between Think Finance and VPC regarding concerns of VPC's "coinvestors" which Lutes describes as "prep questions for the call with Abu Dhabi tomorrow").

191.     In all his years at Think Finance, Mr. Smith cannot recall any in-house training for the compliance team on the regulatory environment applicable to Native American tribes. Dep-1, Smith Penn. Dep. at 80-81.

192.     Think Finance also made the decision not to issue tribal lending products in certain states.  Dep-2, Raining Bird Dep. at 129:25-130:16.  Think Finance did that because "they specifically did not want to deal with the attorney general in that state, or they didn't want to be challenged by that state."  Dep-2, Raining Bird Dep. at 130:10-13.

193.     Think Finance and GPLS effectively controlled whether loans were made in certain states.  Dep-1, Smith Penn. Dep. at 183, 185-186.  Think Finance prepared the "No-State" lists that specified in which states loans would not be offered.  *Id.* at 190, 194-196.  In fact, Think Finance drafted the communications to customers to let them know that they could not apply for a loan in a particular state.  TF-VA030516. (*See* M-67.)

194.     In deciding whether to make a product available in a particular state, Think Finance considered "State law."  TF-VA0719157.  (*See* M-1228.)  In addition, Think Finance considered the regulatory environment that existed in the state.  According to Think Finance, one of the factors it considered was "how hostile are Key State regulators (banking department, AG, governor) or the state legislature."  *Id.*

195.     As part of its ongoing effort to avoid detection of its violations of state law, Think Finance then identified a strategy to "[s]hift from tribal LLC as lender to tribal agency" starting in approximately December 2012.  TF-VA0734744.  (*See* M-1206.)

196.     Think Finance also received complaints from consumers about the legality of tribal loans.  This was the largest category of consumer complaints.  TF-VA019417 (*see* M-1229); *see also* TF-VA042063 (M-540); TF-VA019322 (M-550); Dep-3, Smith Dep. at 203-204.

B.    Tribal Lending Was Launched When Think Finance Sought To Replace The
Lucrative, High-Interest Lending Business It Had Established With FBD.

197.    In October 2010, FBD notified Think Finance that it was terminating its program.
Dep-4, Rees Penn. Dep. at 156.  The FBD program, branded as "ThinkCash," represented a
"very significant part of the revenue and net income of the business."  Dep-4, Rees Penn. Dep. at
157.

198.    Rees understood that the FDIC "forced" FBD to "terminate" its relationship with
Think Finance.  TF-VA0230475.  (*See* M-144.)

199.    Immediately following the termination of the FBD business, the executive team at
Think Finance assembled over the weekend to find a replacement for the FBD business.  One of
the options they considered was tribal lending.  Dep-4, Rees Penn. Dep. at 157.

200.    Think Finance began looking for internet websites/URL addresses and product
names for tribal lending products prior to meeting with any tribal clients.  Dep-4, Rees Penn.
Dep. at 163.  Think Finance was "in full scramble mode to be able to get any [tribal lending
operations] that were finally launched up and operational as fast as possible."  Dep-4, Rees Penn.
Dep. at 169.

201.    Think Finance presented the idea of a tribal lending organization to potentially
cooperative tribes as a fully "turnkey" operation that would require little, if any substantive
participation from the tribe and would present "no risk of loss" to the tribe.  TF-VA0290544 at
545.  (*See* M-88.)

202.    Think Finance made an early presentation about its idea for Great Plains Lending
to the Otoe-Missouria Tribe in January 2011.

203.    Think Finance offered to bring its existing customers from ThinkCash to the first
tribal lender that signed a deal with Think Finance. Dep-4, Rees Penn. Dep. at 264-65.  In

addition, Think Finance brought a ready source of lending capital for the operation from Victory

Park Capital ("VPC" or "Victory Park"), the Chicago-based hedge fund that had been funding

the purchase of "participation interests" for Think Finance under the FBD arrangement. Dep-4,

Rees Penn. Dep. at 170-71.

204.    To set up VPC's investment in the tribal lending enterprise, GPLS was

established. *See* Sixth Amended and Restated Memorandum of Association of GPL Servicing,

LTD dated February 27, 2015. GPL00595637 at 639. (*See* M-16.)

205.    GPLS is a special purpose vehicle domiciled in the Cayman Islands that was

created to facilitate the flow of funds among the lending entities and Think Finance. (*See* M-17.)

206.    GPLS is not licensed to make consumer loans in any state in the United States of

America. (*See* M-15.)

207.    A document entitled "VPC Funding Deal" states that:

> In July 2010 VPC provided a $100 million commitment at 20% to
> participate in the Universal Fund alongside $50 million of
> previously funded friends and family money. The Universal Fund
> purchased installment loan participations that were originated by the
> First Bank of Delaware using the marketing and technology services
> provided by Think Finance. On December 31, 2010, the bank
> regulators asked FBD to stop originating installment loans.

TF-VA0156848. (*See* M-18.)

208.    The VPC Funding Deal document states that: "In Q2 2011 Think Finance began

partnering with various tribes that originated similar installment loans under the sovereign

lending model. VPC created the GPLS Fund to purchase loan participations from these tribes.

VPC is the sole manager of this fund." *Id.*

209.    The document also states that: "GPLS Fund terms – VPC provides debt financing

to GPLS and owns GPLS. Think Finance was contracted by GPLS to serve as administrator for

the fund (handling the accounting and banking, and also providing a guaranty of the loan portfolio – buying charged off loans at full value). GPLS/VPC receives a fixed 20% return on its invested capital and in return Think Finance as admin receives all of the remaining net income of the fund as an admin fee." *Id.*

210. In a presentation entitled "Great Plains Lending Meeting" dated January 12, 2011, before the Great Plains Lending entity was formed, Think Finance presented the underlying plan to create a nationwide online lending RICO enterprise (the "January 12, 2011 Great Plains Presentation"). TF-VA0640885. (*See* M-19.)

211.    One slide in the January 12, 2011 Great Plains Presentation detailed a fully formed structure for the tribal lending scheme.  The slide, entitled "Great Plains Lending Structure," set forth the following structure:



*Id.* at TF-VA0640890.  This slide demonstrates the structure and function of Think Finance and their co-conspirators' RICO enterprise as it relates to the Great Plains Lending product.

212.    This slide states that VPC would receive a "Fixed Return" while TF-Admin. Services would receive "Fund net income as monthly Admin. Fee."  *Id.*

213.    In a January 12, 2011 Great Plains Presentation slide entitled "ACH and Settlement," Think Finance states: "Outbound ACH (credits/funding and any related returns or

rescinds) will be from Great Plains Lending, LLC (Tribal Entity) Initially using FBD as processor." *Id.* at 894.

214.    The "ACH and Settlement" slide also states: "Inbound ACH (debits/collections and related returns will be to GPL Servicing, LLC (Purchasing Entity)." *Id.*

215.    The January 12, 2011 Great Plains Presentation also has a slide detailing the "Next Steps" that needed to be taken to complete the plan to create a nationwide online lending RICO enterprise. *Id.* at 896. One of the "Next Steps" was to "Create Tribal entity – Great Plains Lending, LLC." *Id.* Another "Next Step" was to "Review/approve consumer legal documents and footer disclosures." *Id.*

216.    Months before Great Plains was created as a tribal entity, the January 12, 2011 Great Plains Presentation also featured a screenshot of the Great Plains Lending website. *Id.* at 888.

217.    A document entitled "Great Plains Lending:  Flow of Funds for Ongoing Loan Originations and Sales" outlined the flow of funds for loans involving Great Plains Lending (the "Flow of Funds Document"). TF-VA0373124. (*See* M-20.)

218.    The Flow of Funds Document states that: "GPL Servicing Ltd. ('GPLS') will deposit $1 million into a bank account ('Funding Account') owned by Great Plains Lending, Inc. ('GP Lending,' a tribal entity). This amount is anticipated to cover 3 days of loan origination as well as the 1% ownership that GP Lending will retain. The amount of money in the Funding Account will be adjusted as needed as the loan portfolio grows." *Id.* at 124. (*See* M-20.)

219.    The Flow of Funds Documents states that: "GP Lending will begin to originate loans on a daily basis. The loans will fund out of their bank account to customer bank accounts via nightly ACH processing." *Id.* (*See* M-20.)

220.     The Flow of Funds Document states that: "Two days after customer loans are approved, GP Lending will sell a 99% participation in those loans at book value to GPLS, which will deposit money into GP Lending's Funding Account (for the amount of the loan participations purchased that day).  The proceeds from selling the participation interests will then be used by GP Lending to originate additional loans."  *Id.*  (*See* M-20.)

221.     The Flow of Funds Document also notes that: "Because of the time lags between when the reimbursements are made from GPLS and the bills are due to the Think Finance entities, there will be no out-of-pocket cash required from GP Lending."  *Id.*  (*See* M-20.)

D.     Think Finance Co-Opted Another Tribal Lending Entity, Plain Green, To Serve Think Finance's Goals.

222.     After initial unsuccessful negotiations with the MacFarlane group, an entity that purportedly provided consulting services to the Otoe-Missouria Tribe, Think Finance shifted its focus to the Chippewa Cree Tribe. Dep-4, Rees Penn. Dep. at 181-184.

223.     In March 2011, Rees and Think Finance approached the Chippewa Cree Tribe about forming a tribal entity to conduct an enterprise that would offer loans to consumers and operate "on a nationwide basis through the internet."  TF-BK-VA_FL_CA00003268 (*see* M-30); M-31 at ¶78.

224.     Think Finance came up with the name Plain Green.  Dep-4, Rees Penn. Dep. at 223-24.

225.     Because Plain Green was the first tribal entity to sign on with Think Finance, Plain Green received the benefit of marketing efforts directed to Think Finance's former ThinkCash customers.  Dep-4, Rees Penn. Dep. at 264-266.

1.    Think Finance's Control Over Plain Green and Chippewa Cree Officials.

226.    On March 10, 2011, Neal Rosette, the former CEO of Plain Green, demanded in an email that Think Finance wire $10,000 by March 11, 2011: "My team (me, Billi Anne, and Robin) have worked feverishly to get our end of this deal completed (at least our deliverables) by Friday March 11, 2011 as promised."  Rosette continued: "Therefore, I am again requesting that once you receive the Term Sheet (expected to be signed by my Board, scanned, and emailed to all parties by no later than 12:00 pm MST today) that you release 50% ($10,000) of the agreed upon development fee no later than March 11, 2011 with the final 50% released on the closing ceremony date." Haynes0001407 (*See* M-363.)  The United States Department of Justice indicted Neal Rosette and Billi Anne Raining Bird Morsette for accepting bribes.

227.    Significantly, it was Think Finance, not Plain Green, that paid those bribes, couched as a "development fee."  Dep-7, Haynes Dep. at 211-216.

228.    Neal Rosette testified that he and Billi Anne Raining Bird Morsette ("Raining Bird") received bribes paid by Think Finance for completing the Think Finance/Plain Green deal.  Dep-8, Rosette Dep. at 195-196.  A member of the RICO enterprise and co-conspirator with Think Finance, Steven Haynes, confirmed that Think Finance made payments of $10,000 each to Raining Bird and Rosette.  Dep-7, Haynes Dep. at 211-216.  Haynes also confirmed that Think Finance approved the reimbursement to him for making those payments.  *See id.*

229.    Raining Bird pled guilty to bribery and tax evasion on November 12, 2015.  Plea Agreement of Billi Anne Raining Bird Morsette, *United States v. Rosette, et al.*, No. 4:15-cr-00061-BMM (D. Mont. Nov. 12, 2015), Doc. No. 31.  (*See* M-167.)  Rosette similarly pled guilty to bribery and tax evasion on November 16, 2015.  Plea Agreement of Neal Paul Rosette,

*United States v. Rosette, et al.*, No. 4:15-cr-00061-BMM (D. Mont. Nov. 16, 2015), Doc. No. 32.

(*See* M-168.)

230.    According to Rosette's Offer of Proof, submitted in connection with his guilty

plea: "On March 11, 2011, the day the Tribe created Plain Green, an entity associated with

Encore wired $10,000 to the FACR account."  (*See* M-169.)  In the transcript of the plea hearing,

Rosette agreed that the Offer of Proof represented the facts that formed the basis of his guilty

plea.  Dep-8, Rosette Dep. at 161-162, 165-167; *see also* M-497; M-498; M-499; M-500; M-501;

M-502.

231.    Rosette also stated, in a sworn affidavit: "The primary reason that Think Finance,

Inc. was so interested in partnering with an Indian Tribe was to circumvent the various State laws

governing interest rates on payday and other sub-prime loans."  M-32 at ¶7.

232.    In addition to paying bribes to secure the cooperation of Chippewa Cree officials

in connection with the formation of the Plain Green Enterprise, Think Finance controlled the

management of Plain Green.  Neal Rosette, the first CEO of Plain Green, feared for the loss of

his job.  Dep-8, Rosette Dep. at 70.  As a result, Rosette simply approved anything that Think

Finance asked him to approve.  Dep-8, Rosette Dep. at 99-100; 121-122.

233.    Plain Green had no role in the underwriting, origination, servicing, marketing, or

collection of the loans.  Dep-2, Raining Bird Dep. at 141:9-15.

234.    Raining Bird confirmed that the arrangement with Think Finance was nothing

more than a "rent-a-tribe" scheme.  She confirmed that Plain Green's lack of a role in the

underwriting, origination, servicing, marketing, or collection of the loans formed the basis for

her statement that Plain Green was a rent-a-tribe scheme.  Dep-2, Raining Bird Dep. at 140:21-

141:1.

235.    In response to a question from Think Finance's attorney, Raining Bird agreed that when she "worked at Plain Green [she] and other members of the Tribe were mere figure heads, who had no involvement in or control over any aspect of the business of Plain Green. . . ." Dep-2, Raining Bird Dep. at 52:10-55:3.

236.    At her deposition, Raining Bird was asked, "When you say you had control but you didn't what do you mean?" She responded that:

> If we didn't approve something then our bosses would be called and, you know, it would just come down on us. If we took our time in getting something signed, or if we didn't get something done within a certain timeframe or whatever timeframe they – we were given, then our bosses would be called, which was the tribal council or the Board, and then we would have pressure put on us by them.

*Id.* at 54:16-24.

237.    Raining Bird also testified that she had no idea who GPLS was or what the document even meant when she signed the Participation Agreement, the agreement between Plain Green and GPLS. Dep-2, Raining Bird Dep. at 106. Raining Bird felt that GPLS was merely a "front" that was "an unnecessary piece of the business" that had no apparent purpose other than that "it was something done . . . so it looked continued [sic] to be legitimate." Raining Bird Dep. at 107:7-108:7.

238.    Raining Bird also testified about the Tribe's desire to take more control over Plain Green. She stated that Think Finance did not share the Chippewa Cree Tribe's vision of the tribe taking more control over the lending enterprise. Dep-2, Raining Bird Dep. at 83-85. The Tribe tried to increase its share of the revenue. The Tribe "tried to negotiate [to get more than] the four and a half percent [revenue split but] . . . that wasn't going to happen." Dep-2, Raining Bird Dep. at 84:9-11. Raining Bird testified that: "Think Finance actually wanted to keep the Tribe in the dark so [the tribal members] could not take the business over." Dep-2, Raining Bird Dep. at

85:18-22. Raining Bird felt that Think Finance was "going to use the Tribe temporarily to make as much money as they could, and then move onto another tribe. . . ." Dep-2, Raining Bird Dep. at 86.

239.    Think Finance's control over the Tribe and Plain Green can be seen in numerous incidents. For example, former CEO Neal Rosette tried to test whether he actually had the authority to deny a requested change to a Plain Green policy. Dep-2, Raining Bird Dep. at 158-160. When Think Finance heard about Rosette's action, Jason Harvison, the Chief Operating Officer of Think Finance, called the Plain Green Board. Rosette and Raining Bird could not deny the policy change and "ended up having to . . . approve it." *Id.* at 159.

240.    Think Finance also threatened to terminate its relationship with the Chippewa Cree when the Chairman of the Tribe, Ken Blatt-St. Marks ("St. Marks"), stated that he was going to bring negative information to the CFPB. Dep-2, Raining Bird Dep. at 142-156. According to Raining Bird, "if Mr. Blatt-St. Marks reported any information to the CFPB, Mr. Rees said that would cause Think Finance to stop doing business with Plain Green." Dep-2, Raining Bird Dep. at 151-152.

241.    St. Marks reported information to the federal government about the Plain Green operation.

242.    In March 2013, the Tribe's Business Committee fired St. Marks, but the United States Department of the Interior found that the Tribe had to reinstate St. Marks because he was protected by federal whistleblower statutes. M-38 at 5. According to an anonymous witness interviewed by the Department of the Interior, "the Business Committee removed Blatt-St. Marks as Chairman to continue to hide their wrong doings." M-39 at 4; *see also* M-37 at ¶8. The Ninth Circuit recently affirmed the award of damages based on the retaliation against St.

Marks.  *See Chippewa Cree Tribe of Rocky Boy's Reservation, Montana v. U.S. Dep't of Interior*,

900 F.3d 1152, 1155 (9th Cir. 2018).

243.    According to a sworn affidavit of Neal Rosette, Think Finance directed the ouster

of St, Marks, Chairman of the Tribe's Business Committee, after St. Marks questioned the

division of Plain Green's profits.  (*See* M-32 at ¶¶9-10.)  Mr. Rosette stated in his affidavit:

> After Chairman St. Marks' remarks, Think Finance Inc. met with tribal council members and told them that Chairman St. Marks needed to be removed from office or Think Finance Inc. would pull out of the business arrangement.  Think Finance, Inc. specifically instructed the tribal council members to impeach Chairman St. Marks.  I have personal knowledge of this because it was revealed to me by John "Chance" Houle prior to Chairman St. Marks being impeached the first time.  After Mr. Houle revealed that information to me, Chairman St. Marks was impeached.

*Id.* at ¶10; *see also* M-37 at ¶8.

244.    An interview of a former Chippewa Cree tribal judge conducted by the Federal

Bureau of Investigation ("FBI") and the Office of the Inspector General for the United States

Department of the Interior demonstrates that the Chippewa Cree judici – which, pursuant to the

arbitration provisions in Plain Green Loan agreements, purports to have authority over consumer

borrowers' claims involving their loans – is neither independent nor functional.  M-37 at ¶9.  The

former Chippewa Cree tribal judge stated that when he was deciding whether to issue a TRO

related to the removal of St. Marks, "he feared retaliation from both sides at the time – the

Business Committee and St. Marks – because both could do harm to him job-wise."  *Id.*; M-40 at

2.  The former Chippewa Cree tribal judge said that "the removal of St. Marks as Chairman

should never have been effective because the Business Committee violated the CCT [Chippewa

Cree Tribe] Constitution."  M-40 at 2.  However, the Chippewa Cree tribal judge entered the

order removing St. Marks even though he thought it was improper and unconstitutional because

he feared retaliation.  *Id.*  Think Finance was aware of this issue.  TF-VA0734474.  (*See* M-1230.)  Tellingly, the Tribe's attorney openly admitted the true intent of the operation to get rid of St. Marks: "We need to get away from any hint of retaliation."  *Id.*

245.    Another example of Think Finance's control over Plain Green is the firing of Bobbi Favel, a compliance officer for Plain Green.  Favel was fired "for acting outside the scope of her authority."  Dep-9, Favel Dep. at 57-58.  Think Finance was directly involved in this firing.  Prior to Favel's firing, a Think Finance employee, Michelle Nguyen, told Favel "to stop worrying about all the other parts of the business and get her stuff in order [in] Compliance."  TF-VA0734734. (*See* M-938.)  Think Finance's General Counsel, Sarah Cutrona, reported to Raining Bird that Favel was "undermin[ing] your authority as the CEO as well as any supervisor in the call center."  TFBK-NC-000162.  (*See* M-937.)  Cutrona then reported on a conversation that Favel had with an employee of Think Finance.  In that conversation, Favel apparently raised a number of issues that concerned her about how Think Finance was operating the call center on the reservation.  Cutrona then concluded that each issue raised by Favel was "not compliance."  TFBK-NC-000162 (*see* M-937); *see also* TF-VA0734734 (M-938).  In fact, Cutrona wanted Favel fired because of her association with St. Marks.  Dep-2, Raining Bird Dep. at 153-154.  After all the lobbying by the General Counsel of Think Finance, Raining Bird fired Favel.

246.    Think Finance attempted to gain even more control over Plain Green by initiating a compliance audit by Charles River Associates ("CRA").  Think Finance determined who would conduct the "compliance" audit, requested a proposal for the "compliance" audit from CRA, and put CRA in contact with Pepper Hamilton, LLP ("Pepper Hamilton"), the Tribe's nominal attorneys.  Dep-3, Smith Dep. at 116–117; TF-PA-614166 (*see* M-536).  In an August 22, 2012 letter addressed to Stephen Smith of Think Finance, CRA wrote: "Dear Mr. Smith, Thank you for

providing Charles River Associates ("CRA") with this opportunity to assist the Chippewa Cree

Tribe (the "Tribe") with its compliance audit program.  We are pleased to submit our proposal,

which we believe conveys our enthusiasm, our commitment and our qualifications to serve **you**."

*Id.* at 180 (emphasis added). (*See* M-536.)

247.    The results of the "compliance" audit showed that Plain Green was not in control

of the lending activities.  In assessing the risk rating for Plain Green, CRA found that nearly all

the compliance activities at Plain Green were "high risk," including the following:

- "The board is not reviewing complaint reporting;"

- "Key management positions do not exist;"

- "A documented approval process does not exist requiring the Board of
Directors to periodically review and approve PGL policies;"

- "A formal program for monitoring consumer complaints does not exist
(complaints are monitored by TCDS);"

- "An independent Compliance Audit function, which follows the standards
prescribed by the Institute of Internal Auditors Professional Practices Framework, does
not exist;" and

- "Management oversight controls have not been implemented,
consequently, Management does not have full access to the loan system and is unable to
review account status details."

TF-VA0608525 (*see* M-538); *see also* TF-VA0366847 (M-537).

248.    On March 19, 2013, Raining Bird practically begged Think Finance not to take

negative action as a result of the CRA audit: "The tribe does not want and cannot afford to lose

this project!"  TF-VA0733316 at 317.  (*See* M-936.)  Raining Bird was particularly concerned

with direct conversations that CRA was having with Think Finance staff in their cars outside the presence of Plain Green: "They are currently sitting in their car taking a call from TF-staff regarding the concerns with the current state of the tribal council." *Id.* She ended her email with a plea: "Please contact me if there is something I can be doing or if there is anything you need from me that would be helpful and assist in alleviating the pressure on TF-and PG." *Id.*

249.    After the "compliance audit" began, CRA delivered a proposal on April 8, 2013 for a "forensic audit." This proposal was addressed to Richard Eckman of Pepper Hamilton. TF-PA-614166 at 175. (*See* M-536.) Pepper Hamilton was the firm handpicked by Think Finance for the Tribe. *See* March 2011 Term Sheet (M-30); Rosette Aff. ¶¶11-12 (M-32); Dep-8, Rosette Dep. at 32-33.

250.    Think Finance initially paid CRA for the cost of the forensic audit. TF-VA0583784 (*see* M-1245); *see* also TF-VA0583465 (M-1263).

251.    Think Finance continued to be intimately involved in the process of the forensic audit. To prepare for an April 2013 meeting with Plain Green to discuss the results of the forensic audit, Think Finance employees Jason Harvison and Michelle Nguyen drafted a PowerPoint presentation for Plain Green on April 16 and 17, 2013 that discussed the forensic audit. TF-VA092816. (*See* M-1236.) This PowerPoint summarized the forensic audit and who was responsible for providing the information. *Id.* at 817-820.

252.    The PowerPoint discussed how to minimize the risk of a finding that Think Finance was the "true lender." *Id.* at 824-29. One slide asked: "How is 'True Lender' risk mitigated today?'" *Id.* at 827. The next slide discussed "Opportunities to improve." *Id.* at 828. The very first item was "Increased Oversight by Tribes." In that section, it listed "Tribal management team (CEO, CRO, COO)." *Id.* Plain Green only had a CEO; it did not have a CRO

or COO.  Ironically, in a section purportedly about increasing tribal control, Think Finance was

dictating to Plain Green who it had to hire for its operations.  Finally, one of the agenda items

was to "Eliminate TF-from operations activities (fraud & complaint management)."  *Id.*

253.    Raining Bird was ultimately removed under a process managed by Think Finance.

On June 17, 2013, she lost her job based on the forensic audit: "As your [sic] aware the Plain

Green Board ("Board") hired outside counsel to assist with [an] internal an [sic] forensic audit in

regards to the operation of the Company.  The Board was informed of certain actions you have

taken as CEO that has [sic] caused great concern in regards to the financial operations of the

Company.  Given the severity of the allegations and the open investigation, your immediate

suspension without pay is warranted."  TF-VA0412413.  (*See* M-940.)

254.    Although the forensic audit obviously contained very sensitive information about

embezzlement at Plain Green and there was a contractual obligation of confidentiality, Rees

shared the results of the forensic audit with someone who had no direct connection to Plain

Green or the Chippewa Cree, Mark Curry.  TF-VA0230433.  (*See* M-222.)  Curry was a "service

provider" to the Otoe-Missouria Tribe.  Dep-4, Rees Penn. Dep. at 149-50.

255.    Following the findings of the CRA audits, Think Finance presented the key deal

points to a restructured relationship designed to hide the role that Think Finance played in the

Plain Green Enterprise.  Think Finance wanted to create a new tribal agency (the "Tribal

Agency") that would be created to replace Plain Green in the actual lending.  TF-VA0413739 at

741 ¶5.  (*See* M-1231.)  Think Finance wanted Plain Green or the Tribal Agency to hire a "Chief

Operating Officer, Chief Risk Officer, a controller and a Chief Compliance Officer."  TF-

VA093264.  (*See* M-1242.)  In addition, Think Finance required that the Chippewa Cree Code

"*comply with NAFSA guidelines.*"  *Id.* at 265.  (*See* M-1242.)  (Think Finance's direction of
NAFSA is discussed in Section F, below.)

256.    Think Finance also prepared another term sheet that outlined the essence of the
restructuring of Plain Green.  TF-VA0413739.  (*See* M-1231.)  This term sheet required Plain
Green to "complete their Forensic audit by July 1, 2012 and their 2011 and 2012 financial audit
by August 1, 2012 and provide this information to GPLS and/or its agents."  It also required that
Pepper Hamilton represent Plain Green and the newly proposed Tribal Agency.  TF-VA0413744.
(*See* M-1231.)

257.    Another way that Think Finance exercised control over the Tribe was by having a
number of Chippewa Cree government officials on their "reimbursement" payroll.  TC Loan
Services made payments to Senator Jonathan Windy Boy, a Chippewa Cree member.  TF-
VA0297777 (*see* M-1232); *see also* TF-VA0455892 (M-1233.)  As Martin Wong, CEO of Think
Finance, explained at his deposition, Senator Windy Boy "was or is, I don't know, a member of
the Montana State Legislature.  And obviously being a member of the state legislature and being
a member of the tribe, he was well respected."  Dep-10, Wong Dep. at 24.  He was respected
both inside and outside of the Tribe.  *Id.*  The payments that Think Finance made to him occurred
outside the normal GPLS reimbursement process.  Think Finance paid the amounts directly and
the General Counsel for Think Finance approved the invoices.  TF-VA0455892.  (*See* M-1233.)
To justify these payments, Senator Windy Boy allegedly provided "consultant services" to Plain
Green "as directed by the Tribal Chairman of the Chippewa Cree Tribe" or the Chairman of Plain
Green LLC.  TF-VA0455892 at 901.  (*See* M-1233.)  In fact, Senator Windy Boy did work at the
request of Think Finance.  In an invoice requesting reimbursement from Think Finance, Senator
Windy Boy stated: "The purpose [of his trip] is to educate the State's Attorney General, the

opportunity to learn and know more about how the tribe's on-line lending business is doing business.  Sarah Cutrona of Think Finance requested I be there with full reimbursement for my airfare and expenses."  *Id.* at 913.

258.    Through the GPLS reimbursement process, Think Finance paid the entire cost of the newly created Tribal Agency. TF-VA0676492 (*See* M-551.)  Think Finance paid $5,000 a month to the Office of the Attorney General of the Chippewa Cree Tribe.  TF-VA0444982 at 997. (*See* M-1238.)  Think Finance also paid travel costs for the tribal attorney general.  TF-VA0456864 at 866.  (*See* M-1235).

259.    In June 2014, Think Finance continued to try to limit its regulatory and legal risk. In preparation for a meeting at Martin Wong's office in Washington, D.C., Michelle Nguyen summarized what Joel Rosette, the new CEO of Plain Green, wanted in exchange for agreeing to Think Finance's demands for what it euphemistically called its "tribalization project."  Mr. Rosette wanted "GPLS assistance of $50K month for [a] leadership salary" and a "Possible increase in profit – either via % participation or % profit share."  TF-VA0154835 (*see* M-618); *see also* TF-VA0154826 (M-620).  Think Finance wanted the following outstanding items resolved by Plain Green: "1. Adoption of Regulatory Code by end of July.  2. Updated loan agreement to reflect Regulatory Code.  3. Regulatory commissioner update/strategy."  *Id.* at 829. (M-620.)

260.    Think Finance's then CFO, Chris Lutes, succinctly summarized what was at stake in the negotiations with Joel Rosette: "BTW I don't think we should pinch pennies here.  If $50k per month ensures smooth transitioning, them stepping up and performing even better, etc, then it's probably worth it.  Jean and Jean [new Plain Green employees] have done a great job of

stabilizing that program and I would hate to lose everything they have accomplished if the expense is 'valid.'"  TF-VA0154826 at 827.  (*See* M-620.)

261.    Of course, Think Finance was concerned about the legality of the arrangement. Wong asked Lutes, CFO of Think Finance, whether the enterprise could legitimately reimburse the salaries: "Chris – what does GPLS agreement with the tribes provide with respect to reimbursement of salaries/positions?"  *Id.*

262.    After the June 2014 meeting between Martin Wong, Joel Rosette, and Chris Lutes, it was agreed that the $50,000 monthly payment for the tribal salaries would be provided.  Think Finance agreed that "GPLS will move forward with $50k leadership salary assistance."  TF-VA0363363.  (*See* M-621.)  Of course, GPLS was not really making any decisions about the tribal "salary" payments; Think Finance made any decision regarding expenses related to the tribal lenders.  Dep-11, Welch Dep. at 22–26.

263.    Think Finance paid for two consultants, Jean Patton and Jean Litzler, through the GPLS reimbursement process, to manage compliance and other aspects of the Plain Green Enterprise.  TF-VA0680348.  (*See* M-1234.)  These two consultants were paid approximately $50,000 per month to perform consulting services.  TF-VA0680350; TF-VA0456864; TF-VA0457140.  (*See* M-1237; M-1235; M-1241.)  Jean Patton acted as Plain Green's Chief Operations Officer and Jean Litzler served as the Comptroller.  TF-VA0171327; TF-VA0548666. (*See* M-1239; M-1240.)

        2.    Think Finance Attempted to Insulate Itself from Liability by Pursuing Changes That Obscured Its Role While Simultaneously Increasing Its Control Over The Tribal Entities.

264.    To increase its control over the lending process, Think Finance drafted the Chippewa Cree transaction code.  Dep-2, Raining Bird Dep. at 71.  Raining Bird explained, "I

guess if we wanted the business then we adopt the code that they -- that was placed in front of us." Dep-2, Raining Bird Dep. at 71.

265.    In reviewing the March 2011 Term Sheet, Raining Bird confirmed that Think Finance decided exactly what type of products Plain Green would offer, including the amount of the loan and the annual percentage rates charged.  Dep-2, Raining Bird Dep. at 71-7.  Think Finance initiated any changes to the type of loans offered and their terms.  *Id.*

266.    The March 2011 Term Sheet not only dictated the content of Chippewa Cree law, but it required the Tribe to use Pepper Hamilton as its legal counsel.  (*See* M-31 at ¶91, *quoting* M-30 at 270.)  Neal Rosette, Plain Green's former CEO, stated that, "[p]rior to Think Finance Inc.'s engagement with Plain Green, LLC, the Tribe had not previously used the legal services of Pepper Hamilton nor had the Tribe had any knowledge that Pepper Hamilton even existed."  (*See* M-32 at ¶11.)  In fact, "Think Finance, Inc. brought Pepper Hamilton to the Tribe, even though the Tribe had retained the services of [another attorney] handling all Tribal lending activities." *Id.* "Although Pepper Hamilton nominally represented the Tribe in contracting with Plain Green, LLC, its fees were paid for by Think Finance, Inc. and Pepper Hamilton received a bonus for getting the Tribe to sign on to the agreement with Think Finance."  TF-BK-VA_FL_CA00003270 (*see* M-30); M-32 at ¶12.  The association between Think Finance and Pepper Hamilton was so close that Think Finance did not bother to send its own attorneys to meetings with the Tribe.  (*See* M-32 at ¶13.)  Rosette confirmed the coercive nature of the Pepper Hamilton relationship in his deposition.  Dep-8, Rosette Dep. at 32-33.

267.    Raining Bird testified that Pepper Hamilton represented both Plain Green *and* Think Finance.  Dep-2, Raining Bird Dep. at 81.  However, "Plain Green never paid [Pepper Hamilton]."  Dep-2, Raining Bird Dep. at 81-82.  At the time that Pepper Hamilton was acting as

Think Finance's attorneys, Raining Bird did not know that Pepper Hamilton also represented

Steven Haynes, another party to the March 2011 Term Sheet and member of the Plain Green

Enterprise.  Dep-2, Raining Bird Dep. at 160.

268.    Pepper Hamilton represented the tribal officials in the litigation pending in the

United States District Court for the District of Vermont and continued to represent them in the

Second Circuit Court of Appeals.  (*See* M-34; M-35.)

269.    Despite the conflicts of interest, Pepper Hamilton also served as counsel to Think

Finance and Haynes Investment during this period of time.  Dep-7, Haynes Dep. at 67-68; TK-

BK-VA_FL_CA00003268 (*see* M-30); *see also* Haynes0001100 (M-531).

E.    <u>Think Finance Sought To Restructure Its Relationship With Plain Green To
      Advance Its Plans For An Initial Public Offering</u>.

270.    In 2012, Think Finance renewed plans to pursue an initial public offering ("IPO").

271.    Think Finance originally intended to include the revenue generated from the tribal

lending business as part of its IPO.  Dep-6, Rees Dep. at 107-08.

272.    The desire to include the tribal business was understandable given the

significance of the tribal business — "obviously our 'tsunami' growth is being driven from these

portfolios [Great Plains Lending/Plain Green] at the present . . ."  TF-VA0535530 at 531.  (*See*

M-211.)

273.    Think Finance knew that potential investors were concerned about the legality of

its tribal lending business.  In its end-of-year Board of Directors PowerPoint, Think Finance

identified "Tribal Restructure" as the first "Key Q1 2013 management focus – IPO prep."  TF-

VA0530372 at 383. (*See* M-172.)  In the presentation, the "Tribal restructuring" comments were

"Great improvement ideas, but need to get tribal agreement and commitment to action."  *Id.* at

424. Think Finance admitted that the "Tribal Model Remains Our Biggest Vulnerability." *Id.* at 426.

274. The ideas referenced in the Board of Directors presentation came, in part, from an internal Think Finance team called "Team Think Tank." Think Finance's top executives created "Team Think Tank" as a way to train its promising executives. Dep-6, Rees Dep. at 86. One of the "Key Thrusts" for Team Think Tank was to "protect tribal lending in the U.S." TF-VA0275829 at 834. (*See* M-535.) Think Finance wanted "Improved internal compliance," "Improved tribal regulatory oversight and tribal codes," "NAFSA/government affairs/PR (big ideas!)," and "Legal strategies." *Id.* at 835. In November 2012, Rees identified "Set up tribal regulatory agency" as a "must have" for the Think Finance IPO. TF-VA0733426. (*See* M-1224.)

275. In a May 2013 Executive Meeting, Think Finance executives created specific goals for tribal restructuring. TF-VA0543039. (*See* M-1223.) These goals were broken down by each area within Think Finance's company including "finance, compliance, risk, technology, and marketing." *Id.* at 075-090. Think Finance sought to "eliminate/minimize legal risk, preserve cash flows to Think Finance, and avoid loss of GPLS investors." *Id.* at 091.

276. When the restructuring efforts faltered in September 2013, Rees was not pleased and threatened to cut off the funding for the Plain Green Enterprise. Rees stated that, "The delays on the restructure are not acceptable . . . please notify each of the tribes that GPLS will not fund any new customer loans until the restructure is complete." TF-VA0734105. (*See* M-1194.)

277. Ultimately, Think Finance did not include its tribal lending operations as part of the publicly traded company that was created by the IPO. Dep-6, Rees Dep. at 108. Think Finance dropped the tribal business from its IPO plans because the investment bankers advising

on the IPO told Think Finance that it would be difficult to sell the tribal business to the market. Dep-6, Rees Dep. at 115-118.

278.    On May 1, 2014, Think Finance separated the tribal lending business from its "direct lending" business.  TF-VA0298252 (Separation and Distribution Agreement dated May 1, 2014 referenced as Exhibit B in TF-VA0425528 at 536) (*see* M-1001); *see also* TF-VA0425503 (M-995); TF-PA-276149 (M-707).

F.    <u>Think Finance Drafted Tribal Law</u>.

279.    While it was exercising control over the management of Plain Green, Think Finance also formed the tribal lending lobbying group that became the Native American Financial Services Association ("<u>NAFSA</u>").  In his August 14, 2011 memorandum to the Board of Directors of Think Finance, Rees wrote that "we are trying to accelerate the creation and lobbying efforts of the Native American Lending Association ("<u>NALA</u>").  Getting all of the tribes on the same page about the mission, membership, and activities of the association has been a challenge, but I am optimistic that it will be operational this quarter."  TF-VA0479797 at 798. (*See* M-209.)

280.    In his October 19, 2011 Memorandum to the Board, Rees wrote, "We are taking the lead to start a Native American Lending Association that will promulgate best practices and lobby to ensure that Native Americans can continue to provide these products.  It's taken a while to get it underway (due to challenging politics within the tribes) but we are finally having our kickoff meeting on November 1."  TF-PA-474695 at 698.  (*See* M-210.)

281.    On June 14, 2012, Rees wrote to the Board of Directors that: "We have merged the two tribal lending organizations to be more efficient and effective in our lobbying and PR activities."  TF-VA0535530 at 533.  (*See* M-211.)

282.    In May 2012, a Think Finance document indicated that it had spent $250,000 in startup costs for NALA.  TF-VA0641129.  (*See* M-1222.)  On October 24, 2013, Rees sent an email to Mark Curry (the consultant to Great Plains Lending) stating, "Hopefully you know we're not pulling away from the tribal model.  We're paying over 1mm a month in support of it!" (*See* M-648.)

283.    Think Finance paid outsized dues for being a member of NAFSA.  Think Finance paid $120,000, matching the largest contribution of any NAFSA member; the Otoe-Missouria and Chippewa Cree each paid a mere $5,000.  Dep-6, Rees Dep. at 190; TF-VA0169725 (see M-147).

284.    Think Finance also played an active role in writing a model code developed by NAFSA.  Martin Wong reviewed and commented on several versions of that code.  Dep-10, Wong Dep. at 86-96; see also, e.g., TF-VA0520521 (see M-213) ("Martin and I agreed that because a Licensee will always be an Arm of Tribe, change of control and the change assignment would likely would not be relevant to the Model Code."); TF-VA0522064 at 068 (see M-214) ("At this moment I am entering edits to the NAFSA Model Code Martin and I had discussed on Tuesday, January 14, 2014."); id. at 064 ("Martin has been an invaluable source of assistance on this journey"); TF-VA0522083 (see M-216) (Wong drafting the disclosure language concerning disclaimer of state law).

285.    In addition, Wong was among the attendees of a January 2014 meeting of NAFSA where edits to the model code were made.  In a February 3, 2014 email to Wong and Eric Lau of the MacFarlane Group, David Osterfeld, a member of the Rosette law firm, wrote, "I have entered the recommended edits offered at the most recent NAFSA meeting in Washington, D.C. on January 29, 2014."  TF-VA0732863.  (See M-208.)  Wong forwarded that email to Rees;

Carrie Carbone, the then General Counsel of Think Finance; and Stephen Smith of Think Finance. Wong also participated with Lau on conference calls to discuss the contents of the NAFSA code. TF-VA0520664. (*See* M-207.)

286.    Wong provided word-by-word edits to the NAFSA model code. Dep-10, Wong Dep. at 86-96; TF-VA0520664 (see M-207); see also TF-PA-607140 (M-218). Those edits can be found in the final version of the Otoe-Missouria Code. Compare TF-PA-607140 at 146 (see M-218) with TF-BK Miller_FOO_0004033 at 042 § 4.3(a)(2) (*see* M-206). In the section of the code dealing with unconscionability, Wong gutted any requirement that the lender actually determine whether the borrower could repay the loan. Compare TF-PA-607140 at 152 (see M-218) with TF-BK Miller_Foo_0004046 § 5.2(c) (see M-206).

287.    Eric Lau, the General Counsel for the MacFarlane Group, also played an active role in drafting the NAFSA Code. Osterfeld, an attorney at the Rosette Law Firm, noted that he would incorporate edits into the NAFSA Model Code that Lau made: "Eric, I note your edits in the version you just sent and I will insert those into this new draft." TF-VA0732888. (See M-208.)

288.    The Chippewa Cree Code that was ultimately adopted included ideas and sections of the NAFSA model code.

289.    The Otoe-Missouria Tribe, which nominally ran Great Plain Lending, adopted a tribal code in 2014. That code is nearly identical to the NAFSA model code. *Compare* TF-BK Miller_FOO_0004033 (*see* M-206) *with* TF-VA0732863 (*see* M-208). (Think Finance was literally hiding these documents and did not produce them until the Bankruptcy Court granted a motion to compel.)

290.     The 2014 Otoe-Missouria Code attempts to disclaim the ability to enforce federal law.  "A Lender shall conduct business in a manner consistent with the consumer protection principles set forth in federal law described in this section, ***but reference to the principles of these laws shall in no manner endorse the application of any enforcement mechanism or protections described in those laws as against the Lender.***"  TF-BK Miller_FOO_0004033 at 045 (emphasis added).  (*See* M-206.)  A version of the draft NAFSA law circulated on January 6, 2014 did not contain the bold italicized language above.  TF-VA0520664.  (*See* M-207.)

291.     The Chippewa Cree Code used a similar approach in Section 10-8-101: ". . . a Consumer shall be governed by this Code and the laws of the Tribe notwithstanding any federal or Tribal law to the contrary."  Title 10, Chippewa Cree Tribal Codes, Chippewa Cree Tribal Lending and Regulatory Code.  (*See* M-636.)

292.     The Consumer Loan Agreement attempted to use the disclaimers of federal law in this Code by including choice of law clauses that selected tribal law.  The Consumer Loan Agreements also had their own independent disclaimers of federal law.

293.     Think Finance drafted the Consumer Loan Agreement.  Dep-2, Raining Bird Dep. at 114.  Raining Bird confirmed that the purpose of the waiver of federal law in the agreement was to protect Think Finance from having to comply with federal law.  Dep-2, Raining Bird Dep. at 116.

294.     The documentary evidence supports Raining Bird's testimony.  Think Finance reviewed the language in the Consumer Loan Agreement.  Dep-1, Smith Penn. Dep. at 74-75. Think Finance also drafted and made comments to the Consumer Loan Agreement.  Id. at 76, 77.

G.    Think Finance Controlled And Financed The "*Otoe* Litigation."

295.    Think Finance also made payments for special projects that NAFSA undertook. For example, it spent hundreds of thousands of dollars pursuing litigation to stop New York state from enforcing its usury laws against tribal entities (the "*Otoe* Litigation"). Dep-10, Wong Dep. at 76-77; TF-PA-674488 (*see* M-649). From December 2012 to November 2013, Think Finance paid NAFSA $800,000. Dep-4, Rees Penn. Dep. at 231-234; TF-PA-674488 (*see* M-649). During that same period, Think Finance paid $6.9 million in legal costs, a significant portion of which went to support litigation involving state usury laws. Dep-4, Rees Penn. Dep. at 231-34, 236-240.

296.    The NAFSA model code was created, in part, to block actions by state and federal governments that were seeking to enforce usury laws. In fact, Wong said, "make it clear [the model code] is coming from NAFSA and Otoe is willing to join other tribes in drafting a uniform code if it would further the cause of co regulatory oversight." TF-VA0520511 at 512. (*See* M-1226.) Co-regulatory oversight was an argument that Think Finance made in litigation with the CFPB in which Think Finance sought to establish that the CFPB had no authority to issue a Civil Investigative Demand to members of the Plain Green Enterprise and the Great Plains Lending Enterprise. *See* Brief for Respondents-Appellants Great Plains Lending, LLC, et al., *Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, No. 14-55900 (9th Cir. Dec. 10, 2014), ECF No. 22-1; Respondents' Joint Memorandum of Law in Opposition to the Petition to Enforce Civil Investigative Demands, *Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, No. 2:14-cv-02090 (C.D. Cal. Apr. 11, 2014), ECF No. 14.

297.    On August 21, 2013, Great Plains, the Otoe-Missouria, and another Otoe-Missouria affiliated lender, American Web Loan, Inc. (the "GPL Plaintiffs") sued various New

York state officials in their official capacity, seeking to thwart state enforcement actions against

Great Plains and other Otoe-Missouria tribal lending activity.  In that case, the GPL Plaintiffs

sought "an injunction to restrain and enjoin the State from purporting to pursue and from actually

pursuing any and all state regulatory and enforcement actions over the Tribal Nations and Tribal

Business. . . ."  M-6 at ¶59 (the "Otoe Complaint," cited herein as "Otoe Cmplt.").

298.    Despite claiming that federal law had no application to tribal lending in various

NAFSA inspired tribal codes, the Otoe Complaint repeatedly invokes federal law.  It states, "This

Court has jurisdiction to hear this action pursuant to 28 U.S.C. § 1331 and § 1362."  *Id.* at ¶1.

299.    The Otoe Complaint states that: "Venue is properly laid in this District pursuant to

28 U.S.C. § 1391(b)(1) and (2) in that Defendant resides in this District and he has committed a

substantial part of the acts alleged in this District."  *Id.* at ¶2.

300.    The First Cause of Action in the Otoe Complaint is entitled "Violations of Federal

Law."  *Id.* at ¶15.

301.    The Otoe Complaint alleges that: "The State [of New York] has violated federal

law by invading, infringing upon and otherwise disturbing rights of the Tribal Nations by, among

other acts:  . . . Making widely-disseminated (and false) public statements to the effect that Tribal

Businesses have violated State's usury laws, with the purpose and effect of impeding the

operations of the Tribal businesses."  *Id.* at ¶51d.

302.    Think Finance played an active role in the *Otoe* Litigation and *Consumer*

*Financial Protection Bureau v. Great Plains Lending, et al.*, 2:14-cv-02090 (C.D. Cal.) (the

"*CFPB* litigation").  Dep-10, Wong Dep. at 37-77; TF-VA0522195 (*see* M-81); TF-VA0364119

(*see* M-82); TF-VA0369810 (*see* M-83); TF-VA0366615 (*see* M-84); GPLV00043116 (*see* M-

85); TF-VA0526235 (*see* M-86); TF-VA0365031 (*see* M-87).  Martin Wong, Think Finance's

Chief Integrity Officer, participated in the selection of counsel to pursue the *Otoe* Litigation.

Dep-10, Wong Dep. at 43-45.  Wong also reviewed the *Otoe* Complaint.  *Id.* at 38.  Think

Finance dictated the timing of the filing of the *Otoe* Complaint and the public relations push that

accompanied the filing.  TF-VA0522224.  (*See* M-64.)  Wong provided facts to counsel pursuing

the *Otoe* litigation, including that Great Plains did not have any servers on the reservation.  Dep-

10, Wong Dep. at 42-43, 45-49.

303.    Martin Wong, currently Think Finance's Chief Executive Officer, continued to

participate in the *Otoe* Litigation and *CFPB* litigation.  He read and commented on the briefs.

Dep-10, Wong Dep. at 39, 40.  He attended the oral argument at the Second Circuit.  *Id.* at 39.

He was also involved in the preparation of a Rule 28(j) letter to the Second Circuit.  TF-

VA0521110-15.  (*See* M-65.)

304.    On September 20, 2013, Judge Richard J. Sullivan of the United States District

Court for the Southern District of New York denied the GPL Plaintiffs' Motion for Preliminary

Injunction.  In that opinion, the Court held, "[a]bsent express federal law to the contrary, Indians

going beyond reservation boundaries have generally been held subject to nondiscriminatory state

law otherwise applicable to all citizens of the State."  *Otoe-Missouria Tribe of Indians v. N.Y.*

*State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 360 (S.D.N.Y. 2013) (internal quotation marks

and citation omitted) (alterations in original).  (*See* M-7.)

305.    The Court found that "[the GPL] Plaintiffs have built a wobbly foundation for

their contention that the State is regulating activity that occurs on the Tribes' land."  *Id.*

306.    The Court further found that: "The State's action is directed at activity *that takes*

*place entirely off tribal land*, involving New York residents who never leave New York State.

*These consumers are not on a reservation when they apply for a loan, agree to the loan, spend loan proceeds, or repay those proceeds with interest.*"  *Id.* (emphasis added).

307.     The Court also stated that: "*These consumers have not, in any legally meaningful sense, traveled to Tribal land.*  Therefore, to the extent the State seeks to prevent the Tribes from making loans to New York residents who are in New York, it is regulating off-reservation activity."  *Id.* (emphasis added).

308.     Executives at Think Finance were aware of the Court's holding in the *Otoe* case because they received media reports that quoted from the District Court opinion.  Dep-10, Wong Dep. at 54-56; GPLV00043116 (*see* M-85).

309.     In addition, Rees circulated a copy of the *Otoe* opinion with his insights on the opinion in an email to the Board of Directors.

310.     On October 1, 2014, the United States Court of Appeals for the Second Circuit issued a ruling on the GPL Plaintiffs' appeal of the District Court's ruling in the *Otoe* case.  In affirming the District Court, the Second Circuit stated, "a tribe has no legitimate interest in selling an opportunity to evade state law."  *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't Fin. Servs.*, 769 F.3d 105, 114 (2d Cir. 2014) (the "<u>Second Circuit *Otoe* Decision</u>") (*See* M-8.)

311.     The Second Circuit provided a detailed rebuttal to the claim that the loans occurred on the reservation, including the following: "The complexities introduced by modern electronic commercial transactions also weaken plaintiffs' arguments.  Much of the commercial activity at issue takes place in New York.  That is where the borrower is located; the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation.  Even if we concluded that a loan is made where it is approved, the transaction New York seeks to regulate involves the collection as well as the extension of credit, and that collection clearly takes

place in New York.  The loan agreements permit the lenders to reach into the borrowers'

accounts, most of all of them presumably located in New York, to effect regular, automatic wire

transfers from those accounts to make periodic payments on the loans."  *Id.*

312.    The Second Circuit also confirmed the obligation of Native American payday

lending entities to comply with state law.  "Native Americans 'going beyond the reservation

boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] . . .

otherwise applicable to all citizens of [that] State."  *Id.* at 113 (*citing Mescalero Apache Tribe v.

Jones*, 411 U.S. 145, 148-49 (1973)).

313.    After the *Otoe* decision in the Second Circuit, the GPL Plaintiffs declined to

pursue further appellate review and dismissed their case.  *See* M-9.  They did this because Think

Finance removed its financial support of the *Otoe* Litigation.

H.    Think Finance Operated The Tribal Lending Enterprise.

314.    Think Finance participated in nearly every element of the Plain Green and Great

Plains Enterprises.  Think Finance performed the marketing for the tribal lenders, including

managing their websites, which were the sole conduit through which loan applications were

taken and loan approvals were made.

The Underwriting Platform

315.    Think Finance's Risk Department had highly trained statisticians who handled the

risk analysis for the enterprise.  Dep-12, Kothamasu Dep. at 37.  The statisticians on staff

performed complex multivariate and logarithmic regression analysis in an effort to determine

what factors lead to defaults by borrowers.  Dep-12, Kothamasu Dep. at 36-37.  Plain Green had

no one with similar expertise.  Dep-12, Kothamasu Dep. at 38, 107-109.  Ranga Kothamasu, an

employee in Think Finance's Risk Department, testified that the underwriting algorithm that

determined whether or not to extend a loan was proprietary, much like Coca Cola's formula. Dep-12, Kothamasu Dep. at 16-17, 81. The statistical analysis often led to changes to the algorithm. To make changes to that system, Think Finance executed various "change controls" that were initiated by the Risk Department at Think Finance. Dep-12, Kothamasu Dep. at 35-36; TF-VA0680765 (*see* M-765).

316.    The data purchased for underwriting purposes was delivered to Think Finance and not the tribal lenders. Dep-4, Rees Penn. Dep. at 109-111.

317.    Think Finance had experience with underwriting algorithms since the early 2000's and developed models that had a predictive value for the performance of the loans. Dep-10, Wong Dep. at 119-120. Think Finance developed the underwriting platform for Great Plains Lending. Dep-10, Wong Dep. at 124.

318.    Think Finance did not share the core data that formed the basis of the underwriting model with Great Plains Lending. Dep-10, Wong Dep. at 120.

319.    Think Finance maintained the servers used for the underwriting and operation of the Great Plains website in Texas. Dep-10, Wong Dep. at 126-27.

320.    A customer applies for a Great Plains loan at greatplainslending.com. The application is processed based on underwriting criteria that the lender approved on Think Finance's platform. Think Finance's platform provides the application and provides all the underwriting and decision making. Dep-10, Wong Dep. at 148-49.

321.    The decision on the application is automated. Dep-10, Wong Dep. at 149.

322.    The notice about whether the loan application is approved is also automated and sent by Think Finance's platform. Dep-10, Wong Dep. at 149-150.

323.    Plain Green had so little connection to its own "underwriting" that Think Finance had to provide Plain Green's auditors with Plain Green's underwriting policy.  Dep-1, Smith Penn. Dep. at 92-94, 98-99; TF-PA-327713 (*see* M-559).

Collections

324.    Think Finance was also involved in managing the collections activity for the Plain Green Enterprise.  Think Finance sought to bring on a competitor to the existing third-party collection agency.  "The tribe knows we are wanting to bring on another challenger to the PGL Collections business . . ." TF-VA0310223.  (*See* M-1247.)  Think Finance's Risk Department also performed collections analytics for the Plain Green Enterprise.  Dep-11, Kothamasu Dep. at 66, 98.

325.    Plain Green did not handle any collection of consumer loans on tribal land.  Dep-2, Raining Bird Dep. at 96.  Plain Green did not manage any of the vendor relationships for the collections on behalf of Plain Green.  Dep-2, Raining Bird Dep. at 96-97.  Think Finance also handled any customer support.  Dep-2, Raining Bird Dep. at 98-99.

326.    In investor presentations, Think Finance referred to both Great Plains and Plain Green as "live Think Finance products," and indicated that loans issued in the name of Great Plains and Plain Green were Think Finance's proprietary installment loan products.  TF-PA-185453.  (*See* M-60.)

Standard Operating Procedures

327.    The Think Finance compliance program was responsible for developing standard operating procedures for the tribes and tribal products.  Dep-1, Smith Penn. Dep. at 94-95. Specifically, Think Finance drafted the "Standard Operating Procedures" for Plain Green.  TF-VA0132836 (*see* M-552); TF-VA0316773 (*see* M-61).

328.    Think Finance's loan operations group drafted Standard Operating Procedures for daily review and the approval process for funding applications for Plain Green.  Dep-1, Smith Penn. Dep. at 129-132; TF-PA-037405 (*see* M-561).

329.    Think Finance also created the "Standard Operating Procedures" for Great Plains Lending.  TF-PA-327713 (*see* M-559.); Dep-1, Smith Penn. Dep. at 95, 129-131.

330.    Stephen Smith testified that pursuant to yet another Standard Operating Procedure created by Think Finance, Think Finance drafted the response to customer complaints relating to the loans.  *Id.* at 19, 257.  Smith further testified that the tribal lender only had an opportunity to weigh in on the response after it was already written.  *Id.* at 257-258.  In practice, any input from the tribal lenders was ignored.

331.    Think Finance also prepared Standard Operating Procedures in the area of financial management for the tribal lenders.  Dep-13, Callnin Dep. at 165-166.  Plain Green was not approving loans as required in the Standard Operating Procedures because they did not assign anyone to approve the loans.  Dep-1, Smith Penn. Dep. at 162-167, 174-176; TF-PA-094814 (*see* M-563).

<u>Finance</u>

332.    Linda Rogenski, Think Finance's former Financial Controller, determined how the actual cash flow would occur for Great Plains Lending.  Dep-5, Rogenski Dep. at 15, 60-62, 64.

333.    Think Finance also determined how the cash flow for the Plain Green Enterprise. Plain Green's Chief Executive Officer did not know how the cash flow worked even though Plain Green had been in business with Think Finance for over a year and a half.  Dep-5,

Rogenski Dep. at 73-75.  Rogenski had to prepare a cash flow diagram to explain it to Plain Green employees.  *Id.* at 76.

334.    Although Plain Green and Great Plains Lending were nominally charged fees by Think Finance, GPLS simultaneously reimbursed the tribes for those fees.  Dep-5, Rogenski Dep. at 86-90.

335.    To document the reimbursement, Think Finance simultaneously prepared invoices from Think Finance to the tribes and from the tribes to GPLS for expenses related to the loans. Dep-13, Callnin Dep. at 77-81.

336.    Think Finance then moved the money from the GPLS and Plain Green accounts. Think Finance had actual control over the accounts of Plain Green and Great Plains Lending through an administrative portal at Wells Fargo. Dep-5, Rogenski Dep. at 123-24.

337.    Think Finance employees set up the wire transfers for both Plain Green and GPLS.  Dep-5, Rogenski Dep. at 90-91.

338.    The tribes did not pay anything for the third-party vendors that helped them with things like collections.  Dep-13, Callnin Dep. at 152-155, 164.

339.    Think Finance also provided Great Plains Lending with portfolio management and financial management services.  Dep-10, Wong Dep. at 133, 135.

340.    In connection with the loans to consumers, the legal documents claimed that Plain Green retained a 1% interest or "participation interest" in the loan.  The purpose of the retention of the 1% interest was to allow Plain Green to claim that it was the actual lender.  The reality was different.  Think Finance supplied the money that Plain Green used to buy the 1% participation interest in the loans.  Think Finance disguised its role by passing the money through a Haynes Investment account (the "Haynes Account").

341.   Plain Green did not receive any money relating to its 1% participation interest in the loans.  The "revenue" that Plain Green allegedly received was actually paid to Haynes Investments because Plain Green had a loan with Haynes Investments.  Dep-5, Rogenski Dep. at 94-95.  Think Finance extended a loan to Haynes Investments so that Haynes could "lend" the money to Plain Green.

342.   Plain Green used none of its own money to make loans.  Dep-2, Raining Bird Dep. at 86-88.  As a result, "Plain Green did not have any risk in the loss of the loan."  Dep-2, Raining Bird Dep. at 88.

343.   Think Finance had access to the Haynes Account.  Dep-5, Rogenski Dep. at 99.  A Think Finance employee would move money from a Think Finance account to the Haynes Account so that Plain Green could buy its 1% participation interest in the loans.  *Id.*

<u>Wires and ACH</u>

344.   Think Finance tracked all of the information associated with each loan.  Think Finance's loan ledger "keeps track of the -- of each individual's loan, calculates its interest, produces ACH files to fund loans, produces ACH files to collect for the loans.  It has all the customers information in it, their addresses, the state they're in, everything associated with that customer."  Dep-5, Rogenski Dep. at 148.

345.   The Accounting Operations group at Think Finance was responsible for maintaining collections and funding the tribal lending business through a transfer of money called an "ACH."  Dep-13, Callnin Dep. at 10, 46.

346.   For a customer that applies for a loan online, the money that hits his or her account comes from an ACH provider.  Dep-13, Callnin Dep. at 47.  Plain Green played no role

in the ACH deposits to customer accounts or the preparation of daily remittance reports.  Dep-2, Raining Bird Dep. at 109-110.

347.    When there was disruption to the ACH network providers, Think Finance secured alternative providers of ACH services: "In anticipation of possible disruption of ACH from [Bank of Montreal], we are establishing ACH accounts for tribal entities at PDS."  TF-VA0710682.  (*See* M-1248.)

348.    Think Finance would set up the wires for the tribe's approval.  Dep-13, Callnin Dep. at 47-48.

349.    Think Finance could and did release wires on behalf of Plain Green without obtaining Plain Green's approval.  Dep-5, Rogenski Dep. at 131-133; Dep-13, Callnin Dep. at 173-74.

350.    Think Finance reconciled all of the ACH transactions.  Dep-13, Callnin Dep. at 48-49.

351.    To ensure that there was no disruption in the daily funding and collection of loans, Think Finance maintained two accounts for the enterprise.  The accounts provided a cushion so that money would always be available to make loans.  These accounts were known as the funding account and the collection account.  Dep-13, Callnin Dep. at 53-58 (discussing Exhibit M-250).  Think Finance's loan management system sent files to the ACH provider each night to fund and collect on loans.  *Id.*

352.    Think Finance performed the financial forecasting to make sure that the funding account would have enough money to fund loans. Dep-13, Callnin Dep. at 62-65.

353.    After a loan was made, GPLS immediately purchased a 99% participation interest in the loan.  The money that GPLS paid was used to make more loans to consumers.  Dep-13, Callnin Dep. at 62-63.

354.    To make sure that the money flowed smoothly from the purchase of the 99% participation interests to the funding of new loans, Think Finance also had access to GPLS accounts at Citibank.  *See* Dep-13, Callnin Dep. at 61-62.

355.    Once the participation interest was purchased by GPLS, the risk of loss for 99% of the loan passed away from the Tribe to GPLS.  Dep-4, Rees Penn. Dep. at 88-89.

356.    The real risk of loss belonged to Think Finance.  Think Finance guaranteed that GPLS would receive a fixed rate of return of 18-20% on the money loaned to consumers regardless of the actual return associated with the consumer loans.  *See* Dep-4, Rees Penn. Dep. at 91.  Think Finance also repurchased the past due loans.  Id.

357.    Because of this guaranty, accounting principles required Think Finance to consolidate the loan participations from GPLS on Think Finance's financial statements.  Dep-4, Rees Penn. Dep. at 94-95.

358.    These accounting principles also required Think Finance to recognize the risk of loss on its financial statements.  Dep-4, Rees Penn. Dep. at 95-96.

359.    Think Finance had authority to transfer money in or out of all three tribal lending accounts (Plain Green, Great Plains Lending, and MobiLoans).  Dep-13, Callnin Dep. at 111 114.

360.    For an approved loan, the money is automatically deposited into a customer's bank account, Dep-10, Wong Dep. at 150-51, and Think Finance controls the automated process that deposits those funds into customer accounts.  Dep-10, Wong Dep. at 152.

361.    On a normal basis, Great Plains Lending has no involvement with the automated process on a loan by loan basis.  Dep-10, Wong Dep. at 152.

Marketing

362.    Think Finance identified customers for Great Plains Lending for direct mail marketing of pre-approved offers.  Think Finance helped with "the creative" for the direct mail pieces itself.  Dep-10, Wong Dep. at 114.

363.    Think Finance also assisted with marketing to former clients.  Dep-10, Wong Dep. at 114-15.

364.    Think Finance maintained the website through which customers applied for loans.  Dep-10, Wong Dep. at 116.

365.    Think Finance also provided technology for the loan management system.  Dep 10, Wong Dep. at 127.  The loan management platform is located in Texas.  Dep-10, Wong Dep. at 127.

366.    In addition, Think Finance managed vendor activity for Great Plains.  Dep-10, Wong Dep. at 128.

367.    Think Finance did essentially the same things for loans nominally made in the name of Plain Green.  Dep-10, Wong Dep. at 152-55.

368.    Think Finance prepared communications that were made to Great Plains customers.  TF-VA0316699.  (*See* M-14.)  In addition, Think Finance prepared customer surveys, marketing newsletters, and refinance marketing communications.  TF-VA0506542.  (*See* M-62.)

369.    Think Finance drafted the marketing communications for the tribal lenders and handled the compliance work associated with these messages.  TF-PA-323250 (*see* M-77); TF-

PA-274453 (*see* M-78); TF-PA-271532 (*see* M-79); TF-PA-323911 (*see* M-80); TF-PA-323902 (*see* M-753).

370.    Think Finance controlled whether marketing occurred or not.  In fact, right after the *Otoe* decision, Rees stopped all marketing to new customers without consulting with GPLS: "Definitely shut off new customers immediately.  Obviously, no DM drops."  Dep-6, Rees Dep. at 53-54; TF-VA0170499 (*see* M-224).

371.    Think Finance did user acceptance testing with the websites for the tribal lenders. Dep-1, Smith Penn. Dep. at 57.  Think Finance reviewed and tested the disclosures on the websites of the tribal lenders.  *Id.* at 73-74.

372.    Think Finance handled the marketing for Plain Green, including preparing bulk mail, developing the website, sending out mass emails, buying advertising spots, and managing search engine optimization.  Dep- 2, Raining Bird Dep. at 99-101.

373.    Plain Green had no role in the marketing of the loans.  Dep-2, Raining Bird Dep. at 101-103.

374.    Stephen Smith, Think Finance's Director of Compliance, approved the marketing messages drafted by Think Finance from a compliance perspective.  Smith 7023 Hearing Tr. at 54-56; *see also* M-787-790.

Compliance

375.    The Compliance Department at Think Finance customarily reviewed the Plain Green and Great Plains websites to make sure there were disclosures about tribal lenders and the applicable law.  Dep-1, Smith Penn. Dep. at 73-75.  It also made sure that customers were receiving disclosures in the loan agreements.  Dep-1, Smith Penn. Dep. at 76.  These disclosures

were false because they claimed that tribal law governed the loans. Think Finance continued to make these disclosures even when they knew they were false.

376. The Think Finance Compliance Department did not understand the disclosures about tribal lenders and the applicable law that it was making. None of the employees in that department received training on tribal sovereign immunity law. Dep-1, Smith Penn. Dep. at 84.

377. Think Finance attempted to stop enforcement actions by state and federal regulators by arguing that the tribes had their own regulators who were responsible for monitoring the tribal lenders. However, Think Finance's arguments to courts about the tribal regulators did not match the facts. As of March 2014, the tribal regulator for the Chippewa Cree had not conducted an actual examination of Plain Green. Dep-1, Smith Penn. Dep. at 227-235; TF-PA-185453 (*See* M-60); *see also* TF-VA0316773 (M-61).

     I.    <u>The Agreements Executed with Victory Park Documented The Enterprises and The Conspiracy.</u>

378. All of the agreements executed among Plain Green, Haynes Investments, Victory Park, GPLS, and the Think Finance entities were considered part of one transaction. Dep-11, Welch Dep. at 11-12; GPLP00560490 (*see* M-792).

379. On March 18, 2011, GPLS entered into a Participation Agreement with Plain Green, LLC (the "2011 Plain Green Participation Agreement"). TF-VA0314298. (*See* M-41.)

380. Under the 2011 Plain Green Participation Agreement, GPLS provided funds to make the loans to consumer borrowers. Under Section 2(a) of the 2011 Plain Green Participation Agreement, GPLS had the right to buy 99% participation interests in loans that Plain Green nominally made: "GPLS or one or more of its affiliates, shall have the non-exclusive right, but not the obligation, to purchase . . . undivided ninety-nine percent (99.0%) participation interests in the Loans . . ." *Id.* at 303.

381.    Under the 2011 Plain Green Participation Agreement, GPLS acquired participation interests in "the Loans and the applicable Loan Documents." Under Section 1(n), "Loan Documents" "shall mean the loan agreements, notes and other documentation executed by the Borrowers to obtain Loans." Under Section 1(p), "Loans" is defined as "short-term consumer loans in a principal amount not exceeding $2,500 with an initial term not exceeding 24 months." *Id.* at 301.

382.    Under Section 2(f) of the 2011 Plain Green Participation Agreement, Plain Green had the obligation to establish a Reserve Account with a minimum balance requirement. *Id.* at 304.

383.    The 2011 Plain Green Participation Agreement provided the mechanism for paying GPLS from the Participated Loans: "[A]ny payments received with respect to a Participated Loan, such payments shall be automatically deposited into an account (the "Loan Repayment Account") at a financial institution mutually acceptable to GPLS and PGI. The financial institution shall be directed, pursuant to a daily remittance report (a "Daily Remittance Report"), to transfer the appropriate monies received to GPLS with respect to monies due to it pursuant to its Participation Interests, with the balance paid to PGI, each to deposit account as directed by PGI and GPLS, respectively." *Id.* at TF-VA314306.

384.    Under Section 19(a) of the 2011 Plain Green Participation Agreement, the law firm of Pepper Hamilton was designated to receive notices for Plain Green. *Id.* at TF-VA314320.

385.    On March 18, 2011, Plain Green, LLC and TC Decision Sciences, LLC executed a License and Support Agreement (the "2011 Plain Green License and Support Agreement"). TF-VA013138. (*See* M-42.)

386.    Pursuant to Section 2.1 of 2011 Plain Green License and Support Agreement, TC Decision Sciences granted Plain Green a license to use TC Decision Sciences' Software, Documentation associated with its Software, and Tools associated with its Software.  *Id.* at TF-VA013139.

387.    In exchange for the license, Plain Green agreed to pay $50 per loan per month under Section 5.1 and Exhibit A of the 2011 Plain Green License and Support Agreement.  *Id.* at TF-VA013139.

388.    Pursuant to the 2011 Plain Green License and Support Agreement, Plain Green also had to pay to TC Decision Sciences $150 per hour for the use of TC Decision Sciences' professionals.  *Id.* at 149.

389.    On March 18, 2011, Plain Green, LLC and Tailwind Marketing, LLC entered into a Marketing Agreement (the "2011 Plain Green Marketing Agreement").  TF-VA013154.  (*See* M-43.)

390.    The 2011 Plain Green Marketing Agreement required Tailwind to market the Loans.  *Id.*

391.    Under Section 2(a) of the 2011 Plain Green Marketing Agreement, Tailwind marketed the Loans through "websites, search engine optimization, call centers or other marketing channels."  *Id.* at 155.

392.    Under Section 2(b) of the 2011 Plain Green Marketing Agreement, any loan applicant "will be directed to PGL's website or call center will complete and submit the Application."  *Id.*

393.    Under Section 2(b) of the 2011 Plain Green Marketing Agreement, Tailwind obtained the right to use Plain Green's Trademarks on "letters, print advertisements, the internet, television and radio communications and other advertising and promotional materials."  *Id.*

394.    Under Section 2(d) and Exhibit B of the 2011 Plain Green Marketing Agreement, Plain Green paid Tailwind $100 per loan funded.  *Id.* at 156, 169.

395.    Plain Green entered into a Servicing Agreement with TC Decision Sciences on May 25, 2011 (the "2011 Plain Green Servicing Agreement").  TF-VA013170.  (*See* M-44.)

396.    The 2011 Plain Green Servicing Agreement required TC Decision Sciences to provide customer support and collection services to Plain Green.  *Id.* at 170.

397.    Under Section 1 of the 2011 Plain Green Servicing Agreement, TC Decisions Sciences was "responsible for providing (i) project management, (ii) support personnel, (iii) training support, (iv) the technology infrastructure, and (v) facilities during Hours of Operation." *Id.* at 181.

398.    Under Section 2 of the 2011 Plain Green Servicing Agreement, TC Decision Sciences received $5 a month for each account that it managed under the Servicing Agreement. *Id.* at 170.

399.    On May 10, 2011, TC Loan Services, LLC entered into a Credit Facility Agreement with Plain Green, LLC (the "2011 Plain Green Credit Facility Agreement").  TF-VA000031.  (*See* M-45.)

400.    According to the 2011 Plain Green Credit Facility Agreement, "[I]n order to perform its obligations under one or more" of the agreements with TC Loan's "affiliates and/or business partners," Plain Green "wishes to build a twenty (20) seat call center" (the "Call Center").  *Id.*

401.    In connection with the 2011 Plain Green Participation Agreement, Think Finance and GPLS executed an Amended and Restated Guaranty and Security Agreement on March 18, 2011 (the "2011 Amended and Restated Guaranty and Security Agreement").   TF-VA000046. (*See* M-46.)

402.    The 2011 Amended and Restated Guaranty and Security Agreement included Plain Green and the Chippewa Cree Tribe of Rocky Boy Reservation as well as Great Plains and the Otoe-Missouria Tribe of Indians within its terms: "it is contemplated that one or more federally recognized Indian tribes (each a "Tribe" and together the "Tribes"), including, but not limited to, the Otoe-Missouria Tribe of Indians and the Chippewa-Cree Tribe of Rocky Boy's Indian Reservation, Montana will originate certain "Loans" . . . to Borrowers." *Id.* at 047.

403.    Sections 1(iiii) and (jjjj) of the 2011 Amended and Restated Guaranty and Security Agreement defined "PGI" and "PGI Lending Program" in the context of Plain Green, LLC.  *Id.* at 056-057.

404.    Section 2(a) of the 2011 Amended and Restated Guaranty and Security Agreement revealed that Think Finance SPV had "previously invested an aggregate of $16,000,000 in GPLS in exchange for 16,000 GPLS Shares." *Id.* at 046.

405.    Under Section 2(b) of the 2011 Amended and Restated Guaranty and Security Agreement, Think Finance continued its obligation to maintain certain financial ratios in favor of GPLS.  *Id.* at 059.

406.    The Obligations guaranteed related to the "Fixed Return," "Yield Maintenance Purchase Price," the "Non-Yield Maintenance Purchase Price", the "Maintenance Fee," and the "Agent Shortfall Obligation" are defined in the Administrative Agency Agreement."  They likely do not distinguish between funds from Plain Green and Great Plains Lending, meaning that the

Plain Green Enterprise and Great Plains Lending Enterprise are tied together as one operation. *Id.* at 051-059.

407.     The series of agreements executed among the various parties required the Chippewa Cree to waive its sovereign immunity. *See*, *e.g.*, § 11(a)(v) of the Marketing Agreement. TF-VA013154 at 165. (*See* M-43.) The agreements also required that various state laws be applied to interpret the agreements. *See*, *e.g.*, § 10(h) of the Marketing Agreement. *Id.* at 166.

408.     Think Finance also provided millions of dollars of additional funding to Plain Green using Haynes Investments as a conduit. GPL00560490 (*see* M-792); Dep-5, Rogenski Dep. at 85.

J.     <u>Think Finance Replicated The Plain Green Model With Great Plains.</u>

409.     Great Plains Lending entered into a Marketing Agreement with Tailwind Marketing, LLC ("<u>Tailwind Marketing</u>") on May 25, 2011 (the "<u>2011 Great Plains Marketing Agreement</u>"). TF-VA000593. (*See* M-21.)

410.     The 2011 Great Plains Marketing Agreement required Tailwind to market the Great Plain Lending loans ("<u>GP RICO Loans</u>"). *Id.* at 594.

411.     Under Section 2(a) of the 2011 Great Plains Marketing Agreement, Tailwind marketed the GP RICO Loans through "websites, search engine optimization, call centers or other marketing channels." *Id.*

412.     Under Section 2(b) of the 2011 Great Plains Marketing Agreement, any loan applicant "will be directed to GPL's website or call center and will complete and submit the Application." *Id.*

413.    Under Section 2(b) of the 2011 Great Plains Marketing Agreement, Tailwind obtained the right to use Great Plains Lending's trademarks on "letters, print advertisements, the internet, television and radio communications and other advertising and promotional materials." *Id.*

414.    Under Section 2(d) of the 2011 Great Plains Marketing Agreement, Great Plains Lending paid Tailwind $100 per GP RICO Loan funded.  *Id.* at 595.

415.    On May 25, 2011, Great Plains Lending, LLC and Debtor TC Decision Sciences, LLC ("TC Decision Sciences") executed a License and Support Agreement (the "2011 Great Plains License and Support Agreement").  TF-VA000580.  (*See* M-22.)

416.    Under Section 2.1 of the 2011 Great Plains License and Support Agreement, TC Decision Sciences granted Great Plains Lending a license to use TC Decision Sciences' Software, Documentation associated with its Software, and Tools associated with its Software. *Id.* at 581.

417.    In exchange for the license, Great Plains Lending agreed to pay $50 per loan per month under Section 5.1 of the 2011 Great Plains License and Support Agreement and Exhibit A. *Id.* at 581, 590.

418.    Under Section 5.1 of the 2011 Great Plains License and Support Agreement, Great Plains Lending also had to pay $150 per hour for the use of TC Decision Sciences' professionals. *Id.* at 581.

419.    Great Plains Lending entered into a Servicing Agreement with TC Decision Sciences on May 25, 2011 (the "2011 Great Plains Servicing Agreement").  TF-VA000610.  (*See* M-23.)

420.    The 2011 Great Plains Servicing Agreement required TC Decision Sciences to provide customer support and collection services to Great Plains Lending.  *Id.*

421.    Pursuant to the 2011 Great Plains Servicing Agreement, TC Decisions Sciences was "responsible for providing (i) project management, (ii) support personnel, (iii) training support, (iv) the technology infrastructure, and (v) facilities during Hours of Operation."  *Id.* at 616.

422.    Pursuant to the 2011 Great Plains Servicing Agreement, TC Decision Sciences received $5 a month for each account that it managed under the Servicing Agreement.  *Id.* at 610.

K.    Victory Park also provided funding for Great Plains Lending.

423.    GPLS entered into a Participation Agreement with Great Plains Lending in May 2011 (the "2011 Great Plains Participation Agreement").  TF-VA0179162.  (*See* M-24.)

424.    Under the 2011 Great Plains Participation Agreement, GPLS provided funds to make the loans to consumer borrowers.  *Id.*

425.    Under Section 2(a) of the 2011 Great Plains Participation Agreement, GPLS had the right to buy 99% participation interests in loans that Great Plains Lending nominally made: "GPLS or one or more of its affiliates, shall have the non-exclusive right, but not the obligation, to purchase . . . undivided ninety-nine percent (99%) participation interests in the Loans . . ."  *Id.* at 167.  Under the 2011 Great Plains Participation Agreement, GPLS acquired participation interests in the "the Loans, any income or profits therefrom and the applicable Loan Documents."  *Id.*  Under Section 1(gg), "Loan Documents" shall mean the loan agreements, notes and other documentation executed by the Borrowers to obtain Loans."  *Id.* at 165.  Under Section 1(jj), "Loans" is defined as "short-term consumer loans in a principal amount not exceeding $2,500 with an initial term not exceeding 24 months.  *Id.*

426.    Under Section 2(e) of the 2011 Great Plains Participation Agreement, Great Plains Lending had the obligation to establish a Reserve Account with a minimum balance requirement. TF-VA0179168.  (See M-24.)

427.    The 2011 Great Plains Participation Agreement provided the mechanism for paying GPLS from the Participated Loans: "[A]ny payments received with respect to a Participated Loan, such payments shall be automatically deposited into an account (the "Loan Repayment Account") at a financial institution mutually acceptable to GPLS and GP Lending. The financial institution shall be directed, pursuant to a daily remittance report (a "Daily Remittance Report"), to transfer the appropriate monies received to GPLS with respect to monies due to it pursuant to its Participation Interests, with the balance paid to GP Lending, each to a deposit account as directed by GP Lending and GPLS, respectively."   *Id.* at 171.

L.    Legal Agreements Document Think Finance's Relationship with GPLS and the VPC Entities.

428.    In a document called the VPC Funding Deal Sheet, Victory Park provided an overview of the relationship between Think Finance and Victory Park: "VPC provides debt financing to GPLS and owns GPLS.  Think Finance was contracted by GPLS to serve as administrator for the fund (handling the accounting and banking, and also providing a guaranty of the loan portfolio – buying charged off loans at full value).  GPLS/VPC receives a fixed 20% return on its invested capital and in return Think Finance as admin receives all of the remaining net income of the fund as an admin fee."  TF-VA0156848.  (*See* M-18.)

429.    Investors in GPLS are entitled to a fixed return on their investment and return of the capital invested.  M-26 at 93.

430.    Investors in GPLS received equity shares.  *Id.* at 92.

431.    To invest directly in GPLS, Think Finance created a special vehicle called, Think Finance SPV.  Think Finance SPV was entitled to a Fixed Return.  M-17 at 99; Dep-5, Rogenski Dep. at 91.

432.    The source of money paid to investors in GPLS is the "interest and fees collected on the loan participation balances."  M-26 at 93.

433.    As of May 31, 2017, Think Finance owned 100% of GPLS.  *Id.* at 96-97.

434.    "Victory Park controls the cash flow to Think because the parties made an agreement that Victory Park would have that explicit right. . ."  M-27 at 2.

435.    Think Finance agreed to manage GPLS for Victory Park in the "Administrative Agency Agreement."  In a series of Administrative Agency Agreements, TC Administrative Services, LLC ("TC Administrative") agreed to perform certain acts for GPLS.  TF-BK-VA_FOO_0014597.  (*See* M-28.)

436.    Under Section 2.2(m) of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, TC Administrative was responsible for paying to GPLS the Fixed Return with respect to Series I, II, or III Shares.  *Id.* at 609.

437.    The "Fixed Return" was a set percentage return on investment that varied as the enterprise added different levels of investment.  *See*, *e.g.*, Eleventh Amended and Restated Administrative Agency Agreement dated July 7, 2016 (the "July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement"), Definition of "Fixed Return."  *Id.* at 600.

438.    TC Administrative received from GPLS an Agent Fee that was "net of the expenses that are owed by GPLS."  M-26 at 99.

439.    Under Section 2.6(b)(iii) of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, GPLS "shall pay the Agent Fee for such month to" TC

Administrative.  The Agent Fee is the "interest and financing charges received by GPLS on account of the Participation Interests" less the Fixed Return to investors in GPLS and a variety of fees and expenses associated with GPLS.  Section 1.1 of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement (Definition of "Agent Fee.").  TF-BK-VA_FOO_0014597 at 598.  (*See* M-28.)

440.    "There has historically been sufficient income coming into the GPLS accounts to pay any expenses of GPLS coming due."  M-26 at 99.

441.    Under Section 2.2(a)-(c) of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, TC Administrative agreed to establish an accounting system, perform daily loan settlement and reporting, and disburse funds for the purchase of the Participation Interests by GPLS using the Purchase Account.  TF-BK-VA_FOO_0014597 at 607. (*See* M-28.)

442.    Under Article 1 of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, "Purchasing Account" is defined as "a segregated deposit account in the name of GPLS at a depository institution selected by Victory Park, from which the Agent shall effectuate the purchase of Participation Interests by GPLS."  *Id.* at 604.  (*See* M-28.)

443.    Under Section 2.2(h) of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, TC Administrative was responsible for paying the Service Fee on behalf of GPLS to the applicable tribe.  *Id.* at 608.

444.    Under Section 2.2(j) of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, TC Administrative managed the Collection Account, the Maintenance Account, and the Purchasing Account on behalf of GPLS.  *Id.*

445. Under Section 2.2(k) of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, TC Administrative was responsible for making sure that the Reserve Accounts for each Participation Agreement with Plain Green, Great Plains Lending, and MobiLoans (the "Tribal Lending Entities") were funded. *Id.*

446. Under Section 2.2(n) of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, TC Administrative was responsible for paying the Maintenance Fee. *Id.* at 609.

447. Under Section 2.6(b)(iii) of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, GPLS provided funds for the purchase of Participation Interests in the loans nominally made by the Tribal Lending Entities. *Id.* at 611.

448. Under Section 4.5 of the July 7, 2016 Eleventh Amended and Restated Administrative Agency Agreement, TC Administrative could purchase Participation Interests only if GPLS approved of the purchase. *Id.* at 624.

M. Think Finance Guaranteed the Financial Performance of the Plain Green and Great Plains Enterprises.

449. On February 28, 2011, over 50 entities directly or indirectly related to Think Finance ("Guarantors") entered into a Guaranty and Security Agreement with Victory Park Capital Advisors, LLC. (the "2011 Guaranty and Security Agreement"). TF-VA000233. (*See* M-29.)

450. The 2011 Guaranty and Security Agreement said that, "pursuant to the Loan Purchase Agreement contemplated to be entered into by and between GPL Servicing Ltd., a company formed under the laws of the Cayman Islands ("GPLS") and Great Plains Lending, Inc., a business entity duly organized under and recognized by the laws of the Otoe-Missouria Tribe of Indians . . . and together with the UF Loan Purchase Agreement . . . GPLS or one of its

Affiliates may purchase, and GP Lending may sell, 'Loans' . . . from time to time in accordance with the terms and conditions stated therein." *Id.* at 234.

451.    Under the 2011 Guaranty and Security Agreement, Think Finance, Inc. made certain financial commitments to Victory Park Capital Advisors concerning the performance of loans that were to be made in the name of Great Plains Lending. *Id.* at 283.

452.    Pursuant to Section 2(a) of the 2011 Guaranty and Security Agreement, Think Finance agreed to make available $4,700,000 in cash as follows: "Think Finance shall transfer to TF-SPV at least $4,700,000 in cash and TF-SPV shall acquire at least 16,000 GPLS Shares . . ." *Id.* at 246.

453.    Under the 2011 Guaranty and Security Agreement, Think Finance also made a number of financial commitments to Victory Park Capital Advisors. *Id.*

454.    Under Section 2(b) of the 2011 Guaranty and Security Agreement, Think Finance agreed to purchase additional shares of GPLS to satisfy financial covenants: "Think Finance shall contribute cash to TF-SPV, [and] TF-SPV shall acquire from GPLS a sufficient number of GPLS shares . . . and/or Think Finance shall contribute to TF-SPV other collateral acceptable to the [Victory Park Capital Advisors] . . in an amount that would cause Think Finance to be in pro forma compliance with the financial covenants contained in Section 6(a)(v)(A) . . ." *Id.*

455.    The financial covenants in Section 6(a)(v)(A) of the 2011 Guaranty and Security Agreement relate to the Loan to Value Ratio and the Cash Component of the Loan to Value Ratio. *Id.* at 265.

456.    In a series of Guaranty and Security Agreements, various Think Finance entities made guarantees to Victory Park Capital Advisors, LLC. TF-VA000233 (*see* M-29); TF-VA000046 (*see* M-46); TF-BK-VA_FL_CA00001262 (*see* M-69); TF-BK-VA_FL_CA00001275

(*see* M-70); TF-BK-VA_FL_CA00001290 (*see* M-71); TF-BK-VA_FL_CA00001303 (*see* M-72); TF-BK-VA_FL_CA00001371 (*see* M-73);  TF-BK-VA_FL_CA00001382 (*see* M-74); TF-BK-VA_FL_CA00001620 (*see* M-75); TF-BK-VA_FL_CA00001640 (*see* M-76).

457.    The essence of these guarantees is that Think Finance obtained the net revenue from the enterprise after paying off Victory Park and the tribal lenders. Dep-4, Rees Penn Dep. at 241-242.

Sequoia and TCV participated in the Enterprises.

458.    TCV and Sequoia were active participants in the Enterprises.   This participation included, among other things: (1) participating in the Board of Directors of Think Finance; (2) reviewing, consulting on, and approving the strategic and financial direction of Think Finance; (3) lobbying on behalf of tribal lending and the tribal lenders; (4) allowing their reputations to be used to advance the general purposes of Think Finance and tribal lending in general; (5) assisting in securing additional funding to make the illegal, high-interest loans; (6) providing technical assistance and advice concerning the planned initial public offering for Think Finance; (7) interviewing and recruiting employees for Think Finance; (8) assisting in public relations efforts for tribal lending, Think Finance, and the illegal lending in general; (9) providing assistance in replacing certain ACH providers; (10) providing strategic advice and approving the Elevate Credit spin-off; (11) assisting efforts to recruit new tribes to the scheme; (12) making recommendations to Think Finance about which vendors to use; (13) providing assistance with business operations; and (14) assisting with the acquisitions of companies on behalf of Think Finance.

Board Membership And Strategic Direction

459.    Michael Goguen was a partner at Sequoia.  He also served on the Board of Directors of Think Finance from approximately 2006 until 2014.

460.     John Rosenberg was a partner at TCV.  He also served on the Board of Directors of Think Finance from 2007 until 2014.

461.     In 2014, TCV had John Drew reappointed as a director of Think Finance to represent the interests of TCV.  Drew had been a director of Think Finance prior to the time that Mr. Rosenberg joined the board.

462.     As members of the Think Finance Board of Directors, Messrs. Goguen, Rosenberg, and Drew participated in decisions described throughout this complaint on behalf of Defendants Sequoia and TCV.

463.     Think Finance had board meetings approximately once a month.  During the Think Finance Board meetings, there were active discussions about the issues facing the Enterprises.

464.     In connection with their investments in Think Finance, both the Sequoia Entities and the TCV Entities executed Management Rights Agreements, which were essentially the same in substance.

465.     The Sequoia Entities and the TCV Entities executed the Management Rights Agreements because the Department of Labor had regulations governing certain venture capital operating companies.  The Sequoia agreement recited that: "Whereas, the Regulation generally requires that a venture capital operating company have direct contract rights to substantially participate in, or substantially influence the conduct of, the management of its portfolio companies."  *See*, *e.g.* SEQ-VT 404-07 (Sequoia Management Rights Agreement; SEQ VT 676-712 at 700 (noting the existence of Management Rights Agreement for TCV).

466.     Accordingly, both the Sequoia Entities and the TCV Entities acquired the direct contract rights to substantially participate in, or substantially influence the conduct of, the

management of its portfolio companies.  In this case, the management portfolio company was Think Finance.

467.    In the Management Rights Agreement that the Sequoia Entities executed, they acquired the right to "to consult with and advise management" of Think Finance.  They also acquired the right to examine the books and records of Think Finance.  In addition, they acquired certain rights to have a board member on the Think Finance Board of Directors or to have an observer attend board meetings.

468.    As members of the Board of Directors, Goguen, Rosenberg, and Drew participated in decisions described elsewhere in this Complaint.

469.    Because of Think Finance's domination of Plain Green and Great Plains Lending, the Sequoia Entities and the TCV Entities acquired the right to participate in the management of Plain Green and Great Plains Lending.

470.    As members of the Think Finance Board of Directors, representatives of Sequoia and TCV received detailed information about the operations, financial performance, and strategic direction of the Enterprises.  TCV 1788.

471.    This information came monthly in the form of detailed PowerPoint decks, memoranda from Kenneth Rees, and detailed financial information that explained the business of Think Finance, including its significant involvement in the tribal lending portfolio, which was sometimes referred to as the installment lending portfolio.

472.    At meetings of the Think Finance Board of Directors, representatives of Sequoia and TCV participated in discussions about the operations, financial performance, and strategic direction of the illegal lending enterprises.

473.    As members of the Think Finance Board of Directors, representatives of Sequoia and TCV received updates concerning such topic areas as the formation of the illegal lending enterprises, the attempt to hide Think Finance's role in these enterprises through the restructuring of the tribes, efforts to enforce the law against the enterprises through a combined state and federal law enforcement action called "Operation Chokepoint," the enterprises' failed attempt to establish its legitimacy in the *Otoe* litigation, and the decision to spin-off the assets of the enterprises into Elevate Credit. At meetings of the Think Finance Board of Directors, representatives of Sequoia and TCV expressed their opinions, provided advice, and monitored the performance of the executives at Think Finance.

474.    Representative of Sequoia and TCV participated in determining the strategic direction of Think Finance. For example, Michael Goguen of Sequoia repeatedly emphasized that Think Finance should move away from short term payday loans to longer term "installment lending." John Rosenberg of TCV supported this approach as well.

475.    Through their partners who served as members of the Think Finance Board of Directors, Sequoia and TCV were aware of the facts alleged in paragraphs 197 to 198 related to the end of the relationship with First Bank of Delaware and the significant detrimental impact that dissolution had on Think Finance's revenue.

476.    Through their partners who served as members of the Think Finance Board of Directors, Sequoia and TCV were aware of the efforts to replace that lost revenue with tribal lending revenue as described in paragraphs 199 to 202.

477.    Through their partners who served as members of the Think Finance Board of Directors, Sequoia and TCV were also aware of the triple digit interest rates that were charged through the illegal tribal lending enterprises. They were also aware that states imposed interest

rate caps well below the interest rates charged. They were aware that the interest rates charged through the enterprises were more than two times the interest rate caps established by state usury laws.

478. Because of their prior involvement through board members supervising the PayDay One aspect of Think Finance, Sequoia and TCV were aware of the compliance requirements for lending businesses in different states.

479. Goguen and Rosenberg formally approved the structure of the Plain Green and Great Plains Enterprises during a February 2011 board meeting. The Plain Green structure is described in paragraphs 203 to 225 of the Complaint. Goguen and Rosenberg were aware that Think Finance replicated the Plain Green structure when it created the structure of Great Plains Lending. The agreements that created that structure are described in paragraphs 409 to 457.

480. Through their partners who served as members of the Think Finance Board of Directors, Sequoia and TCV were aware of efforts to restructure the tribal business to reduce the appearance of Think Finance's influence over the tribes and tribal entities. Goguen and Rosenberg had personal telephone conferences with Kenneth Rees and Christopher Lutes where the topic of tribal restructuring was discussed.

481. In connection with Think Finance's IPO, Goguen and Rosenberg received updates about efforts to restructure the relationship with the tribes and tribal entities. *See* paragraphs 270 to 278.

482. Sequoia and TCV were aware that one of the real reasons for the tribal restructuring was to increase Think Finance's control over the tribes. TCV 6799-6802.

483.    They were also aware that it would be "good for PR if the Tribe get a bigger cut." TCV 6799-6802.  However, members of Think Finance's Board of Directors pushed back against the idea of increasing the tribes' revenue because Sequoia and TCV would make less money.

484.    Through their partners who served as Think Finance board members, Sequoia and TCV were aware of the failed efforts to establish the legality of tribal lending through Think Finance's creation and control of industry groups like NAFSA as described in paragraphs 279 to 281.

485.    Through their partners who served as Think Finance board members, Sequoia and TCV were aware of Think Finance's efforts to delay and hinder efforts by states and the federal government to enforce the law with respect to illegal high interest loans as described in paragraphs 295 to 313.

486.    Michael Goguen and John Rosenberg received updates on the *Otoe* Litigation directly from Kenneth Rees.  Rees also provided monthly memorandum to the Board of Directors about the *Otoe* Litigation.  For example, Rees said in a September 18, 2013 memorandum to Think Finance's Board of Directors that: "We are waiting on tenterhooks to learn the outcome of the challenge against New York State."  TF-PA 513939-942.

487.    After receiving the decision in *Otoe*, Rees sent the Southern District of New York decision to the Board of Directors with a note saying: "The judge seems to have focused exclusively on where the customer was physically to say New York law applied rather than deal with the inherent sovereignty issue."  SEQ-VT 10097-10109.  Rees provided a more detailed analysis in his next monthly board memorandum.

488.    Notwithstanding this specific knowledge of the illegality of their operations and other detailed information that indicated that the enterprises were illegal, Michael Goguen and

John Rosenberg continued their efforts to extract value from the illegal enterprises. Instead of stopping the illegal behavior, Goguen and Rosenberg shifted their efforts to separating the tribal lending business from the rest of Think Finance's business.

489.    Even though the tribal lending business was separated from Think Finance's other business, the new entity that was created, Elevate Credit, still received illegal income that was generated through the tribal lending business.

490.    After the district court decision in the *Otoe* Litigation, which made it clear that tribal lending was illegal, in January 2014, John Rosenberg and Michael Goguen took formal action as Think Finance board members to advance the scheme to hide Think Finance's assets and increase the returns of the Sequoia Entities and the TCV Entities by transferring corporate opportunities from Think Finance to the newly created Elevate Credit. Rosenberg and Goguen signed a unanimous Consent of the Board of Directors of Think Finance, Inc. to pledge the assets of Think Finance to secure a new source of funding to obtain capital for loans that the new Elevate Credit would make in the Rise portfolio of loans. In connection with these actions, they approved Think Finance entering into the Financing Agreement, the Pledge Agreement, and various Ancillary Agreements.

491.    The Sequoia Entities and the TCV Entities also executed formal Waiver Agreements to certain rights they had as shareholders to allow Think Finance and Elevate Credit to alter the financing arrangement that existed with Victory Park Capital and GPLS. Without that waiver, Think Finance would not have been able to spin-off Elevate and Elevate would not have been able to secure funding. TF-VA 362133-43.

492.    On May 1, 2014, Rosenberg and Goguen took further formal action as Think Finance board members to advance the scheme to hide Think Finance's assets and increase the

returns of the Sequoia Entities and the TCV Entities.  TCV 644-654.  First, they formally

approved the spin-off of Elevate Credit.  TCV-VT 305-313.  Second, they approved a loan from

Think Finance to Elevate in an amount up to $75 million.  TCV 635-643.  Third, they approved a

number of amendments to the agreements from January 2014.  Fourth, they authorized

adjustments to option grants to incentivize executives to continue to execute the illegal

Enterprises.

493.    The Sequoia Entities and the TCV Entities also executed a number of additional

agreements to effectuate the spin-off of Elevate from Think Finance.  Without their approval, the

spin-off of Elevate would not have occurred.

494.    Throughout their tenure as Think Finance directors, Goguen and Rosenberg also

frequently approved stock options for Think Finance's key executives to incentivize them to

continue the Enterprises.  *See*, *e.g*., SEQ VT 6334-38.  In addition, Rosenberg, Goguen, and

Think Finance's Compensation Committee approved special bonuses to certain executives to

incentivize them to continue their illegal behavior.  SEQ-VT 8061-8606, SEQ-VT 9198.

495.    Some meetings of the Think Finance Board of Directors were held at the offices

of the TCV Entities and the Sequoia Entities.

496.    Goguen, Rosenberg, and Drew breached their duties as directors of Think Finance

because they failed to report the illegal behavior of Think Finance and follow the policies

adopted by the Think Finance Board of Directors.  TCV 2465, SEQ-VT 3272, 3299.

497.    The partners of the TCV Entities and Sequoia Entities failed to supervise Michael

Goguen, John Rosenberg, and John Drew by allowing them to operate as directors for an illegal

loan sharking scheme.  The partners at the TCV Entities and Sequoia Entities obtained detailed

reports from Goguen, Rosenberg, and Drew that put them on notice that the activity that Think

Finance was conducting was illegal.  Plaintiffs are continuing their efforts to obtain relevant information about the legal advice that the TCV Entities and the Sequoia Entities received.  *See*, *e.g.*, TCV 1756-57, TCV 1783 & 1791 (native file), TCV 2092, TCV 9145-9162.

<u>Lobbying</u>

498.    Goguen and Rosenberg knew that the restrictions of ACH processing was the single most important issue facing Think Finance and the Enterprises.  In June 2013, Michael Goguen reported about the illegal tribal lending business to other Sequoia partners and stated that: "The primary concern at the moment is with regard to payments.  Several banks that provide ACH processing for online payday lenders (and tribal lenders) have fallen under increased scrutiny by regulators.  Obviously if banks won't process the ACH payments there is no business, so we are staying very close to this situation and working on alternatives."

499.    After learning that regulators were looking into the illegal tribal lending business, Goguen lobbied John Boehner, the then Speaker of the House of the United States House of Representatives, on behalf of Think Finance and the Enterprises.

500.    In August 2013, Goguen opened his 32,000 square foot ranch in the Rockies so that Boehner could vacation there.  While Boehner was at Goguen's house, Goguen lobbied him about issues related to the Enterprises.  In an email sent immediately after Goguen and Boehner met, Goguen reported: ""Last night couldn't have gotten any better.  It was literally me, Speaker Boehner, Congressman Latham, Congressman Daines (soon to be Sen. Daines, most likely) sitting on my balcony watching the sunset over the Rockies, and a bunch of security folks and staffers who hung out in another room."  In his own description of the event, Goguen said: "I spent a lot of time on the DOJ/FDIC/CFPB ACH issue."  SEQ-VT 3470-72.  At the time, Think Finance faced a significant crisis because federal governmental agencies had been attempting to

stop illegal high interest lending through Operation Chokepoint.  Operation Chokepoint attempted to limit high interest lenders from using the ACH network.

501.    Because of Goguen's efforts, Boehner agreed to open up investigations into the governmental entities that were investigating tribal lending.  About Boehner's reaction, Goguen said: "Boehner got VERY fired up about it (which I strongly believe is a net good thing rather than a bad thing, despite the worries expressed at the board meeting about stirring up a hornet's nest)."  SEQ-VT 3470-72.

502.    Shortly after Goguen's meeting with Boehner, several members of Congress sent a letter to the leaders of the regulatory agencies involved with Operation Chokepoint.

503.    Goguen attempted to conceal and misrepresented Think Finance's lobbying efforts so that no one could detect their attempt to delay and hinder investigations into tribal lending.  He said: "I made sure that we didn't want our (Think Finance's) fingerprints anywhere near the issue, so any investigation will be done without putting us in the spotlight."  SEQ-VT 3470-72.

504.    In addition to lobbying Boehner, Goguen lobbied other congressional leaders as well.  Think Finance reminded Goguen to make contributions to political campaigns so that Think Finance would be able to obtain meetings with various elected officials for the purpose of advancing the interests of the Enterprises.

505.    Kenneth Rees acknowledged Goguen's lobbying efforts in a memorandum to the Think Finance Board of Directors: "Interestingly, Senator Daiche from Montana (who knows Mike Goguen) sent a very strong letter to the head of the CFPB and the FDIC about the impact of their actions on the Plain Green Tribe (Chippewa Cree).  He may actually call for a hearing on

the matter which hopefully will generate appropriate political pressure on these over-reaching regulators." TCV 12233-36.

506.    Think Finance sent preparation materials to Goguen so that he would be ready to answer questions about the Otoe-Missouria and the Chippewa Cree tribes, Plain Green, and Great Plains Lending.

507.    Rees also asked John Rosenberg of TCV to assist with the lobbying efforts on behalf of the Enterprises. TCV responded by developing a list of potential lobbying targets who would support the Enterprises' efforts.

<u>Sequoia and TCV Used Their Reputations To Create An Aura of Legitimacy</u>

508.    The Enterprises also used the reputations of Sequoia and TCV to advance the Enterprises' interests. For example, Think Finance's website touted that its investors included Sequoia and TCV. Think Finance also prepared press releases that used the reputations of Sequoia and TCV as indicators of legitimacy. Sequoia and TCV knew that Think Finance was using their reputations to promote the Enterprises.

509.    Think Finance repeatedly used Sequoia's and TCV's names in PowerPoint presentations to investors, potential IPO investors, industry groups, and other interest groups.

510.    At one point, a potential investor in GPLS sought out Michael Goguen to obtain assurances that Think Finance was a legitimate investment. Goguen assured this potential investor that it was a legitimate business.

511.    Employees of Think Finance also used the reputation of TCV to recruit new employees to Think Finance. TCV 1960-61 & 1969-70. Think Finance used TCV's reputation to overcome Think Finance's negative reputation.

512.    Victory Park used the reputations of Sequoia and TCV to recruit investors in the GPLS fund by using their names in PowerPoint presentations to potential investors.

Recruiting Loan Funding For GPLS and the Enterprises

513.    In April 2012, John Rosenberg led an effort on behalf of Think Finance to reduce the cost of capital that Think Finance paid to Victory Park. During this effort, Rosenberg also used TCV contacts to obtain additional capital to make loans to borrowers of the Enterprises. Rosenberg wanted to obtain new financing to supplement the financing provided by GPLS. One of the sources of financing that Rosenberg pursued was a high yield debt offering through an investment banker. TCV 2374-2402.

514.    Through a series of phone calls and interviews, Rosenberg negotiated directly with Victory Park and other capital providers to obtain lower interest rates for the Enterprises' capital. TCV 2344-2351 & 2371.

515.    Rosenberg tried to establish a relationship with one potential provider of capital because another partner at TCV had a brother in law that worked at that company. While that company ultimately turned down the opportunity to provide money to the Enterprises because of concerns about the legality of the tribal lending business, Rosenberg was able to get the company to conduct a careful review of the opportunity because of his connections at TCV. TCV 2353-54 & 2370. After reviewing material provided by Think Finance and Rosenberg to try to justify the legality of the tribal lending business, the potential provider of capital drew the exact opposite conclusion that Think Finance and Rosenberg wanted. The potential provider cited the legal memorandum provided by Think Finance and Rosenberg as one of the reasons not to do the deal. TCV 2410-16.

516.    In August 2012, people from the Abu Dhabi Investment Council ("ADIC") contacted people at Sequoia to obtain information about Think Finance and the Enterprises.

517.    ADIC had been approached to invest $100 million in the GPLS fund to provide cash to lend to consumer borrowers.

518.    Kenneth Rees and Christopher Lutes of Think Finance flew to Abu Dhabi to pitch ADIC on the idea of investing in tribal lending.

519.    Because ADIC had other investments with Sequoia, they reached out to their contacts at Sequoia to obtain information on Think Finance and the Enterprises.  ADIC's contacts at Sequoia put ADIC in contact with Michael Goguen, Sequoia's representative on Think Finance's Board of Directors.  Goguen failed to disclose the fraudulent nature of the Enterprises to ADIC.

520.    In an effort to recruit funding from ADIC, Goguen had a telephone conference with ADIC and provided information about Sequoia's investment in and activities associated with Think Finance.

521.    A few months before, Goguen reported to his partners at Sequoia that one of his personal tasks was to help Think Finance "quickly secure competing alternatives to their Victory Park lending line."

522.    John Rosenberg of TCV also assisted in securing ADIC's investment.  TCV 1742-43.  Victory Park reached out directly to Rosenberg so that he would provide information about TCV's investment in Think Finance to ADIC.

523.    Rosenberg failed to disclose the fraudulent nature of the Enterprises to ADIC.

524.    ADIC made an investment of $100 million into GPLS.

525.    In 2012, John Rosenberg also used his contacts at TCV to seek other investors who would be willing to invest in GPLS so that funds could be made available for the Enterprises.  TCV-VT  19022-19026.

526.     In September 2012, Rosenberg reported to his partners at TCV that he had helped negotiate financing terms with third party capital providers on behalf of Think Finance. TCV 7649-51.

### Convincing Victory Park to Continue Providing Capital to Fund Tribal Loans

527.     In the fall of 2013, John Rosenberg personally convinced Victory Park to start providing capital to the Enterprises again. Because of concerns about the legality of the tribal lending and Operation Chokepoint, Victory Park had decided to stop funding new tribal loans. Rosenberg personally called Brendan Carroll of Victory Park to "wring [his] neck" to get Victory Park to continue providing capital for the Enterprises.

528.     Rosenberg's efforts succeeded, and Victory Park agreed to provide capital to the Enterprises so that the illegal activity could continue.

529.     Rees and Lutes had previously failed in their efforts to persuade Victory Park to continue providing capital. However, Rosenberg had a personal relationship with Carroll that allowed him to succeed where Rees and Lutes had failed.

530.     Rosenberg also told Rees and Lutes to call him if Brendan Carroll reneged on his commitment to provide the capital for the Enterprises.

### Assistance with IPO Planning

531.     Sequoia and TCV have extensive experience with IPOs because they are venture capital firms with many portfolio investments. They often use IPOs as a way to exit an investment or to obtain a partial return on capital.

532.     Sequoia and Goguen used their experience with IPOs to find the appropriate time for Think Finance's IPO. In addition, they used their contacts with investment bankers to conduct a process for selecting underwriters to assist with Think Finance's IPO.

533.    Michael Goguen reported to his colleagues at Sequoia that he was going to "continue to help [Think Finance] with further diversification to reduce regulatory risk."  He also reported that he was going to "help [Think Finance] build towards a rock-solid 2012 IPO."

534.    In 2011, John Rosenberg of TCV gave a presentation to the Think Finance executive team to teach them about how to prepare for an IPO.    TCV 7649-51.

535.    In preparation for Think Finance's IPO, Goguen and Rosenberg had telephone conferences with Rees to discuss Think Finance's thoughts on tribal restructuring options and the implications of that restructuring.

536.    John Rosenberg provided access to some of TCV's contacts in the investor and underwriting world to provide feedback to Think Finance concerning the right themes to use in selling Think Finance to different types of investors.  TCV 1668-69.

537.    Rosenberg also provided advice about which investor conferences Think Finance should attend.  TCV 1692-93.

538.    Rosenberg encouraged various investment banking firms to participate in promoting the Think Finance IPO to their contacts.  TCV 1913-16.

539.    Rosenberg also prepared the request for proposal that was used to interest underwriters in Think Finance's IPO.  TCV 17233-34.  He used TCV employees to find examples of a request for proposal for the Think Finance IPO process.  TCV 17257-58.

540.    Ultimately, Think Finance's management and the Think Finance Board of Directors concluded that Think Finance could not successfully complete an IPO.  The focus then shifted to spinning-off Elevate Credit and completing an IPO for Elevate Credit.  After this shift in strategy, the TCV Entities continued to assist with preparing the IPO for Elevate Credit.

541.    Rosenberg reviewed and commented on the request for proposal associated with the Elevate IPO.

542.    Rosenberg also helped assemble the list of investment bankers that would serve as underwriters for the Elevate IPO.  He used his connections at the TCV Entities to develop the list of banks that would be willing to assist with an IPO of such a damaged company.  Many of the top tier investment banks were unwilling to assist with the Elevate IPO because of the illegal nature of the activities in which the Enterprises were engaged.  Rosenberg used his connections in the investment banking community to personally talk to the individual investment bankers who would participate in the interview process for the Elevate IPO.  Many of the investment bankers who participated in that process became the investment bankers who underwrote the Elevate IPO.  TCV 12519-35.

543.    Elevate Credit executives also relied on Rosenberg's expertise in preparing and executing the Elevate IPO.  In April 2015, Rosenberg answered Christopher Lutes's questions about how to conduct interviews with investment bankers who would underwrite the IPO because Lutes had no experience with the interview process for investment bankers.

<u>Employees</u>

544.    The Sequoia Entities and the TCV Entities assisted Think Finance with obtaining qualified employees using their contacts in the business world.

545.    John Drew of TCV interviewed candidates for executive positions at Think Finance.  TCV 1327 & TCV 1733-34.

546.    John Rosenberg of TCV interviewed and recruited Martin Wong to work at Think Finance as the "Chief Compliance Officer."  TCV 1795 & TCV 2014

547.    Rosenberg also interviewed and recruited Marcella Butler to work as the chief human resources officer at Think Finance.  TCV 1009-11.

548.     Rees requested that Rosenberg conduct follow up phone calls because Rosenberg had done such a great job selling Think Finance in the past.  Rosenberg did as Rees requested and successfully recruited both Wong and Butler to Think Finance.

549.     Sequoia stopped Think Finance from hiring employees from one of Sequoia's portfolio companies.  Michael Moritz, a partner at Sequoia, directly communicated with Kenneth Rees, the CEO of Think Finance, to tell him that he could not hire current employees of another of Sequoia's portfolio companies.  Moritz laid out guidelines for Rees to follow in future interactions with current and former employees of the portfolio company.  In allowing Moritz to dictate the hiring of Think Finance employees, Goguen breached his fiduciary duties as a director to Think Finance.

550.     Goguen and Rosenberg both sat on Think Finance's Compensation Committee. In their positions as directors of Think Finance, they set the compensation for the executives at Think Finance to incentivize them to continue with the illegal Enterprises.  *See*, *e.g.*, TCV 1849. The compensation included salary, bonuses, and stock options awards.

<u>Public Relations</u>

551.     Michael Goguen of Sequoia promoted tribal lending to both the media and various government officials.

552.     For example, in June 2013, Sequoia organized a press dinner that included media outlets like the New York Times and Bloomberg News.  Sequoia arranged for Kenneth Rees to speak at that event.

553.     When Rees was unable to attend the event, Goguen replaced him and delivered the remarks that had been planned for Rees.  Rees sent Goguen talking points by email to use. Goguen specifically responded to questions about the Native American involvement in the Enterprises.

554.    Sequoia made their public relations person available to assist Think Finance in responding to inquiries from media organizations.  The Sequoia public relations person corresponded directly with the Think Finance public relations staff to advance themes that benefitted Think Finance and the Enterprises.

555.    The Sequoia public relations person also attended meetings with Think Finance's public relations department in New York.  The Sequoia employee developed themes that would be used to advance Think Finance's efforts to sell itself to potential investors in an IPO.

556.    The involvement of the Sequoia's public relations staff continued after the spin-off of Elevate Credit.  In particular, the Sequoia employee reviewed talking points for Joel Rosette, the CEO of Plain Green, to respond to inquiries from various news organizations.

557.    TCV's public relations department also responded to inquiries from investors about the nature of Think Finance by misrepresenting the true nature of the business that the TCV Entities and others were involved in.

558.    In particular, an investment fund for the State of Washington was one of TCV's investors.  A representative of the State of Washington's investment fund contacted TCV and specifically asked whether Think Finance was a payday lender.  TCV 1299.  TCV responded that Think Finance was not a payday lending company.  TCV knew that answer was deceptive because TCV internally referred to Think Finance as a payday lending company.  TCV 20177-78; TCV 20204.  In fact, part of Think Finance's business was called "PayDay One."  The official corporate name of Think Finance was PayDay One Holding Company.  The TCV Entities failed to reveal the true facts surrounding Think Finance to the State of Washington's investment fund.

## Finding Replacement ACH Providers

559.     Think Finance executives also sought to tap into the connections that the Sequoia Entities and the TCV Entities had with various ACH providers.

560.     In July 2013, Kenneth Rees described the "biggest risk" to Think Finance as "the discontinuance of ACH processing to our industry."  SEQ-VT 3360.

561.     In July 2013, Think Finance executives sent an email to members of the Think Finance Board of Directors seeking assistance in finding replacement ACH providers.  SEQ-VT 3360-64.  Lutes prepared material that described the need for ACH providers for Think Finance.

562.     John Rosenberg of TCV forwarded those materials to his contacts at the TCV Entities to assist Think Finance and the tribal lenders in finding alternative payment processors.  TCV 2098-99.

563.     In the fall of 2013, Think Finance obtained a replacement ACH provider named Bank of Montreal.  Rosenberg and TCV had contacts at the Bank of Montreal.

564.     In September 2013, Rosenberg reported to his partners at TCV that he "had recruited payments industry experts to the [Think Finance] Board."  TCV 7649-51.

## Elevate Spin-Off

565.     Prior to the Elevate spin-off, the TCV Entities understood that the only way to extract value from Think Finance was to separate the tribal lending portfolio from the rest of Think Finance's assets.

566.     The Think Finance Board minutes from February 21, 2014 reported "on the progress toward spinning off the entities which are not engaged in any tribal-related business."  SEQ-VT 10350-53.

567.     The Think Finance Board approved a strategy where Think Finance's revenue and assets would provide extra capital should Elevate need it.  The Board also approved that after

Elevate did not need any more capital, Think Finance would distribute cash to shareholders like Sequoia and TCV.

568.    Michael Goguen summarized that strategy in a "GetRealNews" communication to Sequoia personnel: "On Friday, the [Think Finance] Board gave the go-ahead on 'Project Exclaim,' which will split the company into two pieces: Think Finance will continue to be the name for the company containing all of the (extremely profitable but) tainted assets, including all tribal lending products.  These products will continue to generate significant cash, but no effort will be put into growth.  The good stuff will be in the newco with a new name (currently Exclaim), and will contain only lending products with no grey area, eg Rise (which conforms strictly to state by state enabling legislation).  While the investor ownership will be mirrored in each cap table, obviously our active participation and return prospects will be associated only with the new 'good' half."  SEQ-VT 17286-87.

569.    John Rosenberg and Michael Goguen reviewed and approved the plan to spin-off Think Finance's assets into Elevate Credit.  In connection with the spin-off, they approved plans to create non-competes and severance agreements to tie executives to the spin-off.  They also reviewed and approved new compensation structures to continue to incentivize executives to lead the new company.

570.    After the spin-off of Elevate, Think Finance's new CEO, Martin Wong, made a large compensation request.  The TCV Entities recognized that TCV and Sequoia were asking Wong to operate illegal Enterprises so that the TCV Entities and Sequoia Entities would be protected.  The TCV Entities recognized that Wong's large compensation request was motivated by the illegal nature of the Enterprises.  *See* TCV 15144-47 & TCV 17381-83 (compensation memo).

571.    In connection with the Elevate spin-off, John Rosenberg of TCV provided a reference to the State of Virginia to obtain a license for Elevate Credit.  In making the reference, Rosenberg failed to disclose the true facts related to Think Finance and its fraudulent tribal lending business.  TCV 19496-99.

Dividends from Think Finance

572.    In connection with the Elevate spin-off, the TCV Entities and the Sequoia Entities continued to exercise control over Think Finance.  TCV had John Drew appointed as a director of Think Finance.  Sequoia continued to exercise control over the Think Finance Board by using Bob Rees to represent its interests.  Bob Rees is Kenneth Rees's uncle and was an investor and Think Finance board member.  Later, Sequoia had another person appointed to Think Finance's Board of Directors to protect its interests.

573.    Think Finance became a critical investment for the TCV V fund.  To recruit future investors and to keep current investors, TCV had to demonstrate successful management of the money invested with TCV.  As a result, in August 2013, Jay Hoag, one of the founding partners of TCV, insisted that TCV "must be laser focused on doing all we can to insure that Think Finance [and other investments] become huge successes."  TCV 1302-04.  Many of TCV's investors are sophisticated entities like universities and foundations that use complicated metrics to evaluate their portfolio of investments.

574.    In the fall of 2013, John Rosenberg informed Hoag and Rick Kimball, the other founding partner of TCV, about the decision in *Otoe* by the Southern District of New York and the related shift in Think Finance's strategy.  TCV 19413-19414.  In his email update to Hoag and Kimball, Rosenberg said: "I am going to provide a fulsome update on Monday, but the pressure on TF (ACH and NY injunction I mentioned 2 weeks ago) has caused them to change

course and focus on their non-tribal products in the US and UK. It has a meaningful impact on the p&l for the rest of 2013, and a more dramatic change for 2014."

575.     Because Rosenberg needed to show investment success for TCV, he pushed for an early liquidity event at Think Finance board meetings and with Think Finance's senior executives. Rosenberg contacted Goguen directly to discuss the possibility of an early liquidity event. SEQ-VT 3467. In addition, Rosenberg had a lunch with Rees in an effort to persuade Rees to have an early liquidity event. TCV 2092. Rosenberg had this lunch with Rees even though he could have simply raised the issue at the Think Finance board meeting that immediately proceeded it.

576.     Rosenberg arranged a meeting with Think Finance executives immediately after the spin-off of Elevate Credit. TCV 17922-24. Before this meeting, Rosenberg reiterated why it was so important that TCV be able to maximize the money that came out of the Enterprises: "I know it's not ideal to have to stick around for a weekend, but you guys are the big needle movers in our Fund V. And my partners would like to hear how things are progressing post-split." TCV 17922-24.

577.     The Think Finance executives were brought to a general partners meeting at TCV so all the partners of TCV could be updated about Think Finance and Elevate Credit. Kenneth Rees and Christopher Lutes both attended this meeting. They explained to the TCV partners about the risks associated with Think Finance. One of the most significant risks that they conveyed to the TCV partners was a finding that state law applied to the purported tribal loans. TCV 15115-140.

578.     Notwithstanding their knowledge of the illegality of Think Finance, partners at TCV made no effort to end the Enterprises or to stop their involvement in the Enterprises.

579.    In September 2014, internal correspondence to TCV partners raised the issue of the legality of Think Finance.  It also outlined the strategy to obtain liquidity, notwithstanding the illegality of Think Finance.  Despite receiving this communication, no partners at TCV took action to stop the illegal conduct.  In fact, they allowed and encouraged the liquidity plan to proceed.  TCV VT 9145-9162.

580.    The early liquidity event took the form of dividends paid by Think Finance to investors, including Sequoia and TCV.

581.    After Elevate Credit no longer needed cash from Think Finance, Think Finance followed the next step in the plan.  At the January 16, 2015 Board of Directors meeting, Martin Wong, now CEO of Think Finance, reported that Elevate Credit had paid back the loan from Think Finance.  At that same meeting, the "Board directed the officers of the Company to endeavor to pay the first dividend prior to the end of March 2015."  SEQ VT 11467-72.

582.    In March 2015, the Think Finance Board approved the issuance of a dividend to shareholders.  SEQ-VT 11732-36.  That dividend sent over $30,000,000 of cash out of Think Finance to investors, including Sequoia and TCV.

583.    Think Finance paid further dividends on or around December 16, 2015 and on or around February 2, 2016 to investors, including Sequoia and TCV.

584.    John Drew of TCV voted, as a member of Think Finance's Board of Directors, to approve the dividends, as did the board member representing Sequoia's interests.

585.    Think Finance paid those dividends even though Sequoia and TCV knew the result of the *Otoe* Litigation.  By December 2014, Think Finance had also been sued by the State of Pennsylvania for its role in the payday loan enterprise.

586.    In addition, at the time the dividends were issued at the end of 2015 and beginning of 2016, the Plaintiffs in this case had already filed the First Amended Complaint, which described in detail why the actions of Think Finance were illegal.

587.    The dividends issued by Think Finance stripped it of money so that Think Finance became insolvent.  Think Finance filed for bankruptcy in October 2017.

### Finding New Tribal Clients to Further the Scheme

588.    TCV used the contacts its partners had with Native American tribes in an effort to recruit additional tribes into the Enterprises.  TCV 16476-77.

### Vendor Recommendations

589.    Both Goguen and Rosenberg repeatedly made recommendations for vendors who could provide valuable technology services to Think Finance.  TCV 2424.  These vendors tended to be portfolio companies in which the TCV Entities and Sequoia Entities invested.

### Business Operational Advice

590.    The partners at both Sequoia and TCV have significant business experience that they made available to the senior executives at Think Finance.

591.    The business models of the Sequoia Entities and the TCV Entities bring the principals of Sequoia and TCV into frequent contact with high level executives at their portfolio companies.  The Sequoia Entities and TCV Entities used these relationships to further the Enterprises.

592.    In January 2014, John Drew of TCV connected Kenneth Rees with senior executives at another company to obtain advice about splitting a company into parts like Think Finance was doing with Elevate Credit.

593.    John Rosenberg of TCV also connected Think Finance with senior executives at another portfolio company to provide business operational advice.  Rosenberg introduced Think Finance to companies that assisted with the collections of funds from borrowers.  TCV 1896.

594.    The TCV Entities also used Think Finance to acquire information about portfolio companies and technologies in which it was considering investing.

595.    Conversely, the TCV Entities also tried to sell the services of its portfolio companies to Think Finance.  This allowed the TCV Entities to profit off of the illegal activities of the Enterprises.

596.    In July 2011 and January 2012, Goguen reported to his Sequoia partners that he was helping Think Finance diversify to reduce its regulatory risk.

597.    In June 2012, Goguen reported to his Sequoia partners that he helped the company get through its regulatory hurdles and continue to diversify the product lines.

<u>Acquisitions</u>

598.    In September 2012, John Rosenberg reported to his partners at TCV that he helped evaluate acquisitions for Think Finance.

599.    In particular, Rosenberg evaluated and conducted due diligence for Think Finance's acquisition of its United Kingdom operation.  Rosenberg was particularly well suited to assist with the United Kingdom operation because he opened TCV's London office.

600.    Mr. Rosenberg also recruited and retained the leader of Think Finance's United Kingdom operations.  Rosenberg was able to attract qualified candidates because of his connections in Europe.

601.    Think Finance used money that it had obtained from tribal lending to purchase the United Kingdom business.

Sequoia and TCV Agreements to Enter and Maintain The Enterprises

602.    A number of different Sequoia entities entered into agreements around their ownership interests in Think Finance.  The following Sequoia entities entered into agreements: Sequoia Capital Growth Fund III, Sequoia Capital IX, Sequoia Capital Entrepreneurs Annex Fund, Sequoia Capital Franchise Fund, and Sequoia Capital Franchise Partners.

603.    Additional Sequoia entities purport to be the Managing Member of the Sequoia Entities, including SCGF III Management, LLC, SC IX.I Management, LLC, and SCFF Management, LLC.

604.    On September 1, 2005, the Sequoia Entities entered into an Investor Rights Agreement with PayDay One Holdings, Inc., the predecessor company of Think Finance.  This agreement gave them right to demand registration of securities if 40% of the shareholders requested it.  SEQ VT 427-452

605.    On September 1, 2005, the Sequoia Entities entered into a Contribution and Stock Purchase Agreement.  In that agreement, the Sequoia Entities agreed to purchase Series A Preferred Stock in PayDay One Holdings, Inc.  SEQ VT 843-891.

606.    On September 1, 2005, the Sequoia Entities entered into a Voting Agreement. SEQ-VT 713-27.  This voting rights agreement guaranteed that all shareholders would vote to elect a Sequoia designee to the Board of Directors of Think Finance.  SEQ-VT 931-942.

607.    A number of different TCV entities entered into agreements around their ownership interests in Think Finance.

608.    On February 13, 2006, the TCV Entities entered into a Series B Preferred Stock Purchase Agreement to purchase preferred shares from PayDay One Holdings, Inc.  SEQ-VT 676-712.  As part of the transaction, the TCV Entities agreed to purchase additional shares.

609.    On February 13, 2006, the TCV Entities and the Sequoia Entities entered into an Amended and Restated Voting Agreement.  SEQ-VT 713-27.  This voting rights agreement guaranteed that all shareholders would vote to elect a Sequoia designee and a TCV designee to the Board of Directors of Think Finance.

610.    On February 6, 2006, the TCV Entities, and the Sequoia Entities, and the Sequoia Management Entities entered into an Amended and Restated Investors' Rights Agreement.  That Agreement created a number of rights and benefits for the above entities, including the right to request that the securities be registered, the right to request financial information from Think Finance, the right to bring their accountant to a meeting with the management of Think Finance to discuss "the company's affairs, finances, and accounts."  The above entities also had the right of first refusal in connection with certain future sales of Think Finance shares.

611.    On July 6, 2011, both the Sequoia Entities and the TCV Entities committed additional resources in the scheme to defraud by purchasing additional common stock in Think Finance.  TCV 21-33.

612.    In August 2012, both the Sequoia Entities and the TCV Entities recommitted to the scheme to defraud by executing a Fourth Amendment to the Amended and Restated Voting Agreement.  This agreement preserved the rights of the Sequoia Entities and the TCV Entities to select one director.  TCV 46-54.

Failure to Observe Corporate Formalities

613.    The TCV Entities did not respect corporate formalities.

614.    Employees and agents of the TCV Entities sent information concerning Think Finance by email to a broad cross section of TCV personnel, regardless of whether they were partners of TCV V, L.P. or TCV Member Fund.  This information included the most sensitive financial and strategic information that Think Finance held.

615.    In addition, TCV V, L.P. and TCV Member Fund used resources from other TCV Funds without compensation to those funds or companies.  For example, TCV portfolio companies would provide business expertise to Think Finance without compensation from Think Finance or TCV.

616.    Confidential information was also shared orally among TCV personnel without regard to formal affiliation.  For example, at regular weekly meetings, information was presented to all TCV partners regardless of whether they were a partner at TCV V or TCV Member Fund. The same practice occurred at other reviews of investments at quarterly or semi-annual intervals.

617.    The TCV Entities did not maintain formal divisions with respect to its information technology infrastructure.  For example, email addresses for people did not differentiate whether a particular individual was a partner at any particular fund.  Instead, each email address used the same domain: "tcv.com."

618.    Attempts at obtaining discovery about the TCV Entities show that TCV does not keep good corporate records concerning its various legal entities.[6]  Plaintiffs have been seeking simple discovery about the corporate organization of the relevant entities since 2016.

---

[6] The parties still have significant disputes about discovery.  For example, Plaintiffs have still not received the corporate entity and organization charts for either TCV or Sequoia.  The failure to produce these charts has severely limited Plaintiffs' ability to take significant discovery concerning the corporate formalities of the TCV Entities and the Sequoia Entities.  Plaintiffs are filing this Second Amended Complaint because they believe that there is sufficient information to state a claim without this discovery.  However, depending on the arguments raised by the TCV Entities and the Sequoia Entities in their motions to dismiss, Plaintiffs may need to request the Court's intervention.  Plaintiffs have also sought to depose John Drew, a former director of Think Finance who works at TCV.  His deposition would provide additional information about the participation of the TCV Entities in the fraudulent scheme.  The parties also have several, significant remaining disputes about the assertion of privilege.  These disputes include: (1) whether the assertion of a good faith defense amounts to at issue waiver; (2) whether disclosure to internal TCV personnel waived Think Finance's privilege; and (3) the crime fraud exception to the attorney client privilege.  Those disputes have been stalled because the TCV Entities and the Sequoia Entities have failed to produce privilege logs.

Specifically, Plaintiffs have made requests for corporate entity charts and organization charts. Despite requesting this information multiple times in meet and confer conferences, TCV has been unable to provide this information.

619.    The legal structure of the TCV Entities was not well understood by the people at TCV.  Plaintiffs also inquired about this information at deposition.  At deposition, John Rosenberg could not explain the details of the different legal entities.

620.    The Sequoia Entities did not respect corporate formalities either.

621.    Employees and agents of the Sequoia Entities sent information concerning Think Finance by email to a broad cross section of Sequoia personnel regardless of whether they were partners of the Sequoia Entities investing in Think Finance.  Information was featured in a regular internal newsletter called "GetRealNews."  Sequoia personnel responded to this newsletter with suggestions concerning the management of Think Finance.  This information included the most sensitive financial and strategic information that Think Finance held.

622.    In addition, the Sequoia Entities used resources from other Sequoia Funds without compensation to those funds or companies.  For example, Sequoia portfolio companies would provide business expertise to Think Finance without compensation from Think Finance or Sequoia.

623.    Confidential information was also shared orally among Sequoia personnel without regard to formal affiliation.  For example, at regular weekly meetings, information was presented to all Sequoia partners regardless of whether they were a partner at the Sequoia entities involved with Think Finance.  The same practice occurred at other reviews of investments at quarterly or semi-annual intervals.

624.    The Sequoia Entities did not maintain formal divisions with respect to its information technology infrastructure.  For example, email addresses for people did not differentiate whether a particular individual was a partner at any particular fund.  Instead, each email address used the same domain: "sequoia.com."

625.    Attempts at obtaining discovery about the Sequoia Entities shows that Sequoia does not keep good corporate records concerning its various legal entities.  Plaintiffs have been seeking simple discovery about the corporate organization of the relevant entities since 2016. Specifically, Plaintiffs have made requests for corporate entity charts and organization charts. Despite requesting this information multiple times in meet and confer conferences, Sequoia has been unable to provide this information.

626.    The legal structure of the Sequoia Entities was not well understood by the people at Sequoia.  Plaintiffs also inquired about this information at deposition.  At deposition, Michael Goguen could not explain the details of the different legal entities.

COUNT ONE[7]
<u>Consumer Financial Protection Act of 2010</u>
(Dismissed by the Court but restated here for reference purposes.)

627.    Plaintiffs reassert and incorporate by reference each of the above paragraphs.

628.    Defendants' extension of credit under the terms provided without examining the ability to repay is a violation of the CFPA's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]."

---

[7] Plaintiffs recognize the Court's rulings on the various counts of the First Amended Complaint, including its dismissal of Counts One and Two.  Plaintiffs repeat the same counts to preserve the issues for appeal and to maintain the structure and organization of the Complaint. Plaintiffs are not intending to relitigate those dismissal rulings.

629.     The exorbitant interest rates charged by Defendants combined with automatic access to and deduction from a consumer's bank account are a violation of the CFPA's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]."

630.     Defendants have falsely reported the status of consumer's illegal debts to credit rating agencies as if they were legitimate debts.

631.     Defendants' representation of the loans as short term emergency loans is deceptive and false.

632.     Defendants' representation of the loans as legitimate loans to credit rating agencies is deceptive.

633.     Defendants' violations of the CPFA are ongoing.

634.     As a result of Defendants' violations of the CFPA, Plaintiffs were damaged.

COUNT TWO
Federal Trade Commission Act

635.     Plaintiffs reassert and incorporate by reference each of the above paragraphs.

636.     The FTC Act bars the use of "unfair methods of competition."

637.     Defendants' extension of credit under the terms provided without examining the ability of borrowers to repay is a violation of the FTC Act's prohibition on unfair methods of competition.

638.     The exorbitant interest rates charged by Defendants combined with automatic access to a consumer's bank account are a violation of the FTC Act's prohibition on unfair methods of competition.

639.     Defendants' representation of the loans as short term emergency loans is deceptive and an unfair method of competition.

640.     Defendants' representation of the loans as legitimate loans to credit rating agencies is deceptive and an unfair method of competition.

641.     Defendants' violations of the FTC Act are ongoing.

642.     As a result of Defendants' violations of the FTC Act, Plaintiffs were damaged.

COUNT THREE
Electronic Funds Transfer Act

643.     Plaintiffs reassert and incorporate by reference each of the above paragraphs.

644.     Defendants are "persons" as this term is defined in Section 1005.2(j) of Regulation E, 12 C.F.R. § 1005.2(j).

645.     Section 913(1) of EFTA, 15 U.S.C. § 1693k(1), provides that no person may condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers.

646.     Section 1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1), provides that "[n]o financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account."

647.     The Official Interpretation of Regulation E, Section 1005.10(e)(1), 12 C.F.R § 1005.10(e)(1)-1, Supp. I, provides that creditors may not require repayment of loans by electronic means on a preauthorized recurring basis.

648.     Under Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), every violation of EFTA and Regulation E constitutes a violation of the FTC Act.

649.    In numerous instances, in connection with offering payday loans to consumers, Defendants have conditioned the extension of credit on recurring preauthorized electronic fund transfers, thereby violating Section 913(1) of EFTA, 15 U.S.C. § 1693k(1), and Section 1005.10(e)(1) of Regulation E, 12 C.F.R § 1005.10(e)(1).

650.    Defendants' violations of the EFTA are ongoing.

651.    The Defendants conditioned the loans on the acceptance of ACH as the transaction method. If the loan recipient requested a paper check, the loan documents required the recipients to make a payment on the principal before receiving the principal.

652.    One example from the loan documents shows how the economic disincentives worked. One loan was originated on July 16, 2013. Under the purported loan documents, the lender did not send the funds until after the "Right of Rescission" expired five days later. Thus, the lender would have sent the check on July 24. The lending documents state that the borrower should allow 7 to 10 business days for delivery of the check. Thus, the check might arrive on August 5, 2013.

653.    The borrower, on the other hand, was required to make the first payment on August 2, 2013. Allowing the same ten days for delivery, the borrower would have to send the check on July 23, 2013, about two weeks before the borrower received the principal.

654.    The purported lending documents also create significant penalties for a late payment. If the borrower misses a single payment under the documents, the borrower owes the entire balance. In addition, Defendants can take that entire balance immediately from a borrower's bank account by ACH transaction. Thus, under the lending documents, the borrower must pay Defendants a payment before he or she receives the loan principal or Defendants can

take the entire amount of the loan from the borrower's bank account even before the borrower receives the funds that are purportedly being lent.

655.    The choice is a false choice, and in any event, the agreement conditions the borrower to accept transfers by ACH transfer, which is prohibited by the EFTA.

656.    By engaging in the violations of EFTA and Regulation E set forth in this Complaint, Defendants have violated the FTC Act.

657.    As a result of Defendants' violations of the EFTA, Plaintiffs were damaged.

## COUNT FOUR
### Vermont Consumer Fraud Act

658.    Plaintiffs reassert and incorporate by reference each of the above paragraphs.

659.    Under section 2481w of the Consumer Fraud Act, "it is an unfair and deceptive act and practice in commerce" for any lender to make a loan to a consumer unless that lender is in compliance with all provisions of 8 V.S.A. Chapter 73 (Licensed Lenders laws).  In relevant part, 8 V.S.A. § 2201 requires that all lenders obtain a license from the Vermont Department of Financial Regulation before loaning any money in Vermont.  Any unlicensed lender providing payday loans to Vermont consumers is in violation of the CFA.

660.    Defendants are not licensed lenders in Vermont.

661.    It is a violation of the CFA to charge interest in excess of the legal rates set under 9 V.S.A. § 41a (generally 18-21% for the type of loan at issue here).  *See* Consumer Protection Rule 104.05 (making any collection or attempt to collect interest in excess of the legally chargeable rate an unfair and deceptive act under section 2453(a) of the CPA).

662.    Defendants' violations of the Vermont Consumer Fraud Act are ongoing.

663.    Defendants charge interest in excess of the statutory maximum.

664.    Defendants have falsely reported the status of consumers' illegal debts to credit rating agencies as if the debts were legitimate debts.

665.    Defendants' representation of the loans as short term emergency loans is deceptive and false.

666.    Defendants' representation of the loans as legitimate loans to credit rating agencies is deceptive and false.

667.    Defendants' lending practices also violate the CFA's bar on deceptive and unfair business practices, including without limitation the mail and wire fraud described above, the creation of an enterprise to avoid the application of state law, the use of a front company to shield the true managers of the enterprise from liability, the use of economic incentives to force people to use ACH transactions to accept cash, the automatic deductions of funds from a personal account to make illegal and excessive interest deduction, and the use of sophisticated data mining to find targets for the illegal schemes.

## COUNT FIVE
## RICO § 1962(c)

668.    Plaintiffs reassert and incorporate by reference each of the above paragraphs.

669.    This Count is against Rees, the Sequoia Entities, and the TCV Entities for damages and equitable relief.

670.    Plain Green is an enterprise engaged in and whose activities affect interstate commerce.   Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities, and Rosette, Whitford, and McInerney are associated with the enterprises.

671.     Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities agreed to and did conduct and participate in the conduct of the affairs of the Plain Green

Enterprise and the Great Plains Enterprise through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs. Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities agreed with the official representatives of Plain Green and the Chippewa Cree Tribe.

672. Pursuant to and in furtherance of their fraudulent scheme, Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities, and Rosette, Whitford, and McInerney intentionally and willingly committed multiple acts of wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violations of 18 U.S.C § 1341. These acts of wire fraud include the wires made into and out of the accounts of Plaintiffs in Vermont described in paragraphs 62 to 88, 105, 120, 121, 124-27, and elsewhere in the complaint. The wire fraud occurred thousands of additional times on a nationwide basis to other borrowers around the country. The TCV Entities committed wire fraud by deceiving their investors of the true nature of Think Finance. The acts of wire fraud include the use of the Internet to transmit the lending agreement and the arbitration agreements as described in paragraphs 131, 137-39, and elsewhere in the complaint.

673. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

674. Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities and Rosette, Whitford, and McInerney have directly and indirectly conducted and participated in the conduct of the affairs of the Plain Green Enterprise and the Great Plains Enterprise through the pattern of racketeering and activity describe above, in violation of 18 U.S.C. § 1962(c). Through the activity described above, Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities also directed the affairs of the Plain Green Enterprise and the Great Plains Enterprise.

675.    As a direct and proximate result of Rees's, Think Finance's, Victory Park's, GPLS's, the Sequoia Entities', and the TCV Entities', and Rosette's, Whitford's, and McInerney's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their property in that they paid extortionate and illegal interest rates.  Plaintiffs have also been injured in that their credit ratings have been damaged and their ability to obtain credit has been damaged.

## COUNT SIX
### RICO (Illegal Debt)

676.    Plaintiffs reassert and incorporate by reference each of the above paragraphs.

677.    This Count is against Rees, the Sequoia Entities, and the TCV Entities for damages and equitable relief.

678.    Rees, Think Finance, Victory Park, GPLS, TC Loan, TC Decision Sciences, Tailwind Marketing, the Sequoia Entities, and the TCV Entities, as well as Rosette, Whitford, and McInerney, have collected an unlawful debt as that term is defined in 18 U.S.C. § 1961(6).

679.    Rees, Think Finance, Victory Park, GPLS, TC Loan, TC Decision Sciences, Tailwind Marketing, the Sequoia Entities, and the TCV Entities, as well as Rosette, Whitford, and McInerney, are associated with the Enterprises.

680.    Rees, Think Finance, Victory Park, GPLS, TC Loan, TC Decision Sciences, Tailwind Marketing, the Sequoia Entities, and the TCV Entities, as well as Rosette, Whitford, and McInerney, knowingly and willfully participated in the conduct of the affairs of the enterprise through the collection of unlawful debt.

681.    The debts incurred by Plaintiffs and other class members are unenforceable.

682.    Plain Green and Great Plains were engaged in the business of lending money at usurious rates of more than twice the legal limit in several states, including without limitation the State of Vermont.

683.    The usurious rates charged by Rees, Think Finance, Victory Park, GPLS, TC Loan, TC Decision Sciences, Tailwind Marketing, the Sequoia Entities, and the TCV Entities, as well as Rosette, Whitford, and McInerney, were more than twice the enforceable limit.

684.    As a result of the unlawful collection of illegal debt, Plaintiffs have been injured. Plaintiffs have been injured in their property in that they paid extortionate and illegal interest rates.  Plaintiffs have also been injured in that their credit ratings have been damaged and their ability to obtain credit has been damaged.

## COUNT SEVEN
### Unjust Enrichment

685.    Plaintiffs reassert and incorporate by reference each of the above paragraphs.

686.    Defendants have been unjustly enriched by their continued possession of funds illegally taken from people in financially challenged positions.

687.    In equity and good conscience, those funds should be returned to the people who fell victim to Defendants' illegal scheme.

### COUNT EIGHT

### RICO §1962(c)

688.    Plaintiffs reassert and incorporate by reference each of the above paragraphs.

689.    At all relevant times, the Sequoia Entities, the TCV Entities, the Think Finance entities, Rees, Victory Park, GPLS, and Haynes Investments, LLC were members and associates of an internet payday lending enterprise (the "Payday Lending Organization"), whose members and associates engaged in the collection of unlawful debt.

690.     The Payday Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact.

691.     The enterprise is engaged in, and its activities affect, interstate commerce.  The Payday Lending Organization has leadership based in Fort Worth, Texas, Palo Alto, California, and Menlo Park, California.  It operates throughout the United States, including the District of Vermont.

692.     The Payday Lending Organization was an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The Think Finance entities ceased to exist with the confirmation plan entered by the United States Bankruptcy Court for the North District of Texas.

693.     The Payday Lending Organization is led, controlled, and/or managed by Rees, Think Finance, the Sequoia Entities, and the TCV Entities.  They directed the affairs of the Payday Lending Organization.

694.     The purpose of the enterprise was and continues to be the enrichment of the members and associates of the Payday Lending Organization through the collection of unlawful debt.

695.     RICO defines an "unlawful debt" as debt incurred in connection with "the business of lending money or a thing of value at a usurious rate under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).  The Defendants have violated RICO through the "collection of unlawful debt" as that term is defined in RICO, 18 U.S.C. § 1962(c).

696.     The means and methods by which Defendants and other members and associates conducted and participated in the conduct of the affairs of the Payday Lending Organization was the operation, direction, and control of the payday loan companies in the business of lending money at usurious rates under the laws of numerous states, including without limitation Vermont, California, South Carolina, Virginia, and Nebraska, where the usurious rates were at least twice the enforceable rate.

697.     In operating and conducting the affairs of the Payday Lending Organization, Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities used proceeds from the collection of unlawful debt to further the operations and objectives of the Payday Lending Organization.

698.     Defendants' leadership, management, and participation in the Payday Lending Organization began at some point as early as October 2010, following the end of the First Bank of Delaware relationship and continued to date of the confirmation of the reorganization plan in the Think Finance bankruptcy to the detriment of individual consumers throughout the United States.

699.     The predicate acts of collection of unlawful debt are described herein.  The debts incurred by Plaintiffs and all other members of the Class are unlawful and unenforceable.  The predicate acts of mail and wire fraud are described herein.

700.     As a result of the unlawful collection of illegal debt, Plaintiffs and members of the Class have been injured in their property in that they paid extortionate and illegal interest rates.

701.     As a direct and proximate cause of Defendants' violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

COUNT NINE

RICO §1962(c) - Racketeering

702.    Plaintiffs reassert and incorporate by reference each of the above paragraphs.

703.    At all relevant times, the Sequoia Entities, the TCV Entities, the Think Finance Entities, Kenneth Rees, Victory Park, GPLS, and Haynes Investments, LLC were members and associates of the Payday Lending Organization, whose members and associates engaged in racketeering.

704.    The Payday Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact.

705.    The enterprise is engaged in, and its activities affect, interstate commerce.  The Payday Lending Organization has leadership based in Fort Worth, Texas, Palo Alto, California, and Menlo Park, California.  It operates throughout the United States, including the District of Vermont.

706.    The Payday Lending Organization was an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The enterprise ceased to exist with the confirmation plan entered by the United States Bankruptcy Court for the North District of Texas.

707.    The Payday Lending Organization is led, controlled, and/or managed by Rees, Think Finance, the Sequoia Entities, and the TCV Entities.  They directed the affairs of the Payday Lending Organization.

708.    The purpose of the enterprise was and continues to be the enrichment of Defendants, and other members and associates of the Payday Lending Organization through the collection of unlawful debt.

709.    The means and methods by which Defendants and other members and associates conducted and participated in the conduct of the affairs of the Payday Lending Organization was the operation, direction, and control of the payday loan companies in the business of lending money at usurious rates under the laws of numerous states, including without limitation Vermont, California, South Carolina, Virginia, and Nebraska, where the usurious rates were at least twice the enforceable rate.

710.    In operating and conducting the affairs of the Payday Lending Organization, Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the Payday Lending Organization.

711.    Defendants' leadership, management, and participation in the Payday Lending Organization began at some point as early as October 2010, following the end of the First Bank of Delaware relationship and continued to date of the confirmation of the reorganization plan in the Think Finance bankruptcy to the detriment of individual consumers throughout the United States.

712.    Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.  Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities agreed with the official representatives of Plain Green and the Chippewa Cree Tribe.

713.    Pursuant to and in furtherance of their fraudulent scheme, Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, and the TCV Entities committed multiple acts of wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violations of 18 U.S.C § 1341.  These

acts of wire fraud include the wires made into and out of the accounts of Plaintiffs in Vermont described in paragraphs 62 to 88, 105, 120, 121, 124-27, and elsewhere in the complaint. The wire fraud occurred thousands of additional times on a nationwide basis to other borrowers around the country. The acts of wire fraud include the use of the Internet to transmit the lending agreement and the arbitration agreements as described in paragraphs 131, 137-39, and elsewhere in the complaint. The wire fraud also included acts described in paragraph 557.

714.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

715.    Rees, Think Finance, Victory Park, GPLS, the Sequoia Entities, the TCV Entities, and Rosette, Whitford, and McInerney have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity describe above, in violation of 18 U.S.C. § 1962(c).

716.    As a direct and proximate result of Rees's, Think Finance's, Victory Park's, GPLS's, the Sequoia Entities', the TCV Entities', and Rosette's, Whitford's, and McInerney's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their property in that they paid extortionate and illegal interest rates. Plaintiffs have also been injured in that their credit ratings have been damaged and their ability to obtain credit has been damaged.

717.    The predicate acts of racketeering are described herein. The debts incurred by Plaintiffs and all other members of the Class are unlawful and unenforceable. The predicate acts of mail and wire fraud are described herein.

718.    As a direct and proximate cause of Defendants' violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

COUNT TEN
RICO Conspiracy

719.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

720.    Beginning as early as October 2010, the Sequoia Entities and the TCV Entities, being persons employed by and associated with the Plain Green Enterprise, the Great Plains Enterprise, and the Payday Lending Organization willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate 18 U.S.C. § 1962(c)—that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Plain Green Enterprise, the Great Plains Enterprise, and the Payday Lending Organization through the collection of unlawful debt.  In addition, the Sequoia Entities and the TCV Entities knowingly entered into agreements with Think Finance, Victory Park, GPLS, and Rees to facilitate their participation and management of the affairs of the Plain Green Enterprise, the Great Plains Enterprise, and the Payday Lending Organization and engaged in overt acts in furtherance thereof.

721.    Specifically, Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c).  These agreements, include, *inter alia*: (a) agreements between and among Plain Green, Great Plains, Victory Park, VP Management, GPLS, the TCV Entities, the Sequoia Entities, Think Finance, and Rees, to create the necessary legal frameworks and entities to conduct the affairs of the Plain Green Enterprise, the Great Plains Enterprise, and the Payday Lending Organization; (b) agreements between and among the TCV Entities, the Sequoia Entities, Great Plains, Plain Green, Rees, and Think Finance to provide the necessary funds to conduct and expand the affairs of the Plain Green Enterprise, the Great Plains Enterprise, and the Payday Lending Organization

Enterprise; (c) agreements between and among Victory Park, GPLS, Rees, Think Finance, the Sequoia Entities, the TCV Entities, and Haynes to investigate and solicit John Doe banks to perform ACH transactions in furtherance of the affairs of the Plain Green Enterprise, the Great Plains Enterprise, and the Payday Lending Organization; (d) agreements between Great Plains, Plain Green, Victory Park, GPLS, Rees, Think Finance to perform ACH transactions in furtherance of the affairs of the Great Plains Enterprise; (e) agreements between Great Plains, Rees, Think Finance to refinance and further conduct the affairs of the Great Plains Enterprise; (f) agreements between the TCV Entities and Think Finance concerning TCV's participation in the management of the Enterprises; (g) agreements between the Sequoia Entities and Think Finance concerning the management of the Enterprises; and (h) agreements between various shareholders of Think Finance and Elevate Credit concerning the voting rights of the Sequoia Entities and the TCV Entities.

722.    Each of the agreements identified in the above paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the enterprise.

723.    As a result of Defendants' participation in the Plain Green Enterprise, the Great Plains Enterprise, and the Payday Lending Organization and the violations of RICO, Defendants and their co-conspirators are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

<u>Claims for Relief</u>

WHEREFORE, Plaintiffs respectfully seek the following relief:

A.      A declaration that Defendants have violated the Consumer Financial Protection Act of 2010;

B.      A declaration that Defendants have violated the Federal Trade Commission Act;

C.      A declaration that Defendants have violated the Vermont Consumer Fraud Act;

D.      A declaration that Defendants have violated the Electronic Funds Transfer Act;

E.      A declaration that Defendants have violated RICO;

F.      A permanent injunction barring Defendants from providing, collecting on, and servicing illegal loans;

G.      A permanent injunction barring Defendants from conditioning loans on agreeing to ACH withdrawals;

H.      Preliminary and temporary injunctive relief as the Court deems appropriate;

I.      Equitable surcharge seeking return of all interest charged above a reasonable rate and any financial charges associated with the loan;

J.      A constructive trust over funds obtained illegally;

K.      An award of actual damages;

L.      An award of treble damages under 18 U.S.C. § 1964;

M.      An order awarding attorneys' fees and costs; and

N.      Any other relief the Court deems just and proper.

## JURY DEMAND

**Plaintiffs demand trial by jury of all issues so triable.**

Dated:      Essex, Vermont
March 31, 2020

Matthew B. Byrne, Esq.
Gravel & Shea PC
76 St. Paul Street, 7th Floor, P. O. Box 369
Burlington, VT  05402-0369
(802) 658-0220
mbyrne@gravelshea.com

and

Kathleen M. Donovan-Maher, Esq.
Steven J. Buttacavoli, Esq.
Steven L. Groopman, Esq.
Berman Tabacco
One Liberty Square
Boston, MA  02109
kdonovanmaher@bermantabacco.com
sbuttacavoli@bermantabacco.com
sgroopman@bermantabacco.com
(617) 542-8300

For Plaintiffs